EXHIBIT C

# Jacqueline Smith

December 15, 2010

# Smith vs Co-Op Optical

Judy Jettke & Associates
586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACQUELINE SMITH,

    Plaintiff,

                          Case No.:  2:10-cv-13470-PJD-MAR
                          District Judge Patrick J. Duggan

vs.

CO-OP OPTICAL SERVICES, INC.,
a Michigan non-profit corporation,

    Defendant.

_____/

DEPOSITION OF JACQUELINE SMITH

taken by the Defendant on Wednesday, the 15th day of
December, 2010 at 2000 Town Center, Suite 900,
Southfield, Michigan at 10:22 a.m.

APPEARANCES:

For the Plaintiff:    DANIEL D. SWANSON (P29288)
                        JESSE L. YOUNG (P72614)
                        Sommers Schwartz, PC
                        2000 Town Center, Suite 900
                        Southfield, MI  48075
                        (248) 355-0300

For the Defendant:    MARY PATRICIA CAULEY (P38548)
                        GARY W. FRANCIS (P64748)
                        Plunkett Cooney
                        38505 Woodward, Suite 2000
                        Bloomfield Hills, MI  48304
                        (248) 901-4000

Also present:    Marcelus Stepp
                        Ted Winiarski

Reported By:    Judy Jettke Vandenbossche
                      CSR 1398
                      Certified Court Reporter
                      (586) 783-0060

Jacqueline Smith                    Smith vs Co-Op Optical

December 15, 2010

## Page 2

### TABLE OF CONTENTS

JACQUELINE SMITH                    PAGE
   Examination by Ms. Cauley            4
   Examination by Mr. Swanson          319
   Reexamination by Ms. Cauley         325
   Reexamination by Mr. Swanson        330
   Reexamination by Ms. Cauley         331

EXHIBITS:      IDENTIFIED

Deft. #1    Complaint                      32

Deft. #2    12-10-09 Meeting Minutes       46

Deft. #3    Yohannes Bolds Affidavit       50

Deft. #4    1-29-10 Request for
    Leave of Absence               58
Deft. #5    Photograph                     66
Deft. #6    Photograph                     69
Deft. #7    Photograph                     70
Deft. #8    Photograph                     70
Deft. #9    1-28-10 Request for
    Leave of Absence               72

Deft. #10   1-29-10 Request for
    Leave of Absence               75
Deft. #11   2-1-10 Request for
    Leave of Absence               84

Deft. #12   FMLA Documents                 87
Deft. #13   2-1-10 Request for
    Leave of Absence               89

## Page 3

Deft. #14   Short-term Disability Claim    92
Deft. #15   2-3-10 Email                   94
Deft. #16   Tenure Recognition Trip
    Information                   142

Deft. #17   2-24-10 Email                 154

Deft. #18   Emails                        156

Deft. #19   2-4-10 Email                  157

Deft. #20   2-3-10 Letter                 164

Deft. #21   Emails                        168

Deft. #22   2-8-10 Letter                 170

Deft. #23   2-15-10                       171

Deft. #24   2-1-10 Email                  174

Deft. #25   Document                      182

Deft. #26   2-22-10 Email                 184

Deft. #27   12-9-10 Email                 202

Deft. #28   1-12-10 Letter                238

Deft. #29   1-31-07 Email                 239

Deft. #30   3-18-10 Letter                292

Deft. #31   Sixty-page Document           298

Pltf. #32   1-14-10 Letter                330

## Page 4

1  Southfield, Michigan

2  Wednesday, December 15, 2010

3        JACQUELINE SMITH

4  HAVING BEEN CALLED BY THE DEFENDANT AND SWORN:

5     MS. CAULEY:  Let the record reflect that this

6  is the discovery deposition of Jacqueline Smith, the

7  plaintiff in the matter of Jacqueline Smith versus

8  Co-Op Optical Services and it is taken pursuant to

9  Notice and agreement of the parties as to the time

10  and place and is intended for use for all purposes

11  under the rules of evidence and the Michigan Court

12  Rules.

13        EXAMINATION

14  BY MS. CAULEY:

15  Q   Ms. Smith, we've met before, I'm Mary Cauley, I'm

16  the principal attorney on this matter.

17     I'm going to ask some questions of you

18  today.  If you -- have you ever been deposed

19  before?"

20  A   Yes, I have.

21  Q   Okay.  You probably know the basic rules .  I'm

22  going to ask, I think, one of the really important

23  ones for the court reporter is that we not speak

24  over one another, that if I'm talking, you don't

25  interrupt and I'm going to try really hard not to

## Page 5

1  interrupt you when you're speaking.  And we'll work

2  on that because it's easier for her to take down a

3  good record.

4     Also, it's important that you answer all

5  questions verbally.  A nod of the head or shrug of

6  the shoulders could be misinterpreted by the court

7  reporter and we don't want to misinterpret anything,

8  we want to make sure that you verbalize and we'll

9  help you with that.

10  A   Okay.

11  Q   If you need a break at any time, please just tell

12  me.  This is not an endurance test, if you need to

13  get up and move around or need to use the restroom

14  or get something to eat or drink, just say so,

15  please.

16  A   Okay.

17  Q   If you don't understand a question that I ask, I'm

18  going to ask you please to ask me to either rephrase

19  it or repeat it so that you can understand it.  Will

20  you do that?

21  A   Yes.

22  Q   Is it then fair to assume that when you give an

23  answer to a question, it's the answer you intended?

24  A   Yes.

25  Q   Okay.  Are you taking any medication or are you

Jacqueline Smith        Smith vs Co-Op Optical        December 15, 2010

### Page 6

1 suffering from any health circumstances that would
2 interfere with your ability to tell the full and
3 complete truth today?
4 A  No.
5 Q  Okay.  Did anyone at Co-Op Optical ever subject you
6 to sexual harassment?
7 A  Yes.
8 Q  Okay.  Who?
9 A  Raymond Murphy.
10 Q  And tell me on what occasion.  Was it more than one
11 occasion?
12 A  No, just one occasion.
13 Q  One occasion.  When did that occur?
14 A  That occurred this year in January, I believe.
15 And what took place is that he came into
16 my office by himself and he indicated that things
17 will work out.  I gave him a hug, we hugged and when
18 he let go he grabbed my rear end.
19 Q  Who initiated the hug?
20 A  It was kind of what we always did so it was, it was
21 not initiated by either person.
22 Q  Did you find the hug offensive?
23 A  No.
24 Q  And then you say he did what to your rear end?
25 A  He touched my rear end like this.

### Page 7

1 Q  He grabbed it?  You're making a grabbing motion that
2 can't be recorded.  You're showing me that he put
3 his hand on your rear end, is that right?
4 A  Yes.
5 Q  On one cheek of your rear end?
6 A  One cheek.
7 Q  Okay.  How long did it linger there?
8 A  Not long.  I told him not to do that.
9 Q  So you said -- tell me what you said to him, what
10 words?
11 A  I said don't do that.
12 Q  And did he then take his hand away?
13 A  Yes.
14 Q  Okay.  Did he say anything to you?
15 A  No.
16 Q  How old is Mr. Murphy, do you know approximately?
17 A  About eighty-nine, ninety, I assume.
18 Q  Okay.  Any other time when anyone at Co-Op, either
19 with the Board or any of the employees sexually
20 harassed you?
21 A  I feel by preparing food plates on a regular basis
22 to be taken home was sexually harassment.
23 Q  For whom did you do that?
24 A  I did that for Marc Stepp, Raymond Murphy.
25 Q  Anyone else?

### Page 8

1 A  Not to my knowledge.
2 Q  How many times did you do that for Mr. Stepp?
3 A  I don't remember.
4 Q  Was it more than one?
5 A  Yes.
6 Q  More than twenty?
7 A  I don't think so, no.
8 Q  More than ten?
9 A  Possibly.
10 Q  Okay.  So maybe plus or minus ten, is that a fair
11 estimate in your mind?
12 A  Yes.
13 Q  Okay.  And how many times did you do that for Mr.
14 Murphy?
15 A  I don't remember.
16 Q  Would it be about the same estimate, plus or minus
17 ten?
18 A  Yes.
19 Q  And did you prepare those plates for Mr. Stepp and
20 Mr. Murphy or for Mr. Stepp and Mr. Murphy's wives?
21 A  Usually Mr. Murphy's for himself and Mr. Stepp's
22 wife, she was not feeling well.
23 Q  Okay.  So you offered to put a plate together for
24 them?
25 A  I offered maybe once or twice, other than that it

### Page 9

1 was assumed.
2 Q  So is it after you offered it once to put plates
3 together for them once or twice, then you're saying
4 it was assumed that you would do that?
5 A  It was asked sometimes.
6 Q  Okay.  Did you feel as though you were being ordered
7 by a board member to prepare a plate for them to
8 take home?
9 A  Yes.
10 Q  Okay.  And you felt that, well, did anyone ever say
11 if you don't do this we're going to fire you?
12 A  No.
13 Q  Even imply that they would somehow take action
14 against you if you didn't put a plate together for
15 them?
16 A  No.
17 Q  Were you doing it as a courtesy for your board
18 member?
19 A  At times.
20 Q  Sometimes you didn't want to do it, is that right?
21 A  Yes.
22 Q  Did you tell them no, I don't want to do that?
23 A  No.
24 Q  Okay.  Did anyone on the Board ever tell you, you
25 know, you shouldn't do that Jackee, let them do

Jacqueline Smith                    Smith vs Co-Op Optical

December 15, 2010

Page 10

1   their own?
2   A   I vaguely remember someone saying that, yes, yeah, I
3       remember someone saying that before.
4   Q   Do you remember who that was?
5   A   Bernie Adams.
6   Q   Okay.  And so you had a board member saying don't do
7       it, let them do it themselves and did you --
8   A   That was after several times.
9   Q   So did you stop doing it then?
10  A   No.
11  Q   Okay.  And why do you think you offered and then
12      were assumed that you would put a plate together was
13      a form of sexual discrimination or harassment?
14  A   More discrimination because we were the only women,
15      no one else was ever asked, none of the other board
16      members asked any other board member to prepare
17      plates.
18  Q   Okay.  You were the executive director, right?
19  A   I was the president and CEO.
20  Q   I'm sorry, thank you, you're right, president and
21      CEO.
22          Do you know of any male president or CEO
23      of Co-Op who was asked to put plates together or not
24      asked?
25  A   Would you phrase that again?

Page 11

1   Q   Yeah, badly done.
2   A   Yes.
3   Q   Do you think the only reason it was assumed that you
4       would put plates together was because you were a
5       woman?
6   A   Yes.
7   Q   Okay.  And on what do you base that belief, it was
8       only because you're a woman that you first offered
9       and then later it was assumed that you would put
10      these together?
11  A   My tenure on the Board, I have never seen or known
12      of anyone to do that before.
13  Q   Have you ever seen another president and CEO who was
14      male interact with the Board?
15  A   Yes.
16  Q   And who is that?
17  A   At that time it was, his name was Patrick Korth.
18  Q   Okay.  And on what occasions did you see Patrick
19      Korth interact with the Board?
20  A   During our board meetings.
21  Q   Okay.  And were you there during each of those board
22      meetings for the whole length of them?
23  A   Yes, I was mandatory.
24  Q   And what was your position at the time?
25  A   Vice president of marketing.

Page 12

1   Q   Okay.  And did you -- was lunch served at those
2       meetings?
3   A   Yes.
4   Q   Okay.  And did anyone have a plate prepared for
5       them?
6   A   No.
7   Q   Did Mr. Korth ever volunteer initially to prepare a
8       plate for anyone that you know of?
9   A   I don't know.
10  Q   Okay.  Vice president of marketing, would that mean
11      that you would be there the whole time or just
12      during the part where you were doing your report?
13  A   At that time, I was a member of the Board and I was
14      there during the whole time.
15  Q   Okay.  So do you know of any other, including Pat
16      Korth -- is that C-O-R-T-H-E?
17  A   K-O-R-T-H.
18  Q   Thanks, that was for the court reporter.
19          Never mind, I think we got the answer on
20      that.
21          All right.  Any other examples of
22      discrimination on the basis of, discrimination or
23      harassment on the basis of gender that you
24      experienced when you were at Co-Op?
25  A   Yes.

Page 13

1   Q   What?
2   A   Let me get my thoughts together.
3           At one meeting around 2008 when the former
4       city council was in office under the direction of
5       Kwame Kilpatrick, it was stated after a meeting
6       where we were sitting around the table by Mr. Stepp,
7       he said if there were not so many damn women on the
8       city council they could get something done.
9           There's another occasion, I'm trying to
10      think.
11  Q   But why you're sort of thinking on one side of your
12      head, can we talk about this one?
13  A   Uh-huh.
14  Q   Let me get some follow-up on that.  Who was present
15      when Mr. Stepp allegedly made this comment?
16  A   John Trohimczyk, Bernice Adams, myself, if I'm not
17      mistaken, Tom Turner was there and that's all I can
18      remember.
19  Q   Okay.  Have you ever heard Mr. Stepp make a similar
20      comment about anything to do with Co-Op?
21  A   No.
22  Q   Okay.  You said you had something else that you were
23      thinking about, did you think of it?
24  A   Well, I went into the hospital one time and I had a
25      telephone conversation with Mr. Stepp and I did not

Judy Jettke & Associates          Mt. Clemens, MI          586-783-0060

**Page 14**

1    tell him the reason I was in the hospital, however,
2    his comments were if you open your legs you can get
3    pregnant.
4    Q   And when was this?
5    A   It was around May 2008.
6    Q   Eight or seven?
7    A   It could be seven but I believe it was eight.
8    Q   Okay. Anyone witness to this other than the two of
9    you on the phone?
10   A   No, it was just the two of us on the phone.
11   Q   And what did you say to him when he allegedly made
12   this statement?
13   A   I didn't say anything, I just kind of held my breath
14   and chuckled to myself not to him and just let it
15   go.
16   Q   Okay. What did you do when he allegedly said
17   if there weren't so damn many women on the city
18   council they could get something done?
19   A   Nothing.
20   Q   Any other examples of what you believe to be sexual
21   harassment or discrimination that you experienced
22   while you were at Co-Op from anyone?
23   A   When Ken Morris was on the Board --
24   Q   Ken Morris, that is.
25   A   Ken Morris, M-O-R-R-S.

**Page 15**

1    Q   I-S, I think.
2    A   I-S, excuse me. I was never treated like he --
3    whatever he said always went through without any
4    questions. It seems like everything or not
5    everything, I'm sorry, many things that I posed to
6    the Board, there were lots of questions. To me,
7    that was a totally different meeting or meetings
8    than we had in the past.
9         The same thing happened with Patrick Korth
10   when he was, at one short period of time, CEO.
11   Q   So because the Board asked you questions, you think
12   that's a form of sexual discrimination?
13   A   Yes.
14   Q   Okay. And your basis for belief that that was
15   generated or that was caused by a sexual animus
16   toward you is what as opposed to you raised things
17   that interested them, they want to ask questions?
18       I mean, why do you believe it was just because
19   of gender and not because of anything else?
20   A   Sometimes the types of the questions.
21   Q   Can you be specific?
22   A   No.
23   Q   All right. Is it fair to say then, the two reasons
24   why you think it was different with Ken Morris and
25   Pat Korth was number one, they were men and you're a

**Page 16**

1    woman, so that's the difference right there and
2    because of these types of questions that you can't
3    specify?
4    A   Correct.
5    Q   Anything else to form your basis of that belief?
6    A   No.
7    Q   Okay. Any other examples, sexual harassment or
8    sexual discrimination that you feel you experienced
9    by anyone at Co-Op?
10   A   No.
11   Q   Did you ever have sexual relationships with any
12   member of the Board?
13   A   Yes.
14   Q   With whom?
15   A   Raymond Murphy.
16   Q   And when was that?
17   A   Thirty-five years ago.
18   Q   That was before you were an employee here, is that
19   right? Employee at Co-Op?
20   A   I'm sorry, thirty-two years ago.
21   Q   Was it before you were an employee?
22   A   No, I was an employee at Co-Op.
23   Q   Okay. Was it consensual sex?
24   A   Yes.
25   Q   Okay. And do you base any of your allegations in

**Page 17**

1    this complaint on that act?
2    A   No.
3    Q   Okay. Did you ever have sex with anyone else at
4    Co-Op?
5    A   No.
6    Q   The Board members or employees?
7    A   Charles Benson.
8    Q   Okay. And when did you have sex with Charles
9    Benson?
10   A   That was probably in the eighties, early eighties.
11   Q   And you were both working at Co-Op then?
12   A   Yes, we were both managers.
13   Q   And where did that occur?
14   A   In Ohio at a UAW event.
15   Q   So just one time?
16   A   That's what I recall.
17   Q   And was that consensual sex as well?
18   A   Yes.
19   Q   Okay. Do you base anything in your complaint in
20   this matter on anything that occurred between you
21   and Charles Benson in Ohio in the early eighties?
22   A   No.
23   Q   Okay. Have you had sex with anyone else at Co-Op?
24   A   No.
25   Q   Okay. Other than the incidents that you've already

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

## Page 18

1  recalled here involving Mr. Murphy, Mr. Stepp, do
2  you allege that anyone else on the Board of
3  Directors at Co-Op acted in a sexually
4  discriminatory manner toward you?
5  A  No.
6  Q  Did Co-Op ever make a contribution to Janna
7  Garrison's political campaign when she was running
8  for president of the Detroit Federation of Teachers?
9  A  I want to say probably yes.
10  Q  Okay.  Do you, in fact, recall a five-thousand-
11  dollar contribution that you approved?
12  A  Yeah, you know what, I think yes.
13  Q  Okay.
14  A  Yes.
15  Q  And was that sometime after 2005 that that
16  contribution was made?
17  A  I don't remember.
18  Q  Okay.  If the records show that she was running
19  after 2005, would you have any basis on which to
20  dispute that?
21  A  No.
22  Q  Okay.  And in 2005, Co-Op was placed under
23  supervision by OFIR, is that right?
24  A  Yes.
25  Q  Okay.  Who approved the five-thousand-dollar

## Page 19

1  donation to Ms. Garrison's campaign?
2  A  Two executives.
3  Q  What two executives approved that?
4  A  I'm sure my name was on one, I don't know who the
5  other person was.
6  Q  Okay.  Did it go to the Board, did you ask for
7  permission from the Board to do that or inform them?
8  Two different questions, first, did you ask
9  them?
10  A  No.
11  Q  Did you inform the Board of the contribution?
12  A  No.
13  Q  Okay.  Did you ask permission from OFIR to make that
14  kind of a contribution?
15  A  No.
16  Q  Did you inform OFIR?
17  A  No.
18  Q  Would you agree that that kind of a contribution
19  would not be something that would be incurred in the
20  ordinary course of business under OFIR's use of that
21  term?
22  A  Say that again.
23  Q  Would you agree that the five thousand dollar
24  campaign contribution wouldn't be money spent in the
25  ordinary course of business of Co-Op as OFIR defines

## Page 20

1  ordinary course of business?
2  MR. SWANSON:  Let me just object to the extent
3  that that calls for a legal conclusion as to what
4  OFIR, as a governmental agency, may determine
5  ordinary course of business under the statutes and
6  regulations.
7  MS. CAULEY:  Fair enough, let me rephrase.
8  BY MS. CAULEY:
9  Q  Okay.  Did you understand that OFIR required
10  permission, from 2005 until the time you left,
11  required Co-Op to obtain permission to spend monies
12  outside of the ordinary course of business?
13  A  I didn't understand it to be like that.  We also
14  gave Marc Stepp five thousand dollars.
15  Q  When did you give Marc Stepp five thousand dollars?
16  A  We gave Marc Stepp five thousand dollars because of
17  his -- I'm not sure of the date, maybe 2005, 2006.
18  Q  For what?
19  A  For referring the American Axle or giving us a
20  contact for American Axle.
21  Q  Okay.  So --
22  A  So it was nothing out of the ordinary.
23  Q  So he brought some business in?
24  A  Yes.
25  Q  And he received some compensation for that, is that

## Page 21

1  right?
2  A  It was excessive but I was told by the chairman of
3  the board to approve five thousand dollars.
4  Q  Okay.  And other board members occasionally got
5  compensation if they brought business in to Co-Op,
6  is that right?
7  A  No.
8  Q  Mr. Stepp is the only one?
9  A  To this point, yes.
10  Q  Okay, well, to the point in 2005 or 2006 whenever
11  that happened, right?
12  A  Since my tenure, my tenure of CEO, I was under CEO,
13  that's the only one that I can recall.
14  Q  Okay.  That's different than giving money to someone
15  with whom you did business for a political campaign,
16  right?  Giving money to a board member for bringing
17  in business, do you see that as the same as giving
18  money to a board member who does business?
19  A  We gave money, we had a PAC account, Political
20  Action Committee.
21  Q  Uh-huh.
22  A  We took money from the PAC account and we made
23  donations to different politicians that were running
24  for office.
25  Q  Okay.  The five thousand dollars that was given to

Judy Jettke & Associates

Mt. Clemens, MI

586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical

                                                        December 15, 2010

### Page 22

1  Janna Garrison did not come out of a PAC account,
2  did it?
3  A   I don't believe so.
4  Q   No.  That came just out of the general checking
5  account, right?
6  A   Right.
7  Q   Okay.  So that was done on your authority, is that
8  correct?
9  A   That was done, it was requested and I approved it,
10  yes.
11  Q   Okay.  And it was requested by Ms. Garrison of you?
12  A   Yes.
13  Q   And you told your executive staff to do this, to
14  make it happen?
15  A   Oh, I'm sorry, let me turn this off.
16      (Whereupon an off-the-record discussion was
17      held.)
18  BY MS. CAULEY:
19  Q   The Detroit Federation of Teachers did business with
20  Co-Op, is that correct?
21  A   That is correct.
22  Q   Okay.
23  A   And brought business to us.
24  Q   Okay.  Did Ms. Garrison win that campaign for which
25  you gave her the money?

### Page 23

1  A   No.
2  Q   And do you think you used good judgement by spending
3  that money and not reporting it to the Board?
4  A   I was empowered to do that, yes.
5  Q   Okay.  And did you believe that you were empowered
6  to spend that money and not report it to OFIR?
7  A   Yes.
8  Q   How many times did you have sex with Mr. Murphy?
9  A   It was until I found out he was married so I'm going
10  to say less than seven.
11  Q   Maybe it's easier to talk in terms of how long did
12  the relationship, the personal relationship last?
13  A   I found out he was married after about a month.
14  Q   Okay.  What is your current age?
15  A   Fifty-five.
16  Q   So was that about a twenty-five-year difference
17  between the two of you, is that --
18  A   I didn't really know how old he was at that time.
19  Q   Okay.
20  A   I thought he was a lot younger.
21  Q   Okay.  Did you continue to have a close, personal
22  relationship with Mr. Murphy after the sexual
23  relationship ended?
24  A   I told him we could be friends.
25  Q   And did you continue to have that relationship?

### Page 24

1  A   Off and on.  I just would pick out glasses for him
2  and talk, that's about it.  Or he'd ask for
3  donations for his campaign.
4  Q   From the PAC?
5  A   From the PAC, yes.
6  Q   Ever give any donations to Mr. Murphy -- well, you
7  were an executive director when he was asking for
8  donations, is that right?
9  A   That's correct.
10  Q   Okay.  On January 29, 2010, which is the day you
11  fired Mr. Winiarski, do you recall that day?
12  A   Yes.
13  Q   Why did you fire Mr. Winiarski?
14  A   Well, I had been thinking about it for a long time.
15  I found out that he was not reporting information
16  that was crucial to me, like meetings.  He lied in
17  front of the Board, he lied to me and I no longer
18  needed his services.  I was going to replace him
19  with someone else.
20  Q   Okay.  And did you discuss that decision with anyone
21  before you executed it?
22  A   No.
23  Q   You don't recall discussion you had with Mr. Murphy
24  and Mr. Stepp in your office about firing him?
25  A   Yes, that was something entirely different.  You

### Page 25

1  asked me, to me you asked me the question why did I
2  fire him.
3  Q   Then I asked you if you discussed the firing of him
4  before you executed it with anyone.
5  A   I discussed the termination with Raymond Murphy and
6  Marc Stepp, yes.
7  Q   Okay.  And isn't it true that you, during that
8  conversation, the three of you agreed that you
9  weren't going to fire anyone else at that point?
10  A   No.
11  Q   You didn't make that decision?  You didn't make a
12  commitment to Mr. Stepp and to Mr. Murphy that you
13  weren't going to fire anyone?
14  A   No, I did not.
15  Q   Okay.  So after they left the office, you then fired
16  Mr. Winiarski, is that correct?  After Mr. Stepp and
17  Mr. Murphy left?
18  A   There's more to it but, yes, I did.
19  Q   Okay.  Why don't you tell me what's more to it.
20  A   Well, there was a conversation that after what we
21  had learned about how he lied -- and I was going on
22  medical leave, I was told to take a two-week
23  vacation, come back and fire him by Mr. Stepp and
24  Mr. Murphy.
25  Q   Okay.  And you said, okay, I'll do that?

Judy Jettke & Associates          Mt. Clemens, MI

                                                        586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 26

1   A   No, I did not say that.
2   Q   Okay.  How did Mr. Winiarski lie?
3   A   Mr. Winiarski did not inform me, Mr. Winiarski did
4       not inform me there was a crucial meeting that was
5       supposed to be taking place by the Department of
6       OFIR.  That was not -- I asked him, I have asked him
7       in the past just generally how things were going.
8       He said things, he would make it as everything is
9       going, doing just fine.
10          Then I learned at a board meeting that
11      there was a meeting that at the end of the week with
12      some of the heads of the State of Michigan, the
13      Department of OFIR.
14          And first he said he informed me, then he
15      said he did not inform me in front of the board
16      members.
17  Q   That happened in December, correct?
18  A   I'm not -- yes.
19  Q   Okay.
20  A   Yes.
21  Q   So why did you wait until January 27th or 29th to
22      fire him?
23  A   Because Marc Stepp says he does not want to fire
24      anyone before Christmas.
25  Q   Okay.  So after Christmas was January 2nd or so?

Page 27

1   A   I was --
2   Q   How come you didn't fire him then?
3   A   After --
4   Q   Well, what happened that caused the firing on the
5       29th of January?
6   A   We had so many meetings going on, there was so many
7       things that were happening within the office.  The
8       discovery of a whole lot of other things started to
9       come about and we had an audit going on so it just
10      took around that time.
11  Q   This was a financial audit that was going on at the
12      time?
13  A   Yes, from the Department of OFIR.
14  Q   Okay.  And you thought it was a good idea to fire
15      the CFO right in the middle of a financial audit
16      with OFIR?
17  A   No, the financial audit was, hopefully was going to
18      be over toward the end of that month.  They had been
19      there for a while.
20  Q   Okay.  Well, on December 1st you had a meeting with
21      OFIR where you learned that there were some serious
22      concerns that OFIR had about the viability of Co-Op,
23      correct?
24  A   I'm not, I'm not sure if it was December 1st, it
25      might have been.

Page 28

1   Q   I think the records will show that.
2   A   Okay.
3   Q   Yeah.  But whatever date it was, that first meeting.
4   A   Okay.
5   Q   If I'm wrong, then it will be whatever the right
6       date is.
7   A   Also, he --
8   Q   So you -- okay, I'm sorry, let me just follow up if
9       I could please with these questions.
10  A   Okay.
11  Q   You knew on December 1st that OFIR was looking very
12      carefully at Co-Op?
13  A   Uh-huh.
14  Q   And they were there doing an audit, that you were
15      doing weekly or biweekly reports to OFIR, is that
16      correct?
17  A   Yes.
18  Q   Co-op was, okay.  And what I'm trying to understand
19      is, it strikes me as a little risky but I'm not a
20      CEO so you would know better than I, to fire a
21      financial, the chief financial officer in the middle
22      of financial issues at the company.
23          So did you think it was not risky, is
24      that --
25  A   It was a matter of trust.

Page 29

1   Q   Because you say he lied to the Board about some
2       meetings, right?
3   A   Meetings and he also lied to me.
4   Q   Well, how did he lie to you?
5   A   He was not -- first of all, he told me that the
6       Board told him that he could not talk to me anymore.
7       I don't know if that was, to be honest with you, I
8       don't really know if that's a lie or not.
9           The air around the office gave me the
10      impression that I could no longer trust him.
11  Q   Couldn't trust him personally or you couldn't trust
12      him to do a good job for Co-Op?
13  A   Both.
14  Q   Okay.  What had he ever done to put Co-Op in danger?
15  A   First of all, he revealed information that was
16      confidential to other people on the executive staff
17      and other people that were in the office that were
18      not executives.
19  Q   And that was the information regarding the December
20      1st meeting with OFIR, correct?
21  A   With Jim Gerber.
22  Q   Yes.  Is that correct?
23  A   That's correct.
24  Q   Okay.  And you had ordered him and others at the
25      meeting not to say anything to anyone about that,

Page 30

1    that meeting, is that right?
2    A   It was none of their business.
3    Q   You didn't think the chief, the COO had a need to
4        understand that the company was being looked at very
5        carefully by OFIR?
6    A   No.  He was in charge of operations, therefore, he
7        had an assignment to try to make the operations
8        department at a profitable center.
9            We were having major problems in the lab
10       with breakage, we were having major problems in the
11       lab with trying to turn it around and also to try to
12       find a way where we can come out and increase our
13       RBC.
14   Q   Uh-huh.
15   A   And I had been discussing with him to find a way to
16       close down part of the lab and just have the
17       finishing particles to the surfacing area in the
18       lab.
19   Q   You didn't think it was important for the Board to
20       know what was going on with OFIR?
21   A   I was going to -- the Board was going to find out,
22       yes, at the December meeting, at the board meeting I
23       was going to tell them at that time.
24   Q   And what was the date of that meeting?
25   A   I believe the date of that meeting -- I'm not sure,

Page 31

1        I'm not going to guess.
2    Q   Okay.  And you didn't think it was important enough
3        to inform the Board right after the meeting with
4        OFIR about what had occurred at OFIR or with any --
5    A   I thought it was important to inform the board
6        officers first of all of the situation before I
7        inform the entire Board and let the board officers
8        deliver that to the Board with my -- with my
9        presence and also Ted.
10   Q   Okay.  Did you inform the board officers immediately
11       after the OFIR meeting about what had occurred?
12   A   We were having a meeting soon, I was going to tell
13       them at that particular time.
14   Q   Okay.  So the answer is no, you didn't inform them
15       immediately --
16   A   No.
17   Q   -- after the meeting?  Is it --
18   A   The answer is no, as you said.
19   Q   No, you did not inform them?
20   A   Inform them.
21   Q   I just want to make sure --
22   A   Okay.
23   Q   -- it records accurately.  Okay.
24           Did you ever tell anyone that you fired
25       Ted because you found him in the office with a state

Page 32

1        auditor and the door was closed?
2    A   No, that was his job.
3    Q   Okay.  But you didn't ever tell anyone that?
4    A   No.
5    Q   Okay.  So if someone says you said that they'd be
6        lying?
7    A   Yes.
8    Q   Okay.  Did you ever report to the Board that Mr.
9        Benson had sexually harassed you at Co-Op?
10   A   No.
11   Q   Because it didn't happen, is that right?
12   A   That's correct.
13   Q   Okay.  In your complaint you allege that the making
14       of the plates, you know, the issue of food plates at
15       board meetings occurred between 2008 and January
16       2010.
17           Are those accurate parameter dates?
18   A   I don't remember the start date or the end date,
19       ma'am.
20   Q   Well, I guess we'd better take a look.  Let's mark
21       this.
22           (Document Marked for Identification as
23           Defendant's Exhibit No. 1)
24   BY MS. CAULEY:
25   Q   With the exception of a squiggle on page two and a

Page 33

1        squiggle on page four for which I put there, is this, do
2        you recognize this document?
3    A   Yes, this is the complaint.
4    Q   Okay.  And you've seen it before?
5    A   Yes, I have.
6    Q   Do you remember when you first saw it?  Let me ask
7        it a different way.
8            Did you see it before it was filed with
9        the court?
10   A   Yes, I did.
11   Q   Okay.  And did you read it at that time?
12   A   Yes, I did.
13   Q   And are all the allegations in here the truth?
14   A   Yes, ma'am.
15   Q   Okay.  Direct your attention to paragraph sixteen
16       which starts on page three and continues on page
17       four, specifically the sub part C which is on page
18       four.
19           You allege there for nearly every board
20       meeting between 2008 and January 2010, Raymond Mark
21       (sic) and Marc Stepp requested that Smith make
22       plates of food for themselves and their wives.
23           First of all, you were requested to make
24       plates of food for Mr. Murphy's wife, correct?
25   A   Right.

Page 34

1    Q   Okay, so that's incorrect.
2            Then it alleges here that it happened
3    between 2008 and January 2010.  Does that refresh
4    your recollection as to the dates when this occurred
5    or do you still not know?
6    A   I don't believe I made anything in January 2010.  I
7    might have, I'm not sure.
8    Q   Okay.  But it started in 2008?
9    A   About 2008, yes.
10   Q   Okay.  How many board meetings occurred in 2008 and
11   2009?
12   A   Several.
13   Q   What were the regular board meetings that were held
14   normally?
15   A   Normally, there's four board meetings.
16   Q   Okay.
17   A   And then we were committee meetings.
18   Q   Okay.  Do you have food for all the committee
19   meetings?
20   A   Yes.
21   Q   Every one of them?
22   A   Yes.
23   Q   So does that help you guestimate how many times you
24   made plates for --
25   A   Well, it got to a point where we just ordered plates

Page 35

1    to go, where we could, we were first using paper
2    plates and trying to snap them together, put them in
3    a bag.  So I directed Armida to purchase, get those
4    little plates that -- for carry outs.
5            So I want to say that's several, several
6    times.
7    Q   Okay.  Did someone direct you to order those special
8    carry-out containers?
9    A   No.  It was just --
10   Q   That was your idea?
11   A   It was just easier.
12   Q   Okay.  And you did that for anyone who wanted to
13   take food home from the board meeting?
14   A   Yes.  Some people made their own.
15   Q   Okay.  Did you ever suggest to Mr. Murphy that he
16   make his own?
17   A   No, they were my bosses.
18   Q   Did you ever suggest to Mr. Stepp that he made his
19   own?
20   A   No, he was my boss, too.
21   Q   Did you ever off to make them for Bernie Adams?
22   A   No, she made her own.
23   Q   You never said, here, let me do that for you?
24   A   No.
25   Q   So did you ever offer for anyone other than Mr.

Page 36

1    Murphy and Mr. Stepp?
2    A   Maybe once or twice I saw Mr. John Trohimczyk
3    stumbling because he was on, he's partially
4    handicapped.
5    Q   Uh-huh.
6    A   And therefore, I assisted him, so, yes.
7    Q   Okay.  All right, now let me see.
8            So you started as the CEO in 2003?
9    A   July 29th, July, I think July 27, 2003, yes.
10   Q   Okay.  And did you have food at the meeting for the
11   board members as early as 2003?
12   A   Yes.
13   Q   Okay.  When did you first offer to help Mr. Murphy
14   and Mr. Stepp with their plates?
15   A   Probably around 2008.
16   Q   Okay.  Before that, did they take plates home of
17   food?
18   A   Yes.
19   Q   And did they prepare them themselves?
20   A   Yes.
21   Q   Okay.  Was there anyone who witnessed Mr. Murphy
22   allegedly putting his hand on your rear end?
23   A   No one witnessed it, I told someone.
24   Q   Who did you tell?
25   A   I came out of the office and after Mr. Murphy was

Page 37

1    leaving my office I told Armida Parisi that he just
2    gripped me.
3    Q   Uh-huh.  And you believe that was in January, can
4    you narrow it down in terms of the date?
5    A   We had so many meetings in January.  The only thing
6    that I know, it was before the meetings, it wasn't
7    toward the -- maybe the middle, maybe the middle of
8    the month and I am guessing.
9    Q   What was happening between the two of you that
10   caused him to say it's going to be okay?  Were you,
11   was something upsetting you?
12   A   Well, a lot of things were upsetting me.
13           First of all, this, I was being charged by
14   my subordinates with doing things that were not
15   true.
16           I was going through a lot of different
17   things and an investigation with the Board and IHOC
18   committee that was formed.
19           Blair McGowan was calling and writing
20   letters to me that were very strong and very -- and
21   not, well, I don't expect him to be friendly but
22   they were strong and accusing me of certain things.
23   He had also taken records out of the office that
24   should be there.
25           There was just a lot of things.  Stress.

## Page 38

1    The word was going around the entire
2    company that I was, I was stealing money from the
3    company on my credit card.
4        So there was a lot of -- whooh, there was
5    a lot of pressure on me around that time.
6    Q   And thank you for that. I guess I'm trying to
7    understand at that particular moment, what caused
8    Mr. Murphy to, what, what, were you --
9    A   I just told --
10   Q   -- just very upset --
11   A   I told him --
12   Q   -- with all this, is that it?
13   A   No, I told him -- he came into my office after the
14   meeting. Thank you Jesus.
15       He came into my office after the meeting
16   and I was crying. That's what I remember.
17   Q   Okay.
18   A   And I'm -- so it was building up and then he may
19   have initiated the hug, after I think about it. He
20   says everything is going to be all right.
21   Q   Okay. So he's trying to comfort you, is that fair
22   to say?
23   A   Yeah, he comfort me and then gripped me.
24   Q   Okay.
25   A   Uh-huh.

## Page 39

1    Q   Did you consider that to be an act of sexual
2    aggression when he --
3    A   The hug or the grip?
4    Q   The grip.
5    A   The grip. The grip was definitely sexual. I mean,
6    you can tell if someone's hand has slipped or
7    someone was purposely placing their hand on your
8    rear end.
9    Q   So what did you take his intent to be? Understand
10   you can't know what was in his mind, what did you
11   believe his intent was by doing that? He wanted to
12   get you into bed or --
13   A   I don't think he wanted to get me into bed, no. I
14   think he wanted, he just took an opportunity to
15   touch a person.
16   Q   Okay.
17   A   To touch a woman.
18   Q   Have you ever known him to do that before with
19   anyone?
20   A   I've known him to flirt and talk to other women.
21   Q   Okay, I didn't ask that though. The touching, the
22   grabbing, taking a chance to touch another woman?
23   A   I have never, I have never seen him touch another
24   woman.
25   Q   Okay. Did you ever tell anyone at Co-Op or the

## Page 40

1    Co-Op Board that you had surveillance of employees
2    both at their work and at their homes?
3    A   No.
4    Q   You were spying on employees, you never told anybody
5    that?
6    A   No.
7    Q   So if anyone said that you said that, they'd be
8    lying?
9    A   Yeah.
10   Q   Okay. See if you can recall a meeting that I
11   believe occurred on December 10, 2009. It was a
12   meeting of the salary --
13   A   Oh, yes.
14   Q   -- commission. That meeting rings a bell.
15       Do you remember who was present at the
16   meeting?
17   A   Yes.
18   Q   Who?
19   A   Bernice Adams, Marc Stepp, Janna Garrison, Raymond
20   Murphy I believe and that was it. And myself.
21   Q   Blair McGowan?
22   A   No.
23   Q   Okay. What do you recall happened at that meeting?
24   A   This is the meeting that we wanted to give bonuses,
25   if I'm correct. If I recall correctly, this is the

## Page 41

1    meeting that I wanted to offer bonuses to the
2    executive staff.
3    Q   This is in 2009?
4    A   Oh, in 2009? Yeah, this is the same --
5    Q   Yeah, okay.
6    A   Yeah, it's the same meeting.
7    Q   Okay. And this is nine days after a meeting with
8    OFIR when they informed you that Co-Op was in
9    jeopardy?
10   A   OFIR did not inform me Co-Op Optical was in
11   jeopardy.
12   Q   Oh. What did they inform you of?
13   A   Jim Gerber actually said that he was scheduled to
14   come to Co-Op Optical but because, you know, we had
15   made progress, that he had talked to Ken Ross
16   whether to come or not, he said since you scheduled
17   the meeting to go on and go out there.
18       And that's when, and that's, that's what I
19   remember.
20   Q   So you think the December 1st meeting was just kind
21   of a routine, informational meeting?
22   A   December 1st, yes. And I felt that it was an
23   informational meeting, he was not threatening to
24   close Co-Op Optical down, he wanted to give Co-Op
25   Optical a chance.

Jacqueline Smith                Smith vs Co-Op Optical                December 15, 2010

---

Page 42

1    He also listed different things that we
2  could do to bring ourselves back into compliance or
3  to -- into compliance or to speed up the process.
4  Q   Okay.
5  A   And not only that, before he -- after the meeting he
6    stayed around and came back and gave us some more
7    advice.  And at that time in the office, at this
8    December 1st meeting with OFIR --
9  Q   Uh-huh.
10 A   -- and Jim Gerber, that was Ted Winiarski, Larry
11   Gardiner, myself and Matt Groen.
12     So it was not, so I'm not sure if this is
13   the same, if you said the 10th, the 1st.
14     So that particular meeting was not, did
15   not -- and that's why -- and then I had it recorded
16   and I was going to read that to the Board of
17   Directors and tell them exactly.  The officers, not
18   the directors, the Board of Directors officers of
19   what took place with, at the Jim Gerber meeting.
20 Q   Okay.  Well, let's -- we'll come back to the
21   December 10th meeting, let's stick with December
22   1st.
23 A   I got, I'm confused.
24 Q   Who prepared the minutes of that meeting?
25 A   Matt.

Page 43

1  Q   And did he record the meeting?
2  A   He records -- I'm not sure.
3  Q   Okay.  Did you review the minutes before they were
4    finalized?
5  A   I read the minutes and I did not make any changes
6    and I said this is accurate.
7  Q   Okay.  And so this, as far as you were concerned,
8    that January, I'm sorry, December 1st meeting of
9    2009 with OFIR was not really any big change from
10   what had been going on for the last four years with
11   OFIR?
12     Was it just kind of more of the same, more of
13   the same?
14 A   No, I did not think that.
15 Q   Okay.
16 A   I took the meeting very seriously.
17 Q   Okay.
18 A   I knew that there had to be changes and changes had
19   to be made immediately in order for us to try to
20   come in compliance or show that we're trying very
21   hard to make the company, make our, bring up our RBC
22   up to three hundred.
23 Q   What was the RBC in December 2009?
24 A   The RBC in December 2009 I think was like, I'm not
25   sure but I think it was forty-seven.

Page 44

1  Q   Okay.  And it's supposed to be three hundred?
2  A   Yes.
3  Q   Okay.  Anyway, okay, so then there was a meeting and
4    I'm going to show you these minutes in a minute
5    regarding the meeting I wanted to talk about and I
6    don't think it's the same one that you were talking
7    about.
8  A   Okay.
9  Q   And I don't want to mislead you so let's talk about
10   a meeting that you remember where you talked about
11   bonuses.
12     What happened at that meeting?
13 A   Okay.  I called the compensation committee, Mr.
14   Stepp is the chairman of that particular committee.
15   It was -- and I usually take the executive staff out
16   to dinner.
17     We had volunteered to take four percent
18   cuts from our salaries so as, out of gratitude, I
19   wanted to give them something for, you know,
20   decreasing their salary on their own.  We said two
21   months or temporary but it had exceeded that.
22     I brought it to the Board, to the Board,
23   excuse me, I brought it to the compensation
24   committee.
25     They asked me what do I expect the year-

Page 45

1    end deficit to be, year-end profits to be.  I said I
2  don't believe we're going to have any profits, I
3  think it's going to be anywhere from a hundred and
4  thirty to a hundred and forty thousand dollars in
5  deficit.
6    Mr. Stepp said that you want to give them
7  these bonuses and not a raise because this is a one-
8  time thing and not in the compensation, it's not
9  something that's ongoing.
10   I did not recommend compensation, they're
11 bonuses and I told him that he was correct.
12   The bonuses did not exceed three hundred
13 dollars.  The lowest was a hundred and fifty
14 dollars, the highest was three hundred dollars and I
15 did not -- I submitted my papers but I did not place
16 any dollar amount on mine.
17 Q   Uh-huh.
18 A   And that's what that meeting was about.
19   The committee said that they'd have to
20 think about it, make a decision, bring it to the
21 full Board and then they made some type of voting, I
22 believe, on it, as I recall.  It's been a long time.
23 Q   Were those bonuses approved?
24 A   No.
25 Q   Did any member of the committee or any member of the

---

Judy Jettke & Associates              Mt. Clemens, MI

Jacqueline Smith                    Smith vs Co-Op Optical

                                                        December 15, 2010

---

Page 46

1    Board ever express to you that they thought you had
2    used poor judgement in asking for those bonuses?
3  A    Only one, Bernice Adams.
4  Q    Okay.
5        (Document Marked for Identification as
6        Defendant's Exhibit No. 2)
7  BY MS. CAULEY:
8  Q    I'll show you what's been marked as Exhibit 2 and
9        that's the meeting on December 10th to which I was
10       earlier referring.
11  A    Okay.
12  Q    And I think you were maybe confused about them so if
13       you take a minute to look at those and see if that
14       refreshes your recollection about the meeting on
15       December 10th.
16           And by the way, the other meeting could
17       have happened at the same -- I don't know but it
18       doesn't say it here.
19  A    Yes, I remember this one. I think I had about
20       thirty minutes to come up with this.
21  Q    Okay. Well, what do you recall about the meeting
22       itself, how the meeting went?
23  A    Oh, it was very hyper. Charles Benson came in, was
24       talking to Marc Stepp, trying to think of things to
25       tell on me. That they had came up with a proposal

---

Page 47

1        to save money of the dollar amount here, total seven
2        hundred and seventeen thousand dollars and they had
3        been working on this without my knowledge.
4  Q    Okay. So --
5  A    And that, and there was a lot of arguing, bickering.
6        It was not an organized meeting. There was a lot of
7        hollering and screaming, a lot of conversations
8        going on. It was chaos.
9  Q    Did you, were you first able to present your plan,
10       that is, the closing of the retail location?
11  A    No.
12  Q    And the elimination of multiple --
13  A    No. The CFO and the COO and along with Larry
14       Gardiner from LGA Associates and his assistant, I
15       don't remember her name. But they came up, they had
16       been working on this plan without my knowledge.
17           And so what I was told was to go into my
18       office and in thirty minutes come up with some type
19       of plan.
20           But even though I had directed them, they
21       had showed me the pro forma but they did not show me
22       this particular plan.
23  Q    Well, okay. Did you present your plan? The closure
24       of Auburn Hills and --
25  A    What I could do, what I could do in thirty minutes,

---

Page 48

1        yes.
2  Q    Okay, you presented it. Did the Board ask you any
3        questions about it?
4  A    Yes. Blair McGowan asked a lot of questions.
5  Q    Okay. And you answered them?
6  A    Yes.
7  Q    Was there yelling and shouting during that period?
8  A    There was always yelling and -- Blair always yelled
9        and shouted at me. He was, he's a person that just
10       didn't like me period.
11  Q    Okay. Did he call you names or was this in the way
12       in which he was asking questions? What was the --
13  A    No, he told me to fetch a few documents and he used
14       fetch. He was trying to push the CFO and the COO's
15       plan and he just -- there were so many things that
16       were said at that meeting, it's impossible for me to
17       try to remember everything because there was so many
18       conversations it lasted through the -- after the
19       office had closed. So we were there throughout the
20       night, through the, well, not -- through the
21       evening.
22  Q    Okay. Do you know who prepared the minutes of this
23       meeting?
24  A    Most of the recording was done by Matt.
25  Q    Matt wasn't at this meeting, was he?

---

Page 49

1  A    I'm not sure, he doesn't, I'm not sure but this
2        looks like something that Matt may have done. It
3        looks like his form of writing.
4  Q    Well, if that -- wouldn't it indicate that he was
5        present, in fact?
6  A    No, it doesn't indicate in a lot of the meetings he
7        was present, he was just recording.
8  Q    Oh, okay. Do you recall the portion of the meeting
9        where you stood up and called Mr. Murphy and Mr.
10       Stepp motherfuckers?
11  A    No.
12  Q    And yelled at them?
13  A    I have never in my life called anybody that name,
14       MF.
15  Q    Okay. And you didn't do it at that meeting then?
16  A    No, I did not.
17  Q    Okay. Did you run out of that meeting crying?
18  A    I probably cried because no one was listening to me
19       and they were listening to Charles and I felt that I
20       was being disrespected as the CEO.
21           I didn't run out of any meeting. They
22       asked me to be, if I needed to be excused and I said
23       no. And I took a Kleenex and I wiped my eyes and
24       continued on.
25  Q    Who is Yohannes Bolds?

---

Judy Jettke & Associates          Mt. Clemens, MI

                                              586-783-0060

Smith vs Co-Op Optical

December 15, 2010

Page 50

1  A  Yohannes Bolds is the president and CEO of Take 1, a
2     nonprofit organization.
3  Q  Okay.  And you consider Yohannes Bolds a personal
4     friend?
5  A  No, he's a business friend.
6  Q  Okay.  Is he the kind of person that you'd send
7     emails to if you got a joke or something or not in
8     that kind of a relationship?
9  A  I have, yes, I have sent, well, no, they are more
10    inspirational type of emails.
11 Q  Oh, okay.
12 A  Not jokes.
13 Q  Oh, okay.  Did you ever send jokes, silly things
14    through the email?
15 A  Did I?
16 Q  Yeah.
17 A  To Yohannes?
18 Q  To -- fair question.  To people at Co-Op and others.
19 A  Yes.
20    (Document Marked for Identification as
21    Defendant's Exhibit No. 3)
22 BY MS. CAULEY:
23 Q  I'll show you the affidavit of Yohannes Bolds that
24    was produced along with other documents produced to
25    us by your attorneys.

Page 51

1     Can you tell me how this affidavit came to
2     be prepared?
3     MR. SWANSON:  Objection to the extent that it
4     may, would appear to, it may be attorney/client
5     privilege as to any communications, Jackee, that we
6     as your attorneys had with you that related to this
7     affidavit, you are not to disclose that.
8        If you have knowledge outside of anything
9     that anyone in this office may have told you about
10    this affidavit, feel free to testify.
11 BY MS. CAULEY:
12 Q  Can you answer my question?
13    MR. SWANSON:  If you know anything other than
14    what I or Jesse may have told you about this
15    affidavit, you can answer her question.
16 BY MS. CAULEY:
17 Q  Let me try to ask it a different way that might help
18    that.
19       Did Yohannes Bolds contact you and inform
20    you of attending a meeting at Mr. Murphy's house or
21    a party at Mr. Murphy's house?
22 A  Yes.
23 Q  Okay.  And what did he say about that meeting, about
24    that party?
25 A  He called me and he says, I heard what happened to

Page 52

1  you at Co-Op Optical.
2     And I was wondering how he heard.  I said
3  what do you -- and first I was, I was not
4  necessarily going around telling everybody that I
5  had been terminated so I said, what do you mean.
6     I heard you got fired.
7     And I had said, I had been saying we had a
8  separation so I said how did you hear that.
9     He said that I was at a fund-raiser at
10 Raymond Murphy's home and he told me all that took
11 place during your board meetings and that they did
12 not treat you fairly.
13 Q  Okay.  Anything else that you can think of that he
14    said?
15 A  No, he said -- I asked him, I said, are you willing
16    to -- I said, those should have been confidential
17    meetings and I said, you shouldn't be aware of
18    those, the details of those meetings or some of the
19    details of those meetings.
20       So I asked him if he would be willing to
21    provide me an affidavit stating that.  He said, he
22    said, I don't care, he didn't seem like it was, it
23    was like a secret.
24 Q  As far as you know, does this affidavit reflect
25    everything that Mr. Bolds told you that was said by

Page 53

1  Mr. Murphy?
2  A  May I take time to read it?
3  Q  Sure, sure, sure.
4  A  This is correct.
5  Q  Okay.  When did you first treat with Dr. Rosalind
6     Griffin?
7  A  My first treatment was January 29, 2010.
8  Q  How did you learn of her, how did you come to go
9     there?
10 A  Well, first of all, my medical doctor, my primary
11    doctor Dr. Lanore Najor told me that I needed, by
12    the stress that I needed to see someone that
13    practices that type of medicine.
14       A friend of mine that's an attorney
15    recommended me to -- I had two recommendations, Dr.
16    Robert Phol and Dr. Rosalind Griffin.  One was given
17    to me by my doctor, the other was given to me by my
18    friend that's an attorney.
19       So I went to Dr. Griffin and when I went
20    in there I could hardly walk, I was shaking like a
21    leaf on the tree.  I was highly upset and she told
22    me that I need to take time off.  I was, she says I
23    was stressed out and she felt that it should be
24    confirmed that the things that are happening to me
25    is due to stress and mental anguish, I guess, is

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

Page 54

1   what she said.
2   Q   How many times did you see her?
3   A   I saw Dr. Griffin probably about maybe four or five
4       times.
5   Q   During what period of time?
6   A   From January through -- I saw her every week.
7       January through about March, the beginning of March,
8       I believe.
9   Q   Did you treat with anyone else during that same
10      period?
11  A   I was treating with a rheumatologist because of my
12      joints, Dr. Jerrold Shargin and also I was seeing
13      Dr. Lanore Najor. Also, let's see, and a Dr. Patel.
14  Q   What's Dr. Patel's specialty?
15  A   Neurology.
16  Q   Where is Dr. Najor located?
17  A   In Beverly Hills, Michigan. I do not know the
18      address, I just know it's in Beverly Hills.
19  Q   Is it N-A-G-E-R, A-R?
20  A   N-A-J-O-R.
21  Q   J-O-R, thank you. And Dr. Shargin, how do you spell
22      that?
23  A   S-H-A-R-G-I-N. And it's Jerrold, J-E-R-R-O-L-D.
24  Q   And Dr. Patel, P-I?
25  A   Dr. Patel was the doctor at Beaumont. Oh, I don't

Page 55

1   know his first name but it was P-A-T-E-L, he was a
2   resident at Beaumont because I went into the
3   emergency sometimes.
4   Q   Okay. Dr. Shargin?
5   A   Yes.
6   Q   Where is he located?
7   A   He's located in Beverly Hills.
8   Q   On what street?
9   A   On Southfield Road.
10  Q   Is that the same with Dr. Najor?
11  A   No, Dr. Najor is on Thirteen Mile Road.
12  Q   Okay. Why did you stop seeing Dr. Griffin?
13  A   Because I had to go into the hospital again and I
14      had fell out once again and I missed two or three
15      appointments and she kind of wrote me a letter and I
16      just read between the lines.
17          She suggest I continue seeing someone and
18      she wishes me well. That's when I contacted the
19      other doctor, Dr. Pohl.
20  Q   P-O-H-L?
21  A   P-O-H-L, Robert Pohl.
22  Q   And where is he located?
23  A   Royal Oak, Michigan.
24  Q   And how many times did you see Dr. Pohl?
25  A   I see him every month. Several times, I don't know

Page 56

1   the exact amount of times.
2   Q   Is he a psychiatrist or psychologist?
3   A   Psychiatrist. He's an MD.
4   Q   So he prescribes medication for you?
5   A   Yes.
6   Q   What medication?
7   A   Effexor, Abilify, Klonopin, Ambien CR.
8   Q   Do you take all four of those medications daily?
9   A   I do. I have -- I do.
10  Q   How often daily?
11  A   One each day. I have chronic insomnia so I take
12      Ambien CR every night. Effexor and Abilify is for
13      my depression. Klonopin helps my anxiety and my
14      panic attacks.
15  Q   The Effexor, Abilify and Kolox --
16  A   Klon, Klonopin.
17  Q   What you said.
18  A   Uh-huh.
19  Q   Did you take those today?
20  A   Yes, I have.
21  Q   Okay.
22  A   I did not take Ambien.
23  Q   You take that at night?
24  A   Yes, at bedtime.
25  Q   What other medications are you on?

Page 57

1   A   I'm on Norvasc for high blood pressure and also on a
2       diuretic, Maxzide, I believe it's called.
3   Q   Prior to the last three months at Co-Op, had you
4       ever taken anything for depression?
5   A   Dr. Najor had started me on Klonopin.
6   Q   When?
7   A   I'm not sure but I think it was probably in 2008. I
8       was working anywhere from sixty to eighty hours a
9       week.
10  Q   Any other -- well, that, you said that that was for
11      anxiety and panic attacks. Did you ever take
12      anything for depression?
13  A   No.
14  Q   Prior to treating with Dr. Griffin, have you ever
15      treated with any psychiatrist or psychologist?
16  A   No.
17  Q   What was the serious health condition for which you
18      needed a leave in the end of January 2010?
19  A   Repeat your question.
20  Q   What was the --
21  A   You said January?
22  Q   Yes.
23  A   Oh. Stress, anxiety, panic attacks, unable to sleep
24      and when I did sleep it was recurring dreams of
25      Co-Op Optical. That's it.

Smith vs Co-Op Optical

December 15, 2010

Page 58

1  Q   When did you first call Dr. Griffin for an
2       appointment?
3  A   A few days or a week before the 29th. I'm not sure
4       of what the exact date is, ma'am.
5  Q   You saw Dr. Griffin on the 29th, correct?
6  A   Yes.
7  Q   Prior to that, had you talked with anyone at Co-Op
8       about taking some time off?
9  A   If anybody, it would have been Armida. She was
10      concerned about my health.
11 Q   So how did you go about proceeding to get some time
12      off in the end of January 2009 (sic), what process
13      did you follow?
14 A   Oh. Dr. Rosalind Griffin gave me a paper, I took it
15      to human resources. These are the normal procedures
16      for all employees. And I told them that I would
17      have to take some time off per my doctor and I
18      presented the human resource manager the papers.
19         (Document Marked for Identification as
20      Defendant's Exhibit No. 4)
21 BY MS. CAULEY:
22 Q   Did you complete the document that is now listed as
23      Exhibit No. 4?
24 A   Yes.
25 Q   Is everything that's written on that page in your

Page 59

1       handwriting?
2  A   Yes.
3  Q   Okay. And this is the form you submitted to Temeng
4       Darko?
5  A   Yes.
6  Q   T-E?
7  A   T-E-M-E-N-G and Darko is capital D-A-R-K-O.
8  Q   Thank you, okay. And what did he do with it, if you
9       know?
10 A   He gave me some other papers, he says that I'd have
11      to apply for family medical leave and that was it.
12      And I informed the Board, well, I informed the
13      chairman of the board, I informed Marc Stepp because
14      he was a part of the personnel committee and
15      compensation and Ray Murphy was acting chairman of
16      the board.
17 Q   Okay.
18 A   At that time.
19 Q   Now this document indicates that you submitted it to
20      Raymond Murphy, chairman of the board although you
21      just told me you submitted it to Temeng Darko.
22      Which is accurate?
23 A   Oh, I submitted to both of them. I took it to HR so
24      he would have a copy.
25 Q   Uh-huh.

Page 60

1  A   And then I gave a copy to Raymond Murphy.
2  Q   So you Xeroxed a copy or what?
3  A   Yes.
4  Q   Okay.
5  A   Actually, the copy was Xeroxed in the HR department.
6  Q   Okay. And did you go right from Temeng's office and
7       then go right to see Mr. Murphy?
8  A   No, Mr. Murphy, I called Mr. Murphy and he and Marc
9       Stepp was, they said that they were planning on
10      coming in into the office later that afternoon.
11 Q   Okay.
12 A   And I told them I had something that I had to tell
13      them, tell, I told actually Raymond Murphy I had
14      something I had to tell them.
15 Q   So you first submitted this to Temeng Darko, is that
16      correct?
17 A   Correct.
18 Q   Why didn't you write on this that you submitted your
19      request to Temeng Darko?
20 A   That was not a part of the procedure.
21 Q   Well, you just told us the procedure was to go to HR
22      and submit the request.
23 A   Right. Doesn't mean that I have to write it on the
24      paper, though. No one really writes it on the
25      paper.

Page 61

1  Q   Oh. What do they write?
2  A   They just -- who their supervisor, submit it, if
3       it's John Doe they would say submit request to John
4       Doe.
5  Q   Okay. So you always put the supervisor's name in
6       there?
7  A   Yes, ma'am.
8  Q   Okay. And you understood that to be the procedure?
9  A   Yes.
10 Q   Okay, all right. So you gave it to Temeng, you
11      called Mr. Murphy, he said he and Mr. Stepp were
12      coming later that afternoon.
13         Did anything happen between the time you
14      submitted this to Temeng Darko and when Mr. Murphy
15      and Mr. Stepp came in that afternoon in regards to
16      the leave?
17 A   Between the time I submitted it to Temeng Darko and
18      before I seen Mr. Stepp and Mr. Murphy?
19 Q   Yes.
20 A   Did anything happen?
21 Q   Regarding the leave.
22 A   The leave. No, I held it in, I, it was at, it was
23      in human resources.
24 Q   Okay.
25 A   And that's about it.

Smith vs Co-Op Optical

December 15, 2010

Page 62

1   Q   They had it?

2   A   They had it.

3   Q   Okay. Then tell me what happened when Mr. Murphy

4       and Mr. Stepp came in.

5   A   Well, Mr. Murphy and Mr. Stepp came into my office

6       and I told them that I had to go on a family medical

7       leave.

8           Mr. Stepp said, has anybody seen this

9       document? I said the only person that have seen it

10      is Temeng Darko.

11          He says, retrieve the document and go on

12      vacation for two weeks and come back.

13          And so I retrieved the document and was

14      going to go on vacation for two weeks and come back,

15      more so because it was, it seemed to me like an

16      order.

17          And then I thought about it the night,

18      overnight and one of those nights I still couldn't

19      sleep, I could tell that I was not feeling well

20      mentally or emotionally and I changed my mind and

21      decided that I should go according to my doctor's

22      advice opposed to according to the advice of Mr.

23      Murphy and Mr. Stepp.

24  Q   Okay. So you understood that you could, you could

25      go ahead and take the leave that you wanted to take

Page 63

1       and you were going to do it?

2   A   Yes.

3   Q   Right? Okay. Did you have, did you reach the

4       understanding in your own mind or a belief in your

5       own mind as to what Mr. Stepp and Mr. Murphy were

6       suggesting to you or telling you when they said, you

7       know, take two weeks off, do something like that?

8       I mean, did you reach a conclusion in your head as

9       to what they were up to or were they looking out for

10      your best interest, did they say you've got to do

11      what your doctor says, if you need a rest you've got

12      to have a rest?

13          They said that, didn't they?

14  A   By that time, I'm to be candid or honest, I didn't

15      know what to believe. I didn't know whether I could

16      trust Marc or Raymond Murphy so, therefore, in my --

17      I felt it my best interest and my health's best

18      interest that I should just go ahead and go with my

19      doctor's recommendation.

20  Q   Okay.

21  A   So I don't know what they were thinking, I can't, I

22      could not interpret.

23  Q   Did they, in fact, indicate to you that you've got

24      to do, if your doctor says you need rest, you need

25      rest?

Page 64

1   A   No, they didn't say that.

2   Q   They didn't support the fact that you needed to take

3       some time off?

4   A   They told me to take, it was kind of like take off a

5       couple of weeks, cool off and come back.

6   Q   Okay.

7           MR. SWANSON: At some point that's convenient,

8       can we take a break?

9           MS. CAULEY: Sure. Want to take it right now?

10          MR. SWANSON: Okay, if that's good.

11          MS. CAULEY: Uh-huh.

12          WITNESS: Okay.

13          MR. SWANSON: Five minutes?

14          MS. CAULEY: Five minutes.

15          (Whereupon an off-the-record discussion was

16          held.)

17  BY MS. CAULEY:

18  Q   There's a group called the Optical Management Group,

19      right?

20  A   OMG.

21  Q   Okay, OMG. Oh, I think that is --

22  A   A lot easier.

23  Q   That is something that I text to people.

24  A   Oh.

25  Q   Or what I say when I'm surprised about something,

Page 65

1       OMG.

2           And do they have conferences?

3   A   Yes.

4   Q   And do you attend those conferences on occasion?

5   A   We attend two conferences per year.

6   Q   Okay. Do you recall a particular one in 2008 when

7       you and another attendee engaged in a cussing match

8       with a vendor? Remember anything about that?

9   A   No.

10  Q   No? Okay, that's fine.

11  A   We may have, I may negotiate but not curse.

12  Q   Okay, okay. Do you use any kind of what's generally

13      considered, you know, foul language like shit or

14      damn or hell?

15  A   Yes.

16  Q   You do, okay.

17  A   Uh-huh.

18  Q   But you don't use the F word?

19  A   Not to my knowledge, no.

20  Q   Okay. And do you engage in, you know, like sort of

21      off-color remarks, off-color sexual remarks in

22      business?

23  A   No, but I have received off-color remarks in

24      business.

25  Q   Uh-huh. Do you remember an occasion in November

Judy Jettke & Associates

Mt. Clemens, MI

17 (Pages 62 to 65)

586-783-0060

Jacqueline Smith                           Smith vs Co-Op Optical
                                                    December 15, 2010

### Page 66

1    2009, that's just before, you know, the month before
2    the OFIR meeting --
3    A   Uh-huh.
4    Q   -- when you and other members of management were on
5    a conference call with a company about some kind of
6    a business relationship and you stated in response
7    to something that that person said on the phone,
8    "You almost made me come" when you heard something
9    they said.
10        Did you ever say that?
11   A   No.
12   Q   And if every person in that meeting said you said
13   that they'd all be lying?
14   A   Yes.
15   Q   Yeah, okay.  Because that certainly wouldn't -- to
16   do that wouldn't have demonstrated good judgement on
17   the part of the CEO, right?
18   A   No.
19   Q   Would you agree?
20   A   Yeah, I agree.
21   Q   Yeah, okay.
22        (Document Marked for Identification as
23        Defendant's Exhibit No. 5)
24   BY MS. CAULEY:
25   Q   Did you distribute that photograph by way of an

### Page 67

1    email to some coworkers and others outside the
2    company?
3    A   There is a series of art that was along with this
4    that came from Larry Gardiner from LGA Associates.
5    Q   Uh-huh.
6    A   He sent it to me and I didn't really look at this
7    and I just forward it on.  And until I found out
8    that I was -- it was later brought to my attention
9    that there was somebody that was sitting on a bath,
10   on a toilet that -- then I was informed of that and
11   then that's when I went back and looked at my
12   deleted files and looked at it.
13   Q   So you forwarded these things on to other people
14   without looking at them you're saying?
15   A   Yeah.  Because I looked at a couple of the pictures
16   and they were art.
17   Q   How many pictures were there?
18   A   Oh, probably about maybe, I'm not, I'm guessing, I'm
19   going to say maybe about ten, fifteen.
20   Q   Okay.
21   A   And I don't know where this one came in or what
22   number this one was.
23   Q   Do you think it was appropriate to send something on
24   without reviewing it to coworkers?
25   A   It appeared harmless in the beginning because it was

### Page 68

1    art and I would not have known.  And coming from
2    Larry Gardiner, I just didn't think that it would
3    have anything on there like that.  At that
4    particular time, I respected him and thought that he
5    would use the best judgement.
6    Q   And you thought it was appropriate for a CEO to
7    forward on ten photographs of art, regardless of the
8    content, to coworkers?
9    A   The art was beautiful in the beginning.
10   Q   And that's the way you want your executives to spend
11   their time, to look at art while they're working?
12   A   Well, according to what they were doing while they
13   working from selling real estate to other things
14   that were not related, sometimes it's, to me, it's
15   okay for if something is going to break up the time
16   and not take up too much time, to look at art or
17   something of beauty or send a joke that is safe,
18   then, yes, I would send that.
19   Q   Oh, and that, as CEO you think that's appropriate
20   behavior?
21   A   I totally don't understand you by saying is it
22   appropriate behavior.
23   Q   To forward on sort of emails full of whatever,
24   whether it's inspirational things or whatever that
25   aren't business related, do you think that's

### Page 69

1    appropriate?
2    A   I think it's the judgement of the CEO individually
3    whether to do that.
4    Q   Could you see how maybe board members might not
5    think you exhibited good judgement in doing that?
6    A   I receive things from board members, too.
7    Q   Can you see how a board member might not consider
8    that to be good judgement?
9    A   I've read them.
10   Q   Could you answer my question, please?  Can you
11   understand why a board member might not consider it
12   good judgement for a CEO to send out emails
13   unrelated to business to their executives?
14   A   No.
15        (Document Marked for Identification as
16        Defendant's Exhibit No. 6)
17   BY MS. CAULEY:
18   Q   Is Exhibit 6 another one of those pictures that came
19   from Larry Gardiner?
20   A   I've never seen this picture before in my life.
21   Q   So are you denying having forwarded it on to --
22   A   I'm not denying it, it's just I've never seen this
23   picture before in my life.
24   Q   Okay.  Now, you hired Larry Gardiner, right?
25   A   Larry --

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 70

1          MR. SWANSON:  Larry or Blair?
2    BY MS. CAULEY:
3    Q   Larry Gardiner.
4    A   Larry Gardiner, yes, I did.
5          (Document Marked for Identification as
6          Defendant's Exhibit No. 7)
7    BY MS. CAULEY:
8    Q   Is this another one of the pictures that you
9         forwarded on to employees at Co-Op?
10   A   I don't know, I've never seen this one before
11       either.
12   Q   When you went back to your computer after someone
13       said there are some inappropriate pictures in there
14       and you went back to check, didn't you look at them
15       all?
16   A   No.  I looked at all of them and I don't know if, I
17       remember -- I'm sorry, ma'am, I just don't remember
18       seeing this.
19   Q   Okay.
20         (Document Marked for Identification as
21         Defendant's Exhibit No. 8)
22   BY MS. CAULEY:
23   Q   And didn't you, in fact, also forward this document
24       on to members of your executive staff and others?
25   A   I don't remember seeing this one either.  To me,

Page 71

1        this is something someone does as art but I don't
2        remember seeing it.
3    Q   You don't find this at all objectionable in the
4        workplace?
5    A   In our workplace, there were so many things that
6        were going on that was so, that could have been
7        inappropriate by the gentlemen there.
8            I don't know.  I haven't seen this one.
9    Q   Ms. Smith, you were the CEO of Co-Op, is that
10       correct?
11   A   That is correct.
12   Q   Would you agree that the CEO sets the tone for the
13       kind of environment or should, in fact, set the tone
14       for the kind of environment at the workplace?
15   A   I agree.
16   Q   And you forwarded on photographs that you received
17       from Larry Gardiner without reviewing them, is that
18       correct?
19   A   Yes, probably so.
20   Q   And if you forwarded on, if, in fact, you forwarded
21       on documents like No. 7 with the two nude women in
22       it, would you agree that that would be an offensive
23       thing to do in a workplace, that would be
24       inappropriate for a CEO to do?
25   A   If I would have seen the pictures, I would not have

Page 72

1        forwarded them on.  But I'm not -- I'm sure if they
2        were sent to me, they're, if Larry Gardiner sent
3        them to other people within the office.
4    Q   Do you know that for a fact, ma'am?
5    A   No, I do not.
6    Q   Can you see why a board member might think it would
7        be inappropriate for a CEO to forward these kind of
8        photographs?
9          MR. SWANSON:  I'm going to just object to the
10         extent you're asking her to speculate what's in a
11         board member's mind.
12   BY MS. CAULEY:
13   Q   Can you understand why someone might find that
14       offensive in a workplace?
15   A   Yes, I feel it's possible, yes.
16         (Document Marked for Identification as
17         Defendant's Exhibit No. 9)
18   BY MS. CAULEY:
19   Q   What was this leave request for?
20   A   I don't know, I didn't write it but I did sign it.
21   Q   Whose handwriting or who wrote it, can you tell, do
22       you know?
23   A   It's very neat.  Could be, oh, it's, no that's, I'm
24       not -- no, I'm not going to guess, I'm not sure who
25       wrote this but I did sign it so I must have taken

Page 73

1        that day off.
2    Q   Okay.  And what day --
3    A   Personal business.
4    Q   What day would it have been that you took off?
5    A   That would have been January 27th, personal business
6        day.
7    Q   Okay.  And when were you making the request?
8    A   Oh, it could have been a doctor's appointment.
9    Q   And when were you making the request?
10   A   Because that's a Wednesday.  Pardon me?
11   Q   When did you make the request for the day off on
12       1-27?
13   A   Probably the day after, 1-28.
14   Q   That's because that's when your signature is dated,
15       is that right?
16   A   Uh-huh.
17   Q   Is that a yes?
18   A   That's a yes.
19   Q   Okay.  Is that proper procedure to request a day off
20       the day after you've taken the day off?
21   A   It depends.  What happens, if I was sick that day or
22       had a doctor's appointment and I was unaware of it,
23       then when I came back the following day then my
24       assistant, it may have been Armida, would fill out
25       the blue form so I could sign.

Page 74

1  So it has happened and it happens, it's
2  not uncommon within our organization for this to
3  happen because you, sometimes you never know when
4  you're sick.
5      Personal business days, sick days,
6  floating holidays are all considered the same in the
7  salary level of the company.  So if I have personal
8  business days, it could have been a sick day, it
9  could have been a personal business day.
10 Q  Doesn't this form allow for an indication for
11 vacation, sick, personal business, funeral or
12 floater holiday or floater day?
13 A  Huh?
14 Q  Doesn't this form, in fact, allow for an indication
15 for the type of pay, whether it should be vacation
16 pay which is a V, sick pay which is a K?
17 A  Uh-huh.
18 Q  Personal business which is PB, funeral with F,
19 floater which is FH?
20 A  Uh-huh.
21 Q  So you're saying that the company didn't follow
22 those?
23 A  If I didn't have sick days I would have put personal
24 business or if I had personal business I would have
25 put personal business.  I have no idea what I did on

Page 75

1  the 27th.
2  Q  Okay, all right.
3      (Document Marked for Identification as
4  Defendant's Exhibit No. 10)
5  BY MS. CAULEY:
6  Q  No. 10 is a two-page document.
7  A  Uh-huh.
8  Q  First page of which I believe is nearly identical to
9  Exhibit No. 4.  Can you verify that for me?
10 A  Yes.
11 Q  Okay.  But on the bottom of Exhibit 10 first page it
12 has the word, over.  Who wrote that?
13 A  I did.
14 Q  Okay.  And then are the notes that are attached,
15 it's the second page of those would have been on the
16 opposite side of the over to which you're referring?
17 A  Uh-huh.
18 Q  Is that a yes?
19 A  Yes.
20 Q  Okay.  When did you make those notes?
21 A  1-29-10.
22 Q  Okay.  Where were you when you made the notes?
23 A  In my office.
24 Q  Was this before or after you had fired Ted
25 Winiarski?

Page 76

1  A  This is probably before.
2  Q  Okay.  I can read, well, why don't you read what it
3  says there, then we'll have it in your words.
4  A  Do you want me to read it?
5  Q  Please, out loud.
6  A  Okay.  1-29-10 meeting with Marc and Ray in my
7  office.  I informed Marc and Ray the stress, the
8  joint pain, lies are getting to me.  I went to my
9  doctor and she placed me on a medical until April 1,
10 2010.  Dash.  Marc said he has --
11 Q  No, Marc --
12 A  Marc --
13 Q  Marc said has.  You're putting words in.
14 A  Marc said has, okay, I'm speaking.
15     Marc said has anyone seen -- let me put on
16 my glasses, that may help.  Okay.
17     Marc said has anyone seen this.  Only
18 Temeng, the HR person.  Marc told me to go back and
19 get, and get, take -- Marc told me to go back and
20 get a two-week vacation.
21 Q  Get, take a, isn't it?
22 A  Yeah, get, take a -- I messed up.
23     Take a two-week vacation and return and
24 the medical papers and return and return and the
25 medical papers back to HR.

Page 77

1  Q  Back from HR, isn't it?
2  A  Back from HR, yeah.  Jackee Smith, 1-29-2010.
3      My head is hurting, my knees and hips and
4  back.  I feel like dying.  Save.  I don't trust
5  Marc, just a gut feeling.
6      Marc made cracks about women, he is not to
7  be trusted.
8  Q  Does it say trust?
9  A  Not to be trust.  Remember, Jackee, do not trust
10 Marc Stepp.
11     Those are my inner thoughts, set them on paper
12 and that's probably why over is on here and not on
13 the other one.
14 Q  Okay.  So how is it that you had two copies of this
15 request for leave, one on which notes were written
16 and one on which notes were not written?
17 A  I probably took a photocopy of my own.
18 Q  But you're guessing, is that correct, you don't
19 know?
20 A  That's most likely what happened, yes.
21 Q  Okay.  You're assuming that's it, correct?
22 A  I can pretty, I can pretty much say that I probably
23 photocopied a copy of this for my personal use and
24 they may have the original.  I probably wrote over
25 and put my thoughts on the back of the page.

Page 78

1  Q   Okay.
2  A   I would not turn something like this in to HR.
3  Q   Okay.  Do you know if you turned either one of these
4      documents in to HR?
5  A   Oh, yes, I'm positive.  I had to in order to go on
6      family medical leave.
7  Q   Well, didn't --
8  A   As it shows in Exhibit 4.
9  Q   Okay.  Didn't it, in fact, didn't Mr. Murphy say,
10     tell you to go and get your paperwork back from HR?
11 A   No, Marc Stepp told me to go back.
12 Q   Marc, I'm sorry.  Did Marc Stepp tell you to go get
13     your paperwork back from HR?
14 A   Yes.
15 Q   And did you do that?
16 A   Yes, I did.
17 Q   Okay. So what did you do with that once you took it
18     back?
19 A   I held it in my hand, I kept it in my possession.
20     It was, it was like a week.  I think if I'm not
21     mistaken, January 29, 2010 if you could look at a
22     calendar it might have been a weekend, like a
23     Friday.
24 Q   I don't know.
25 A   I'm not sure either but it might have, I just

Page 79

1      probably -- my thoughts is that is something that
2      I'd -- knowing me I was just thinking, thinking it
3      over and when I think, sometimes I write.
4  Q   Okay.  And you decided at that meeting that you
5      didn't trust Marc Stepp?
6  A   For the first time, yes.
7  Q   That's the first time you ever decided you couldn't
8      trust him?
9  A   Yes, probably so.
10 Q   Okay.  And what had he said that made you think you
11     couldn't trust him?
12 A   Well, the meeting from when he told me I couldn't
13     let anybody off before Christmas if we were
14     concerned about the budget.
15         I think that that's something, the
16     holiday, even in my, well, even if it was me, should
17     not be a concern and also to tell me not to listen
18     to my doctor and do as he had said.
19 Q   Okay.  Now it says, Marc made cracks about women.
20     To what are you referring to there?
21 A   He made cracks about women, I don't know.  He said
22     some. I don't know what the cracks was so I didn't
23     write that down so I don't know.
24 Q   Are you referring to what he allegedly said about if
25     there weren't so many women on the --

Page 80

1  A   Oh, yeah, that could have been it.
2  Q   But you don't know?
3  A   I'm not sure.
4  Q   Okay.  You don't know any other cracks about women
5      that he's made?
6  A   No, I do not.
7  Q   Okay.  And you had to remind yourself not to trust
8      him by saying, remember, Jackee, do not trust Marc
9      Stepp?
10 A   In the state of mind I was in at that particular
11     time, I wrote down things to try to help me remember
12     and to make sure that they were in my head, yes.
13 Q   Is it fair to say when you made these notes that you
14     were kind of in bad shape?
15 A   I was depressed, I was having the anxiety attacks,
16     the panic attacks, I couldn't sleep so, yes.  And
17     sometimes when you have insomnia and you can't sleep
18     for three days, you can't remember and that's what I
19     was experiencing so I was writing things to myself
20     while I had them on my mind or waking up in the
21     night.
22         I do that when I go to bed, something
23     comes to my head, I have a notepad on my side table,
24     I write notes.
25 Q   Okay.  And would it be fair to say at the time you

Page 81

1      made these notes that you --
2  A   I was in my office.
3  Q   That you were in such shape that you, you weren't
4      making good decisions, you weren't comfortable with
5      your ability to make decisions because you were so
6      upset or is that fair to say?
7  A   Right.
8  Q   Okay.  Yet it was after this that you fired Ted
9      Winiarski, after you wrote these notes?
10 A   I had planned --
11 Q   In the condition you were in?
12 A   No, I had planned on firing Ted prior to February
13     1st.
14 Q   So after you held on to the Exhibit, I guess it's 4,
15     the one without the notes?
16 A   Uh-huh.
17 Q   This is the one that you got back from HR, is that
18     right?  Exhibit 4, I'm sorry.
19 A   Oh.  Probably so.
20 Q   Because you didn't have notes on the one, yeah,
21     okay.
22 A   Yeah, probably so.
23 Q   So you went and got that back from Temeng?
24 A   Uh-huh.
25 Q   Is that a yes?

Jacqueline Smith                    Smith vs Co-Op Optical

December 15, 2010

---

Page 82

1  A   Yes.

2  Q   Wait, I'm just reminding, we have to say the whole

3      thing.

4  A   Yes, I'm sorry.

5  Q   That's all right, it's okay to forget.

6      Then what did you do with this after that?

7  A   When I got it back from Temeng?  I held onto it and

8      I was trying to weigh out whether I should take two

9      weeks off or whether I should take the advice of my

10     doctor.

11         I had a fear that if I -- I had a fear

12     that if I took any longer than two weeks off that I

13     could possibly be fired, too.

14  Q   Did anyone tell you that?

15  A   No.

16  Q   Okay.  That was just something you had decided in

17     your head that --

18  A   I hadn't slept for a while then, that was, January

19     was my, probably one of the worst months I've ever

20     had in my life.

21  Q   Okay.  So what did you do with it?  Then you thought

22     about it over, if it was over a weekend or whatever,

23     you thought about it for some period of time, then

24     did you do anything else with this piece of paper?

25  A   I kept it.

---

Page 83

1  Q   Okay.  Did you present it back to HR?

2  A   Yes.

3  Q   Okay.  And that was to get your -- when you decided

4      you wanted to take a leave then?

5  A   Yes.

6  Q   And this is the one you presented back to them?

7  A   No, I think I gave them one that, I gave them

8      another one to, just to say, to show the update of

9      2-1 and not January 29th.

10  Q   Oh.

11  A   Because I came in the 1st of February.

12  Q   Okay.  So you never -- you just kept this, you never

13     gave it back to HR?

14  A   You're talking about --

15  Q   Exhibit 4, sorry.

16  A   -- Exhibit 4?

17  Q   Yes.

18  A   Oh, Exhibit 4, yes, ma'am, I did give it back to HR.

19  Q   When did you give it back to HR?

20  A   I gave it back to HR on, it had to be the 2nd, I

21     mean, 2-1, February 1st.

22  Q   Why did you give HR this particular Exhibit 4 if it

23     said that your leave was supposed to start at 1-29?

24  A   Because there were things in my office that were

25     personal that I wanted to get out.  I had said to

---

Page 84

1      Marc and Ray that I was going to take two weeks and

2      come back so didn't change, it changed and I wanted

3      to come into my office and get some of my personal

4      effects.

5  Q   Okay.  I must not have made -- let's try it a

6      different way.

7  A   Okay.

8         (Document Marked for Identification as

9          Defendant's Exhibit No. 11)

10  BY MS. CAULEY:

11  Q   Let's look at Exhibit 11, please.

12  A   Yeah.

13  Q   Did you submit this document to HR?

14  A   Yes, I did.

15  Q   Okay.  And did you submit both Exhibit 11 and

16     Exhibit 4 to HR on or about February 1st?

17  A   Yes.

18  Q   Okay.  I'm trying to understand why you would submit

19     both of those.

20  A   Because the date changed.

21  Q   But the one was no good anymore, right?

22  A   No, I wouldn't say that.  It's just the dates

23     changed and I went back to the day of what my doctor

24     said.

25  Q   Okay.  Were you off work on the 29th of January?

---

Page 85

1  A   No.

2  Q   Were you off work on the 1st of January, 1st of

3      February?

4  A   About a half day.

5  Q   Okay.  So you worked that day.

6  A   Or a few hours.

7  Q   So nothing that's requested in Exhibit 4 ever

8      happened.  You never got a leave for that day,

9      correct, because you took it back, Exhibit 4?

10  A   I was technically there but technically not there.

11  Q   And you said the appropriate procedure when you fill

12     out these forms is to submit them to your

13     supervisor, correct?

14  A   Yes.

15  Q   Okay.  You didn't submit the Exhibit 11 to your

16     supervisor though, you submitted it to Temeng Darko?

17  A   I called Raymond Murphy and he could not come down

18     so I gave it to Temeng Darko.

19  Q   Okay.  If you could just answer my question.  The

20     question was you submitted it to, in fact, you

21     didn't submit it to Temeng Darko, you sent it to

22     Temengo Darko, right?

23  A   That's my A.

24  Q   That's you're A?

25  A   Uh-huh.  Just I just didn't put the --

---

Jacqueline Smith                   Smith vs Co-Op Optical

December 15, 2010

Page 86

1   Q   Temengo?
2   A   I know it looks like Temengo but that should have
3       been an A.
4   Q   His name is Temenga or is it Temeng?
5   A   It's Temenga, Temeng. I'm sorry, E. I messed up.
6   Q   There's no vowel at all at the end of his name, is
7       there?
8   A   No. Temeng E.
9   Q   There's no O or A or E or anything?
10  A   I think it's an E. Temeng. T-E-M-N-G-E, if I'm not
11      mistaken. I'm not sure, ma'am.
12  Q   And you actually submitted this on 2-2-2010,
13      correct?
14  A   Yeah, someone told me to come in and sign some -- I
15      had to sign a document.
16  Q   For what?
17  A   I think it was a bank, it was either a bank or a
18      letter to the state. It was something.
19          I remember that day. I came -- because I
20      was technically off. It might have been, it was
21      probably Ted Winiarski told, said that something had
22      to be signed or either it was a quarterly report.
23  Q   But, in fact, you didn't, I mean, you came in on 2-2
24      and submitted this, is that right? Is that a yes?
25  A   Came in on -- yes.

Page 87

1   Q   You filled it out on 2-1-2010, correct?
2   A   Yes.
3   Q   Okay.
4           (Document Marked for Identification as
5           Defendant's Exhibit No. 12)
6   BY MS. CAULEY:
7   Q   Have you seen Exhibit 12 before?
8   A   Yes.
9   Q   On what date was that completed if, according, at
10      least to the document itself, do you know? I'll
11      refer you to the last page, there's a date.
12  A   Oh, it is Temeng, okay.
13          Go to the last page, 2-2-10.
14  Q   So it's at least, according to the document, this
15      was filled out by Dr. Griffin on the 2nd of
16      February, is that correct?
17  A   Yes.
18  Q   Okay. Did you present these forms to Dr. Griffin to
19      be completed?
20  A   Yes.
21  Q   Okay. And when did you give her the forms?
22  A   One, two, three --
23  Q   Maybe I can help by asking a couple questions.
24          Did you fax the forms to Dr. Griffin?
25  A   Yes.

Page 88

1   Q   Is there a fax indication on the top at least of the
2       first page that says it went on 2-1-2010?
3   A   Yes.
4   Q   Do you believe that that's when you faxed them to
5       Dr. Griffin as a form for her to complete?
6   A   Yes, it's right on the paper.
7   Q   Where is it, you mean, the --
8   A   It's right on the document.
9   Q   Are you talking about the fax line?
10  A   Yes.
11  Q   Yes, okay. And do you know by what means she
12      returned these documents to you?
13  A   Wasn't by fax, I might had to have picked them up or
14      either -- probably picked them up.
15  Q   Okay. Do you recall specifically picking them up?
16  A   No, I do not, ma'am.
17  Q   Okay. Do you know where Dr. Griffin's office is?
18  A   Yes, I think it's, that was, I think it's, it's not
19      far from my home. It's either Farmington or I think
20      it's Farmington if I'm not mistaken.
21  Q   On Northwestern Highway?
22  A   Pardon me?
23  Q   On Northwestern Highway?
24  A   Yes.
25  Q   As of 2-1-2010, what was your intent in terms of

Page 89

1       your leave?
2   A   As of 2-1-2010 what was my intent as for my leave,
3       is that what you're saying?
4   Q   Yeah, how much leave did you intend to take?
5   A   I believe, well, I know that I was going to follow
6       my doctor's instructions and take off until April
7       1st.
8   Q   Okay. Did anyone, after this was submitted, did
9       anyone at Co-Op tell you you cannot take this leave?
10  A   No.
11  Q   In fact, you took the leave, is that correct?
12  A   Correct.
13          (Document Marked for Identification as
14          Defendant's Exhibit No. 13)
15  BY MS. CAULEY:
16  Q   Can you tell me what that document is?
17  A   Yes, this is a request for me to be off after that
18      time, after my medical but I know why.
19  Q   What do you mean after your medical?
20  A   After, after this was submitted, Exhibit No. 12, I
21      came back into the office on 2-2, 2-3, 2-4 and 2-5.
22      I mean, I did not come back into the office.
23  Q   Okay.
24  A   I'm sorry.
25  Q   But you were going to be off on leave from 2-2 going

Judy Jettke & Associates                Mt. Clemens, MI

586-783-0060

Jacqueline Smith          Smith vs Co-Op Optical          December 15, 2010

## Page 90

1    forward so -- and that's, this asks for pay for 2-1,
2    2-2, 2-3, 2-4 and 2-5, correct?
3  A   Yes. However, I was in the office.
4  Q   Well, you just said you were home sick all those
5    days.
6  A   Well, if I said that, I made a mistake because I had
7    to prepare a document for the State of Michigan and
8    also do some other work that was requested from me
9    by the Board.
10 Q   Did you work on 2-2, 2-3, 2-4 and 2-5 at Co-Op?
11 A   Yes.
12 Q   Then why do you have something that indicates that
13   you want sick pay for those times or personal
14   business?
15 A   Because I'm working.
16 Q   If you're working, why do you need sick pay?  You're
17   working.  You're asking for sick pay for times that
18   you're saying now you worked.
19 A   Because I chose to come into the office and do the
20   assignment that was requested to me by the Board of
21   Directors.
22 Q   Then you weren't off, you were working?
23 A   No.
24 Q   You should have gotten your regular pay, correct?
25   So why are you asking for sick time?

## Page 91

1  A   Well, because I already submitted my leave of
2    absence for family medical leave.
3        I'm sorry if you don't understand, maybe I
4    did something that was not --
5        MR. SWANSON:  Just answer the question.
6  BY MS. CAULEY:
7  Q   Did you have sick time paid?
8        MR. SWANSON:  Excuse us.
9        MS. CAULEY:  Probably switch.
10       MS. CAULEY:  Excuse us for a minute, we have to
11   go off the record.
12       (Whereupon an off-the-record discussion was
13       held, Mr. Stepp left the deposition and Mr. Ted
14       Winiarski entered the deposition.)
15 BY MS. CAULEY:
16 Q   Ms. Smith, I want to try to get this clear.  So it's
17   your testimony that you worked on February 1st, 2nd,
18   3rd, 4th and 5th in the office at Co-Op?
19 A   I'm not sure.
20 Q   Okay.
21 A   I don't know.
22 Q   Well, did you have paid sick time available to you
23   when you took your FMLA leave?
24 A   If it's on here, yes.
25 Q   I'm not asking you if it's on there, I'm asking you

## Page 92

1    if you had paid time available to you.
2  A   Yes.
3  Q   Okay.  Did you have more -- how many days, paid
4    time, did you have available?
5  A   I don't know.
6  Q   Okay.  Is it the policy at Co-Op when someone takes
7    FMLA leave that they must use their paid time as
8    part of that leave?
9  A   I don't remember the policy.
10 Q   Okay.
11       (Document Marked for Identification as
12       Defendant's Exhibit No. 14)
13 BY MS. CAULEY:
14 Q   Is the document which is Exhibit 14 -- do you know
15   what that is?
16 A   It's a claim for short-term disability.
17 Q   Okay.  Does your handwriting appear anywhere on that
18   document?
19 A   At the top where it says Co-Op Optical, Jacqueline
20   Smith and that's all.
21 Q   Okay.  And do you know on what date you completed
22   that document?  The first top, obviously, I mean.
23 A   Oh, it says 2-1-2010.
24 Q   That says that's the date the benefits was to begin,
25   benefits were to begin rather?

## Page 93

1  A   It says that, yes.
2  Q   Okay.  You don't know when you actually completed
3    the document or do you?
4  A   I don't know.
5  Q   Okay.  Did you complete this document in the office
6    or somewhere else, if you know?
7  A   In the office.
8  Q   Okay.  Armida Parisi worked for you, is that
9    correct?
10 A   Correct.
11 Q   She was your executive assistant?
12 A   Yes.
13 Q   And she did things at your direction?
14 A   Yes.
15 Q   And it's pretty accurate to say that no one else
16   really was able to direct her, they all had to come
17   through you and you directed her?
18 A   That's not true.
19 Q   Oh, anyone could give her assignments?
20 A   She has received assignments from others, yes.
21 Q   Okay.  And that was okay with you for anyone?
22 A   Especially in my absence.
23 Q   Who could assign things to her if you were not
24   absent?
25 A   Ted, Charles, Ben.

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

**Page 94**

1  Q   Okay. And did you ever put that in writing to them,
2      telling them that they could do that?
3  A   No.
4  Q   Okay. As of February 3, 2010, was it your belief
5      that you were on medical leave until April 1st?
6  A   Repeat the question. On February 3rd?
7  Q   Yes.
8  A   2010? And the rest of your question?
9  Q   Was it your belief that you were on medical leave
10     until April 1st?
11 A   My intentions were to be on medical, yes.
12 Q   Okay.
13     (Document Marked for Identification as
14     Defendant's Exhibit No. 15)
15 BY MS. CAULEY:
16 Q   Did you direct Ms. Parisi to send this email that is
17     Exhibit 15?
18 A   No.
19 Q   Have you ever seen that email?
20 A   No.
21 Q   It said it was cc'd to you, you --
22 A   Sure is but --
23 Q   Did you receive -- I'm sorry, I didn't mean to cut
24     you off.
25 A   Never seen this one.

---

**Page 95**

1  Q   Okay. Did you receive emails at home on your home
2      computer while you were on leave?
3  A   Yes. But the reason I know -- yes.
4  Q   Okay. But the reason you know what?
5  A   I don't know if it came to my home.
6  Q   Well, could you read emails that --
7  A   Jackee will be taking a two-week vacation for --
8      Jackee Smith and the Board of Directors -- Ben
9      Edwards vice president will be acting as CEO and
10     president, please provide Mr. Edwards with any
11     assistance during this time.
12 Q   Did you have an email address at Co-Op?
13 A   Yes.
14 Q   Did you have a different email address at home?
15 A   Yes.
16 Q   Could you access your Co-Op email from home?
17 A   I've been trying to do that forever since I've been
18     there, no.
19 Q   While you were on leave you could not, is that your
20     testimony?
21 A   Yes.
22 Q   Okay. Did Armida Parisi email you at your home
23     email address while you were on leave?
24 A   Yes, she has.
25 Q   Okay. Did you think it was improper for anyone at

---

**Page 96**

1      Co-Op to contact you while you were on your leave?
2  A   At first, no, I did not think it was improper, I
3      still wanted to give my all to Co-Op Optical if
4      needed or if I had to sign anything.
5  Q   Okay. When did you change your mind that it no
6      longer was okay?
7  A   My husband changed my mind because he was tired of
8      the phone ringing and me on the computer and he said
9      I was not getting my rest.
10 Q   Okay. So is it fair to say that you're not
11     complaining in this complaint, in this lawsuit about
12     the contacts you received from the company at least
13     prior to when your husband decided it was no longer
14     okay?
15     MR. SWANSON: She didn't testify that it was
16     when her husband decided. Go ahead and answer the
17     question.
18 BY MS. CAULEY:
19 Q   Was there something I just -- my husband decided --
20 A   Now, now, okay, say that again now?
21 Q   No, I'd like to go back please and read the last
22     question and answer.
23     (Whereupon the question and answer was played
24     back by the court reporter.)
25 BY MS. CAULEY:

---

**Page 97**

1  Q   So is it fair to say that you're not complaining in
2      this lawsuit about any contacts you received from
3      Co-Op prior to your husband changing your mind about
4      whether it was okay to receive things at home?
5  A   Yes.
6  Q   That's accurate? Okay. So the only complaint you
7      have in the lawsuit, in regard to the contacts I
8      mean, you know, were any contacts that occurred
9      after your husband said no more contacts, is that
10     correct?
11 A   Yes.
12 Q   Were there any contacts after your husband said no
13     more contacts?
14 A   Yes.
15 Q   Okay. Who contacted you after your husband said no?
16 A   The auditors from the State of Michigan and Ben
17     Edwards requesting documents, papers and things of
18     that nature.
19 Q   Okay. And you didn't want the auditors from the
20     State of Michigan contacting you, is that correct,
21     after, after the time that your husband said no more
22     contacts?
23 A   I didn't want the auditors to really contact me but
24     I was still concerned about Co-Op not receiving the
25     information that they needed to be audited.

---

Jacqueline Smith                Smith vs Co-Op Optical

December 15, 2010

**Page 98**

1  Q   In fact, didn't you tell the State that the
2      prohibition of contacting you at home did not apply
3      to them and that you wanted them to continue to
4      contact you at home?
5  A   I think I said to them in an email that if you have
6      any questions, please contact me.
7  Q   Okay.  So is it fair to say you're not complaining
8      in this lawsuit about any contacts made by the
9      auditors after your husband said no more contacts?
10     You told them it was okay.
11        MR. SWANSON:  Is that a question or are you
12     testifying, Mary?
13 BY MS. CAULEY:
14 Q   Go ahead and answer, please.
15        MR. SWANSON:  Is there a question?
16        WITNESS:  I'm thinking, ma'am.
17        MS. CAULEY:  Yeah, she's got the question.
18        WITNESS:  I'm thinking.
19 BY MS. CAULEY:
20 Q   Oh, okay.
21        MR. SWANSON:  I thought you were going to give
22     question and your own testimony, that's what it
23     sounded like.
24        WITNESS:  I'm going to say this.  I did not
25     want the auditors to probably contact me but I am,

**Page 99**

1      to be honest, I'm just don't remember.  I'm sorry, I
2      don't remember that.  You may have something that's
3      related, I don't remember.
4  BY MS. CAULEY:
5  Q   All right.  But then you said Ben contacted you.
6      What did he contact you about after your husband
7      said no more contacts?
8  A   To return all Co-Op Optical documents, CDs and per
9      Raymond Murphy, all hands on deck.
10 Q   Any other contact that he made with you after?
11 A   No.  Ted stopped the auditors and I think Ted
12     stopped the people at the office, but I did receive
13     emails.
14 Q   From who?
15 A   Just people checking to see how I was doing.
16 Q   Oh, so you're not complaining about any of those
17     emails about people checking to see how you were
18     doing, are you?
19 A   Yes, I am.
20 Q   Oh, that was improper?
21 A   I didn't want to be bothered.
22 Q   Okay.  Who, who --
23 A   I don't remember.
24 Q   Let me ask my question, please.
25 A   Uh-huh.

**Page 100**

1  Q   Who emailed you after your husband said no more
2      emails to see how you were doing, who from Co-Op?
3  A   One I remember, I think John Barnes.  I know there
4      were a couple others and I don't remember who.  I
5      don't think I responded, I deleted them.
6  Q   So you have no record of anyone contacting you after
7      your husband said no contact to find out how you
8      were doing?
9  A   I have no recollection of who the people are that
10     contacted me.
11 Q   And you have no record of it, no written, no
12     document or --
13 A   Correct.
14 Q   -- electronic thing.  Who is John Barnes?
15 A   He's in IT.
16 Q   Is he one of the persons you hired?
17 A   No.
18 Q   You didn't hire him?
19 A   No.
20 Q   Did you recommend his hiring?
21 A   No.
22 Q   Did you know him before he came to Co-Op?
23 A   No.
24 Q   Never met him before, didn't know who he was?
25 A   Correct.

**Page 101**

1  Q   Is that right?  Okay.  How long had he been there?
2  A   John's been there probably about nineteen, twenty
3      years.
4  Q   Okay.  And how many times did he email you to see
5      how you were doing?
6  A   He's emailed me until this day.
7  Q   Is he still working at Co-Op?
8  A   Yes.
9  Q   Did you ever tell anyone in management at Co-Op that
10     John Barnes was not following the directive of no
11     emails?
12 A   No.
13 Q   Why not?
14 A   I treat John -- John is a special case.
15 Q   What does that mean?
16 A   He's, he has some mental issues and the emails that
17     he sent were basically -- he sent me two that were
18     inappropriate that showed hot dogs with penises and
19     I didn't respond to those.
20        And then he sent me email, the very first
21     email he sent me was just asking me how I was doing
22     and how my granddaughter was doing.
23        And then they got a little racy and then I
24     just stopped answering him.
25 Q   Okay.  My --

Judy Jettke & Associates            Mt. Clemens, MI

586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

## Page 102

1    A   And that was as of this month. Last month.
2    Q   So did he send the racy, hot dog pictures while you
3        were still employed at Co-Op?
4    A   No.
5    Q   Going back to what my real question was and that
6        was, why didn't you ever complain to anyone at Co-Op
7        about Barnes violating that order that nothing was
8        to be sent to you?
9    A   I just didn't respond.
10   Q   Are you blaming Co-Op for the fact that he continued
11       to email you?
12   A   No, I'm not.
13   Q   So that's not one of your complaints in this
14       lawsuit?
15   A   No, ma'am.
16   Q   Okay. Let me see then, we've got -- oh, and are you
17       -- you're blaming Co-Op, though, for the couple of
18       others who emailed you to see how you were doing but
19       you --
20   A   No, I'm not.
21   Q   -- don't know who they -- oh, you're not blaming
22       them for that either?
23   A   No.
24   Q   Okay, well, I thought you said you were.
25           Okay, let me see, Ted stopped the

## Page 103

1        auditors, Ted stopped the office.
2            So we've got Ben Edwards emailing you once
3        asking for documents, is that accurate or is there
4        more that happened after your husband said no more
5        contact?
6    A   I'm not, to be -- I'm not sure whether it was before
7        or after. So I know, I remember Ben, I think I
8        received maybe one from Ben but I don't remember
9        whether it was before or after I was on medical.
10   Q   Okay. Well then, I guess I need to ask you what --
11   A   You mean, after I was on medical or after --
12   Q   No, ma'am.
13   A   I'm sorry.
14   Q   I'm sorry. After your husband said no more emails.
15   A   They stopped, except for the ones I indicated.
16   Q   Okay. And I guess, because I'm confused now, I'm
17       sorry.
18   A   I am, too.
19   Q   What emails were sent from Co-Op after your husband
20       sent notice to Ben Edwards to not send any more?
21       What emails came?
22   A   John Barnes.
23   Q   Anyone else?
24   A   I don't remember.
25   Q   So is it accurate to say that you have no complaint

## Page 104

1        in this lawsuit about having been contacted while
2        you were on medical leave by anyone at Co-Op?
3    A   Correct. I have no complaint.
4    Q   Okay. Did Sharmien Scott take a FMLA leave when she
5        had her medical problems?
6    A   Did --
7    Q   Did she take an FMLA leave?
8    A   Yes, I believe so. When she had her medical back
9        problems?
10   Q   Yeah. I don't --
11   A   Yes.
12   Q   -- know what the problems were.
13   A   Yes, she did.
14   Q   I just know that she was off for a period and it was
15       during that period that she was paid her disability
16       plus Co-Op made up the difference in her salary, is
17       that correct?
18   A   Yes.
19   Q   Okay. Had that ever been done for anyone else at
20       Co-Op --
21   A   No.
22   Q   -- as far as you know?
23   A   No.
24   Q   Okay. And what was the reason that Co-Op made up
25       her salary when she was on disability?

## Page 105

1    A   Ted and Temeng got together and they found a way to
2        make up her salary because she was still working at
3        home on her computer, helping out with the payroll.
4    Q   Okay.
5    A   I had nothing to do with that.
6    Q   As CEO, were you aware that she was working at home
7        on her computer?
8    A   As CEO I made a statement that I am not a part of
9        any decisions of any of the members of my family
10       that works there.
11   Q   I'm sorry, it could go a lot faster if you could
12       answer my question.
13           My question was, as CEO, were you aware
14       that she was working at home for Co-Op while she was
15       on leave?
16   A   Yes.
17   Q   Okay. And did you think that that was proper that
18       she should work at home while she was on leave?
19   A   It didn't faze me one way or the other.
20   Q   Did Co-Op purchase a computer for her so she could
21       work at home while she was on leave?
22   A   I don't remember that.
23   Q   If that happened, do you think that would be
24       appropriate?
25   A   If she was, if she didn't, if she was working for

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

Page 106

1    Co-Op maybe so, not for her personal use but for
2    Co-Op Optical's use.
3    Q   Okay.  And what was she doing at home?
4    A   I have no idea, that was not my department.  She was
5        not under my guidance, she was under the guidance of
6        Matt and Temeng Darko.
7    Q   So as CEO you had no idea what she was doing at
8        home?
9    A   No.
10   Q   Just that she was working?
11   A   Correct.  I know that people came to her home from
12       Co-Op Optical to get some training, like, Cristell
13       and also the other young lady that was temporarily
14       replacing her.
15   Q   Okay.
16   A   Angela, I believe her name was.
17   Q   So someone was hired to replace her while she was on
18       leave, is that correct?
19   A   She was already hired.
20   Q   Didn't you just say the person who was hired to
21       replace her?
22   A   Take her place, I'm sorry.
23   Q   Who was -- was anyone new hired in to cover while
24       she was out on leave?
25   A   I don't know, I don't hire people but I don't know

Page 107

1    if she was hired or not.  I know she worked there
2    before so I know she worked there.  She was laid off
3    a couple times.
4        I don't have an answer to your question.
5    Q   Okay.  So are there -- but I think you've mentioned
6        two people then who were kind of covering for her,
7        is that right?  Whether they worked there before or
8        hired in or not, we don't know but is that right?
9    A   Right.
10   Q   So we've got two people covering for her, right?
11       And she's working at home and being paid for it,
12       right?
13   A   No, that's not --
14   Q   What's wrong?
15   A   -- exactly right.
16   Q   Okay, what's wrong?
17   A   One person went there to train her on the new system
18       or a new -- some software as I recall, what I was
19       told by Ted or either Temeng.
20   Q   Okay.
21   A   One lady was there because she did not necessarily
22       have any payroll experiences to walk her through
23       payroll so we would make sure the employees were
24       paid.
25       That's what was reported to me.  Other

Page 108

1    than that, I had no other knowledge.
2    Q   Okay.  In May 2009, okay, we're going to go back
3        now --
4        MR. SWANSON:  Is this a new topic, Counsel?
5        MS. CAULEY:  Oh, I'm sorry, you wanted a break.
6    Absolutely.
7        MR. SWANSON:  Yeah, okay.
8        MS. CAULEY:  I'm sorry, I forgot.
9        MR. SWANSON:  No, that's okay.
10       MS. CAULEY:  I've been through a couple of
11   others, I didn't mean to do that.  So what is the
12   time?
13       MR. SWANSON:  It's ten to one, you want to come
14   back at 1:30?
15       MS. CAULEY:  Sure.
16       (Whereupon an off-the-record discussion was
17   held.)
18   BY MS. CAULEY:
19   Q   Did you consider Ms. Parisi to be a loyal employee
20       of yours?
21   A   Yes.
22   Q   Did you believe that she would do anything against
23       you to harm you?
24   A   No.
25   Q   Can you think of any reason why you might not have

Page 109

1    gotten Exhibit 15, that email?
2    A   Could have been just an error.
3    Q   Okay.  Is it your belief that if Armida Parisi said
4        she sent something to you, she at least meant to
5        send it to you, right?
6    A   Yes.
7    Q   Yeah, okay.  Did you ever tell her that you were
8        going to be taking a two-week vacation?  Did you
9        ever tell Armida that?
10   A   No.
11   Q   No?  Okay.  I'm going to go back to Exhibit 13 if
12       you don't mind, please, because just before we broke
13       I think we were both maybe a little confused and I
14       just want to see if there's a way that we can
15       clarify this --
16   A   Okay.
17   Q   -- about what went on there.  Let's try again.
18       Did you work on February 1st, 2nd, 3rd,
19       4th and 5th, and/or 5th?
20   A   I don't know.
21   Q   Okay.  Would you have asked for paid time off for
22       that period if you had worked?
23   A   No.
24   Q   Okay.  Did you receive disability payments for the
25       period that you were off on leave?  Short-term

Jacqueline Smith                Smith vs Co-Op Optical                December 15, 2010

Page 110

1  disability payments?
2  A  Oh, okay, yes.
3  Q  Okay. For what period did you receive benefits from
4     the short-term disability insurance?
5  A  I was denied so I had one lump sum, I don't know
6     what the dates were and that was it.
7  Q  You were initially denied and then approved, is that
8     right?
9  A  After appeals, yes.
10 Q  Okay. And did anyone ever tell you for what period
11    you were approved?
12 A  I'm not sure.
13 Q  What was -- I'm sorry.
14 A  I'm not sure.
15 Q  What was the period of your disability?
16 A  My disability was, according to this, February 1,
17    2010.
18 Q  Until when?
19 A  Until April 1, 2010.
20 Q  I know that was what the initial certification was
21    for but what was the term of your actual disability?
22    What period of time were you actually unable to
23    work?
24 A  I'm still on disability.
25 Q  So you're still unable to work?

Page 111

1  A  Yes.
2  Q  Okay. And are you still receiving disability
3     payments?
4  A  Yes, but not from this company.
5  Q  From what company are you receiving disability
6     payments?
7  A  Northwestern Mutual.
8  Q  And what insurance policy is that, who holds that
9     policy?
10 A  I do.
11 Q  It was a personal policy that you purchased?
12 A  It was originally from the company and I purchased
13    it myself now, yes.
14 Q  When did you purchase that?
15 A  When we -- I don't remember. I don't remember. I'm
16    guessing so I don't know.
17 Q  Well, was it before 2009?
18 A  I don't know.
19 Q  Okay. Was it before you went off on leave in 2010?
20 A  After.
21 Q  So you were on leave when you purchased it?
22 A  No, it was, no, it had to be before. I'm sorry.
23 Q  Before. So you were still actively at the company
24    when you purchased that policy?
25 A  Yes.

Page 112

1  Q  Why did you purchase the policy?
2  A  Because we were trying to cut cost and I had the
3     option. This is from -- I was grandfathered in from
4     the old executive staff with this insurance. So
5     cutting costs, I cut the life insurance because the
6     executive staff had a special life insurance that
7     was personally theirs and also I learned later there
8     was one for disability.
9  Q  Okay.
10 A  So I cut mine. I cut, I cut mine off, too. Well,
11    after all of them left, I -- it was cut off.
12 Q  Was that a long-term disability policy?
13 A  Yes.
14 Q  Okay. Did your short-term disability from the
15    company end at some period of time?
16 A  April 1st.
17 Q  It ended April 1st, okay. Who has certified you as
18    being disabled after April 1st?
19 A  Robert Pohl, Dr. Robert Pohl, MD.
20 Q  And what has he indicated in terms of your
21    prognosis?
22 A  Depression, anxiety, still having panic attacks,
23    mental anguish and just coping.
24 Q  Okay. That would be your diagnosis. Now do you know
25    what your prognosis is? Do you know what that

Page 113

1     means, prognosis, what does he predict is going to
2     happen to you in the future?
3  A  Hopefully that I get better and can, will start
4     working again.
5  Q  Does he give any time limit when that might happen?
6  A  Yes, he indicated possibly January or February of
7     2011.
8  Q  Okay. And I'm sorry, I could try to find it in my
9     notes but it would be much faster if you would tell
10    me where Robert Pohl -- is he in Royal Oak?
11 A  Royal Oak, 123 Main, Royal Oak.
12 Q  Thank you.
13    MS. CAULEY: I assume there's no objection to a
14    release for all the documents?
15    MR. SWANSON: An appropriate release there
16    would be no objection to. Yeah.
17    MS. CAULEY: Do you have a form that you
18    prefer?
19    MR. SWANSON: I think we typically use the
20    Record Deposition or Record Copy Service form so
21    that ensures that we get a copy of it when --
22    MS. CAULEY: That's fine with me.
23    MR. SWANSON: Okay.
24    MS. CAULEY: So we'll just do that and
25    you'll --

29 (Pages 110 to 113)

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

Page 114

1    MR. SWANSON: That's fine.
2        MS. CAULEY: We send it to you and you'll sign
3    them, is that it, release?
4        MR. SWANSON: Yeah.
5        MS. CAULEY: Good.
6        MR. SWANSON: Not a problem.
7        MS. CAULEY: Okay.
8        MR. SWANSON: Just want to make sure we get a
9    copy of it when they issue it.
10       MS. CAULEY: Fair enough.
11   BY MS. CAULEY:
12   Q   Did you meet at a restaurant with -- no, wait a
13   minute, no, let's, that's, I don't want to get to
14   that yet, this has got to wait.
15       Have you ever, do you know of any children
16   of board members who have been employed at Co-Op?
17   A   Yes.
18   Q   Who?
19   A   Janna Garrison, this is before my time as CEO but
20   Garrison and I think -- Garrison is all I know of.
21   Q   Okay. And that was before you were CEO?
22   A   Uh-huh.
23   Q   Is that a yes?
24   A   That's a yes, I'm sorry.
25   Q   Okay. You were not the CEO when Janna Garrison's --

---

Page 115

1    that would be her son, right?
2    A   Right, he was brought in by -- he was brought in by
3    Ken Morris.
4    Q   Okay. Who recommended Ben Edwards to be the acting
5    president and CEO, if you know?
6    A   I don't know.
7    Q   You didn't recommend him?
8    A   No. We, I -- no.
9    Q   Did you recommend him to be the interim president
10   and CEO? Maybe I'm using the term wrong, did you
11   recommend him to take over your place while you were
12   on leave?
13   A   Yes.
14   Q   Okay. For what position were you recommending him?
15   A   Interim.
16   Q   Interim?
17   A   Uh-huh.
18   Q   President and CEO, is that right?
19   A   Correct.
20   Q   Okay. And why did you recommend him?
21   A   Because he was basically the most honest and the
22   next, the next, honest and truthful and loyal
23   executive and I felt he would treat people fairly.
24   Q   Okay. Loyal to whom?
25   A   Loyal to the company.

---

Page 116

1    Q   Okay. When you felt that you could not longer trust
2    Marc Stepp, what did you mean by that that you
3    couldn't trust him? Did you feel like you didn't
4    have his support anymore?
5    A   I didn't know whether I had his support anymore.
6    Q   Okay. Why do you think you were fired from Co-Op?
7    A   A series of events. Being, going on medical, having
8    this coup take place by Benson, Ted Lang, Nicole
9    Nault, Andy Broder, Larry Gardiner.
10       Then, shortly after that, I went, I needed
11   time, medical time off that exceeded two weeks and I
12   felt that I was fired because I was off too long.
13       And then after adding Ben Edwards to
14   interim president CEO, the documentation that they
15   were requesting from me from home.
16   Q   I'm sorry, I don't know what you mean by that, what?
17   A   Well, I received a series of emails from Ben saying
18   I would like all corporate information to return to
19   the corporate office, anything related to Co-Op
20   Optical, return to the corporate office. And over
21   and over again, I will be putting this person in
22   charge per Ray Murphy, the chairman of the board,
23   interim chairman of the board per Ray Murphy.
24       So it looks like the writing was on the
25   wall.

---

Page 117

1    Q   Okay. But do you think you were fired in part
2    because of the documentation or is that just another
3    thing that led you to the belief that you were on
4    the way out?
5    A   It was just to led me to the belief.
6    Q   Okay. So then I think -- and tell me if I'm wrong,
7    please.
8    A   Sure.
9    Q   That you believe you were fired because of the coup
10   and because you took a medical leave exceeding two
11   weeks?
12   A   Correct.
13   Q   Okay. I would like every fact of which you are
14   aware to support your belief that you were fired
15   because you took a week, you took a leave in excess
16   of two weeks.
17   A   Well, being off, I wasn't working at Co-Op Optical,
18   there was an interim leadership, all these things
19   were coming out.
20       I had fired Ted, they had brought Ted
21   back.
22       And basically being off under family
23   medical leave.
24   Q   Okay. Other than the fact that you were off on
25   family medical leave --

---

Jacqueline Smith                    Smith vs Co-Op Optical

December 15, 2010

Page 118

1  A   Uh-huh.
2  Q   Do you know of anything other than what you've said
3      to support a belief that you were fired because you
4      were off on leave, other than the fact that you were
5      off on leave?
6          I mean, did anyone say to you if you take
7      FMLA leave, we're going to fire you or no one -- no
8      one walks out of here and leaves this place
9      unattended and goes off on an FMLA leave?
10         Something like -- is there anything like
11     that that happened that made you connect you going
12     off on leave and being fired?
13  A   Marc Stepp would call me and continuously ask me
14     when am I coming back, I thought I told you to come
15     back in two weeks.
16         And that was said to me several, several,
17     several, several different times.
18  Q   Okay.  Tell me each and every occasion when Marc --
19  A   I don't remember each and every occasion.
20  Q   Excuse me, could I finish my question, please?
21  A   I thought you were.
22  Q   No.  When Marc Stepp called you and asked when you
23     were coming back?
24  A   February through March.
25  Q   And how often did he call you?

Page 119

1  A   Several times.  I didn't take count.
2  Q   Was anyone else on the phone or hearing both ends of
3      the conversation while you were having these
4      conversations with him?
5  A   Not to my knowledge.
6  Q   Did he ever tell you that you were going to be fired
7      if you didn't come back?
8  A   No, he asked me to resign.
9  Q   Okay.  And that was, what, in mid March, right?
10  A   The first indication was early March.
11  Q   Okay.  Did he tell you why he was asking you to
12     resign?
13  A   He was, I believe he -- no.
14  Q   Okay.  You have a belief as to why, okay, what is
15     your belief?
16  A   Because I was off.
17  Q   Okay.
18  A   And I wasn't there.
19  Q   Okay.  I need to know the basis for that belief.
20     Did he say anything to the effect of, you know,
21     you've got to resign, you're not here, you know,
22     you're off on this leave, you got to get out of
23     here?
24  A   He said, god dammit, when you coming back.
25  Q   Okay.

Page 120

1  A   And I said, I don't -- my medical leave states April
2      1, 2010.  That was over the phone.
3  Q   Okay.  And you don't remember how many times this
4      happened, these phone calls?
5  A   No.
6  Q   From February to March?
7  A   No.
8  Q   Assume for purposes of this question, the record
9      later will bare it out, it hasn't been on the record
10     now that Mr. Stepp is going to deny that that
11     occurred.
12         Can you help me with any other information
13     that would support your position that it did occur?
14  A   No.
15  Q   Okay, all right.  Is there anything else on which
16     you base your belief that you were fired because you
17     took an FMLA leave?
18  A   It was, it was -- no.  It was two weeks earlier than
19     when I was supposed to come back when I was
20     terminated.  I really -- no, I don't have an answer
21     for you.
22  Q   Okay.  Do you believe, is it your belief that if you
23     had not taken an FMLA leave, you would not have been
24     fired?
25  A   Yes.

Page 121

1  Q   Okay.  On what do you base that belief?
2  A   Because I was not doing a bad job.  I was loyal to
3      the Board, I felt I was loyal to my staff and tried
4      to do everything I could for them.
5  Q   Before you went on -- I'm sorry, did you finish?
6      Okay, is that a yes?
7  A   Yes.
8  Q   Okay.  Before you went on leave, had you received
9      any criticism about the way you had been doing your
10     job?  Let's say from December 1st until when you
11     went on leave did anyone criticize you?
12  A   Yes.
13  Q   Who criticized you?
14  A   Charles Benson.
15  Q   Anyone else?
16  A   Ted Wernarski.
17  Q   That's Winiarski?
18  A   Whatever.  I'm sorry.  Wininarski.
19  Q   Okay.
20  A   Ted.
21  Q   Anyone else?
22  A   No.
23  Q   Any board members?
24  A   No.
25  Q   No board members questioned the way you were doing

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 122

1  your job or criticized you about the way you were
2  doing your job?
3  A  No.
4  Q  Okay.  Now you said that you also believed you were
5  fired because of this coup, is that right?
6  A  Correct.
7  Q  What is the coup to which you are referring?
8  A  I'm referring to the time on December 5th when Ted,
9  Charles, Nicole Nault, Larry Gardiner, Andy Broder,
10  Tom Montiglione got together and came up with these
11  accusations that I was taking money from the company
12  and I was doing some other things that are listed in
13  the complaint.  I call it the Charles Benson's case.
14  Q  Okay.
15  A  So he could become CEO.
16  Q  Okay.  How long had you believed that Charles was
17  out to become CEO?
18  A  Well, I was grooming him to be CEO.
19  Q  Okay.  Well?
20  A  So he always had that in mind.  In our first
21  interview, that's one of the first things he told me
22  is that one of the things he would one day want to
23  do was to run a company or run the company.
24  And I thought -- and that's not an unusual
25  answer.

Page 123

1  Q  Uh-huh.
2  A  So I just think he wanted it a little bit faster
3  than what it was intended to be.
4  Q  Okay.  Did you hire Charles Benson?
5  A  I sure did.
6  Q  Did you hire Ted Winiarski?
7  A  No.
8  Q  Did you hire Larry Montiglione?
9  A  That's two people.  It's Tom Montiglione.
10  Q  Oh, Tom, thank you, Tom Montiglione.
11  A  No.  I was a part of, I was part of the interview
12  process but the CFO made the ultimate decision.
13  Q  Okay.  Was he someone that you wanted to work with,
14  Tom Montiglione?
15  A  Yes.
16  Q  Okay.  How about Larry Gardiner, did you bring him
17  in?
18  A  Yes.
19  Q  Okay.  How about Andy Broder?
20  A  Andy Broder has, was grandfathered in, he had been
21  in there ever since Ken Morris.
22  Q  Did you find, prior at least to December 5th, that
23  you worked well with Andy Broder?
24  A  Yes.
25  Q  Okay.  So what part of your, I mean, you think you

Page 124

1  were fired in part because of this coup.  What about
2  the coup do you think led to your firing?
3  A  It led to a long investigation, it led to people not
4  being able to work together in harmony.  It brought
5  the Board in to where we paid over six thousand
6  dollars in one month in fees where they only receive
7  like fifty dollars per meeting and there is only a
8  few board members.
9  And then because of this, I, mentally and
10  emotionally, I started feeling well (sic) so I went
11  on family medical leave.  It was just, it was just
12  too much and I needed to break.
13  Not only that, prior to that I had been
14  working anywhere from sixty to eighty hours per
15  week, sometimes six, seven days a week.
16  Q  So with this coup, okay, that was going on and all
17  the things that flowed from that, all the
18  difficulties, the allegations, the lack of loyalty,
19  the lack of support, you think if you had stayed and
20  not gone on leave you wouldn't have been fired
21  because of that, is that right?
22  A  I can't say that.  I hope not.
23  Q  But you don't know?
24  A  No.
25  Q  Okay.  Any other factors, other than what you've

Page 125

1  told me?  And if you want to repeat yourself you're
2  welcome to but you don't have to, it's on the record
3  and I'm not trying to ask you to do so that's why I
4  say anything else.
5  Any other factors on which you base your
6  belief that you were fired in part because you took
7  family medical leave?
8  A  The actions of the Board.  They voted me out.
9  Q  Okay.
10  A  Or terminated me immediately.
11  I'm sure the State of Michigan was
12  notified and told that I was terminated per my
13  absence or something, I'm not sure because we had to
14  tell them everything.
15  Q  The State was notified --
16  A  I'm not sure but if -- if Ted was, if Ted is doing
17  his job then there should be, it should have been
18  informed by to the State.
19  Q  I can tell you that the Board will testify that you
20  were not terminated for your absences.  So do you
21  think they still told the State that you were
22  terminated because you were absent?
23  A  I have no idea.
24  Q  You just made that up?
25  A  I made that up.

Jacqueline Smith      Smith vs Co-Op Optical      December 15, 2010

Page 126

1  Q   Oh, okay.  Other than the fact that the Board
2      terminated you, I'm trying to understand why you
3      think you were terminated because you were on FMLA
4      leave?
5  A   I have no more answers for you under this subject.
6  Q   Okay, good, thanks.
7  Q   Other than, obviously, your termination that
8      occurred -- I believe on March 19th, is that
9      correct, 2010?
10 A   Yeah.
11 Q   Was there anything else that happened at that
12     meeting or immediately after that meeting that you
13     thought was inappropriate or wrong or --
14 A   Yes, I heard Marc Stepp say, I know it's hard for
15     her husband to get anything out of her.  And it was
16     in a sexual content.
17 Q   What was the sexual content?
18 A   He was talking about sex from me, as if I was to,
19     like, if I was stubborn enough -- everybody, people
20     were there and they heard it.  He said, I bet it's
21     hard for her husband to get it from, get it, get
22     it -- I'm trying to say what he said.  To get it,
23     get any, get any from her, get any from her.
24 Q   And he said that to whom?
25 A   He was telling that to Ray but there were other

Page 127

1      people around like Bernie Adams and Janna Garrison
2      was there and also John Elliot heard it, too.
3  Q   To get any from her?
4  A   Uh-huh.
5  Q   Is that a yes?
6  A   Yes.  Sorry.
7  Q   Okay.  And this was after you had been terminated by
8      the Board?
9  A   Yes, as I was walking out of the room.
10 Q   Okay.  You also allege in your complaint that you
11     were retaliated against because you took FMLA leave.
12         I just want to understand.  Are the facts
13     that support that the same facts that support I was
14     fired because I took FMLA leave?
15 A   Yes.
16 Q   They're not something different?
17 A   No.
18 Q   Okay.  Is there anything other than your termination
19     that you feel was a form of discrimination or
20     retaliation because you took FMLA leave?  Did any
21     other bad things happen to you because you took the
22     leave or was that it?
23 A   I'm sorry, say that again.
24 Q   I'll try.  I'll try to make it clearer but I thought
25     it was sort of clear.  Anyway --

Page 128

1  A   It wasn't to me.
2  Q   You said that you believe you were fired in part
3      because you took FMLA leave?
4  A   Yes.
5  Q   Did any other bad thing happen to you at Co-Op
6      because you took FMLA leave, other than your firing?
7  A   Personally?
8  Q   I guess, because you're a person.  Anything happen
9      to you?
10 A   A lot of things happened.
11 Q   I mean, I'm sorry, did Co-Op do anything else to you
12     other than fire you?
13 A   That's what I was trying to clear up from you.
14 Q   Okay.  Yeah, thank you, yeah.
15 A   You're welcome.  No.
16 Q   Okay.  You also allege in your complaint -- and if
17     you want to look at it you can.  But you allege that
18     Co-Op interfered with your FMLA leave.  And that's
19     at paragraph forty-six if you want to look at it.
20 A   It should say CEO.
21 Q   Oh, then, well, let me catch up with you.  Okay.
22 A   It says account executive.
23 Q   Oh, as account executive, you're right.
24         Co-Op engaged in a prohibited act under
25     FMLA by preventing Smith -- oh, I'm sorry, I gave

Page 129

1      you the wrong paragraph.  We can talk about that
2      one, too but I meant to say forty-five.
3  A   Okay.
4  Q   Oh, no, I don't.  Oh, that's where, I'm sorry,
5      that's where your complaint refers to interfere
6      with.  All right.
7         MR. SWANSON:  What paragraph are we on?
8         MS. CAULEY:  Forty-six.
9  BY MS. CAULEY:
10 Q   Let's get it -- I'll read it for the record, please
11     tell me if I'm reading this wrong, okay?
12         Co-Op Optical engaged in a prohibited act
13     under the FMLA by preventing Smith from resuming her
14     position as account executive -- which should be
15     CEO, that was the intent.
16         And then there's the cite to 29 USC
17     Section 2614.
18         Other than preventing, well, the
19     preventing you from resuming your position as
20     account executive, that was your termination, right?
21 A   Uh-huh.
22 Q   Is that a yes?
23 A   Yes.
24 Q   Okay.  Is there anything else that Co-Op did to
25     interfere with, restrain or deny your rights under

33 (Pages 126 to 129)

Judy Jettke & Associates      Mt. Clemens, MI      586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 130

1    the FMLA other than by terminating you?
2  A  No.
3  Q  Okay, all right.  Here's where we were when it
4    looked like we were going in a different direction
5    which we were.
6        In May 2009, remember I started to take
7    you back there?
8  A  Uh-huh.
9  Q  Do you recall traveling anywhere by plane in 2009?
10  A  Could have.
11  Q  Okay.  Well, let me ask you this.  When you traveled
12    by air, what class ticket did you purchase?
13  A  First class.
14  Q  Okay.  And --
15  A  Or I used my perks or either I helped, I gave my
16    perks to Ted.
17  Q  Okay.  But it's accurate that you purchased either
18    first-class tickets or upgrades and you charged them
19    to the company --
20  A  Not all the times.
21  Q  -- on occasion.
22  A  Right.
23  Q  On occasion?
24  A  Yes.
25  Q  Okay.  Did anyone authorize you to travel first

Page 131

1    class when you traveled?
2  A  No.
3  Q  Okay.  You just did that on your own, is that right?
4  A  Yes.
5  Q  Okay.  Did you authorize your executives to travel
6    first class and charge the company for that?
7  A  They never asked but I have offered.  Yes, yes.  In
8    answer to your question, yes, I have, I've offered,
9    I offered it to Ted.
10  Q  And to have the company pay for it?
11  A  Yes.
12  Q  And he refused?
13  A  No.
14  Q  Oh, he accepted --
15  A  Not all the time.
16  Q  -- that?
17  A  Yes.
18  Q  Oh, he accepted sometimes?
19  A  Uh-huh.
20  Q  Okay.  And that was your decision to make, you
21    think?
22  A  Yes.
23  Q  Okay.  Do you think that was a good decision to
24    travel first class and pay for first-class travel
25    out of Co-Op funds while the company was under

Page 132

1    supervision by OFIR?
2  A  As long as the price of the tickets were not
3    exorbitant and usually they were not.  Armida was
4    very good at getting deals.
5  Q  Okay.
6  A  And I -- Ted's, I tried to give him first class to
7    accommodate him.
8  Q  Were --
9  A  Oh, and Ben Edwards, I offered him first class, he
10    took it, too.
11  Q  Okay.  And you authorized that for the company, is
12    that right?
13  A  Yes.
14  Q  For the company to pay for?
15  A  Yes.
16  Q  Okay.  Back to you, my question again was, and you
17    thought that was appropriate to authorize first-
18    class travel for yourself or others while the
19    company was under supervision by OFIR?
20  A  Yes.
21  Q  Okay.  Can you see why someone else might not think
22    that that was appropriate?
23  A  No.
24  Q  Okay.  In the fall of 2009 did you go to Las Vegas?
25  A  I might have, I'm not sure.

Page 133

1  Q  Staying at the Venetian, does that ring a bell?
2  A  Oh, that's where the conference was, yes.
3  Q  Okay.  So you stayed at the Venetian and did you
4    upgrade your room there at the Venetian over the
5    standard rate room?
6  A  At some times I have a suite, yes.
7  Q  Okay.  And the company pays for that?
8  A  The company pays for that because I have meetings
9    sometimes, I invite the employees to come up, too.
10  Q  Okay.  Did you ever upgrade the employees' rooms so
11    that they could have the meetings there?
12  A  They have upgraded their rooms themselves.
13  Q  And they pay for them themselves?
14  A  Right.  Without my authorization.
15  Q  But they pay for them themselves?
16  A  No, they did not.
17  Q  Okay.
18  A  The company paid for them.
19  Q  Oh, who did that?
20  A  Charles Benson and Ben Edwards.
21  Q  When did that happen?
22  A  I don't know.  I just -- they just told me that they
23    had a suite and I think that was in Las Vegas, too.
24  Q  Was that in the fall of 2009?
25  A  Don't know.

Jacqueline Smith                 Smith vs Co-Op Optical                 December 15, 2010

---

Page 134

1    Q   Okay.  And did you tell them, no, you've got to pay
2        that money back?
3    A   No, I did not.
4    Q   Did you think it was inappropriate for them to
5        upgrade and charge the company for that?
6    A   The amount was, the amount was not, no, the amount
7        was not that big, I did not give them a hassle.
8    Q   Okay.  So you thought that was okay?
9    A   Yes.
10   Q   Okay.  How long were you in Las Vegas at the
11       Venetian?
12   A   I think the conference lasts three days.
13   Q   Okay.  How much would be a lot of money for an
14       upgrade?  I mean, what do -- I don't stay in
15       upgrades, I don't know.
16   A   The rooms, well, rooms is probably about four to
17       five hundred dollars a night.
18   Q   Is that the upgraded room?
19   A   Yes.
20   Q   What would a regular room be, do you know?
21   A   About three to four hundred dollars a night.
22   Q   So about a hundred dollars difference?
23   A   Yes.
24   Q   Okay.
25   A   And I think that's why I didn't bitch with -- excuse

---

Page 135

1        me for saying that -- with Ben and Charles.
2    Q   Okay.  While you were on leave, did you have the
3        belief that Ben Edwards was doing a good job as the
4        interim CEO and president?
5    A   I have no idea.  Shortly after -- no, I have no
6        idea.
7    Q   You don't remember writing a letter to Mr. Stepp
8        saying that he doing a fine job and he was
9        handling everything very well and that he deserved
10       more of a raise than you had even recommended for
11       him?
12   A   No, I don't remember that.
13   Q   You don't remember that?
14   A   No.
15   Q   Do you and your husband, do you or did you own a
16       timeshare in Cancun?
17   A   Yeah, it was, it was a vacation trips in Cancun.
18       Yeah, Aventura Spa Palace.
19   Q   And you own something there or what was the
20       arrangement?
21   A   It's that you lease, you pay, you pay a membership
22       fee for ten years and you have the ability to go and
23       stay in an all-inclusive resort.  It's valued
24       anywhere from eight to ten thousand dollars for
25       eight days and you receive a reduced rate anywhere

---

Page 136

1        from fifteen hundred to possibly two thousand
2        dollars a couple.
3    Q   And what was the membership?
4    A   The membership is called the Aventura Spa Palace,
5        Spa Palace Vacation Packages.
6    Q   And how much membership did you pay for ten years?
7    A   About thirteen thousand dollars.
8    Q   Per year?
9    A   Oh.  Thirteen thousand dollars for the initial
10       payment and then there was a membership fee every
11       year of about three hundred and some dollars.
12   Q   And did you have like monthly fees, like, like,
13       administrative fees or monthly minimum amount that
14       you had to -- I'm sorry, I meant to say yearly,
15       yearly fees other than the membership of three
16       hundred dollars?
17   A   The membership fees were monthly.
18   Q   Oh, it was three hundred dollars a month?
19   A   Yes.
20   Q   Okay.  So it would be like thirty-six hundred
21       dollars a year, right?
22   A   Correct.
23   Q   Okay.  And you had to pay those whether you stayed
24       there or not?
25   A   Correct.

---

Page 137

1    Q   But if you stayed there, did that constitute your
2        payment for that?
3    A   No.
4    Q   I'm thinking it's some golf courses, I think, you
5        know, you either pay this amount or you use the
6        facilities X amount and that covers it.
7    A   No.
8    Q   No.  So you pay the thirty-six hundred dollars
9        regardless but then if you went there you also had
10       to pay an amount, right?
11   A   Yes.
12   Q   Okay.  And what was the amount you had to pay, the
13       reduced amount?
14   A   It depended on the season but it can range in, it
15       can be anywhere from fifteen hundred dollars to over
16       twenty-six hundred dollars.
17   Q   For a week?
18   A   For a week.  For eight days, seven nights.
19   Q   Okay.  And have you, I mean, can you use that as
20       often as you want?
21   A   No, you bought a certain amount of weeks and then I
22       don't remember how many weeks we had.
23   Q   Do you still own, are you still members down there?
24   A   Yes.
25   Q   When was the last time you went?

---

Jacqueline Smith                          Smith vs Co-Op Optical                          December 15, 2010

Page 138

1   A   Probably the last time I have gone was probably
2       2008.
3   Q   Okay.  Let me see, in two thousand -- I don't know
4       the date, eight or nine and maybe you can help me,
5       did Co-Op send people to this property as a reward?
6       Some people or --
7   A   We have tenure recognition and employees that did
8       outstanding jobs we, I gave away four trips with the
9       approval of the executive staff and with the
10      executive staff knowing that there would be
11      additional monies that would be required and Co-Op
12      would pay those since we own the vacation weeks.
13  Q   Okay.  You didn't need the approval of the executive
14      staff to do this, you're the CEO, right?
15  A   Well, no, we -- I believe in being inclusive so when
16      we, when we, when we have employee recognition, the
17      whole executive staff would be in there together and
18      we would talk about what would happen and what would
19      be given away, who we would ask for to donate gifts
20      for our employees, et cetera.
21          So that was something that was done
22      collectively and then once it's done collectively it
23      was turned over to another department to complete.
24  Q   You did not need the approval of the executive staff
25      in order to decide what to do with the tenure

Page 139

1       recognition --
2   A   We voted.
3   Q   -- of employees, did you?  Could you answer my
4       question, please?
5   A   I am.
6   Q   Did you need the approval of the executive staff in
7       order to do this?
8   A   I sought it.
9   Q   Did you need -- if you could just answer the
10      question I ask it would be really helpful.
11          Did you need the approval to do it or
12      could you have done it as CEO?
13  A   Yes.
14  Q   Okay, thank you.  And did anyone donate anything for
15      this trip or was this all paid for?
16  A   Oh.
17  Q   By Co-Op?
18  A   For the trip?
19  Q   Yes.
20  A   We donated the trip.
21  Q   Who is we?
22  A   My husband -- we donated our membership so they can
23      have a reduced fee.  It belongs to joint.
24  Q   And what was the value of what you donated?
25  A   If we had to pay for it or if we wanted them to go

Page 140

1       on their own, they would have had to pay a lot more,
2       we would have paid a lot more money.
3           We gave our trips every year.  So we
4       donated, we could give away weeks.  So we had X
5       amount of weeks so we gave away weeks to four
6       different employees.  Highest sales, best doctor, et
7       cetera.
8   Q   Could you answer my question?
9   A   Maybe I don't understand it then.
10  Q   What was the -- and please, if I use any words that
11      you don't understand or you don't know the meaning
12      of, I'll be happy to try to explain them.
13          My question was what was the value of what
14      you donated.
15  A   Oh, the value?
16  Q   Is there anything -- yes.  Is there anything in
17      there you don't understand?
18  A   You're talking about the value of --
19  Q   Of what you donated.
20  A   Okay.
21  Q   How much --
22  A   Thirteen, thirteen --
23  Q   -- did it cost you to donate?
24  A   Thirty-six hundred dollars a year and thirteen
25      thousand dollars in purchasing the vacations.  I

Page 141

1       think it was thirteen thousand.  Either thirteen
2       thousand or either nine, I'm not sure.  That's it.
3   Q   So let me see.  Thirty-six hundred dollars times ten
4       and how many years have you been in it as of the --
5   A   No -- and it goes up in interest with interest rates
6       or prime.
7           I had owned it, we have owned it about
8       four years.  We pay three hundred and some dollars a
9       week, a month.  And we paid a major down payment
10      while we were there.
11          So I don't know what you want me to say.
12      That's all I can really answer for you.
13  Q   I'm asking you the value of what you gave away.
14  A   I just said.  To me, thirty-six thousand, about,
15      that would have been -- no, I'm sorry.  Thirteen --
16      about sixteen.
17  Q   Fourteen thousand, thirty-six hundred times four
18      would be fourteen thousand.  So you're saying for
19      four years so you're saying you gave away both the
20      initial, the eight, the thirteen thousand dollars
21      added to the forty-four thousand which is fifty-
22      seven, you gave away fifty --
23  A   No, I didn't give -- it's not giving it away.  That
24      was the value of being a member there.
25  Q   That's what I asked.

Judy Jettke & Associates                  Mt. Clemens, MI                          586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

**Page 142**

1  A   It's like a country club.

2  Q   I asked you what was the value of the donation.

3  A   From me?  Zero.

4  Q   What was the value of the donation from Larry?

5  A   Zero.  Because I'm not sure of what you're saying.

6        (Document Marked for Identification as

7        Defendant's Exhibit No. 16)

8  BY MS. CAULEY:

9  Q   Do you know who drafted this?

10 A   Marketing.

11 Q   Was it set with your approval?

12 A   No, I didn't see this until the day of the

13       employees' recognition.

14 Q   Was it set with your, was it distributed with your

15       approval?

16 A   I handed them out, yes.

17 Q   It says Jackee and her husband Larry Smith provided

18       these wonderful prizes.

19       What did you provide?

20 A   I provided four trips at a reasonable price to four

21       groups of great employees that I felt, that we felt

22       that was deserving of these prizes.

23 Q   What did you provide?  Other than Co-Op, take away

24       what Co-Op paid for.

25 A   Uh-huh.

---

**Page 143**

1  Q   What did you provide or Larry?

2  A   The Spa Palace, our membership benefits.

3  Q   The employees paid for the room, is that correct?  I

4        mean, Co-Op paid for the room, is that correct?

5  A   No.  Co-Op did not pay for the room.  The fee that

6        Co-Op paid for is considered a service fee because

7        it's all-inclusive.

8        A service fee for gratuities, a service

9        fee for the different restaurants there, service fee

10       for someone to be with you at all times while you're

11       there to be at your, be, to serve you.

12 Q   Okay.  So Co-Op paid that service fee?

13 A   No, we paid the -- that's, yeah, they paid that

14       service fee, you're right.

15 Q   Okay.  Larry and Jackee didn't pay that service fee?

16 A   No.

17 Q   And Co-Op paid for their air fare to go to Cancun?

18 A   Correct.

19 Q   Okay.  And do you know in what year this took place,

20       was this in 2009 or 2008?

21       I don't think there's any on the document

22       if that's what you're looking for.

23 A   Yeah, it's not -- that's what I'm looking for, too.

24       I think this was eight.

25       MR. SWANSON:  I think it was eight.

---

**Page 144**

1  BY MS. CAULEY:

2  Q   Okay.  And then in 2008 was -- well, do you know how

3        much this whole thing came to?

4  A   About ten thousand dollars.

5  Q   Okay.  Had Co-Op ever paid ten thousand dollars for

6        tenure recognition trips before?

7  A   Yes.

8  Q   When?

9  A   Oh, over the years.

10 Q   To whom?

11 A   To employees.

12 Q   Who?

13 A   I don't know.

14 Q   When?

15 A   Well, Deborah Murphy has been a recipient of prizes

16       for a long time.  Ben Edwards had taken trips also

17       on for tenure recognition.

18 Q   And those are things that have been donated by other

19       people, is that right?

20 A   No, Co-Op paid for some of them.

21 Q   Co-Op has never paid ten thousand dollars for

22       recognition gifts ever before this time, isn't that

23       right?  Co-Op paid?  At least while you were CEO?

24 A   I don't know if I agree with that because I remember

25       there was one, there was a few trips that we gave

---

**Page 145**

1        away that Charles and Ben took.  Deborah Murphy took

2        about two and they were in the thousands of dollars,

3        too.

4        So I can't say, I'm not sure.

5  Q   Okay.  When anyone else took a gift that was

6        provided by Co-Op, was Co-Op under supervision by

7        OFIR such as when this happened?

8  A   Yes.

9  Q   Okay.  Did you report this to OFIR, that you were

10       spending this kind of money for Co-Op?

11 A   No, we did not.

12 Q   Okay.  Why did you not provide, why did you not seek

13       approval from OFIR?  Or well, I should ask this, was

14       this money spent in the ordinary course of business?

15 A   Because it was not a contract.  OFIR has

16       stipulations on certain things that needs to be

17       reported.  Tenure recognition is not one of them.

18 Q   Do you understand that OFIR, the spirit of reporting

19       for OFIR required that you talk to them about any

20       expenditures that are not in the ordinary course of

21       business?

22       Did you have that understanding?

23       MR. SWANSON:  Let me just object to the extent

24       that that calls for a legal conclusion.  There is no

25       spirits in agencies, they have regulations and laws,

---

Judy Jettke & Associates            Mt. Clemens, MI            586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical

                                                        December 15, 2010

---

**Page 146**

1  that sort of thing to my knowledge.
2       MS. CAULEY:  We don't need a speech, I just
3  asked her for her belief.
4  BY MS. CAULEY:
5  Q   Did you have an understanding?
6       MR. SWANSON:  Well, you believe -- wait a
7  minute.  The objection is that you're asking her for
8  a legal conclusion.  Whether you want to call it a
9  spirit, a regulation or law, it's a legal
10  conclusion.  She's not a lawyer.
11       If you can answer it, go ahead.
12       WITNESS:  Can't answer.
13  BY MS. CAULEY:
14  Q   Did you have an understanding that OFIR expected to
15  know what was going on at Co-Op in terms of the
16  spending of money?
17  A   In certain areas.
18  Q   In certain areas.  So if you're going to make a
19  capital expenditure of two thousand dollars, they
20  needed to hear about it, is that right?
21  A   No, we make capital, we made -- this is not
22  considered a capital expenditure.
23  Q   I know that, that's not what I'm asking you.
24       If you made a capital expenditure, did you
25  understand that that had to be reported to OFIR,

---

**Page 147**

1  well, that you had to request --
2  A   The CFO, the CFO had to report it.
3  Q   But there had to be a request to spend the money.
4       Did you understand that, and OFIR had to approve it?
5  A   Okay.  Then it should have been sent to the CFO for
6  approval.
7  Q   Ma'am, that's not my question.
8  A   That's my answer.
9  Q   Did you have -- but I'd like you to answer, please,
10  my question.
11       Did you understand that if Co-Op was going
12  to make a capital expenditure while they were under
13  supervision of two thousand dollars that they had to
14  first seek approval from OFIR before they could
15  spend that money?
16  A   Under capital expenditures, yes.
17  Q   Okay.  So your understanding was it was okay to
18  spend -- it wasn't okay to spend two thousand
19  dollars by yourself out of capital expenditure but
20  it was okay to spend ten thousand dollars because it
21  wasn't called a capital expenditure, is that right?
22  A   Yeah.
23  Q   Okay.  Is there a requirement of the weeks that --
24  you don't remember how many weeks a year you
25  purchased?

---

**Page 148**

1  A   No.  You don't have that in your documents?  I don't
2  have it.  I have it at my home, I haven't looked at
3  it in a while.
4  Q   Okay.  Is there a requirement that if you don't use
5  all of those weeks that you have to pay an extra fee
6  or some kind of user fee?
7  A   Oh, no.
8  Q   So you could never go there again as long as you
9  still pay your thirty-six hundred dollars a year and
10  never have to spend another dime there?
11  A   Oh, no, I'm sorry.  We can go there any -- as long
12  as our weeks are in existence and within a time
13  frame, I can go there anytime I want to.
14  Q   Okay, that wasn't my question.
15       Let's say you purchased ten weeks, okay?
16  In a year.
17  A   Yeah.  I think that's what it was.
18  Q   Oh, I'm just guessing ten weeks, okay?
19  A   Uh-huh.
20  Q   You purchase ten weeks and you use five of them in a
21  given year.
22  A   Uh-huh.
23  Q   Is there any penalty or any other payment that you
24  have to make for the five you weren't there and
25  otherwise spending money?

---

**Page 149**

1  A   No.
2  Q   No.  So if you purchased ten and you didn't go at
3  all the whole year --
4  A   Uh-huh.
5  Q   -- there would be no additional fee other than the
6  three hundred dollars a month, is that right?
7  A   Exactly.
8  Q   Okay.  So since you said that you didn't -- there
9  was no value to anything you donated here and no
10  value to anything your husband donated here, how is
11  it that we're saying that Jackee and her husband
12  Larry Smith provided these wonderful prizes?
13  A   Because we paid for the membership and also the
14  weeks.  Those -- no one came up, Co-Op Optical
15  didn't come up with the money for the membership,
16  Co-Op Optical didn't come up with the money for the
17  down payment.  That came out of our pockets.
18  Q   Okay.  And you can't tell me the difference between
19  what these recipients would have paid if they didn't
20  have this membership package --
21  A   What they would pay?
22  Q   -- and what they did --
23  A   I'm sorry?
24  Q   If I could finish my question then maybe we wouldn't
25  have so many misunderstandings.

---

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

**Page 150**

1  My question to you is, and you can't tell
2  me the difference between what these recipients
3  would have paid if they had gone without a
4  membership and what they paid with the membership,
5  is that correct?
6  A  Yes, I can tell you that.
7  Q  Yes, you can?
8  A  Yes.
9  Q  Then tell me, please, I've asked you.
10 A  It would have been about eight to thirteen thousand
11    dollars a couple.
12 Q  Eight to thirteen thousand?
13 A  Dollars per person.
14 Q  Per person or per couple?  You just said two
15    different things.
16 A  Per couple, I'm sorry, per couple.
17 Q  Per thousand, per couple.
18 A  Uh-huh.
19 Q  So if I wanted to go to this vacation place da, da,
20    da, da at Aventura whatever Spa, I would have spent
21    a minimum of eight thousand dollars plus what Co-Op
22    paid for to go there?
23 A  That's what I understand.
24 Q  Okay.  And your understanding is based on what?
25 A  On what was explained to us by the sales rep that we

**Page 151**

1  purchased them from.
2  Q  Can you explain please for us what RBC is?
3  A  Risk-based capital.
4  Q  What does that mean?
5  A  That means that you have, it's kind of like your,
6    it's like a reserve or an underwriting for the
7    department of OFIR which means that you have to have
8    at least a three hundred -- our company had to have
9    a three hundred risk-based capital in order to
10   operate and be up under, in order to be in
11   compliance with the State of Michigan.
12 Q  What does the three hundred mean, what is risk-based
13   capital?
14 A  That is the amount of business versus dollars that
15   we were taking in.
16 Q  Give me an example.
17 A  If we have large accounts of fifty thousand people,
18   this is an example and there's over a million, it's
19   an account of ten million dollars and that's new
20   business, we have to have enough money to make sure
21   that the claims are going to be paid and that the
22   people that are beneficiaries will not be out in the
23   cold in case our company goes out of business or
24   bellies up or something like that.
25 Q  Okay.  While you were CEO, was the risk-based

**Page 152**

1  capital ever at three hundred?
2  A  No, it was not nor was it before.
3  Q  Was it ever over three hundred?
4  A  No.
5  Q  Okay.  Was it ever over two hundred?
6  A  Yes.
7  Q  And for how long had it been under a hundred?
8  A  Well, that's a very hard question because our former
9    CFO tampered with the books so I have really no idea
10   how to answer that question.
11 Q  Okay.  When did Mr. Winiarski start?
12 A  It wasn't him but Ted came in five years ago.
13 Q  Okay.  You think he came in about five years ago.
14   From then on what has happened with the RBC?
15 A  It's been going up and down.
16 Q  Okay.  Did you ever recommend Ben for a raise when
17   he was appointed as the interim?
18 A  Yes.
19 Q  How much of a raise?
20 A  I don't remember.
21 Q  Do you know if he accepted that raise?
22 A  Yes, he did.
23 Q  Do you know if he's still being paid that amount
24   today?
25 A  According to -- no, he's not unless something

**Page 153**

1  happened different.
2  Q  When did that change, if you know?
3  A  Marc Stepp called me and told me that Ted and Ben
4    both went to reduce their salaries.  So he said he
5    wouldn't take his raise, he went back to what he was
6    making, I believe.
7  Q  When you were on leave did you come up with any
8    ideas on how to save Co-Op without the State and
9    still be an insurance company?
10 A  Yes.
11 Q  What was that idea?
12 A  The idea was to close the Auburn Hills office and
13   also to close half of the surfacing lab which would
14   have laid off people, cut down a department, cut
15   down a store that was only bringing in seventy-eight
16   thousand dollars a year to try to maintain the
17   business.
18 Q  And with whom did you share those ideas if anyone?
19 A  I shared them with the Board of Directors.
20 Q  When?
21 A  Probably, I think that was, could have been either
22   late February or March.  It was a directive that was
23   given to me by the Board while I was on family
24   medical leave.
25 Q  Okay.  And how did they respond to that?

39 (Pages 150 to 153)

Judy Jettke & Associates          Mt. Clemens, MI          586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 154

1   A   They took it and they didn't say anything. They had
2       two.
3   Q   Didn't you share it with anyone else or did you
4       share it with anyone else about that?
5   A   I shared it -- no. At that time, I realized there
6       was a camp of enemies so therefore I shared it only
7       with the Board as requested.
8           (Document Marked for Identification as
9           Defendant's Exhibit No. 17)
10  BY MS. CAULEY:
11  Q   Have you ever proposed closing the lab prior to that
12      time?
13  A   Yes.
14  Q   When?
15  A   Part of the lab. Since 2007, I believe.
16  Q   Okay.
17  A   To save money.
18  Q   Didn't you, in fact, communicate with Ted and Ben on
19      February 24th that you had an idea on how to save
20      Co-Op without the State and still be an insurance
21      company that you wanted to speak with the two of
22      them about?
23  A   Yes, that was the, that was the close, that's the
24      same thing, yes.
25  Q   That's the thing that you just told me you didn't

Page 155

1       share with anyone other than the Board because you
2       had enemies out there and you weren't going to talk
3       to them about it, right?
4   A   Well, I didn't share it with them because they
5       didn't call me.
6   Q   It was your intent to share it with them, wasn't it?
7       You had the idea, you emailed them and said I want
8       to share this idea with you, right?
9   A   Yes.
10  Q   Okay. But a minute ago you said I wasn't going to
11      share it with anyone because I had enemies and I
12      wasn't going to tell them.
13  A   Ben was not my enemy.
14  Q   Ted was. You fired him, right?
15  A   Well, Ted -- well, Ted would have found out. I just
16      copied -- yeah, I guess you're right.
17  Q   Thank you. When you were on leave did you -- and
18      let's just put this before your husband sent the
19      letter to Ben saying don't contact her anymore.
20          Did you communicate, did you initiate
21      communications with people at Co-Op?
22  A   Yes.
23  Q   Fairly regular basis?
24  A   Yes, until I got bawled out by Ben.
25  Q   Okay. For bothering him so much, right?

Page 156

1   A   He said I was, yeah.
2   Q   Said you were being a pest?
3   A   Yeah.
4   Q   Yeah, okay. When you were on --
5   A   And then also Ted.
6   Q   When you were on leave, did you, did you expect your
7       executives to be working?
8   A   When I was on -- I was hoping so.
9   Q   Okay.
10          (Document Marked for Identification as
11          Defendant's Exhibit No. 18)
12  BY MS. CAULEY:
13  Q   Did you send this email to Ted, Matt, Tom and
14      others?
15          MR. SWANSON: Which email are you referring to?
16          MS. CAULEY: I'm sorry, Exhibit 18.
17          MR. SWANSON: There are several pages here.
18  BY MS. CAULEY:
19  Q   Well, Exhibit 18.
20  A   What was sent?
21  Q   The last send. Did you send that and the
22      attachments to those folks?
23  A   Oh, this was just -- yeah, this is true, I'm
24      thinking about testing it out and there's a smiley
25      face so it was a friendly --

Page 157

1           It was a friendly thing and I know Ted
2       liked dogs. These are people that had cats or dogs
3       at the time or animals.
4   Q   And that's how you wanted your executives spending
5       time while you were on leave, right?
6   A   No, but I couldn't control the time they were
7       spending when they weren't working either.
8   Q   Well, that wasn't my question. You're the CEO, you
9       want them working and you're sending them things
10      like this, is that right? Does that further
11      distract them?
12  A   I think that's a question they should be asked.
13  Q   Did you expect them to ignore something coming from
14      the CEO?
15  A   At that time I was on medical, family medical leave,
16      they could have looked at it if they wanted to.
17  Q   And you were still the CEO, weren't you ma'am? In
18      fact, didn't you send people emails saying, I'm
19      still the CEO here?
20  A   I said that, yes. And also my --
21          (Document Marked for Identification as
22          Defendant's Exhibit No. 19)
23  BY MS. CAULEY:
24  Q   Did you send Exhibit 19 to Ben Edwards, Armida
25      Parisi, Sharmien Scott, Temeng Darko, Tom Dick,

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 158

1   Cristell Jones, Valerie James, Matt Groen and others
2   at Co-Op?
3   A   Date, February 4. Yeah.
4   Q   And that's an eighteen-page document with pictures
5   of pets, correct?
6   A   Uh-huh.
7   Q   Is that a yes?
8   A   Yes. If I may add, these are a group, I had a list
9   of friends because I see personal names on here as
10  well so these are not Co-Op Optical people, these
11  are just people that I casually talk with so these
12  are not all Co-Op Optical people.
13       Lee Settle, he's in North Carolina. Lucy
14  Patel is in Miami Beach, Florida. A lot of these
15  people are out of state.
16       So these are just people that I kind of
17  converse with so these are not necessarily all
18  employees, they just were a part of my contact
19  group.
20  Q   I never said it was all Co-Op employees, did I?
21  Didn't I list the names and say, and others?
22  A   I don't remember you saying that but you may have.
23  Q   Is Ben Edwards an employee or was he on February 4,
24  2010 an employee of Co-Op?
25  A   Yes.

Page 159

1   Q   Melvin Evans?
2   A   Yes.
3   Q   Scott J. McFall, where was he from?
4   A   He's from OFIR.
5   Q   Oh, he was from OFIR.
6   A   Uh-huh.
7   Q   Okay. Armida Parisi, was she a Co-Op employee at
8   the time?
9   A   Uh-huh.
10  Q   Is that a yes?
11  A   Yes.
12  Q   Mervin Hawk, yes or no?
13  A   Yes.
14  Q   Bernard Davis, yes or no a Co-Op employee?
15  A   Bernard Davis, I don't know if he was working for
16  Co-Op at that time.
17  Q   Okay. Sammie Morrison?
18  A   He -- that's outside.
19  Q   Okay. Sherold Riddles?
20  A   I believe she had been terminated.
21  Q   Okay, that's a relative of yours, right?
22  A   Yes.
23  Q   Shapira Scott?
24  A   That's a relative.
25  Q   Sharmien Scott?

Page 160

1   A   Relative.
2   Q   Was she working at Co-Op at the time?
3   A   Yes. No, she was terminated also.
4   Q   Had Sherold Scott worked at Co-Op at some time?
5   A   Shapira?
6   Q   Sherold Riddles, I'm sorry, thank you.
7   A   Sherold Riddles, yes, but she was terminated as
8   well.
9   Q   Shapira Scott, did she ever work at Co-Op?
10  A   No.
11  Q   Okay. Temeng Darko, he worked at Co-Op, right?
12  A   Correct.
13  Q   Tom Dick worked at Co-Op?
14  A   Yes.
15  Q   What about Bernice McLodden?
16  A   Yes, but this is her home email, I believe.
17  Q   Cristell Jones worked at Co-Op?
18  A   Yes.
19  Q   Valerie James worked at Co-Op?
20  A   Yes.
21  Q   Matt Groen worked at Co-Op?
22  A   Yes.
23  Q   Michelle Torrence?
24  A   No.
25  Q   D. Higgins?

Page 161

1   A   No.
2   Q   Lucy Patel?
3   A   No.
4   Q   Is Lucy Patel related to any physician that you've
5   seen?
6   A   No.
7   Q   Lee Settle?
8   A   No.
9   Q   Okay. So at least what, six or eight of these
10  people, whatever the number is worked at Co-Op, is
11  that right?
12  A   Yeah.
13  Q   And you sent them an eighteen-page email five
14  minutes after noon, isn't that right, on February
15  4th?
16  A   Yeah, that was an error.
17  Q   It was an error?
18  A   Yeah.
19  Q   You never meant to send it to them?
20  A   I never meant to contact Co-Op.
21  Q   You sent it to employees at Co-Op?
22  A   Right. It's on your email, it's like, I have a
23  group of friends or group of people that we shared
24  different things like this with each other.
25       It's not that these people that are on the

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 162

1   same list that has not shared things with me. So
2   everybody on this list has sent something to me
3   similar to this or like this and it was shared with
4   me so therefore I put them in this particular group
5   which means I sent it back.
6   Q   Wasn't the issue that you are sending your
7   executives and employees who work for you
8   nonbusiness-related emails, extensive ones, in the
9   middle of a workday while you're not there but
10  they're there and supposed to be working and you're
11  sending it to them and you think that's okay, is
12  that right?
13  A   Well, let me say it like this to you.
14       I don't think it's okay that our CFO goes
15  on Amazon.com and buy things and presents and stuff
16  like that and have them shipped to our office. I
17  don't think it's okay that there are other things
18  that they do and in groups of office that is
19  unrelated to Co-Op Optical.
20       There's a lot of things that they do not
21  do, they should not do but I feel if they're doing a
22  job, sometimes -- there's no employee in the world
23  that I think that works eight consecutive hours in a
24  day.
25       So therefore, if I may say, that if this

Page 163

1   was sent out, you always have a right to delete it
2   if it's a large email or not.
3        So I was not intending for them to stop
4   their work and send it out. Technically, I was off
5   on family medical leave and if they felt the way
6   they felt -- if Ted received this -- by now I have
7   found out Ted was a part of the coup to try to get
8   rid of me so he probably was not taken out of that
9   contact list and any and some of the others, too.
10       But even sending it to Scott McFall, that
11  was, that was just an error.
12       So if it's a big deal and this is -- you
13  think that I, this is how I run the office then
14  you're totally mistaken. It was just a contact
15  group and I had no idea who was in that contact
16  group because it does not list each and every one of
17  their names.
18  Q   Who set up the contact group?
19  A   I did but that doesn't mean that I have to remember.
20  Q   Is it fair to say that at least during the month of
21  November 2009 you sent out at least one of these
22  types of emails every single day to a contact group?
23  A   Maybe I did.
24  Q   How many letters did Mr. McGowan send to you?
25  A   I don't know, I don't remember.

Page 164

1   Q   Have you produced all of them here in connection
2   with this case?
3   A   If I have them, they are with my attorneys so I
4   don't know.
5   Q   Do you know what documents were produced to us on
6   your behalf?
7   A   Do I know what documents that were produced to you?
8   Q   Yes, ma'am.
9   A   On my behalf?
10  Q   Yes, by your attorneys.
11  A   Not all, I'm not sure.
12  Q   Okay.
13  A   I know that Blair had sent a letter or two, I'm not
14  sure.
15  Q   Oh, it's a letter or two now? Because before you
16  said he was sending all these letters so now it's a
17  letter or two?
18  A   I said Blair has been sending a letter or two,
19  letters to me all my life since I've been knowing
20  him.
21  Q   Since December 1, 2009, how many letters has Blair
22  McGowan sent to you?
23  A   Don't know, don't remember.
24       (Document Marked for Identification as
25       Defendant's Exhibit No. 20)

Page 165

1   BY MS. CAULEY:
2   Q   Who prepared Exhibit 20?
3   A   Probably Matt.
4   Q   When you say probably, did he, I mean, do you know
5   that for a fact or who provided the information, I
6   guess I should ask?
7   A   I don't -- let me check my attendance records you
8   gave me to see if I was there.
9   Q   I don't think I gave you any attendance records.
10  A   You gave me a record saying I was off.
11  Q   Saying that you asked for paid time off.
12  A   Right.
13  Q   Not that you were off.
14  A   Well --
15  Q   And you said you don't know if you were there or
16  not.
17  A   I think I said I wasn't there.
18       So if this was on 2-3-2010, I was off sick
19  for eight hours, I didn't prepare this letter.
20  Q   Was it prepared at your direction?
21  A   No. As you can very well see, I am cc'd on it.
22  Q   Oh, so it was to be -- this was a letter then from
23  Senator Raymond Murphy?
24  A   I guess so.
25  Q   Do you know anything about it?

Jacqueline Smith                   Smith vs Co-Op Optical                   December 15, 2010

### Page 166

1   A   Yeah, I read it.
2   Q   When?  Before it went out or --
3   A   No, I just read it now.  I'm reading it now, I've
4       seen it before in the past, though.
5   Q   But you didn't see it before it went out or you did?
6   A   No, I don't think it went out.  See, it says hold on
7       there, I don't know who put that on there.
8   Q   You don't recognize the handwriting?
9   A   Uh-uh, no.
10  Q   Okay.  So it's your belief that Exhibit 20 or at
11      least this letter, in effect, never went out, is
12      that right?
13  A   I'm not, I don't know.  I don't know.  I know that
14      there's a letter that was similar to this that they
15      put my name on there, too.
16  Q   Where was your name?  Well, your name is on here?
17  A   As the, as the -- I know.  But as the sender.
18  Q   Okay.  And you had nothing to do with any of that?
19  A   It looks like it was a duplicate, I think Raymond
20      Murphy could not come in and sign the letter.
21          It, yeah, it says it right here, Matt
22      Groen wrote this letter.  Raymond Murphy, the
23      initials under Raymond Murphy is Raymond Murphy and
24      Matt Groen so that was, this is Raymond Murphy's
25      letter and they may have told me to put my name on

### Page 167

1       it.
2   Q   Okay.  And it shows the MJG refers to --
3   A   Matt.
4   Q   -- the signal for someone who types a letter, right?
5   A   Uh-huh.
6   Q   Is that a yes?
7   A   Yes.
8   Q   Does it also -- but you believe he also put the
9       words down?
10  A   There's an RM in there that means Raymond Murphy.
11  Q   So you believe Raymond Murphy put the words down?
12  A   I know I didn't.
13  Q   Okay.  Did you have anything to do with, any
14      involvement at all in the preparation of this or the
15      sending out of this letter?
16  A   No.
17  Q   It was all done unbeknownst to you?
18  A   Right.
19  Q   Is that right?
20  A   Yes.
21  Q   Okay.  But I can't remember what you said, did you
22      say you did see it before, if it went out or
23      something?
24  A   I seen something -- no, no, to be, you know, I'm not
25      trying to be difficult.

### Page 168

1       I've seen this letter before and then I
2       think I seen this letter before with my name on it,
3       too.
4   Q   Okay.  Did you ever sign a letter?
5   A   Probably someone told me to sign it, yes.
6   Q   Okay.  But it wasn't your idea?
7   A   This is not, this is not, this is, this is not my
8       technique of writing, this is not my style.
9   Q   Okay.  Did you have any discussions with anyone
10      before this letter was sent out, either verbally or
11      by email, to decide how it should go or anything
12      like that?
13  A   No, I wasn't in the office.
14  Q   What is your home email address?
15  A   Jackee2311@comcast.net
16  Q   Okay.
17          (Document Marked for Identification as
18          Defendant's Exhibit No. 21)
19  BY MS. CAULEY:
20  Q   Please review this string of emails starting at the
21      back working forward and tell me when you're done
22      reviewing it.
23          Weren't you, in fact, involved in the
24      preparation and the sending of this letter, contrary
25      to what you just testified?

### Page 169

1   A   Not in the preparation but in the signing and the
2       sending probably.
3   Q   Contrary to what you just testified to, is that
4       correct?
5   A   No, I'm not going to say that, I don't agree with
6       that, I'm sorry.
7   Q   Didn't you just say a few minutes ago that you had
8       nothing to do with the preparation or the deciding
9       of who should sign this or getting this out?
10  A   Well, I said Ray Murphy should stop by and sign the
11      letter.  Matt had wrote the letter up, it appears
12      that Matt wrote the letter on Armida's behalf
13      possibly.
14  Q   Didn't you, in fact, direct him to write the letter?
15  A   No, no.
16  Q   And tell him what to put in it, in essence?
17  A   No, no, no.
18  Q   So if he says that you did, he's lying?
19  A   Well, that's what happens.
20  Q   Have you ever known Matt Groen to lie about
21      anything?
22  A   No, he's not a liar.
23  Q   In fact, he asked you how are we going to handle the
24      signature, who should sign it, right?
25  A   Uh-huh.

Jacqueline Smith

**Smith vs Co-Op Optical**

December 15, 2010

Page 170

1  Q   Is that a yes?

2  A   Yes.

3  Q   And you said Ray Murphy should sign the letter,

4      right?

5  A   Yes.

6  Q   Did it ever go out under Ray Murphy's signature?

7  A   I don't know, it says hold.

8      (Document Marked for Identification as

9      Defendant's Exhibit No. 22)

10 BY MS. CAULEY:

11 Q   Is that your signature on the second page of Exhibit

12     No. 22?

13 A   Yes.

14 Q   And that's the letter to which we've just been

15     referring, is that right?

16 A   Yeah.

17 Q   Do you know if that letter was ever sent?

18 A   This one was sent, yes. As you can see, it was five

19     days later, though. Oh, this is different. No.

20     Twenty-one, twenty-two.

21 Q   You testified earlier that you never thought that

22     Ben Edwards should receive more of a raise than what

23     was already being recommended, right?

24 A   Excuse me?

25 Q   That he should have got -- yeah. Remember

Page 171

1      testifying earlier and I just want to make sure I

2      have it right, that when you were on -- I'll just

3      ask it straight out.

4          When you were on leave --

5  A   Uh-huh.

6  Q   -- did you indicate to anyone that Ben Edwards

7      should get more of a raise than what you were

8      recommending, that he was, in essence, doing a great

9      job and should get more money for what he's doing?

10 A   No, not to my knowledge. I feel, I feel that, you

11     know, we, everybody was underpaid.

12 Q   Okay. But you never specifically singled him out

13     and said he should get more money, even though we

14     can't afford it, you know?

15 A   Not to my knowledge.

16 Q   Okay.

17 A   I don't remember.

18 Q   Okay.

19     (Document Marked for Identification as

20     Defendant's Exhibit No. 23)

21 BY MS. CAULEY:

22 Q   Do you see in Exhibit 23, in the second paragraph

23     where you indicate, as he temporary takes over the

24     position of president and CEO, I think that there

25     should be a higher compensation. But at this time,

Page 172

1      whereas our finances are concerned, this is the most

2      I can go without exceeding our budget or pro forma.

3      However, I believe he deserves a lot more than what

4      he is about to receive.

5          Does that refresh your recollection of

6      whether you ever recommended that he receive more

7      money than he was about to get?

8  A   February 15th. Yeah, I think he should have, I

9      think, I think he should have received more than

10     what he was receiving.

11 Q   That isn't what I asked you before. I asked if you

12     had ever told anyone that and you said no, you

13     didn't believe so.

14         So now do you see that you did, in fact, tell

15     Mr. Stepp that?

16 A   I see that. I think that that may have said it but

17     this is not my signature.

18 Q   So did you authorize this letter to be sent?

19 A   I don't remember.

20 Q   Did you ever know Armida Parisi to send out a letter

21     on your behalf that you had not authorized?

22 A   Yes.

23 Q   What letters did Armida Parisi ever send out that

24     you hadn't authorized?

25 A   Oh, there are several different memos and things

Page 173

1      that Armida sent out that I didn't never really

2      reviewed.

3  Q   Okay. I --

4  A   So but it was not related to this case.

5  Q   Wait, wait, okay. I'm sorry, I've got to back up

6      because I didn't ask you if you had ever known her

7      to send out a letter that you hadn't reviewed.

8          I asked if you ever knew her to send out a

9      letter that you hadn't authorized.

10 A   No.

11 Q   Do you believe you authorized this letter which is

12     Exhibit 23?

13 A   I believe so.

14 Q   At the end of January or the very first part of

15     February, like January, January 29th, did you ever

16     tell anyone that they had to keep it confidential

17     that you were going on leave?

18 A   I don't remember.

19 Q   Did you have any reason for people not to know that

20     you were going on leave?

21 A   I don't remember that either.

22 Q   Did you ever know directing anyone not to tell

23     Ted that you were going to go on leave?

24 A   I don't remember that.

25     (Document Marked for Identification as

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 174

Defendant's Exhibit No. 24)

2   BY MS. CAULEY:

3   Q   Exhibit 24, Temeng Darko sent you an email on
4       February 1st.  It says, again, I apologize for
5       mentioning that you may be out on leave to Ted.  I
6       will keep this message confidential.  Thanks.
7           Do you know to what he was referring
8       there?
9   A   Yes.  My medical leave.
10  Q   You told him don't tell Ted I'm going on medical
11      leave?
12  A   No, because Ted was being fired.
13  Q   So you told him on the 29th not to tell Ted that you
14      would be on leave?
15  A   And the person below is the person that I was hiring
16      as a CFO candidate.
17  Q   Could you just stick to my question, please?
18          I want to be clear, you told Temeng
19      Darko --
20  A   Uh-huh.
21  Q   -- not to tell the CFO that you were going to be out
22      on leave because you were firing the CEO, is that
23      right?
24          MR. SWANSON:  CEO?
25          MS. CAULEY:  CFO, sorry, thank you.

Page 175

1   BY MS. CAULEY:

2   Q   CFO.

3   A   Yes.

4   Q   Okay.  When had you decided to hire Ashok,
5       A-S-H-O-K, Parikh?
6   A   Parikh.
7   Q   P-A-R-I-K-H.
8   A   He was coming in a few days after Ted was leaving.
9       About, probably about a week after Ted was
10      terminated.
11  Q   I'm pretty sure that wasn't my question.
12          MS. CAULEY:  Can you tell me what it was?
13          (Whereupon the question was played back by the
14          court reporter.)
15  BY MS. CAULEY:
16  Q   When had you decided to hire Ashok Parikh?
17  A   Probably the beginning of January or mid January.
18  Q   Had you told anyone about that?
19  A   The Board had some knowledge.
20  Q   Who on the board knew that you were going to hire
21      Ashok Parikh?
22  A   The personnel committee.
23  Q   Constituted of who?
24  A   Marc Stepp, Ray Murphy was there and I think Letha
25      Lardy may have been there if I'm not mistaken.

Page 176

1   Q   And did you hire him?

2   A   Tried to.

3   Q   And why didn't you hire him?

4   A   Because they turned around and rehired Ted.

5   Q   In fact, didn't OFIR indicate that Mr. Parikh was
6       not a suitable candidate?
7   A   No, they did not say he was not a suitable
8       candidate.  He said that he was a part of an
9       organization that they had to -- he was a CFO at the
10      time that they took the takeover.
11          He -- and Parikh had explained to me and I
12      believed it, believed what he said in order with
13      that takeover and I thought he was the best
14      candidate because he knew and he also provided some
15      wonderful information on how to work with the State
16      of Michigan.
17  Q   Did Ted or Matt ever advise you about whether you
18      should ask for bonuses for people at the end of 2009
19      before you went to the personnel committee?
20  A   No, that was Ted and -- Ted and Charles.
21  Q   Okay.  And what was their advice?
22  A   They said that we shouldn't, that maybe we shouldn't
23      get bonuses but I think they were thinking about
24      thousands.  Only, they were only a hundred and fifty
25      and two hundred dollars.

Page 177

1   Q   How do you know what they were thinking about?

2   A   Because that's how it was in the past.

3           They thought it was going -- Ted has a
4       tendency to panic so he had, they think of thousands
5       of dollars when you say bonuses.
6           The bonuses were a hundred and fifty, two
7       hundred and three hundred dollars.
8   Q   Do you know for a fact what Ted or Charles had in
9       their mind when they advised you not to ask for
10      bonuses?
11  A   I have no idea what Charles and Ted was thinking.
12      The only thing I know they were thinking was to try
13      to eliminate me.
14  Q   When did you first believe that some of the
15      executives were plotting against you?
16  A   When I found a copy of the letter from Andy Broder
17      at the public fax machine and then a day or two
18      later I received an anonymous letter from an outside
19      source which I don't know where it came from with a
20      copy of the letter in there.
21  Q   That was when you first believed that they were
22      plotting against you?
23  A   Oh, it was in writing.
24  Q   That isn't what I asked you.  I asked you --
25  A   Yes.

Judy Jettke & Associates              Mt. Clemens, MI              586-783-0060

Jacqueline Smith                     Smith vs Co-Op Optical                     December 15, 2010

---

Page 178

1   Q   -- when did you --
2   A   Yes.
3   Q   When did you first believe that Charles and Ted were
4       plotting against you?
5   A   I found out probably December 8th.
6   Q   So before that you had no concerns about them
7       plotting against you?
8   A   No, I considered them very loyal employees.
9   Q   You never believed that Charles Benson was out to
10      get your job before then?
11  A   He surprised me the most.
12  Q   You never believed that Charles Benson was out to
13      get your job prior to that?
14  A   No.
15  Q   Okay.  Prior to December 2009 -- and I'm not
16      suggesting that you believed it at that time but
17      prior to that date, did you ever have a belief that
18      the State was going to take over Co-Op?
19  A   No.
20  Q   Did you ever tell anyone prior to that date that the
21      State was in danger of taking over Co-Op?
22  A   No.
23  Q   You never told Bob Morris in 2006 that the State was
24      going to take over Co-Op?
25  A   No, I told -- no.

---

Page 180

1       minutes ago?
2   A   Uh-huh.
3   Q   What lie did he tell?
4   A   When we had a meeting in my office between he and
5       myself and we talked over about the company and he
6       was agreeing with me.  But on the other hand when
7       the votes came down, he was one that voted against
8       everything.  So to me he was just blowing smoke,
9       some of the things that he was saying.
10  Q   What's the lie in there?
11  A   When someone says I agree with this, I agree with
12      that or agree with what you're saying about saving
13      the company.
14  Q   Uh-huh.
15  A   And then turn around and believe that I cannot save
16      the company and vote against me, to me, there's some
17      untruth to that.
18  Q   Did he tell you in the meeting that he supported you
19      and that he would vote in favor of keeping you, in
20      the meeting in your office?
21  A   We never -- we couldn't say that because we never
22      knew about the vote, ma'am.
23  Q   So did he ever tell you I will never, I will never
24      want to get rid of you and then he voted to get rid
25      of you?

---

Page 179

1   Q   You never told him in December 2009 that the State
2       was going to take over Co-Op?
3   A   No.
4   Q   So if he says that he's lying?
5   A   He is lying.
6   Q   Has he lied about -- do you know him to be quite a
7       liar?
8   A   I don't know.  Yeah, now I do.
9   Q   Oh, because of what I just said?
10  A   Yes.
11  Q   Oh, but prior to that you never thought he would
12      lie?
13  A   Yes.
14  Q   Oh, you knew him to be a liar prior to that?
15  A   Not a liar but a lie.
16  Q   You knew him to be a lie?
17  A   Liar and lie to me is two different things.
18      Somebody can tell a lie but then there's a habitual
19      liar.
20  Q   Oh, what --
21  A   So which one you think I'm -- which one are you
22      talking about?
23  Q   I'm sorry, I didn't mean to interrupt.
24      You say you're talking about a lie.  So
25      you knew Bob Morris to tell a lie prior to five

---

Page 181

1   A   We never spoke on that.
2   Q   Okay.  Were you ever told by any board member to
3       stop hiring friends and relatives?
4   A   Uh-huh, yes.
5   Q   Who told you that?
6   A   They didn't say that, they just -- the compensation
7       committee said that that might be a policy that
8       we'll put in place.
9   Q   They never told you to stop doing it?
10  A   No, not directly, I have nothing in writing that
11      says that.
12  Q   Do you know a Sue Ellen Eisenberg?
13  A   Yes, I do.
14  Q   Who is she?
15  A   She's a friend of mine.
16  Q   Uh-huh.
17  A   She's an attorney.
18  Q   Uh-huh.
19  A   And she's a wonderful lady.
20  Q   Okay.  Do you have an attorney/client relationship
21      with her?
22  A   I talked to her about this case before I retained
23      Dan Swanson and Jesse Phillips and we went over some
24      things.
25  Q   Jesse Young.

---

Jacqueline Smith                 Smith vs Co-Op Optical                 December 15, 2010

---

Page 182

1   A   I'm sorry.
2       WITNESS:  What did I call you?
3       MR. YOUNG:  Phillips.
4       WITNESS:  Jesse.
5       MR. YOUNG:  Young.
6       WITNESS:  Young.  Sorry about that.
7   BY MS. CAULEY:
8   Q   Are you sure?
9   A   I'm getting like you.
10      So I know Sue Ellen very, very well.
11  Q   Okay.  When did you first contact her about this
12  case?
13      MR. SWANSON:  Well, hold on for a second.
14      MS. CAULEY:  I'm just asking when she contacted
15  her, I'm not asking what they talked about.
16      MR. SWANSON:  Contacted her about this case --
17      MS. CAULEY:  Well, she's the one that said she
18  did that.
19      MR. SWANSON:  -- which references to the
20  content of communication.  So that does go to the
21  attorney/client privilege.
22  BY MS. CAULEY:
23  Q   When was the first time in 2010 that you contacted
24  Sue Ellen Eisenberg for anything?
25  A   I don't know, it was in the wintertime because I

---

Page 183

1   remember she had on a fur coat.
2   Q   That would be Sue Ellen.
3   A   And red glasses.
4   Q   Did you contact her while you were on leave and
5   still working at Co-Op?
6   A   Yes.
7   Q   Okay.
8       (Document Marked for Identification as
9   Defendant's Exhibit No. 25)
10  BY MS. CAULEY:
11  Q   Have you seen this document before?
12  A   Uh-huh.
13  Q   Is that a yes?
14  A   Yes.  I'm sorry, I am so sorry I keep doing that.
15  Yes.
16  Q   Did you prepare this document?
17  A   Yes, I finally started a time line.
18  Q   Okay, I'll ask the questions, if I may.
19      What was the purpose in preparing this
20  document?
21  A   To give her some type of idea what was going on.
22  Q   Okay.  And going on about what?
23  A   About what was going on at Co-Op Optical.  I just
24  needed some professional advice.
25  Q   Okay.  With you or with everyone?  Was this -- I

---

Page 184

1   guess what I want to ask is, does this have anything
2   to do with the Benson lawsuit?
3   A   Yeah.
4       MR. SWANSON:  Counsel, before we go into
5   further questions on this, I want to confer with my
6   client for a second.
7       WITNESS:  I think, I'm not sure.
8       MR. SWANSON:  To make sure we can deal with
9   this, if there is a privilege or if it's applicable
10  or not then we can --
11      MS. CAULEY:  Okay.
12      MR. SWANSON:  Take five minutes.
13      (Whereupon an off-the-record discussion was
14  held.)
15      (Document Marked for Identification as
16  Defendant's Exhibit No. 26)
17  BY MS. CAULEY:
18  Q   Here's Exhibit No. 26 and I ask you if you sent that
19  email to Matt Groen?
20  A   Yes.
21  Q   Okay.  And that was in relationship to what's been
22  marked as Exhibit No. 25?
23  A   No, this was done at home.
24  Q   And so was this email, correct, sent from home?
25  A   Yeah, but I wouldn't have, I wouldn't send this to

---

Page 185

1   Matt.
2   Q   So if he said that you did, that wouldn't be the
3   truth that he'd said that you sent it to him to
4   proofread or rewrite and add the dates, that you'd
5   pick it up tomorrow?
6   A   See, this is impossible because see, well, one is
7   dated the 18th, the other is dated the 22nd.
8   Q   Uh-huh.
9   A   And I wouldn't send this to Matt.
10  Q   So if he said you did then he's wrong?
11  A   Yeah.  This is a home document, I know that one for
12  sure.  That was, that was for another attorney.
13  Q   Okay.  Well, then can you explain why it got into
14  Matt Groen's possession?
15      MR. SWANSON:  Well, that lacks foundation.  We
16  don't know that it is in, was in Groen's possession.
17      MS. CAULEY:  Well, the record is going to
18  reflect that because that's what he produced.
19  BY MS. CAULEY:
20  Q   So if, in fact, assume for purposes of the question
21  that it was in Matt Groen's possession.
22  A   Uh-huh.
23  Q   Assume that the record is going to show that.  Can
24  you explain how it got in his possession, how
25  Exhibit 25 got there if you didn't send it along

---

47 (Pages 182 to 185)

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

---

**Page 186**

1  with Exhibit 26?

2  A   Unless it was sent in error because this is

3  basically from my attorneys, that has nothing to do

4  with Matt.

5  Q   Well, so if it got sent in error, it got sent by you

6  in error --

7  A   I will also send you a copy --

8  Q   Excuse me.

9  A   -- of the lawsuit to see if -- I'm sorry, ma'am.

10 Q   If it was sent in error, it was sent by you in

11 error, is that correct?

12 A   Yeah.

13 Q   Is it like you to send something that you consider

14 to be between you and your attorney, to send it to

15 Matt Groen in error?

16 A   It could have happened, I was having a migraine

17 headache.

18     MR. SWANSON:  Counsel, I've got a concern with

19 this whole line of questioning based upon the email,

20 Exhibit 26.  It says attachment, it references a

21 date 2-22-2010 period doc.

22     MS. CAULEY:  Well, that's a doc number, yeah.

23     MR. SWANSON:  But then the document Exhibit 25

24 that you're asserting is apparently the attachment

25 that was dated February 18, 2010.

---

**Page 187**

1     WITNESS:  That's what I'm saying.

2     MS. CAULEY:  Uh-huh.

3     MR. SWANSON:  So I'm a little confused.  I

4  mean, we've got no foundation that's clear that I

5  can see that ties 26 and 25 together as we sit here

6  today.

7     MS. CAULEY:  I'm just trying to understand how

8  Exhibit 25 got in the possession of anyone at Co-Op

9  other than your client.  If you can explain that

10 because we've got it and we had it and we're giving

11 it to you and showing you, so, you know.

12     MR. SWANSON:  But you're asking, I think, her

13 to really speculate.  But, you know, if she's got

14 some idea, I'm not going, I'm going to let her

15 testify to that but --

16     MS. CAULEY:  And you're right, it is, you know,

17 I am asking for speculation.

18 BY MS. CAULEY:

19 Q   Can you help us understand?

20 A   Can I ask him a question right quick?

21 Q   No, not while I'm asking a question.

22     MR. SWANSON:  You've got to answer her

23 question.

24 BY MS. CAULEY:

25 Q   Can you understand, do you have any reason to

---

**Page 188**

1  believe or understand why, how this could have

2  gotten to Co-Op, other than it was sent by you in

3  error?

4  A   The only thing that I know is that Kathy Bogas told

5  me that she knew Ted because he had came into her

6  office to file suit against Co-Op Optical.  She is

7  the only other person that I know that has this

8  document.

9     MS. CAULEY:  Maybe Co-Op, Kathy Bogas gave it

10 to you?

11     MR. WINIARSKI:  Uh-uh.

12 BY MS. CAULEY:

13 Q   So Kathy Bogas has now breached her confidentiality

14 with Ted Winiarski by telling you that he came in to

15 talk to her, right?  That's what you're putting on

16 the record here?

17     MR. SWANSON:  Well, that's not what she said.

18 She's not an attorney.  Kathy Bogas may have told

19 her these things.  Whether that was a breach or not,

20 God only knows.  I don't know what the understanding

21 is there.

22     MS. CAULEY:  That's what I'm asking.

23     MR. SWANSON:  You'll have to ask Kathy and Ted

24 or I'll ask Ted, I imagine.

25 BY MS. CAULEY:

---

**Page 189**

1  Q   Well, we can put these aside for now, those

2  exhibits, I'm not going to ask any more questions

3  about that.

4     Did you ever accept any gifts or

5  gratuities from individuals while you were working

6  at Co-Op through which you had, you know, business

7  relationships.

8  A   Such as?

9  Q   Any kind of gift or gratuity more than a cup of

10 coffee, a cookie, cake, candy?

11 A   I don't remember.

12 Q   Okay.  Do you have a Pistons ring, a sport ring?

13 A   Oh, yeah.

14 Q   Yeah, who did you get that from?

15 A   Ben Wallace.

16 Q   And was that while you had business relationship

17 with the Pistons and/or the Palace in terms of

18 advertising, et cetera?

19 A   No, that was, no, no we were in New York and there were

20 thirty tequila shots and he said that if I could

21 drink thirty tequila shots that he would give me a

22 ring.  He took off his ring and showed me his ring

23 or, you know, have it made up.

24     I couldn't take thirty tequila shots but

25 he gave them to me, I took a couple, two or three,

---

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

### Page 190

1    I'm not sure and I got a ring.
2    Q    Why were you in New York with Ben Wallace?
3    A    To go see the Pistons game along with the New York
4    Nicks, I think it's what they're called.
5    Q    And who paid for that trip?
6    A    I guess the Palace.  Cindy went with me, Cindy
7    Merenick.
8         It was a part of a package, they sent all
9    their vendors to one of the games that are close to
10   home.  There were several employees I sent before to
11   different places.
12   Q    That was a gratuity you accepted from the Palace, is
13   that right, the trip to New York?
14   A    Yes.
15   Q    Did you accept any other gratuities while you were a
16   member, while you were the chairman of the board,
17   I'm sorry, the CEO from anyone with whom Co-Op was
18   doing business?
19        Maybe, I'll suggest maybe you think about
20   the list of things that were removed from your
21   office and given back to you.  Were there any things
22   in all those that were given to you?
23   A    I haven't gone through those boxes yet.
24   Q    Did you have anything in your office, ma'am, that
25   were gifts from people with whom Co-Op did

### Page 191

1    business --
2    A    No.
3    Q    -- that you took with you?
4    A    Not to my knowledge.
5    Q    So other than this one trip to New York, which was a
6    gratuity from the Palace, you're telling us there
7    were no other gifts from anyone with whom Co-Op did
8    business that you received personally?
9    A    I'm telling you I don't remember until you brought
10   up the ring.
11   Q    Is it contrary to Co-Op policy for you to accept
12   gifts other than something which was nominal like
13   cookies or candy?
14   A    You're telling me that, you're asking me a question?
15   Q    I'm asking you if that was against Co-Op policy for
16   any Co-Op employee to accept a gratuity from someone
17   with whom you did business other than a nominal gift
18   such as cookies or candy?
19   A    I believe that is a policy.
20   Q    Okay.  Did you ever violate that policy?
21   A    Yes.
22   Q    Did you ever allow others to violate that policy?
23   A    Others have violated that policy.
24   Q    Did you ever allow others to violate that policy and
25   have it go unanswered?

### Page 192

1    A    Yes.
2    Q    So you didn't think that that was a policy that as a
3    CEO you should enforce at Co-Op, is that correct?
4    A    Most of them are glasses.  Yeah.
5    Q    Glasses?
6    A    Yeah.
7    Q    Like eye glasses?
8    A    Yes.
9    Q    Like other people were giving you eye glasses?
10   A    They would market, market them.  Everybody received,
11   even Ted received eye glasses.  Everybody received
12   eye glasses.
13   Q    You allowed --
14   A    Frames.
15   Q    You allowed that in violation of --
16   A    I didn't know --
17   Q    -- company policy?
18   A    I didn't know about it until our operations person
19   did that, I didn't do that.  I received some and the
20   operations person would give glasses out to others.
21   Q    And you allowed it to happen?
22   A    I found out about it later.
23   Q    What did you do about it?  Did you enforce the
24   policy?
25   A    I didn't tell, I didn't tell Ted and them to give

### Page 193

1    their glasses back.  They're still doing it now.
2    Q    Did you do anything to enforce the policy?
3    A    No.
4    Q    And you violated the policy on more than one
5    occasion.  Now you're telling us you got glasses,
6    too, right?
7    A    I have glasses, yes.  So does the board members.
8    Q    And you allowed that to happen?
9    A    I guess.  The board members are my bosses.
10   Q    I've got to ask you, you really think it's okay as
11   the CEO to violate the company policy and allow
12   others to do it?  Is that -- how do I understand
13   that?
14   A    You just, well, you don't understand, ma'am, is that
15   your Board would fire you in a blink of an eye.
16   Q    The Board would fire you if you didn't let Ted keep
17   a pair of glasses that someone gave him?
18   A    They may have, I'm not sure.  They fired me before
19   from family medical leave.
20   Q    How long were you the CEO?
21   A    From 2003 until 2010.
22   Q    Almost seven years?
23   A    Uh-huh.
24   Q    In that time, were you ever fired before March 19,
25   2010?

49 (Pages 190 to 193)

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 194

1   A   No.
2   Q   When did you first learn of a letter that had been
3       composed or that has been presented to the Board by
4       Andy Broder concerning some alleged -- well, raising
5       some concerns about your conduct?
6   A   I found that letter on the fax machine on December
7       8th, I believe.
8   Q   So the same day it was dated, is that right?
9   A   I think it was dated December 5th, if I'm not
10      mistaken.
11  Q   Well, the records are going to show it's December
12      8th, just, I mean, you'll see it.
13  A   Well, I saw it on the -- yeah, I think it was the
14      9th.
15  Q   You saw it on the 8th, okay. I just don't want you
16      to be tripped, I mean, it's going to say it but --
17  A   Okay.
18  Q   What fax machine?
19  A   The fax machine that's in the back near our copy
20      machine, the public fax that everybody can use.
21  Q   Public that I can walk in off the street and use?
22  A   Well, no, you could not, you're not an employee but
23      there's --
24  Q   I'm a member of the public, though, so it's not a
25      public --

Page 195

1   A   It's the public employee fax machine.
2   Q   Okay, it's the employee fax machine, all right.
3   A   Uh-huh.
4   Q   As opposed to a fax machine that's in someone's
5       office?
6   A   Correct.
7   Q   Okay, got it. And what time of day did you find it
8       there?
9   A   I was there until about, about 6:00, 7:00 when I
10      went back to fax something and saw it on there.
11  Q   Did you remove it?
12  A   Yes, I did.
13  Q   Okay. And you kept it?
14  A   Yes, I did.
15  Q   Okay. Do you know who put it there?
16  A   No, I don't.
17  Q   Do you have any facts to support a conclusion that
18      any board member put it there?
19  A   Uh-uh, no.
20  Q   Is that a no? Okay.
21  A   No.
22  Q   Did you show that letter to anyone? And let's say
23      like within that week, we'll start there. Well, no,
24      let's make it a little bit bigger than that.
25          From December 8th you said you saw it,

Page 196

1       until you went on leave, did you show that letter to
2       anyone?
3   A   Yes, I showed it to Sue Ellen.
4   Q   Okay. Other than an attorney because you don't need
5       to tell me about that.
6           Other than to an attorney, did you show that
7       letter to anyone? Like, did you show it to anyone
8       at Co-Op? How's that, I'll narrow it down.
9   A   I didn't show it to anyone at Co-Op.
10  Q   Okay. Did you ever share any of the contents --
11  A   Well, you know, I don't know, I might have given it
12      to Matt.
13  Q   Okay. When did you give it to Matt?
14  A   I said I might have, I'm not sure, ma'am.
15  Q   Okay.
16  A   I might have.
17  Q   Okay.
18  A   I might have given it to Matt because Matt carries,
19      keeps all the documents. I might have shown it to
20      him and maybe have given him a copy.
21  Q   Well, if you might have done it, do you have any
22      sense of when you might have done that?
23  A   When I probably, probably maybe the next day or if
24      it was the next week after I found it on the fax
25      machine.

Page 197

1   Q   Okay. And you gave it to him for what purpose?
2   A   Just for record.
3   Q   Okay. Did you give it to him in a sealed envelope?
4   A   Probably so. And slit --
5   Q   Are you guessing?
6   A   I'm guessing.
7   Q   Okay.
8   A   And usually what I would do is -- that is kind of
9       like the procedure, I would put things in a sealed
10      envelope and slide it up under his door because his
11      door was always locked.
12  Q   Okay. Did you say on the envelope, do not open?
13  A   No, I just said that -- I don't know what I said and
14      I'm not sure if I gave it to Matt to be honest with
15      you.
16  Q   Okay.
17  A   So I'm kind of, I'm kind of foggy in that area.
18  Q   And understanding and acknowledging your fogginess
19      about that, I'm just trying to get some
20      understanding.
21          Was it, if in fact you gave it to him, was
22      it your intent that he would read the letter?
23  A   Well, being in the meeting and recording, I think he
24      was already aware of the letter, recording for the
25      Board. So I didn't think it was, if I gave it to

Judy Jettke & Associates                    Mt. Clemens, MI                    586-783-0060

Jacqueline Smith                Smith vs Co-Op Optical                December 15, 2010

---

### Page 198

1     Matt, I don't think it would have been a surprise to
2     him.
3   Q   Okay.  So you believe that Matt was in that meeting
4     and recording what occurred with the Broder letter?
5   A   Yes.
6   Q   Okay.  Did he ever tell you that?
7   A   No, I just know he disappears and when -- because he
8     worked, his job was to take the minutes for the
9     Board of Directors whether I was there or not.
10   Q   Okay, okay.  Did you ever share the -- understanding
11     that the only person you may have shown it to other
12     than an attorney is Matt and you're not sure about
13     that, did you ever share the contents, either some
14     or all of the contents of that letter with anyone?
15   A   Yes.
16   Q   With whom?
17   A   The executive --
18   Q   Other than an attorney.
19   A   The executive staff.
20   Q   Okay.
21   A   I read it to them.
22   Q   Oh, you read the letter to the executive staff?
23   A   Yeah, a few, couple of weeks, a week or two later,
24     yeah.
25   Q   Why did you do that?

---

### Page 199

1   A   To let them know what was going on.
2   Q   Okay.  Did anyone tell you you had to tell them, you
3     had to read the letter to them?
4   A   No.
5   Q   Okay.  Prior to reading the letter to the members of
6     the executive staff -- and who were those members,
7     by the way?
8   A   Charles Benson, Ted Winiarski, Ben Edwards, Dr.
9     Joshua Lang and Matt Groen.
10   Q   Okay.
11   A   Well, he, no, Matt was not the executive staff, he
12     was the recorder.  I'm sorry.
13   Q   Okay, all right.  But he was at that meeting?
14   A   Yes.
15   Q   Yes, okay.  Prior to reading that letter to them
16     whenever it was -- well, first of all, was it at an
17     executive staff meeting?
18   A   Yes.
19   Q   Okay, that helps.  Prior to that meeting, had you
20     heard from anyone about what was in that letter?
21     Other than you having read it, had anyone come to
22     you and said, well, we know what was in that letter?
23   A   Yeah.  Raymond Murphy said something about it, I
24     don't remember what it is.
25   Q   Okay.  I'm sorry, I should have said other than a

---

### Page 200

1     member of the board.
2   A   Oh.  No, ma'am.  My spouse.
3   Q   Because you shared that with him?
4   A   Yes.
5   Q   Were there any rumors prior to you telling the
6     Board, I'm sorry, your executive staff?  Prior to
7     reading them the letter, were there any rumors about
8     what was in the letter?
9   A   Oh, yes.
10   Q   Okay.  What were those rumors?
11   A   I had heard that I had used my credit card and spent
12     six million dollars, I had taken money from the
13     company.  I was -- Charles Benson is going to be the
14     president of the company.
15       Ted told me himself that he doesn't want
16     to -- it wasn't him, he didn't want to be CEO and it
17     was Charles.
18       And that's -- rumors, people were asking
19     me questions.  Were we being taken over by the
20     State.  A lot, almost, whoah, I want to say if you
21     say a number, over twenty people shortly after that
22     asked me questions and then more questions came
23     after that because I had an open-door policy.
24       But I did not share any of the contents of
25     the letter with any of the employees or staff.

---

### Page 201

1   Q   Okay.  Now, I'm going to take that apart, let's see.
2       If the records indicated that you had a
3     meeting with the officers on December 14th and read
4     them that letter, would you have any reason to
5     question that date?
6       MR. SWANSON:  Did you say officers or executive
7     staff?
8       MS. CAULEY:  I said officers and I meant
9     executive staff.
10       MR. SWANSON:  Okay.  Ah, I wasn't sure.
11       MS. CAULEY:  Thank you.
12       WITNESS:  I don't remember the date.
13   BY MS. CAULEY:
14   Q   Okay.
15   A   I'm going to say I don't remember.  During the time,
16     I was having a lot of headaches and migraines and
17     taking medication for migraines.
18   Q   I don't know if I brought those minutes with me,
19     they're somewhere.
20       Well, the records will reflect that.  I
21     believe that on file it's December 14th.
22   A   Okay.
23   Q   So assuming that that's right and we'll check the
24     record to make sure and if it's wrong, all these
25     questions --

---

Judy Jettke & Associates      Mt. Clemens, MI      586-783-0060

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

---

Page 202

1   A   And my December 8th day may be off a little bit,
2       too.  It may be the date of the letter, I'm not
3       sure.
4   Q   Okay.  The date of the letter is December 8th, for
5       your information.
6   A   Okay, all right.
7   Q   I think we can agree on that.  You believe you saw
8       it on December 8th as well?
9   A   I don't know if it was December --
10  Q   Let me see if this --
11  A   MBA came down, that was December 5th.
12  Q   Who came down?
13  A   It was one of our partners --
14  Q   Oh, MBA, okay.
15  A   -- came down.  MBA came down, that was December 5th.
16      December 6th was my birthday.
17  Q   This might help you, what I'm about to show you,
18      okay?
19  A   Okay.
20      (Document Marked for Identification as
21      Defendant's Exhibit No. 27)
22      MR. SWANSON:  Counsel, this has got a big black
23      square in it like something has been redacted from
24      it.
25      MS. CAULEY:  Yeah, it has because this was to

---

Page 203

1       Andy Broder.  I mean, it was something from Andy
2       Broder and it had to do with, actually had to do
3       with the Cordell case but it was attorney/client
4       privilege, that's why it's redacted.
5       WITNESS:  Oh, I seen it on the 9th then.
6       I had a chance to reach --
7   BY MS. CAULEY:
8   Q   There's nothing harmful for you to see but it was
9       still attorney/client and we were doing our best to
10      protect that.
11  A   Yep, I wrote this.
12  Q   So you wrote this to Andy Broder?
13  A   I sure did.
14  Q   And you're telling him that you saw the letter today
15      and that's Wednesday, December 9th, is that right?
16  A   So it's the 9th instead of the 8th.
17  Q   Okay, okay.  So now we know that you saw the letter
18      on the 9th and we're going to assume for purposes of
19      these questions that you met with your executive
20      staff on the 14th.
21  A   Okay.
22  Q   Because I think that's what the records are going to
23      show.
24  A   Okay.
25  Q   So based on that assumption, assuming that we're

---

Page 204

1       right, from the 9th to -- well, let's make it from
2       the 8th.
3       From the 8th to the 14th, tell me every rumor
4       you heard about anything that was said about you in
5       the Broder letter.
6   A   That I had messed up the company, the State of
7       Michigan was coming over to take over Co-Op Optical
8       because of my excessive spending, I had spent over
9       six million dollars on credit cards, I abused my
10      credit cards, that the Board is coming in to make a
11      decision to make Charles president of the company, I
12      was, I think, a liar, I had -- oh, wow, and rumors
13      are still going around.
14      Let's see.  That's basically what I kept
15      hearing is that I was taking money out of the
16      company.
17  Q   Okay.
18  A   And I had, and I was -- I even heard one that I was
19      supposed to flee the country or something because I
20      had taken so much money from the company.
21      And the six million dollars was the one
22      that was the general comment in the retail offices
23      and the administrative offices that were coming from
24      me back of the offices and also some of the retail
25      employees.

---

Page 205

1   Q   Okay.  Now, between the 8th of December --
2   A   Uh-huh.
3   Q   -- and the 14th of December, those six days, give me
4       the names of every person who shared with you any of
5       these rumors that you've just enunciated.  Between
6       those dates.
7   A   All I can say, some of the people, I do not know
8       them by name.  I do not know every single employee's
9       name.  They may see me in the hallway, they may see
10      me at an office so I don't know.
11      I know the -- and then there are employees
12      that have left that were saying --
13      But Annette Smith --
14  Q   These are people who reported to you --
15  A   No.
16  Q   -- these things?
17  A   Oh, these are people that mentioned --
18  Q   Yeah, who, I'm sorry, who told you.
19  A   -- things, mentioned things to me.  Right.
20  Q   That's what I meant to say.
21  A   What is her name, she had a mole on her face, oh,
22      Gloria Davis.
23  Q   Is that the person with the mole?
24  A   No.
25  Q   No.

---

Judy Jettke & Associates                Mt. Clemens, MI

586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

## Page 206

1  A  I can't think of the lady's name with the mole.
2  Q  Okay.
3  A  Oh, she has a French name.  Muzette.
4  Q  Okay.
5  A  Bernard Davis, Courtney Hooper.  That was such a
6  long time ago.  I know there was a couple of people
7  in accounting but I don't remember their names and
8  who -- things were just going so, spinning in my
9  head so much I couldn't remember.
10     I can't remember but I remember they were
11  probably union employees and at that particular
12  time, Armida and I discussed it.
13  Q  Did you tell Armida what was in the letter?
14  A  Yeah, I think so.  Yes, I believe so, yes.
15  Q  Did you tell her like pretty much after, right after
16  you read it?
17  A  Yes.  She was one I trusted at that time.
18  Q  Didn't you trust Matt at that time, too?
19  A  I trust Matt, I still trust Matt.
20  Q  Would you have given him the letter right about then
21  then for the same reason?
22  A  Yes, unless he was in the room with the Board.
23     Yeah, that's why I told you I didn't
24  remember.
25  Q  Yeah.  In fact, didn't you -- you talked to him

## Page 207

1  about the contents of the letter didn't you?  You
2  didn't just give it to him?  Do you remember talking
3  to him about it?
4  A  I might have.
5  Q  Okay.
6  A  Let's see.
7  Q  Armida Smith, Muzette.
8  A  No, Armida Parisi.
9  Q  No, I'm sorry, Annette Smith.
10  A  Uh-huh.
11  Q  Muzette, Gloria Davis, Bernard Davis, Courtney
12  Hooper, people in accounting can't remember their
13  names but they might be union and Armida and Matt.
14  A  And there was some others, I just don't remember
15  their names, you know, just looking at them.
16  Q  All right.  Maybe as we talk because I'm going to
17  ask you more questions about these.
18  A  Okay.  If they --
19  Q  If you think -- they might come to you.
20  A  If they pop up, I'll make sure I write them.
21  Q  Okay.  Now who is Annette Smith, what is her
22  position?
23  A  Annette is an optician.
24  Q  What did she say to you exactly, the precise words?
25  A  Well, wowwee.  I don't remember the precise words.

## Page 208

1     We were walking in the hall and she was
2  going to the lab or coming or going to HR, I'm not
3  sure.  She might have been laid off at the time.
4     Maybe something like, I heard what's
5  happening.  Something like that.  Are we and
6  people -- since the State found out, the State knows
7  about these things, everybody was concerned about
8  the State, the State knows about these things,
9  what's going to happen to Co-Op.
10     And I just told them I couldn't answer
11  those questions.
12  Q  What did she tell you about what was in the letter
13  about you?
14  A  I don't remember.
15  Q  You've dropped an earring there.
16  A  Thank you.
17  Q  You found it?  Okay.
18  A  Uh-huh.  Thank you.
19  Q  Well, let me ask you this.  Who at Co-Op do you
20  charge with defamation?  Who defamed you?
21  A  Charles, Ted, Nicole Nault, Blair McGowan for
22  stealing.  I'll say defamation of character would be
23  those people and I was guilty until proven innocent
24  from the Board of Directors, most of the Board of
25  Directors.

## Page 209

1  Q  But you charge Charles, Ted, Nicole and Blair with
2  defaming you, is that accurate?
3  A  No, and also Benny, Bernie Adams.
4  Q  Okay.
5  A  Marc, Marc Stepp probably.  I'm going to say that
6  because they thought that I was guilty until -- they
7  thought I had actually done those things until the
8  investigation was completed.  That's, that was what
9  was, to me, that's how I felt.
10  Q  Oh, they didn't tell you that, you just felt that
11  way?
12  A  No, they -- I felt that way.
13  Q  Okay.  Charles, Ted, Nicole, Blair, Bernice and
14  Marc?
15  A  Uh-huh.
16  Q  Anyone else?
17  A  Not that I can think of right now.
18  Q  Okay.  Other than providing Andy Broder and the
19  board members --
20  A  And also I'm going to say over the defamation, I
21  don't know who believed it because we got a letter
22  saying that that was sent to the Board, excuse me,
23  that was sent to the Board saying that I should be
24  let go, that was given to all, an anonymous letter
25  sent to the Board of Directors that says that I

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

Page 210

1    should be let go for what I'm doing.
2           So I'm going to say it could be up to a
3    hundred and -- a hundred employees that would have
4    known because the employees talk.
5           So addressed to me, I don't know but the
6    word was out there.
7    Q   Well, that's what I have to get to. Who put the
8        word out?
9    A   I don't know. Now your guess is as good as mine.
10   Q   Okay. What is the word that was put out?
11   A   That I was taking money from the company.
12   Q   Okay.
13   A   Bob Jenuzzi was one that said, until Jackee started
14       stealing from the company. I think that came --
15       that was thirdhand information.
16   Q   Do you know if Charles Benson said anything about
17       you to anyone other than OFIR, the Board and the
18       attorney?
19   A   I don't follow him around, no. He probably said it
20       to Nicole Nault.
21   Q   Okay. Do you know of anyone, do you know if whether
22       Mr. Winiarski said anything to anyone about you
23       other than the Board, maybe OFIR, we don't know
24       and --
25   A   Ted tells everything.

Page 211

1    Q   Excuse me. -- and the attorney Andy Broder?
2    A   Ted tells everything. I, he's not --
3    Q   Do you know for a fact that he revealed anything
4        that was in that letter prior to the 14th of
5        December 2009?
6    A   Oh, Melvin Taylor. Yes.
7    Q   Could you answer the question about Ted, please?
8        You're going back and answering questions that I
9        haven't, that I asked before.
10   A   Well, the name came up to me, I'm sorry.
11          MR. SWANSON:  You told her to come up with
12       names --
13          WITNESS:  As we talk.
14          MR. SWANSON:  -- whenever she thought of them.
15   BY MS. CAULEY:
16   Q   Can you answer the question I was asking you,
17       please?
18   A   Okay.
19   Q   And that was, do you know for a fact that Ted
20       Winiarski told anyone what was in that letter, any
21       accusations about you stealing from the company
22       prior to December 14, 2009?
23   A   I don't know.
24   Q   Do you know for a fact or any facts to support a
25       belief that Nicole -- well, was Nicole an executive

Page 212

1    of the company?
2    A   No.
3    Q   Do you know or do you have any facts to support a
4        conclusion that Blair McGowan told anyone about any
5        of the allegations raised in the letter about you
6        prior to, outside of the Board of Directors and
7        talking with them and the attorney, if he said
8        anything to anyone outside of that group prior to
9        December 14, 2009?
10   A   If I remember correctly, I remember him saying that
11       he consulted with his brother that's an attorney.
12   Q   Okay. Did he tell you when he consulted with his
13       brother an attorney?
14   A   No, Blair is not like that.
15   Q   Okay. Other than that, any other facts to support a
16       conclusion that he told anyone --
17   A   No.
18   Q   -- about the allegations in the letter that Andy
19       Broder presented the Board?
20   A   No.
21   Q   Okay. Do you know of any facts to support a
22       conclusion that Bernice -- well, let's do it quicker
23       -- that anyone on the Board told anyone outside of
24       the Board of Directors and their attorney what was
25       in that letter and the allegations against you prior

Page 213

1    to December 14, 2009?
2    A   I'm going to say, no, I don't know.
3    Q   Okay. Did any one of the people who came to you
4        whether named or not named, whether you can't think
5        of their name yet or not, did any of those people
6        from whom you heard rumors, tell you the source of
7        the rumor from where they got this information?
8    A   The letter.
9    Q   Who told you that the letter is where they got the
10       information?
11   A   Employees have the -- everybody almost have a copy
12       of the letter. So of the, of the Benson case thing,
13       there's a lot of people that the letter, a lot of
14       people have that letter.
15   Q   What, the Benson, the -- what?
16   A   The allegations against me.
17   Q   In the Benson case?
18   A   Yes, a lot of people have that.
19   Q   Have the complaint? A copy of the complaint you
20       mean?
21   A   Not the legal complaint but the complaint from Andy
22       Broder.
23   Q   You're talking about the Broder letter?
24   A   Yes.
25   Q   And it's your allegation that everybody has a copy

---

Judy Jettke & Associates                    Mt. Clemens, MI                    586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

Page 214

1  of the Broder letter?
2  A  There are several, not everybody, I'm --
3  Q  Okay.
4  A  Let me rephrase that.
5  Q  Okay.
6  A  Several people have that.
7  Q  Okay.  Did they tell you from where they got it?
8  A  No.  I just assumed it was from the fax machine.
9  Q  Well, you didn't assume it was in the fax machine,
10    you found it in the fax machine, right?
11  A  Well, everybody had left, yes, the office except for
12    me.
13  Q  You don't know if it was faxed to anyone?
14  A  Oh, yes, you could tell it was faxed to someone
15    because it was still in the tray.
16  Q  Okay.  To whom was it faxed?
17  A  It didn't say.
18  Q  You couldn't read back in the machine to see?
19  A  I don't know how to use it, no.
20  Q  Okay.  So you don't -- all right, I'm trying to get
21    to the source of these rumors.
22      Where do you, you know, I know you probably
23    have an idea where you think it came from but how
24    did people get the letter?  Did anyone ever tell you
25    how they got the letter, the Broder letter?

Page 215

1  A  No.
2  Q  And you don't know the -- you say you also received
3    another copy by an anonymous source?
4  A  Yes.
5  Q  And you have no idea who that was from?
6  A  I just know it was from 48211 zip code, Detroit.  I
7    think it was a 48211 zip code in Detroit.
8  Q  Okay.
9  A  But it was not -- that's the only thing I know.
10  Q  Okay.  Do you have any facts to --
11  A  48211, yeah.
12  Q  Do you have any facts to support a conclusion that
13    any board member released, gave the letter to
14    everybody or anybody?
15  A  Oh, I forgot about this.
16  Q  Okay.
17  A  I was, after one meeting I was cleaning up the board
18    room and one of the letters were left, one of the
19    letters was left on the board table.  I found out it
20    was Ray Murphy's copy and I returned it to him the
21    next time I saw him.
22  Q  Okay.  So no one else got it, you found it and gave
23    it back to him?
24  A  Well, that was, the meeting was earlier that
25    morning, it had been on the board table for a long

Page 216

1    time.
2  Q  Okay.  Do you know of anyone that saw it?
3  A  I know people went into the board room to get water.
4  Q  Do you know of anyone who saw the letter?
5  A  No, I didn't watch them.
6  Q  Okay.  Any other facts to support a conclusion that
7    anyone at Co-Op spread this letter around?
8  A  Oh, I think Temeng saw it.
9  Q  Okay.  Who did he see it from?
10  A  I don't know.
11  Q  Okay.  Did you ever talk about the contents of the
12    letter or the allegations against you with any other
13    group?
14  A  No.  No.
15  Q  Never?
16  A  No, it was embarrassing.
17  Q  Yeah, okay.
18  A  And hurt, it hurt.  It did, it was embarrassing, it
19    hurted, it humiliated me, it took, it took so much
20    out of me to read things like that and for somebody
21    to think that way about me.  It hurted to know that
22    people that I trust and I loved in that
23    organization --
24  Q  Uh-huh.
25  A  Ted, Charles, Ben, Dr. Lang, Nicole and people that

Page 217

1    I would do anything in the world for, to sit down
2    and concoct something of that nature, to try to get
3    rid of me.
4  Q  Well, you did, in fact, violate the company policy
5    regarding credit card usage, right?
6  A  Yes, I did.
7  Q  Okay.
8  A  Along with everybody else.
9  Q  You're the --
10  A  I know you don't want me to say anything --
11  Q  Well, you're the boss, right?  So if the boss does
12    it, it's okay for everybody to do it?
13  A  No.  In 2007 I had forgot about that policy, ma'am.
14    It was brought to my attention back in -- I forgot
15    about the policy.  The policy was never enforced.  I
16    put it in force in 2007.
17  Q  Okay.
18  A  And that was because of one person that used the
19    credit card that was involved with Charles where
20    they had rented a room at the Palace for a concert
21    and one person did not have enough money to pay for
22    it and there was going to be some, there was some
23    problems going on with Charles and this other name,
24    other girl named Nicole Weldon.
25      So therefore, I said no one uses a credit

---

Judy Jettke & Associates            Mt. Clemens, MI                    586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 218

1   card for personal, for personal reasons.
2        So many things go through it and at times
3   I had a credit card that looked just like the one
4   that I had at the company.  Sometimes I used it
5   purposely, sometimes I used it by mistake.  But
6   whatever I did, I tried to make sure I paid
7   everything back.
8        I told anybody in several meetings
9   including the CFO if they knew about the policy that
10  if they used the credit card to make sure that when
11  you turn in your credit card statement, a check is
12  attached.
13       Sometimes they paid with their own credit
14  cards to pay for it.
15       So if I violated that policy, I did it
16  ignorantly and I did not realize that it was in
17  force.  I did not do it purposely.
18       So I didn't go around trying to break
19  every rule in the office.
20  Q   In fact, doesn't the policy say that as part of the
21  policy it was your responsibility to review those
22  credit card statements every month?
23  A   I delegated that to Armida Parisi.
24  Q   So you did not follow through to make sure that was
25  being done properly?

Page 219

1   A   I can't do every single thing in the office.  My job
2   was also to delegate things.
3        There were several different credit cards
4   that are out.  Technically, if someone was looking
5   at them closely and we would find them, it was
6   supposed to be for the CFO but he would miss some of
7   them.
8        So basically I had Armida look through it
9   so she could go through details and check and do
10  things like that, tell people how much they owed and
11  brought a check and make sure that it was turned
12  back in to the company so the company wouldn't lose
13  any money.
14  Q   Did you always pay with that statement, any amounts
15  that were due from your personal use, every time
16  right with the statement?
17  A   Yes, unless, unless I forgot or unless I was doing
18  something or busy on some other project.
19       I know during the ENR merger, there was a
20  lot of things going, sometimes my statement piled up
21  for a couple of months.
22  Q   Isn't it true that on several occasions it was a
23  matter of weeks and/or months before you paid back
24  money that you had charged on the company credit
25  card?

Page 220

1   A   I don't remember and I don't know.  Sometimes it
2   was, sometimes it wasn't.
3        I gave it to Armida and wrote out the
4   check and gave it to her.
5        I know that there was one time that I had
6   not had a chance to get to the bank where I didn't
7   put it in there.
8        But I also had to put the receipts with
9   the credit cards, then write the checks.  So
10  sometimes it took me time to get the receipts
11  together.
12       I'm not saying I was the most organized
13  person in that area.  But trying to get the receipts
14  together, put them together and then write the
15  check.
16  Q   In fact, didn't someone from OFIR tell you that that
17  practice was, in fact, stealing from the company
18  because you were taking an unauthorized, an
19  unauthorized interest --
20  A   No one from OFIR --
21  Q   -- interest-less loan, I mean and interest-free
22  loan?
23  A   No.  No, no one from OFIR told me that.  Who told me
24  that from OFIR?
25  Q   They told you in open meeting with many other people

Page 221

1   there, didn't they, in fact, that that was, that was
2   stealing money from the company is a practice that
3   should never be allowed?
4   A   No, it was not an open meeting.  I would like to see
5   that in those minutes.
6   Q   Okay.  Then do you think that that's not stealing
7   from the company?  By using a personal credit card
8   to charge it on the company card, do you believe
9   that that is not, in fact, stealing from the company
10  by taking an unauthorized loan?
11  A   I don't believe it was stealing.  Sometimes we were
12  on business trips.
13  Q   I asked for personal use, ma'am.
14  A   That's what I'm saying.
15  Q   Personal use.
16  A   Personal use on business trips.
17  Q   So you were taking a personal loan from the company
18  by using their credit card and it wasn't authorized,
19  correct?  Whenever you charge something personally
20  on the card, that's like a personal loan.
21  A   So you're saying everyone except for three people
22  within the company were all in error?
23  Q   Ma'am, I'm talking about the CEO, the person who
24  wrote the policy and who was --
25  A   You're trying to put it on me.

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 222

```
 1   Q   -- and who was in charge of that.
 2           I want to know if you set the standard for
 3       taking unauthorized loans from the company on a
 4       regular basis by using the credit card for personal
 5       use?
 6   A   I used the credit card for personal use.
 7   Q   Do you have any facts, do you have any information
 8       as to who put the Broder letter on the fax machine?
 9   A   No.
10   Q   You have no idea, okay.
11           Do you know how the Broder letter was
12       presented to the Board of Directors?
13   A   No.
14   Q   You allege in paragraph fourteen of your complaint
15       that upon information and belief, Co-Op caused
16       allegations of theft to be published to third
17       persons.
18           I need to know all the facts that you have
19       to support that allegation in paragraph fourteen.
20   A   First of all, the letter was sent to the Board of
21       Directors, therefore, should never have left that
22       room or no one should ever have found out about it
23       except for the board members.
24   Q   May I have an answer to my question, please?
25   A   That was the answer.
```

Page 223

```
 1   Q   Oh, I'm sorry.  Oh, okay.  I didn't recognize it as
 2       that.
 3           So just because somehow it got out, it was
 4       the Board's fault?
 5   A   Yes, because it was in their, it was in their, it
 6       was in their hands.  It was only supposed to be
 7       distributed to the Board.  It even told them, Jackee
 8       Smith shouldn't even see this.
 9   Q   Okay.  Well, you showed it to people, right?
10   A   Armida, yeah.  It's about me.
11   Q   Matt?
12   A   Matt would have known anyway.
13   Q   And you read it to the executive staff?
14   A   Right.  That was after it's been all over the
15       office.
16   Q   In those six days with --
17   A   Didn't take long.
18   Q   Okay.  Tell me, again, how do you know that those
19       people who were talking about Benson is going to be
20       president, I stole six million dollars from the
21       company -- first of all, is there anything in the
22       Broder letter that accused you of stealing six
23       million dollars from the company?
24   A   Uh-uh, no.
25   Q   Okay.  So that didn't come from the letter?
```

Page 224

```
 1   A   No.
 2   Q   Do you know whoever started that rumor that you
 3       stole six million?
 4   A   That's exactly what it is, a rumor, no.
 5   Q   Okay.  So who started it?
 6   A   I don't know.  If I know I would address that and
 7       tell you.
 8   Q   Okay.  So was there anything in the letter that said
 9       that Benson is going to be president?
10   A   No, that was a rumor and Ted said that.  He says
11       Charles want to be president, I don't.
12   Q   Okay.  You knew Charles wanted to be president, he
13       had told you that, right?
14   A   He told me that during the interview.
15   Q   And he's told you that since then?
16   A   No.
17   Q   You knew that, you knew he was out to get you?
18   A   I did?
19   Q   Didn't you?
20   A   No.
21   Q   No?  Never told anybody that?
22   A   No.
23   Q   Okay.  But that wasn't in the letter?
24   A   No.
25   Q   Okay.  So that didn't come from the letter.
```

Page 225

```
 1           Is all the defamation that you're charging
 2       based on what was in that letter?
 3   A   No.
 4   Q   Well, what else is there?  What was, I mean, your
 5       complaint says it's based on the letter.
 6   A   That's the letter but defamation is not only
 7       defamation, it was, it's going, it's on the
 8       Internet, it's on the newspaper --
 9   Q   Okay, I'm sorry, I'm going and I am, I acknowledge
10       I'm interrupting here.  I'm just talking about the
11       statements in the letter, not where they've maybe
12       been republished.
13           Is there anything other, like, for
14       example, are you --
15   A   I thought --
16   Q   Are you suing -- this might clear it up.
17   A   Okay.
18   Q   Are you suing Co-Op because someone said I heard you
19       stole six million dollars?
20   A   No, I'm suing Co-Op because they said that I was,
21       I'm a thief.
22   Q   Because of the letter, because of the statements in
23       the Broder letter, is that right?
24   A   Yes.
25   Q   So if it was over the Broder letter, you're not
```

Judy Jettke & Associates            Mt. Clemens, MI                    586-783-0060

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

Page 226

1   blaming Co-Op for anything that's just out there
2   floating if it wasn't in the letter, is that fair to
3   say?
4   A   The Board is Co-Op.
5   Q   But you're only blaming the Board for what was in
6   the letter, is that right?  You're not blaming them
7   for people saying Jackee stole six million dollars
8   because it wasn't in the letter?
9   A   They had, they knew about the credit cards, they may
10  not have known the amount.  So to me, if I may or do
11  you want me to?
12  Q   Go ahead, go ahead, go ahead.
13  A   To me, that tells you that leaks -- if you started
14  at one person and go down to fifty, the information
15  is going to be wrong by the time you get to the
16  fiftieth person.
17  Q   Okay.
18  A   So it's, it was, what I'm, I understand that it was
19  blown out of proportion, I know it's not six
20  thousand dollars so that's, to me is irrelevant.
21  Q   Oh, is it six thousand?  You said six million.
22  A   Six million.  Million, I'm sorry.
23  Q   Okay.
24  A   It's kind of like when I make, you make mistakes.
25  Q   Okay.

Page 227

1   A   So what I'm saying is defamation of character to me
2   is that now, that has hindered me from employment.
3   Q   Well, we're going to get to that but --
4   A   Well --
5   Q   Go ahead.
6   A   -- you asked me the question.
7   Q   Go ahead, go ahead.
8   A   Hindered me from employment.  The optical industry
9   is a close circle, people outside now, outside of
10  the optical industry are very well aware of what has
11  taken place, they know different things.
12      So defamation of character to me means a
13  lot of things that has, has, has said things about
14  me that are not necessarily true or totally
15  accurate.
16  Q   The thing is, in order to find Co-Op responsible, I
17  have to know who at Co-Op did these things.
18      And you've given me your list of people,
19  that you think Charles did, Nicole, Blair, Bernice,
20  Marc and then what they said and two whom.
21      Because, see, you've told people about
22  this so how do we know that those people aren't
23  ruining your reputation?
24      I need to know what you believe came from
25  Charles, Ted, Nicole, Blair, Bernice and Marc.  What

Page 228

1   they said and to whom they said it and when they
2   said it.
3       Can you provide me with that information?
4   A   If I knew, I would have it in front of you.  I do
5   not know.  They -- I know that it didn't come from
6   me and I know that Charles -- Charles, Ted and
7   Nicole were all a part of it.  It says that in the
8   document.
9   Q   Okay.  Do you think Charles, Ted and Nicole defamed
10  you --
11  A   And Larry Gardiner, I'm sorry, he was a part of it,
12  too.
13  Q   Okay, well, Larry wasn't even working for Co-Op at
14  the time, was he?
15  A   Yeah, that's another person outside the Board that
16  could have said something about that letter.
17  Q   Okay.  But he wasn't even working for Co-Op?
18  A   No.  I don't know.  That's why -- isn't that funny?
19  That is really funny because Ted, Charles and Nicole
20  added Larry Gardiner to it.
21  Q   Okay.
22  A   And he's outside the Board and they're getting his
23  advice.
24  Q   Okay.
25  A   I'm glad you brought up that point.

Page 229

1   Q   Okay.  Can I get to my question?
2       Do you believe that Charles, Ted and
3   Nicole defamed you when they went to Andy Broder and
4   the Board with concerns they had about you?
5   A   Yes, because a lot, because a lot of it was, are
6   lies.
7   Q   So they had no right going to the Board about you?
8   A   They could have, there's a way to, they should --
9   they can go to the Board, yes.
10  Q   Okay.  So they --
11  A   In a different way.
12  Q   You mean, saying different things or just using a
13  different process to get there?
14  A   Process.
15  Q   Okay.  So it's not what they said to the Board that
16  bothers you, it was the process?
17  A   Yes, you could say that.
18  Q   Okay.  And who did Blair defame you in front of, who
19  did he say bad things about you to?
20  A   Oh, he said bad things about me all the time in
21  front of meetings.  There's records of minutes of
22  meetings and everyone knew that Blair has wanted me
23  to be off, be out of there for years.
24  Q   Okay.  Those are in board meetings, is that correct?
25  A   Yes.

Judy Jettke & Associates          Mt. Clemens, MI

586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

**Page 230**

1  Q   Okay.  And to whom did Bernie defame you?  To other
2      board members?
3  A   Charles and Ted.
4  Q   And Charles and Ted, okay.  What did Bernie say to
5      Charles and Ted about you?
6  A   It was not told to me directly, I just know that
7      they were all three in the office together
8      discussing the situation and Ted and Bernie were
9      always in the car together and talking so I don't
10     know, I have no idea.
11 Q   Okay, I'm going to try it again.
12         Can you tell me what Charles, Ted, Nicole,
13     Blair, Bernice and Marc said about you to whom and
14     when?
15 A   No.
16 Q   Is there anyone other than those?  And I know you're
17     saying Larry Gardiner.  You can sue him separately,
18     he's not in this.
19 A   I am.
20 Q   You are?  Other than Charles, Ted, Nicole, Blair,
21     Bernice and Marc, anyone else at Co-Op who you say
22     defamed you?  I want to just make sure I've got it
23     all.
24 A   That's it.
25 Q   That's it, okay.  And other than reading the letter

---

**Page 231**

1      to -- well, and other than talking to Armida, maybe
2      giving it and talking to Matt and reading the letter
3      at the executive, yeah, executive staff meeting, you
4      never talked to anyone else at Co-Op about those
5      allegations, is that correct?
6  A   No, even the janitor knew about it.
7  Q   Okay.  But is that correct what I said?
8  A   Yes.
9  Q   Okay.  Did you ever go on a trip where you took a
10     bodyguard?
11 A   A bodyguard?
12 Q   Uh-huh.
13 A   No.
14 Q   Never took a bodyguard?  Who is Courtney Hooper?
15 A   Oh, that's the -- I paid for that.  Yes, I did, I
16     paid for that out of my own money.
17 Q   You paid for Courtney Hooper to be your bodyguard on
18     a trip?
19 A   Right, because I was getting threats.
20 Q   What threats were you getting?
21 A   I was getting threats when I became first president
22     and CEO.  And I took him to Ohio with me, it was a
23     drive trip and I paid for it myself.
24 Q   When did that happen?
25 A   That was back in probably 2003, 2004.

---

**Page 232**

1  Q   Who were the threats from?
2  A   Whoever was on the phone and whoever threw the eggs
3      on my porch.
4  Q   You never found out who threatened you?
5  A   They usually don't give you their name, no.
6  Q   Was it ever investigated by the police?
7  A   No.
8  Q   Didn't you at one time fly to St. Louis with
9      Courtney Hooper as your bodyguard as well, for which
10     Co-Op paid for him to go with you?
11 A   I don't remember that.
12 Q   Was Courtney Hooper an employee of Co-Op in 2003?
13 A   I don't think so.
14 Q   So he wasn't an employee when you took him as a
15     bodyguard to Ohio or he was by then?
16 A   Was it -- what year was that?
17 Q   Well, you said it was 2003 so I'm going by you.
18     Whenever it was, whenever you took the trip to --
19 A   2004 because the end of 2003.
20 Q   Okay.
21 A   Could be 2004.
22 Q   So in 2004 was Courtney Hooper an employee of Co-Op
23     when he went with you to Ohio?
24 A   That's what I'm trying to think.
25 Q   Okay.

---

**Page 233**

1  A   I'm trying to think, I need time to think.  I'm
2      trying to think when Courtney was hired.
3          I took him to, I took him to Miami, Miami
4      Beach but I paid for that, that was a gift.
5          And it had to be the times that I was
6      being threatened.  If I paid for it, it was to, it
7      was to watch me.  And my husband was unable to go
8      with me to watch me.
9  Q   Okay.  Why did you take him to Miami Beach?
10 A   Because he was a good person and he would stay in
11     the office with me because I was at the office at
12     2:00 and 3:00 in the morning working, so he would go
13     in the room.  He wasn't being paid so I, as for
14     Christmas I gave him and his wife a trip to Miami
15     Beach, Florida.
16 Q   Did you go with him?
17 A   My husband and I both went with him.
18 Q   Okay.
19 A   It came out of my pocket.
20 Q   Okay.  And Ohio was, again, have you figured out
21     whether he was working at Co-Op when you took him to
22     Ohio?
23 A   I don't -- if you're saying 2003, 2004 --
24 Q   No, you're saying it.  It's up to you.
25 A   Okay.  I don't think he was an employee in 2003 or

---

Judy Jettke & Associates          Mt. Clemens, MI          586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 234

1   2004 but he was, he went in with me because I, because
2   of the Pat Korth case and I was being threatened.
3        People were calling and hanging up on me
4   and I don't know whether it was Pat or whether it
5   was Deborah Matthews or who but I had and I might
6   still have notes.  I had notes threatening me,
7   people were sending like, I, well, not some but
8   one, I received another, a letter at my house.  I
9   would receive emails and I couldn't trace the emails
10  back.
11       So I was being threatened at that time and
12  my husband did not want me to go alone so he sent
13  Courtney because he trusted Courtney.
14  Q   My question was, was he an employee of Co-Op at the
15  time and that's all I cared for an answer on.  I
16  just -- was he?
17  A   I don't know.
18  Q   And how did you know him then?
19  A   He worked, he worked for the janitorial service from
20  an outside source.
21  Q   Okay.  When you say you paid for him, did you pay
22  him an hourly rate to be there or just paid for the
23  trip?
24  A   I gave him a hundred dollars and paid for his
25  accommodations.

Page 235

1   Q   And how long were you there?
2   A   Just that day, we were opening offices or something.
3   Q   And you don't recall going to St. Louis with him?
4   A   I don't know but if it's, if it's on the record it
5   has to be true.
6   Q   As of December 8th had you informed the Board of
7   Directors of the December 1st meeting with OFIR?
8   A   As of?
9   Q   December 8, 2009, had you informed the Board of
10  Directors about the meeting on December 1, 2009 with
11  OFIR?
12  A   No, I was going to inform -- we had a scheduled
13  meeting so they were going to be informed and I
14  think it was the 14th if I'm not mistaken, December
15  14th.  I'm not sure.
16  Q   Okay.  Was the CFO removed from oversight of payroll
17  and was your niece put in charge of payroll?
18       Just listen to my question and answer it,
19  please.
20       Did the CFO, was he removed from the
21  oversight of payroll?  First of all.  That's part of
22  it.
23       Had the CFO done payroll and then was he
24  removed from doing that?
25  A   Yes.

Page 236

1   Q   Okay.  Was your niece put in charge of payroll?
2   A   Yes.
3   Q   Okay.  Did you inform the Board of that change?
4   A   I didn't make the change, Ted made the change,
5   Charles made the change.
6   Q   My question was --
7   A   Those things we didn't talk to the Board of
8   Directors about -- I know your first name is Mary.
9        But we didn't tell the Board every single
10  action that took place within Co-Op Optical.
11       So staff changing, I had, I was, the
12  empowerment was between the management team of Co-Op
13  Optical.
14  Q   And you didn't think it might be something that the
15  Board would want to know, that one of your relatives
16  had --
17  A   I didn't make the decision, I --
18  Q   I didn't ask that, ma'am.  Did you think that a
19  Board of Directors might want to know that one of
20  the CEO's relatives was being given more --
21  A   CEO.
22  Q   That's what I said, CEO.
23  A   You said CFO.
24  Q   The CEO's relatives was given more authority.  You
25  don't think the Board, that was information that the

Page 237

1   Board should have had?
2   A   That should have been told by human resources and
3   the people that did it.
4   Q   When the executives would make reports to the Board,
5   did you ever review those reports before they were
6   given?
7   A   Most of the time, yes.
8   Q   And did you make changes to them?
9   A   Sometimes, yes.
10  Q   And you added things that had been left off, should
11  have been there?
12  A   Sometimes I added, sometimes I deleted.
13  Q   You had the opportunity, if something wasn't in a
14  report that should have been there you could have
15  added it, is that right?
16  A   Right, if I had the chance to review it.
17  Q   Okay.  Did you amend the corporate credit business
18  card policy of Co-Op in January 2010?
19  A   Amend?  Amend it how?
20  Q   I don't care, I just want to know if you amended it.
21  Did you change it in any way?
22  A   Yes, we added one more line.
23  Q   What was the line that you added?
24  A   I don't remember.
25  Q   Well, let's see if we can figure it out.

Jacqueline Smith                    Smith vs Co-Op Optical

December 15, 2010

Page 238

1       (Document Marked for Identification as
2       Defendant's Exhibit No. 28)
3    BY MS. CAULEY:
4    Q   Does this two-page exhibit show first a cover memo
5        and then a Co-Op Corporate Credit Business Card
6        Policy dated January 2010?
7    A   Yes.
8    Q   Okay. Is this the policy that was issued in January
9        2010?
10   A   Yes.
11   Q   And it was an amendment from some other policy?
12   A   Yes.
13   Q   Okay. What was, can you tell by looking at this
14       what the added --
15   A   Authorized corporate purchases.
16   Q   Could you let me finish my question, please?
17   A   Oh, I'm sorry, I thought you were.
18   Q   -- what the added line was?
19           And you said, authorized corporate
20       purchases, right?
21   A   Uh-huh.
22   Q   Is that a yes?
23   A   Yes.
24   Q   Okay. And why was that line added?
25   A   Because people were purchasing things that were not

Page 239

1        authorized and we, after we did our own
2        investigation we found out that there was a lot of
3        expenses that were not, that needed to have
4        corporate authorization such as computers, other
5        type of major purchases. Trips, licensings, things
6        of that nature.
7    Q   Okay. And was that line added at your direction?
8    A   I think we came together as a group to add that.
9    Q   You were part of those discussions?
10   A   Yes, I was.
11   Q   And these discussions occurred in January 2010?
12   A   Yes.
13   Q   Okay.
14       MR. SWANSON: Counsel, was this document
15   produced by you in the course of documentation? I
16   see no Bates stamp number and I don't know that I've
17   seen --
18       MS. CAULEY: And you're right and you're going
19   to see the same thing on the other, the next two if
20   I use them both, I don't know.
21       I believe they were produced. I went to
22   look through yours and ours and I found a whole
23   bunch of credit card policies and I don't know if it
24   was in there or not, quite honestly.
25       So that's all I can tell you. I know some

Page 240

1    of them were, I didn't copy the ones with the things
2    and I'm just not sure. But you have it now, so in
3    any event --
4        (Document Marked for Identification as
5        Defendant's Exhibit No. 29)
6        MR. SWANSON: Well, I'm going to pose an
7    objection to Exhibit 28, I'll pose the same
8    objection to 29 in terms of there's no indication as
9    to when or whether this was produced and I'm not
10   sure that it was.
11       MS. CAULEY: 29 was produced I'm sure of that,
12   you can look in the documents and find it. I'm not
13   positive about 28.
14   BY MS. CAULEY:
15   Q   So will you take a look at No. 28 and tell me what
16       that is? I mean, Exhibit 29, I'm sorry, Exhibit 29.
17   A   This is the corporate credit card policy and it was
18       revised 1-30-07.
19   Q   Okay. And was that sent out at your direction?
20   A   Yes.
21   Q   Okay. And was this the policy from which a revision
22       was made in January?
23   A   Yes.
24   Q   Okay. Can you show me between Exhibit 28 and 29
25       what was changed?

Page 241

1    A   I don't see a change.
2    Q   Okay. So contrary to your earlier testimony, there
3        were no changes made to the policy in 2010, is that
4        correct?
5    A   Yeah. I thought the highlighted one was, the
6        highlight was a change but not.
7    Q   Okay. Did you ever tell anyone at Co-Op that the
8        policy in January was revised, it was a newly-
9        revised policy?
10   A   We reissued. Yeah, probably, on this here it says
11       it, revised.
12   Q   Where does it say that?
13   A   It says it on the page, revised version, excuse me,
14       on Exhibit 28.
15           Maybe it wasn't revised, maybe it was just
16       reissued.
17   Q   It doesn't say reissue, does it?
18   A   No. Some things we don't -- just were left off, to
19       be left off.
20   Q   Could you answer my original question which was did
21       you ever tell anyone at Co-Op that you were issuing
22       a revised policy in January 2010 for the credit card
23       policy?
24   A   I don't remember.
25   Q   Did you receive more than one payroll advance from

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

Page 242

1    Co-Op?
2  A    Yes.
3  Q    Did any of the payroll advances that you received
4       cause any problems for Co-Op at any time?
5  A    I don't know, it was never reported to me by the
6       CFO.
7  Q    You never learned that it put the company into a
8       whole different bracket that caused all kinds of tax
9       problems one year?  You were never told that?
10 A    Vaguely I remember something like that, I'm not sure
11      but that was after the fact.
12 Q    Okay.  Did you ever use your -- oh, I'm sorry, I
13      already asked you that.
14           How many of your relatives worked at Co-Op
15      in 2009?  And would you list them so you might as
16      well say them.
17 A    Sharmien Scott -- Sharmien like Charmin toilet paper
18      except for with an S.
19           Sherold Riddles, Edward Scott and Carise
20      Torrence.
21 Q    Any other relatives that worked there prior to 2009
22      that had been let go?
23 A    Yes.  Cullen Torrence.  Cullen, C-U-L-L-E-N
24      Torrence.
25 Q    Okay.  How about any of your husband's relatives?

---

Page 243

1       They ever been --
2  A    Oh, yes.  Christopher Pieprzak, P-I-E-P-R-Z-A-K.
3  Q    Who is Sherold Riddles?
4  A    Niece.
5  Q    By the way, I learned of your mother's death and my
6       condolences to you.
7  A    Thank you.
8  Q    When Mr. Murphy grabbed your rear end -- I did say
9       that right, right, it was Murphy?  Yeah.  How did
10      that, if at all, did that interfere with your
11      ability to do your job?
12 A    It made me very uncomfortable to be around him.
13 Q    Okay.  And how much longer were you around him until
14      you leave, day or two?
15 A    Not much longer.  I was happy to be away.
16 Q    Okay.  Did it prevent you from doing your job, I
17      mean, stop you?  Is that what put you on leave, that
18      he grabbed your rear end?
19 A    No.
20 Q    Okay.  Did it interfere with any duty you had to
21      perform that you couldn't or were unable to perform
22      because of it?
23 A    Gave me a headache, a migraine.
24 Q    That one act gave you a headache?
25 A    Gave me a headache.

---

Page 244

1  Q    It wasn't the fact that you were crying because you
2       were so upset about what had happened in the
3       meeting?
4  A    I have no idea about my biological functions, I just
5       know after that happened I started having a migraine
6       headache.
7  Q    Okay.  So you don't know that that particular thing
8       caused it in light of other things that were going
9       on?
10 A    I don't know if that was the particular thing that
11      caused it but yet I do not know if it was the
12      particular thing that caused it.
13 Q    Yeah, you don't know either way?
14 A    Right.
15 Q    Okay, that's fair.  Did preparing the plates of food
16      the times you did that for Mr. Stepp and Mr. Murphy,
17      did that interfere with your ability to do your job?
18 A    I didn't like it.
19 Q    Did it prevent you from performing any duties that
20      you needed to perform?
21 A    Yes, it did.  It took --
22 Q    What?
23 A    It took time for me to get back to my office to do
24      the work that I had to do.
25 Q    Okay.  How much time did that take?

---

Page 245

1  A    Sometimes I had to do two, two plates so -- and put
2       everything on it and separate them from desserts to
3       everything so sometimes it took me, if it was two of
4       them and no one was helping me, maybe about thirty
5       minutes sometimes.
6            We had, it was a buffet and then they were
7       particular about separating foods out and then
8       making another plate for their one wife.
9  Q    So you're saying it took you thirty minutes to put
10      together a plate for one person and then you had to
11      do it for maybe two or three people so you might
12      have spent an hour and a half putting together
13      plates?
14 A    I didn't say an hour, I said thirty minutes.
15 Q    Thirty minutes per one?
16 A    Total.  Total.
17 Q    Oh, thirty minutes total if you did it for three
18      people, okay.
19           Did it, did you not perform a particular
20      duty ultimately because you were doing that?
21 A    Yes.
22 Q    What?  What didn't you perform that you should have
23      performed?
24 A    I had all types of work on my desk.
25 Q    What didn't get done because --

---

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 246

1    A    Don't, I don't remember.
2    Q    -- you were putting things on a plate?
3    A    Don't remember.
4    Q    Can you point to a single thing that didn't get done
5         because you were putting food on a plate?
6    A    I could say reading annual report. I mean not --
7    Q    And that's the only thing that --
8    A    -- annual, I mean quarterly report or reading
9         something the attorney has sent. There are all kind
10        of things that were coming across my desk that I had
11        to read, that's why I stayed there sometimes until
12        12:00 midnight or 2:00 and 3:00.
13   Q    You're saying that you could have used the time
14        better?
15   A    Yes.
16   Q    Fair to say? Okay.
17        Do you believe you were terminated because
18        you're a woman?
19   A    Uh-huh, I do.
20   Q    Is that a yes?
21   A    Yes.
22   Q    Okay, tell me every fact in support of your
23        conclusion that you were terminated because you're a
24        woman. After seven --
25   A    Well, after the comments that Marc Stepp has made

Page 247

1         about women, of getting things, not getting things
2         done. They replaced me with a male.
3    Q    Excuse me, didn't you replace yourself with a male?
4    A    Technically, Ben was there but it was highly, it was
5         told to me to replace him by Ben. That was through
6         the personnel committee. Marc will tell you that.
7    Q    Didn't you tell us earlier that he was your choice
8         because he was the logical one, he was trustworthy,
9         you could trust him, he was honest and that's why
10        you wanted him in that job? That's what you
11        testified to earlier.
12   A    He was the only one that was left but however, that
13        was, the decision was already made up at the Board.
14   Q    Okay. So you were replaced by a man. Go ahead.
15   A    I was replaced by a man.
16   Q    What else?
17   A    They removed everything out of my office, the office
18        that I once had. Well, no, that's irrelevant.
19   Q    So these are the facts in support of why you believe
20        you were terminated because you're a woman, okay?
21   A    Uh-huh.
22   Q    What other, other than the comments by Stepp, we
23        have the one comment by Stepp.
24   A    I wasn't obedient.
25   Q    Wasn't obedient.

Page 248

1    A    By not taking, by not, by going on, not taking what
2         they told me to do and taking, I took my family
3         medical leave instead.
4    Q    Okay. Anything else?
5    A    I felt they started to see that I couldn't be
6         controlled, which is basically the same thing.
7    Q    Who told you that they started to see that you
8         couldn't be controlled?
9    A    I started talking back to them and Marc especially
10        did not like that.
11        They didn't want to consider my, didn't
12        want to consider me as a vote.
13   Q    They didn't want to consider you as what?
14   A    A vote.
15   Q    Okay.
16   A    Even though it's in the bylaws.
17   Q    They didn't want to consider your vote on whether or
18        not you should be terminated?
19   A    Yes.
20   Q    You didn't consider that a conflict of interest just
21        sort of ethically? Like I really shouldn't vote on
22        this, I sort of have an interest in it?
23   A    Yeah, you know, I, you know, I thought about that
24        but then I thought about the last two that we had
25        where they allowed that the president and the CEO

Page 249

1         vote for themselves.
2    Q    Uh-huh.
3    A    And they didn't -- and those were men.
4    Q    Uh-huh.
5    A    So they never stopped them from voting but when it
6         came to me and I'm a woman, yes, they stopped me
7         from voting.
8    Q    Okay. So no woman was ever allowed?
9    A    I'm the only woman who has ever been the president
10        and CEO of Co-Op. So as a position --
11   Q    I don't know what that means. Yeah.
12   A    A position.
13   Q    Okay.
14   A    Maybe let me say it like this, as a position.
15   Q    Wouldn't consider my vote --
16   A    My vote was not considered.
17   Q    Okay.
18   A    Saying it was a conflict of interest and it doesn't
19        say anything like that in the bylaws.
20   Q    Okay, well --
21   A    So if you go back to that, it will tell you.
22   Q    Okay. But, in fact, your vote was registered,
23        wasn't it? As a five/four vote?
24   A    Some documents it is, some documents it's not.
25   Q    Okay. Well, in any way, in any event your vote

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

Page 250

1   didn't make a difference, did it, on the outcome?
2   A   No, it was four to five.
3   Q   Okay.
4   A   With two people absent.
5   Q   Okay. So, all right. Any other reason why you
6       think you were terminated because you're a woman?
7   A   I'm going to say, I don't know, there could be other
8       reasons but I'm not sure.
9   Q   Well, any that you know of factually.
10  A   I know. If I come to it, can I bring it up to you
11      later?
12  Q   Yeah, if you're not answering another question and
13      confuse us all, yeah, I appreciate that.
14  A   Only if you let me.
15  Q   Okay. So how do you know that -- assume for
16      purposes of the question that the Board didn't like
17      it that you couldn't be controlled and you started
18      talking back to them.
19          How do you know, the question is, how do you
20      know that's because you're a woman and not just
21      anyone who couldn't be controlled and started
22      talking back to them?
23  A   Can I take a break?
24  Q   I'd like you to answer that question if you can.
25          MR. SWANSON: Just answer that question.

---

Page 251

1           WITNESS: Okay. Phrase your question again,
2       please.
3   BY MS. CAULEY:
4   Q   Okay. If you were a man -- and there's going to be
5       a couple follow-ups then.
6           If you were a man who was in your position
7       who couldn't be controlled and started talking back
8       to the Board, do you believe that person wouldn't
9       have been fired?
10  A   Yes.
11  Q   Okay. Why? What's the difference? Why wouldn't
12      the Board fire someone who was talking back to them
13      and couldn't be controlled because they're a man and
14      they would fire someone who was talking back to them
15      and couldn't be controlled who was a woman?
16  A   Because I felt that they thought that women were
17      subservient.
18  Q   Did they tell you that?
19  A   No, it was just the actions.
20  Q   And the only action that you know of is after you
21      offered to make plates they continued to ask you to
22      make plates?
23  A   Make plates, my, telling me to take two weeks off
24      for vacation opposed to family medical leave.
25  Q   Okay.

---

Page 252

1   A   All those things and I didn't obey that.
2   Q   Okay.
3   A   I told people I disagreed with them. And I have to
4       go to the bathroom.
5   Q   Okay. Go ahead.
6           MR. SWANSON: Yeah, let's take a break.
7           (Whereupon an off-the-record discussion was
8           held.)
9   BY MS. CAULEY:
10  Q   Do you know of any facts to support a conclusion
11      that you have not been able to get a job because of
12      anything Co-Op did?
13  A   I've sent out several, several resumes so I have a
14      list of people that I sent resumes out to.
15  Q   Well, we've asked for those, we haven't gotten them.
16  A   I haven't sent them to my attorney, I'll be doing
17      that. I was requested yesterday to get that
18      information to you.
19  Q   Okay, so back to my question. Do you have any facts
20      to support a conclusion that anything Co-Op did to
21      you --
22  A   Oh, yes.
23  Q   -- has prevented you from getting a job?
24  A   Yes. Everybody has heard about, on the, in the
25      industry about things that are happening or some of

---

Page 253

1   the rumors and things like that.
2   Q   And when you say everyone, how do you know this?
3   A   Well, some have been candid to talk to me and some
4       have sent me very nice letters, some have just said
5       no. People that had offered me positions while I
6       was at Co-Op Optical all of a sudden --
7   Q   Don't have a position available?
8   A   Yes.
9   Q   Well, if they don't have a position available, how
10      is that a problem? I mean, you couldn't get it if
11      they didn't have one, right?
12  A   You may think it's that way but I think it has
13      something to do with the -- it always comes back to
14      the -- when we talk, it always comes back to well,
15      what happened at Co-Op, we heard this, we heard
16      that.
17  Q   If you're telling people what happened at Co-Op, how
18      does that become Co-Op's problem if it gets out in
19      the community?
20  A   First of all, I didn't tell you I was telling people
21      what was happening at Co-Op Optical.
22          Secondly, I told them I'm applying for a
23      position and I submitted my resume to them and I did
24      not necessarily disclose it, I just told them that
25      it was time for me to move on.

---

Judy Jettke & Associates              Mt. Clemens, MI              586-783-0060

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

---

Page 254

1  Q   Okay.  Did you, after you read the letter, the
2      Broder letter to your executive staff on December
3      14th, did you then discuss it with any other,
4      discuss the allegations any other time with your
5      executive staff?
6  A   No.
7  Q   Did you ever talk to your executive staff about the
8      investigation that the Board was conducting of you
9      and the status of the allegations?
10  A   **I think they, the staff knew that there was an**
11     **investigation being conducted.**
12  Q   That wasn't what I asked.  I asked you if you ever
13     discussed with the executive board --
14  A   **Oh. No.**
15  Q   -- about the status of the investigation and the
16     status of the allegations.  You never talked to them
17     about that after December 14th?
18  A   **Not to my knowledge, I'm not sure.**
19  Q   Would you agree that the minutes would be an
20     accurate reflection of what had occurred at meetings
21     like that?
22  A   **Yes.**
23  Q   Okay.  Have you had any interviews since you left
24     Co-Op?
25  A   **No.**

---

Page 255

1  Q   When were you released to return to work?
2  A   **April the 1st.  Well, that's what the short-term**
3      **disability but I -- that's when they said that but I**
4      **was not, I'm not released but I'm still looking and**
5      **I volunteer, do other things just to keep my mind**
6      **active. I --**
7  Q   I'm sorry, I'm going to interrupt you because your
8      attorney is going to cut me off.
9  A   **Okay.**
10  Q   And tell me I can't take a deposition past seven
11     hours when you have been over and over again not
12     responding to my question.
13         So I'm going to have to insist that you
14     respond to the question I ask, please.
15     MR. SWANSON:  Excuse me, Counsel.  That's just
16     not true.  You know it, you knew the rules walking
17     in here.
18     MS. CAULEY:  The record will reflect it.
19     MR. SWANSON:  You've been practicing for how
20     many years?
21     MS. CAULEY:  That's fine.  The record will
22     reflect it.
23     MR. SWANSON:  Just don't make false accusations
24     about me or about my client.
25     MS. CAULEY:  I said you're holding me to these

---

Page 256

1      seven hours so as a result --
2      MR. SWANSON:  That's not how you said it.
3      MS. CAULEY:  I want her to please answer the
4      questions I ask because we've wasted at least an
5      hour by me having to go back over and over again
6      asking for the right answer.
7      MR. SWANSON:  The answer that you want.  That's
8      exactly --
9      MS. CAULEY:  The answer --
10     MR. SWANSON:  -- correct because you've reasked
11     the questions repeatedly so you could get the answer
12     you want from her.
13     MS. CAULEY:  I want an answer to the question.
14     MR. SWANSON:  That's the problem, Counsel.
15     MS. CAULEY:  I want an answer to the question.
16     MR. SWANSON:  Not the answer you want, she'll
17     give you the truth.
18  BY MS. CAULEY:
19  Q   When were you considered to be no longer disabled?
20  A   **It hasn't been determined.**
21  Q   So you're still disabled from work, is that correct?
22  A   **Yes.**
23  Q   So you could not be working all this period anyway
24     because of a medical disability, is that correct?
25  A   **Correct.**

---

Page 257

1  Q   And yet you've been looking for work?
2  A   **Yes.**
3  Q   And, in fact, you had a possibility out at Beaumont
4      maybe that just didn't work out, is that right?
5  A   **No.**
6  Q   You never told anyone that you had a job opportunity
7      out in Beaumont that didn't work out?
8  A   **No.**
9  Q   Okay.  Never sent an email to someone telling them
10     that?
11  A   **No.**
12  Q   Would you agree that if employees believe that there
13     is misconduct occurring at a company that they have
14     a duty to report that to someone who can do
15     something about that?
16  A   **If it was true.**
17  Q   Okay.  And you've admitted that you have violated
18     the credit card policy, that was true, right?  You
19     admitted that?
20  A   **Yes.**
21  Q   You admitted that as of December 8th you hadn't told
22     the Board of Directors about the OFIR meeting on
23     December 1st, right?
24  A   **Yes.**
25  Q   You admitted that you had a number of your relatives

---

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 258

1    working for the company?
2    A   Yes.
3    Q   Okay.  You admitted that the CEO was removed from
4        overseeing payroll and that your niece was put in
5        charge of payroll, is that right?
6            MR. SWANSON:  CEO?
7    BY MS. CAULEY:
8    Q   CFO, sorry.
9    A   Yes.
10   Q   Okay.  You admit also that you sent an email to Ted
11       Winiarski, Matt Groen and Larry Gardiner that they
12       were not to discuss anything that occurred at the
13       December 1st meeting?
14   A   Yes.
15   Q   Okay.  Did you go to California in September 2009
16       for your uncle's funeral?
17   A   Yes.
18   Q   And did you also conduct business at that, on that,
19       at that time?
20   A   Yes.
21   Q   With whom did you conduct business?
22   A   With VSP.
23   Q   Who did you -- I'm sorry?
24   A   VSP, the CEO.  Well, the former CEO there.
25   Q   And who is that person, what is that person's name?

Page 259

1    A   I don't remember his name.
2    Q   When did he stop being the CEO?
3    A   Shortly after I left.
4    Q   Okay.  Did you conduct any other business on that
5        trip?
6    A   No, that was, no.  He was kind enough to come to the
7        wake and invite us down to the office.
8    Q   And who is us?
9    A   I have -- Craig Jones with, is another insurance
10       company that was trying to connect me with VSP so we
11       can accept VSP for insurance to improve revenue.
12   Q   So this former CEO whose name you can't remember
13       came to your --
14   A   Actually, they --
15   Q   -- uncle's wake?
16   A   I don't know if he was a CEO.  He was a
17       representative but he was high up.
18   Q   You don't even remember his first name?
19   A   It was kind of like an Italian name but I don't
20       remember.
21   Q   If there's testimony in this case that no one at VSP
22       met with you during that meeting, would you have a
23       basis to dispute that?  Any facts or documents or
24       anything to support that?
25   A   Yeah, I have his card.  The card is left at Co-Op

Page 260

1    Optical in my Rolodex.
2    Q   Does it say on the card, I'm meeting with you on
3        such and such a date?
4    A   No, it says VSP, it says VSP and it has his name on
5        there.  It may have said the meeting date on my
6        Rolodex at the office.
7    Q   Okay.  Did you ever tell anyone that you conducted
8        business with anyone else other than VSP when you
9        were in California for your uncle's funeral?
10   A   Craig Jones.
11   Q   And --
12   A   Risk Management which is another insurance company
13       to try to get business for Co-Op Optical.
14   Q   Anyone else?
15   A   No.
16   Q   Okay.  How many days were you gone for that funeral?
17   A   The funeral itself took about three days.
18   Q   And did you stay over after that to conduct
19       business?
20   A   Yes, I stayed, yeah.
21   Q   How much longer did you stay?
22   A   I think the total we were there about maybe five
23       days total.  I'm not sure.
24   Q   Okay.  And did you stay at a hotel?
25   A   No.

Page 261

1    Q   Who did you stay with?
2    A   I stayed with Craig Jones.
3    Q   Okay.  The whole time?
4    A   He's a cousin.
5    Q   The whole time?
6    A   Yes.
7    Q   Oh, okay.  Are you now or have you ever been -- I'm
8        not going to ask if you've been a member of the
9        communist party, remember those questions, have you
10       now or have you ever been --
11           Are you now or have you ever been an Amway
12       representative?
13   A   Yes.
14   Q   Okay.  Did you ever give Amway gifts, gift cards to
15       employees at Co-Op?
16   A   Yes, we did.
17   Q   Did Co-Op pay for those?
18   A   Yes.
19   Q   Okay.  And did they pay for them through you?  I
20       mean, did you, did you purchase them through, I
21       mean --
22   A   They, we, I gave -- what we did, we just gave
23       everybody their own number so they can make the
24       purchases for the gift cards.
25   Q   Okay.

Jacqueline Smith                    Smith vs Co-Op Optical

December 15, 2010

Page 262

1   A   And then if there was any, any monies that came back
2       in my name that was related to those gift cards,
3       they were donated to the Co-Op Optical scholarship
4       fund.
5   Q   Okay, well, okay.  But who bought the gift cards?
6   A   F.L. King, Armida Parisi, sometimes we would put
7       them on my card, Jackee Smith.
8   Q   Okay, okay.  But they were all paid for by Co-Op?
9   A   Yes.
10  Q   That's what -- so Co-Op bought these cards, these
11      gift cards?
12  A   Uh-huh.
13  Q   Through whom at Amway did they buy those cards?  Was
14      it through you?
15  A   It would go through me, yes.
16  Q   Okay.  And did you receive a commission for selling
17      those cards?
18  A   Yes.
19  Q   Okay.  Did you donate that commission back to Co-Op?
20  A   Yes, I did, to the scholarship fund.
21  Q   Okay.  What records show that?
22  A   I gave the checks to Co-Op Optical.
23  Q   And when did that happen, to whom did you give the
24      checks?
25  A   I gave them to the front desk because they record

Page 263

1       the checks.
2   Q   Okay.  And what do the checks say, what's the
3       amount?
4   A   Sometimes, sometimes I would, depending, depending
5       on what it was, sometimes I would order products for
6       myself because I still use their products.  But if
7       there was something directly, directly from Co-Op, I
8       would write, give the check that said Amway to Co-
9       Op.  I would give or I would write my personal check
10      out and give it to Co-Op Optical for and I would put
11      down memorial scholarship fund.
12  Q   So is it your testimony that you gave all of your --
13      I'm going beyond what you said but I want to get it
14      clear.
15  A   Uh-huh.
16  Q   Did you give all of your profits from Amway to the
17      Co-Op scholarship fund?
18  A   No, only when the Amway gift cards were purchased.
19  Q   Okay.  And how many times did that happen?
20  A   I have no idea.  We used them for the tenure
21      recognition.
22          They were suggested to be used for the
23      tenure recognition not by myself but from former
24      executives before I was the president and the CEO.
25  Q   Okay.  And if I wanted to go back and find out --

Page 264

1   A   Uh-huh.
2   Q   -- where you gave this money back to the scholarship
3       fund, how, where would I look?
4   A   You should look in the Co-Op Optical records because
5       we kept record of all of the checks and took copies
6       of the checks as they came in.
7   Q   Okay.  What records?
8   A   Records of the checks.
9   Q   So there's a check register --
10  A   Yes.
11  Q   -- that takes every check that ever came into Co-Op?
12  A   Right.  It's a check, when -- every check that comes
13      into Co-Op Optical, it is written down and it is
14      given to the person at the front desk and it's, it's
15      a process to make sure everybody is honest.
16          So if I give the check to, I would give it
17      to the front desk, the front desk would give them to
18      accounts receivable, accounts receivable would
19      process it then someone else would take it to the
20      bank.
21  Q   Okay.  So --
22  A   So Co-Op has the records.
23  Q   So if we look in those records we're going to find
24      checks from you to the Co-Op Optical scholarship
25      fund?

Page 265

1   A   Sure.
2   Q   And is it going to say on there that this is Amway
3       commissions or --
4   A   No, it didn't say all that.  It may, I'm not sure
5       what I wrote on there.
6   Q   Okay.
7   A   I just said Co-Op scholarship fund.
8   Q   Okay.  And you don't know how many times you wrote
9       such checks?
10  A   It wasn't, it wasn't that often.
11  Q   Okay.  But it was always in connection with your
12      commission for the --
13  A   It wasn't that large amount of money either.
14  Q   Pardon me, please.  It was always in connection with
15      your giving money back from your commissions from
16      Amway, is that right?
17  A   Yes, uh-huh.  And I'm not a member of Amway.
18  Q   But you sell -- did I say it wrong?
19  A   You could, you could be, yeah, they'll send you,
20      they send you points.  You get money on points, not
21      dollars.
22  Q   Oh, okay.
23  A   Like the points will add up and it will turn into a
24      dollar amount.  So sometimes the checks may be three
25      and four dollars.

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

Page 266

1  Q   Okay.  Did Co-Op do business with NVA?

2  A   Yes.

3  Q   And did there come a time when you engineered -- I

4      don't, I'm not using it as a pejorative word but

5      when you managed to negotiate a change in the way

6      Co-Op paid NVA, like you used to pay for like a cost

7      per claim and then now you're paying cost per member

8      or something like that?

9  A   Yes.

10 Q   Is that ringing a bell?

11 A   Uh-huh, it does.

12 Q   Forgive me because I don't understand this and I

13     should --

14 A   What happened is that NVA no longer carried that

15     policy so what it was, because we were an insured

16     program and not necessarily a program that paid per

17     fee, we negotiated an administrative fee of forty-

18     five to fifty-five cents depending on the amount of

19     people which comes out to be a lot cheaper than a

20     claim by fee in the beginning.

21         How it is now with the reduction of

22     membership, it may be a little bit different.

23         But at that particular time and the person

24     that was in charge of the accounting department at

25     that time showed that we came out better by -- and

Page 267

1      I'm not a numbers person so the person that was in

2      charge of the numbers or the figures at that time

3      and I don't think it was Ted, it came out to show

4      that it was cheaper for us to have a claim per

5      member.

6         And they also did our geo access, they

7      provided the customer service so it was a service

8      fee, not a fee for, a claim for fee.  They no longer

9      would do that.

10 Q   Oh, you're saying it wasn't possible to continue

11     on --

12 A   No.

13 Q   -- the claim for fee?

14 A   No.

15 Q   That it had to be done a different way?

16 A   Right.  And they'll tell you that, too.

17 Q   Who at --

18 A   Dave Karlin, the president.

19 Q   K-A-R-L-I-N.

20 A   Dave Karlin at NVA.

21 Q   Okay.

22 A   And also Millie Monaco.

23 Q   Did you put a lawsuit against Artis Thomas on behalf

24     of Co-Op?

25 A   I sure did.

Page 268

1  Q   Okay.  And did you win?

2  A   Yes, we did.

3  Q   Did it go to trial?

4  A   No, we settled in the judge's chambers.

5  Q   Okay.  And how much was it settled for?

6  A   About three thousand something dollars.  The judge,

7      the judge convinced us we couldn't get blood out of

8      a turnip.  No one believed that she was, messed up

9      payroll except for me.

10 Q   Okay.

11 A   And we chose to try to get something back from her

12     so we were able to get something back by her and the

13     judge said we could also prosecute her so we -- the

14     judge, I think there was a connection, she with the

15     judge.  She -- judge talked us out of prosecuting

16     her and tried to get us to come down, to come down

17     to a rate that or some type of fee to settle.

18 Q   Do you know how much it cost Co-Op to go after that

19     three thousand dollars?

20 A   Yes, we do but we also found that --

21 Q   How much was it?

22 A   About, I think, it started to build up, it was

23     probably about twenty thousand.

24 Q   Wasn't it more like sixty thousand dollars?

25 A   That's a lie.  It shouldn't cost about sixty

Page 269

1      thousand dollars.

2  Q   Wasn't it twenty thousand dollars just for the

3      computer forensics and another fifty-seven thousand

4      for attorney's fees?

5  A   Well, you know what, if it was it was a lesson

6      learned.

7  Q   And --

8  A   Because people -- she came into our, into our

9      computers and committed larceny in the building.

10 Q   How much money did you spend on the Pistons and the

11     Palace over like --

12 A   Two hundred and fifty-one thousand.

13 Q   Oh.  And at some point in time did that all have to

14     get paid back?  How did that, I mean, how did you

15     pay for all that?  Was it paid --

16 A   It paid, was --

17 Q   -- all in glory days or --

18 A   No, it was paid over payments over a series of

19     years.

20 Q   Okay.

21 A   And that was for us to get more name recognition.

22 Q   Okay.

23 A   Tickets were thrown in, other things were thrown in

24     as packages.

25 Q   Did you --

Judy Jettke & Associates

Mt. Clemens, MI

586-783-0060

Jacqueline Smith                Smith vs Co-Op Optical                December 15, 2010

## Page 270

1  A   We did the circus.  It wasn't just the Pistons, we
2      were a part of the circus, we were part of the Globe
3      Trotters and other things.
4  Q   Did you ever go to any of those events?
5  A   No.  I went to, I went to the -- I'm not a sports, I
6      can't stand sports so to go to those events, no.
7          I would give them to our clients, I would
8      give them to the employees and that was it.
9  Q   So it's your testimony you never went to any Pistons
10     games?
11 A   I went to a Pistons game but to tell you what
12     happened at that game, I couldn't even tell you who
13     won.
14 Q   But --
15 A   Or who was playing.  Yes.
16 Q   I'm sorry, I don't know how you were confused before
17     when I asked if you ever went and you said no and
18     then now you're saying yes.
19 A   Well, I'm thinking.
20 Q   Yes but I didn't pay attention.
21 A   I went when they had, when we were at, went to
22     suite.
23 Q   Okay.  How many times did you go to Pistons games?
24 A   Less than a dozen.
25 Q   Did you take your husband?

## Page 271

1  A   He came sometimes.
2  Q   What concert did you sponsor from Co-Op?
3  A   What concert?
4  Q   Ever sponsor a concert?
5  A   Oh, Chene Park Concert Series.
6  Q   Okay.
7  A   Chene Park in Detroit.
8  Q   How much did that cost?
9  A   I think it was like ten thousand a year.
10 Q   For how many years?
11 A   We started back in 1984.
12 Q   How many years did you sponsor concerts as CEO?
13 A   Nineteen, well, I just kept on so it was 2004
14     through two thousand and about eight.  Well, when
15     Kwame Kilpatrick came in, we no longer sponsored
16     them.
17 Q   Okay.  Who is Tim Romish?
18 A   Tim Romish was an employee that's related to Matt
19     that was brought into our office and found out that
20     he had a criminal record but he was vindicated but
21     they wanted him terminated so we, he was terminated
22     for his act.
23 Q   Was it a practice at Co-Op to pay for terminated
24     employees' insurance after the date of termination?
25 A   I don't know how that happened.

## Page 272

1  Q   My --
2  A   That's not a policy, no.
3  Q   Okay, all right.  Was Tim Romish paid Blue Cross
4      Blue Shield benefits for six months after he left?
5  A   Not to my knowledge.
6  Q   You did not approve that?
7  A   No.
8  Q   You did not direct that?
9  A   No.
10 Q   Would you believe that at the end you did not have a
11     supportive and loyal executive team around you?
12 A   I believe that, I knew at the end I didn't have a
13     loyal executive team around me.
14 Q   Okay.  And other than Ted, you had built that team,
15     is that right?
16 A   Yes.  Well, no, Ted was, I put Ted on the executive
17     staff.
18 Q   Oh, okay.  So he -- you had built your entire team
19     that was no longer loyal to you, is that right?
20 A   True.
21 Q   Okay.  At the time you left Co-Op, was Co-Op on hold
22     with some suppliers?
23 A   Yeah, manufacturing suppliers.
24 Q   What does that mean to be on hold?
25 A   Means that they were not, accounting, they were not

## Page 273

1      being paid.
2  Q   Had you --
3  A   And they were not --
4  Q   Oh, I'm sorry.
5  A   -- replenishing the supplies.
6  Q   Okay.  They wouldn't send any money until they got
7      paid, is that right?
8  A   Right.  We were having so much waste and our bills
9      were so high, that's why we wanted to close the lab,
10     part of the lab.  We had so much waste and they're
11     so much higher, there were still vendors that were
12     outstanding that we were not paying.
13 Q   Who told you there was so much waste at the lab?
14 A   I could see it myself, I worked in the lab.
15 Q   Who told you there was so much waste in the lab?
16 A   I saw it myself.
17 Q   You saw it in 2009?
18 A   Oh, I'm sorry.  I can tell you who told me.  In
19     yeah, 2009, too, yes.
20 Q   You worked in the lab in 2009?
21 A   The employees in the lab was telling me.
22 Q   The employees in the lab were telling you that there
23     was waste in the lab?
24 A   The employees that were concerned, yes.
25 Q   Had there been any audit done of that through the

Judy Jettke & Associates            Mt. Clemens, MI            586-783-0060

Jacqueline Smith                 Smith vs Co-Op Optical                 December 15, 2010

## Page 274

1   finance department or your, you know, your money
2   people?
3   A   The finance department and operations departments
4   were buddies. So what -- they believed each other
5   no matter what happened. That was Charles Benson
6   and Ted Winiarski.
7        So they would audit each other, they'd
8   justified it. Whatever Charles told Ted, Ted
9   believed it.
10  Q   Okay. Now could you answer the question I asked
11  you? Was there ever --
12  A   I thought that was.
13  Q   I asked if there was an audit done.
14  A   No.
15  Q   Okay.
16  A   It may, unless they made up an audit, no.
17  Q   Did anyone under the CFO ever tell you that the
18  waste in your lab was right at par with the standard
19  in the industry of four to five percent?
20  A   Everything I don't believe.
21  Q   Did anyone tell you that? I'm asking you.
22  A   No.
23  Q   No one from the CFO's office or the CFO himself
24  ever --
25  A   No.

## Page 275

1   Q   -- informed you that, in fact, that was the truth?
2   A   No. Not to my knowledge.
3   Q   Do you have any way to argue with that point? Any
4   facts to support a conclusion that's different than
5   the waste, then that the waste was at four to five
6   percent?
7   A   Yes. Because we compared it, the waste, with OMG.
8   OMG's waste was not as high as ours and they're OMG,
9   Optical Management Group.
10  Q   Uh-huh.
11  A   OMG's waste was -- our waste was a lot higher than
12  theirs.
13  Q   What was Co-Op's waste?
14  A   As you said, to me it was probably, I feel it was
15  about forty, forty, forty-five percent.
16  Q   No, I said four to five percent.
17  A   No, I believe it was forty to forty-five percent.
18  Q   Okay. On what do you base that belief?
19  A   On the employees. Sometimes the employees know a
20  lot more than the officers.
21  Q   Okay.
22  A   Or the CFO.
23  Q   So it's your belief that almost one out of every
24  pair of, one out of every two pair of glasses was
25  waste?

## Page 276

1   A   I saw the remakes coming back, ma'am.
2   Q   Was it your belief that one out of every two pair
3   almost was wasted?
4   A   Uh-huh. Uh-huh.
5   Q   Okay.
6   A   And I heard it from the retail employees as well.
7   They were all concerned.
8   Q   Did you hire a new law firm right toward the end
9   before you left Co-Op, the Rehman Group?
10  R-E-H-M-A-N.
11  A   I'm sorry?
12  Q   A CPA firm, I'm sorry, I said law firm.
13       Did you hire a new CPA firm, the Rehman
14  Group?
15  A   No.
16  Q   Did you have any conversations or exchanges of
17  communications with anyone from the Rehman Group?
18  A   People always talked about that but we were very
19  satisfied with Huggifer (phonetic).
20  Q   Okay, I --
21  A   And they were just changing partners. No.
22  Q   My question ma'am --
23  A   No.
24  Q   Did you have any conversations or exchanges of
25  communication with anyone from Rehman toward the end

## Page 277

1   of your tenure at Co-Op?
2   A   No.
3   Q   Who prepared the minutes of the December 1st meeting
4   with OFIR? I asked you that already, I'm sorry,
5   you've answered that.
6        Where do you look when you say you're
7   looking for work?
8   A   Where do I look?
9   Q   Yes.
10  A   I look in the healthcare industry.
11  Q   Okay. Where? I mean --
12  A   Vision, dental.
13  Q   What do you look at? Is it online, is it in the
14  newspaper, is it --
15  A   Oh. I look at Crain's.
16  Q   Okay.
17  A   I look at, I looked in the phone book for
18  headhunters, I look at, I go by referrals.
19  Q   Okay.
20  A   Things of that nature.
21  Q   If you can't work, why are you looking for work?
22  A   Because I want to be prepared to go back to work. I
23  want to work. The time is -- you look and it takes
24  sometimes four, five, six, seven months before
25  somebody may call you.

70 (Pages 274 to 277)

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

**Page 278**

1  Q  Okay.
2  A  So I don't want to sit around and wait, I want to be
3     prepared to work.
4  Q  Do you, when you apply for jobs do you tell them I'm
5     not able to work but maybe someday I will be or, I
6     mean --
7  A  No, they don't really --
8  Q  I'm going to be in a few months?
9  A  No, that doesn't happen.  Either half knows about
10    the ordeal at Co-Op Optical or the other half does
11    not have a position so they do not ask that
12    question.
13 Q  Okay.
14 A  I haven't ran into that question yet.
15 Q  Has anyone told you or otherwise indicated to you
16    verbally, nonverbally, in some kind of measurable
17    way that they're not interested in hiring you
18    because of what happened at Co-Op?
19 A  Indirectly.
20 Q  Who?
21 A  I'd have to look at my list.  I've sent out so many
22    different resumes.
23 Q  And this is the list that I've asked for and haven't
24    gotten, right?
25 A  Yes.

**Page 279**

1  Q  So --
2  A  I just found out about it yesterday.
3  Q  Then I can't ask you questions about it because you
4     have to look at your --
5  A  Right, have to look it up.
6  Q  -- list, is that right?
7  A  Uh-huh.
8  Q  Well, what medical conditions do you have that you
9     blame Co-Op for?
10 A  My depression.
11 Q  Uh-huh.
12 A  Anxiety.
13 Q  Uh-huh.
14 A  Panic attacks.
15 Q  Uh-huh.
16 A  Chronic insomnia.
17 Q  Uh-huh.
18 A  Joint pains.
19 Q  Uh-huh.
20 A  Migraines.
21 Q  Uh-huh.
22 A  Already had high blood pressure.  That's it.
23 Q  You didn't have migraines before December 1, 2009?
24 A  Not on a regular basis like I have them now.
25 Q  You didn't have joint pains before?

**Page 280**

1  A  Not on a regular basis and different joints have
2     started to hurt me now.
3  Q  Who has --
4  A  And my hands are bending.  My fingers.
5  Q  Joint pain is from what?  Is it from rheumatoid
6     arthritis or something or do you have a condition
7     from which the joint pains are coming?
8  A  He said it's arthritis but the stress is aggravating
9     them.  The arthritis, you can see it in my hands.
10 Q  And does the migraine come from arthritis as well?
11 A  No, the migraines comes from stress.
12 Q  Okay.  Insomnia, did you ever have that before?
13 A  No.
14 Q  Who treated you prior to December 1, 2009?  Who was
15    your primary --
16 A  Primary care physician?  Dr. Lanore Najor.
17 Q  Is there a company called March out in California?
18 A  March Vision.
19 Q  Okay.  You didn't do business with them though when
20    you went out to your uncle's funeral?
21 A  Oh, sure did.  I forgot about that, yes, we did.
22 Q  Okay.
23 A  I'm sorry.  And that's Dr. March.
24 Q  Oh, it's -- okay.
25 A  I forgot, thank you.

**Page 281**

1  Q  Did you purchase a coat and hat and gloves for Sal
2     Parisi when he was first hired at Co-Op?
3  A  Yes, I did.
4  Q  Co-Op pay for that or did you?
5  A  I paid for it.
6  Q  You paid for it personally?
7  A  Yes, I did.
8  Q  Okay.  Did you involve anyone else at Co-Op in
9     purchasing those?
10 A  Yes, I asked Ted.  I asked Ted's opinion on what to
11    purchase because he was a man.
12 Q  Okay.
13 A  He was there, he had ordered it over for me on the
14    Internet for me.
15 Q  And you didn't charge that to Co-Op?
16 A  No, I did not, I charged it on my own credit card.
17 Q  Okay.
18 A  And if I charged it on Co-Op's credit card, I think
19    I put, wrote a check out.
20 Q  So there would be a check there, it would show it in
21    the records that you gave a check to pay for this?
22 A  Yeah.  Yeah, but I think I --
23 Q  If it was on the credit card?
24 A  Yes.
25 Q  From where was it purchased, do you remember?

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

---

**Page 282**

1  A   JC Penney.

2  Q   Okay.  Did you become aware of, did you impose a

3      twenty-four-dollar copay on union employees and

4      families who used the eyecare benefit at Co-Op?

5  A   Yes.

6  Q   Okay.  Was that negotiated in the contract?

7  A   It didn't have to be.  On our contract is medical

8      and we increased their vision contract, their vision

9      benefits.  We were giving away four, five, six

10     hundred dollars worth of products and nothing was

11     coming in.

12         It's no different than what you said with

13     Artis Thomas and what we put in there.  We're

14     paying, we ran, we were paying six figures in

15     optical products and receiving nothing for it.

16  Q  Have you notified the union that you were going to

17     make this twenty-four dollar --

18  A   No, I did not, I didn't have to.

19  Q   Would you let me finish my question so she can get

20     it down without us talking over, please.

21  A   I'm sorry.

22  Q   Under what authority did you do that?

23  A   The authority of the CEO.

24  Q   Okay.  Do you know if that still stands or if that's

25     changed?

---

**Page 283**

1  A   I don't know what they've done now.

2  Q   Okay.  In front of you is a notebook with documents

3      Bates stamp numbered one through four fifty-four.

4      And these are documents that were produced on your

5      behalf by your attorneys.

6          Some of these document, not all of them

7      but some of them include things like Power Point

8      presentations that were made, financial documents of

9      Co-Op, some minutes.

10         Under what authority did you remove any

11     Co-Op documents from Co-Op?

12  A   It was on my computer, primarily, I would send it on

13     the computer.

14  Q   Okay.  Was there a policy at Co-Op that said you

15     cannot remove any documents from Co-Op?

16  A   No.

17  Q   No such policy?

18  A   No.  People removed documents from Co-Op but you

19     have to bring them back.  You sign them out.

20  Q   Doesn't it say in the policy that it's considered to

21     be a major, major rule -- let me go back.

22         Your policies talk about major rules and

23     minor rules.  Major rules are things for which you

24     can be terminated immediately, right, in the policy

25     handbook?

---

**Page 284**

1  A   Uh-huh.

2  Q   Is that right?

3  A   Uh-huh.

4  Q   Is that a yes?

5  A   Yes.

6  Q   Okay.  And isn't one of those major rules that you

7      may not misuse or remove from the premises without

8      authority of Co-Op, company records?

9  A   That's medical records.

10  Q  It doesn't say.  It says company records.

11  A   Okay.  But that meant to be medical records because

12     of HIPAA rules.

13  Q   Wouldn't it say medical records if it was about --

14  A   Well, it should have said but that, that was when --

15  Q   So you're saying there's no policy that --

16  A   That was written by Mr. Patrick Korth, he was an

17     attorney so if he didn't put medical records down,

18     that's, that's not me.

19  Q   Okay.  But that was the policy of the company, that

20     you couldn't remove company records.  Don't you

21     consider financial records of the company company

22     records?

23  A   No, some were actually my records that they gave to

24     me.

25  Q   For use in your job, right?

---

**Page 285**

1  A   Right.  On the --

2  Q   Not for personal use?

3  A   It's hard to delete all that stuff off the computer.

4      Everything that I had, I sent it back to

5      Ben Edwards that was on the computer.  If I had

6      something at home, I don't know.

7  Q   Is it accurate to say the Board of Directors never

8      gave you authority to remove any company records

9      from Co-Op?

10  A   They did not say that until Ben Edwards took over

11     and then I started sending things back to Ben.

12     But --

13  Q   I'm not sure what your answer means, I'll have to

14     ask the question again, see if I can get an answer.

15         Did any board member at Co-Op ever give

16     you authority to remove records from Co-Op?  Company

17     records.

18  A   Did they give me authority?  No.

19  Q   Yes, that's what I was -- thank you.

20         Was your FMLA leave that you took in 2010, was

21     that the only FMLA leave you ever took from the

22     company?

23  A   Yes.

24  Q   You never had other medical leaves?

25  A   No.

---

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 286

1  Q   Okay.  Do you know, do you have any understanding I
2      guess is a better way to ask, of Marc Stepp's and
3      Mr. Murphy's expertise in terms of FMLA?
4          For example, do you know, were they
5      responsible for administering FMLA at Co-Op?
6  A   They should know.
7  Q   I'm sorry?
8  A   I'm sure they should know and they should
9      administer, they're the compensation and committee.
10 Q   No, okay, let me ask you again.  You're the CEO --
11 A   Maybe I don't understand your question.
12 Q   You're the CEO.  Was it Marc Stepp's responsibility
13     to administer FMLA at Co-Op?
14 A   I don't know what you mean by administer.
15 Q   Well, handle it, decide who gets to go, who doesn't
16     get to go, all that, handle the paperwork.
17         Whose job was that?  Was that Temeng's?
18 A   Probably so.
19 Q   Okay.  Was it Mr. Murphy's responsibility?
20 A   Yes.
21 Q   I thought it was Temeng's responsibility?
22 A   Well, why would you ask me about Mr. Murphy?
23 Q   Well, I'm just checking.  I mean, you said Temeng
24     was responsible so you're saying now Temeng and
25     Murphy were responsible?

Page 287

1  A   Temeng is, Temeng is human resources, he would have
2      to process the paperwork.  Ray Murphy is not going
3      to go in there and process the paperwork.
4  Q   Okay.
5  A   Marc Stepp should be aware of it as well because
6      he's, why be in personnel and compensation if you
7      don't have any idea of the federal laws.
8  Q   Okay.  As the CEO, do you know of any specific
9      knowledge or understanding that either one of them
10     have regarding the FMLA?
11 A   I don't know of any knowledge of understanding they
12     have under FMLA.
13 Q   Okay.
14 A   I informed them, though.
15 Q   When you -- of what?
16 A   Of FMLA.  It was, that's my job to inform them of
17     the Family Medical Leave Act.
18 Q   What did you inform them of?
19 A   Of what the definition of.
20 Q   When did you do this?
21 A   When it, that was years ago.  Because some people
22     were taking, people were taking leaves, we had a lot
23     of people taking leaves under family medical act
24     having babies or something like that.
25         So what we did was tell them that these --

Page 288

1      we would replace employees, hire employees and they
2      wanted to know what happened so we said that they're
3      under the family medical leave.
4          That should be reflected in some of the
5      minutes from years have past.
6  Q   Okay.  And that was the extent of it?  You'd say all
7      these people are out on FMLA?
8  A   And then I would explain to them that it's a federal
9      law.
10 Q   And so you explained it was a federal law that they
11     were under FMLA?
12 A   Yeah.
13 Q   Is that right?
14 A   Because they were wondering why we were bringing
15     more people in.
16 Q   Okay.  So how did it come that you -- what happened,
17     when was the first conversation you had with anyone
18     at Co-Op regarding leaving?
19 A   Excuse me?
20     MR. SWANSON:  Leaving?
21 BY MS. CAULEY:
22 Q   Leaving the company.
23 A   I didn't leave the company, I was terminated.
24 Q   Well, you're no longer at the company.  When was the
25     first time you had any discussion with anyone at the

Page 289

1      company about you leaving?
2  A   Leaving for family medical leave or --
3  Q   Leaving the company, leaving employment with the
4      company.
5  A   What conver -- I'm sorry, I misunderstood you, now
6      say that again.
7  Q   Didn't you have conversations with some board
8      members about you leaving the company, whether it be
9      through retirement, resignation, termination,
10     whatever?
11 A   Oh.  That was in March, middle of March.  I
12     contacted Raymond Murphy and I asked him, I would
13     like to know what my future is at the company, which
14     I thought was a normal question.
15         He said, let me arrange something.  He
16     called me back and we met at Sammy's Restaurant on
17     Eight Mile Road and discussed and discussed the
18     position.
19 Q   And who was there?
20 A   Raymond Murphy, Marc Stepp, Larry Smith and
21     Jacqueline Smith.
22 Q   What occurred during that meeting?
23 A   They encouraged me to resign.
24 Q   Okay.  Did they say why?
25 A   I'm not there.

73 (Pages 286 to 289)

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

---

Page 290

1   Q   They wanted you to resign because you weren't there?
2   A   Right.
3   Q   Okay.
4   A   I explained to them under family medical leave and
5       that's why I'm not there.
6   Q   Okay.  What else was said?
7   A   Someone said that they had to go and the meeting
8       ended and they said that they were going to have
9       another meeting tomorrow over Raymond Murphy's house
10      on Chicago Boulevard.
11  Q   Did you go to that meeting?
12  A   I did.
13  Q   Okay.  Who was there?
14  A   Lashondra White or West, I'm not sure of her last
15      name, she's new.  Marc Stepp, Ray Murphy, Larry
16      Smith, Jacqueline Smith.
17  Q   And what occurred at that meeting?
18  A   Once again they asked me what I wanted in order to
19      resign.
20          A list was made out of what my demands
21      were if they wanted me to just resign after I
22      returned at April 1st and they said that at that
23      particular time they were going to make that happen.
24  Q   They said they were going to, they were agreeing to
25      your demands?

---

Page 291

1   A   Yes, they were going to agree, yeah.  And I have a
2       witness, Larry Smith.
3   Q   Okay.
4   A   That was there.  The next day we had another
5       meeting, they called a board meeting for everybody
6       without a subject and very quickly and two board
7       members were missing that were more on my side.
8           And they had a resignation letter filled
9       out for me and told me that my severance package
10      would come later after discussion with the
11      compensation committee.
12          I refused to sign the letter.
13  Q   Uh-huh.
14  A   Therefore, they said that they were going to take a
15      vote and see whether I should remain as president
16      and CEO.
17          A vote was taken, the vote came out five
18      to four in favor of me being terminated while on
19      family medical leave.
20  Q   Did anyone at the second meeting tell you why they
21      were discussing with you resignation?
22  A   No.  Basically because I, basically because I was
23      not there.
24  Q   Well, no.  Did they say that at the second meeting?
25      I just want what was said.

---

Page 292

1   A   Well, Marc said it several different times, you're
2       not here.  Reduce the salary of the CEO, you're not
3       here, Ben's doing a good job and that's it.
4   Q   And Marc said that.  Did Mr. Murphy say anything as
5       to why?
6   A   Murphy was quiet, he was mute most of the time.
7   Q   And did Lashondra say anything?
8   A   Lashondra didn't say very much either.
9   Q   Okay.
10          (Document Marked for Identification as
11      Defendant's Exhibit No. 30)
12  BY MS. CAULEY:
13  Q   Does this document reflect the demands that you
14      needed in order to be, in order to resign?
15  A   Some of it, yes.
16  Q   Was there more than this?
17  A   No.  The vehicle, I wasn't going to purchase a
18      vehicle.
19  Q   Well, this says that you were going to have to
20      purchase another vehicle, your own vehicle.
21  A   Yes, oh, okay, another vehicle.
22  Q   So is this accurate or not?
23  A   Yes.
24  Q   Okay.  Was it your intent to harm Co-Op in
25      connection with your leaving it?

---

Page 293

1   A   No.
2   Q   Okay.  How did you figure --
3   A   I loved Co-Op, I still do.
4   Q   How did you figure Co-Op was going to pay you a
5       hundred and fifty thousand dollars without hurting
6       it?
7   A   One of the things that it says, it does not need to
8       be paid in one lump sum payment, it can be spreaded
9       out over twelve months.
10  Q   Okay.  But with your demand, you wanted them to pay
11      you as a CEO and pay somebody else that's running
12      the company as the CEO, is that fair to say?  I
13      mean, that's kind of what it would be like, right?
14  A   Sometimes that's what severance pay is all about,
15      yes.
16  Q   Okay.  Given the financial situation that Co-Op was
17      facing at the time that you left, did you have an
18      understanding of how they could possibly make that
19      happen and not harm the company?
20  A   They harmed me but they didn't think of that.
21  Q   That wasn't my question.  Did you have an idea of
22      how --
23  A   I can make that statement.
24  Q   -- that could happen without harming Co-Op?  Was
25      there any way that you know of as the CEO that they

---

Judy Jettke & Associates          Mt. Clemens, MI          586-783-0060

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 294

1    could have agreed to pay a hundred and fifty
2    thousand dollars to somebody without hurting the
3    company in the state they were in?
4    A    After thirty-two -- no. Say --
5    Q    Do you know of any way in which Co-Op -- because you
6        were the boss --
7    A    I think they would be harmed.
8    Q    Excuse me, ma'am, sorry. You were the boss, you
9        know what was going on at the company. Did you know
10       of any way that the company could have paid a
11       hundred and fifty thousand dollars to you without
12       harming the company given the state it was in at
13       that time?
14   A    According to -- no, I don't think the company was
15       going to be harmed.
16       And this is what was told to me, that
17       Co-Op Optical was doing quite well by me not
18       working. That was told to me directly by Ted
19       Winiarski. Without my salary they were doing even
20       better.
21       That was told to me also by Marc Stepp and
22       that things were turning around and everybody was on
23       deck and they were making progress.
24       So it showed that they had the, they had the
25       money.

Page 295

1    Q    Oh, based on those comments you think Co-Op had the
2        money to do that, is that right?
3    A    They were all glowing comments.
4    Q    Okay, all right. Anyone ever tell you -- never
5        mind.
6    A    And they told me -- nothing.
7    Q    And they told you what?
8    A    They told me it was best for me not to be there
9        while they can collect salary so they've been
10       collecting the salary and saving money off of me and
11       the other executives that were let go for a long
12       time.
13       The board members also were always paid,
14       they never thought about it, they always raised
15       their rates per meeting.
16   Q    Okay. Have you told me everything today in support
17       of your claim that you've been defamed by Co-Op?
18       Everything you can think of?
19   A    Yes.
20   Q    Okay. Have you told me all the bases for your
21       belief that you were fired because you are a woman?
22   A    Yes, to my knowledge.
23   Q    Okay. Have you told me everything on which you base
24       your claim that you were treated in a discriminatory
25       fashion as a woman while you were at Co-Op?

Page 296

1    A    Yes.
2    Q    Okay. And have you told me everything on which you
3        believe or base your claim that you were fired
4        because you took FMLA leave?
5    A    Yes.
6    Q    Okay. Was there something in your mind -- well, let
7        me ask, how I ask this.
8        If you had taken a vacation for the month
9        of February and March, just taken, say, all kinds of
10       vacation, do you think you would have been treated
11       differently by Mr. Stepp and Mr. Murphy than if you
12       took an FMLA leave?
13       MR. SWANSON: Objection, hypothetical, no basis
14   in fact, no foundation.
15       MS. CAULEY: Okay.
16       MR. SWANSON: And calls for speculation.
17       MS. CAULEY: Okay.
18       WITNESS: I was going to say the same thing,
19   that's speculating to me.
20   BY MS. CAULEY:
21   Q    Okay. Well, you said that Mr. Stepp said, well,
22       you're not here?
23   A    Yeah.
24   Q    So if you went there because of a vacation as
25       opposed to being on FMLA leave, would that have been

Page 297

1        any different?
2        MR. SWANSON: Objection, calls for speculation,
3    all the same reasons.
4    BY MS. CAULEY:
5    Q    Go ahead.
6        WITNESS: Answer?
7        MR. SWANSON: You can answer it if you can.
8        WITNESS: I would never take a two-month
9    vacation.
10   BY MS. CAULEY:
11   Q    I didn't ask that.
12   A    I know but I'm telling you.
13   Q    I said assume for purposes of the question that
14       you're on a vacation and you're not there.
15   A    If I'd have, if I've taken a two-month vacation, I
16       don't know what they would have done. Still spec, I
17       don't know.
18   Q    Was it your belief that you could not be terminated
19       from your -- you could not legally be terminated
20       from your position while you were on FMLA leave?
21       Was it your belief at the time you took the leave?
22   A    I've learned more about that since then. I didn't,
23       I didn't know exactly, no.
24   Q    But at the time that you took the leave, was it your
25       belief that, well, I'm on leave, I can't be fired?

Jacqueline Smith
Smith vs Co-Op Optical
December 15, 2010

Page 298

1  A  No, I didn't know that.
2  Q  You didn't know that?
3  A  No.
4  Q  Okay.  Do you believe it now?
5  A  Yeah, now I do, now that I went on the Internet and
6     found a lot of information.
7  Q  It says under no circumstances can you be terminated
8     while you're on FMLA leave?
9  A  That's not what I read on the Internet.
10 Q  Oh.  So do you now understand that there are
11    circumstances under which you could be terminated?
12    Because you learned this from the Internet, I mean.
13        Did you learn that there were
14    circumstances under which you could be terminated
15    while you're on FMLA leave?
16 A  I don't remember.
17 Q  Okay.
18    MR. SWANSON:  Counsel, it's 5:30, I believe you
19    have exhausted your time.
20        (Whereupon an off-the-record discussion was
21    held.)
22        (Document Marked for Identification as
23    Defendant's Exhibit No. 31)
24 BY MS. CAULEY:
25 Q  Do you recognize -- now, this is a very large

Page 299

1     document.
2  A  Uh-huh.
3  Q  And it goes for many pages and I can't even tell you
4     the exact number.  Well, it goes from 1408
5     consecutively to 1468 which makes it a sixty-page
6     document by, sixty-one, sixty-page by my count.
7  A  Uh-huh.
8  Q  Do you recognize this document?
9  A  Yes.
10 Q  As a whole?
11 A  Yes.
12 Q  Okay.  And is this a document that you prepared or
13    that was prepared at your direction?
14 A  It was prepared at my direction.
15 Q  Did you prepare any parts of it yourself?
16 A  I wrote it and I had someone type it.
17 Q  You wrote what parts of it?
18 A  The entire thing.
19 Q  You wrote all the exhibits as well?
20 A  Oh, no, I didn't write the exhibits, I just --
21 Q  Okay.  What did you write, pages what through what?
22 A  I answered the questions from pages 1408 through
23    page 1412.
24 Q  Okay.  And then you prepared -- did you prepare the
25    exhibits to be attached?

Page 300

1  A  No, I had Matt do that.
2  Q  Okay.  To whom was this document given?
3  A  Marc Stepp and also to the State of Michigan.
4  Q  When was it --
5  A  The department of OFIR.
6  Q  When was it given to the State of Michigan
7     department of OFIR?
8  A  We had a meeting, I'm not sure of the exact date.
9     This is when they came, December --
10 Q  If I told you it was --
11 A  7th I think or 8th, I'm not, I mean, not December,
12    this is --
13 Q  I believe it was February 23rd but --
14 A  You probably are right.  I'm sorry.
15 Q  I think the records will show when the meeting was.
16    To help you out, I'll tell you I believe it was --
17 A  Can I put 23rd on here if you don't mind?
18 Q  No, you can't write on that, no, that's --
19 A  Oh, I can't, I can't write on this?
20 Q  Not on that exhibit, that's an original.
21 A  Okay.
22 Q  I mean, it's a marked one.  But you can write on a
23    piece of paper, I mean, write on a napkin, there you
24    go.
25        February 23rd, I believe that to be the

Page 301

1     date and I'm not trying to mislead you, I think
2     that's right.  If the records show that it's
3     different then we'll certainly amend the testimony
4     accordingly.
5         But why did you give this, well, first of
6     all, why did you prepare this document?
7  A  I was instructed to do this by Marc Stepp.
8  Q  And what did he say you had to do?
9  A  He said he would like for my, he wanted my answers
10    on this.  This was the questions of charging me of
11    certain things so he wanted my, the investigative
12    committee requested that I respond to the executive
13    summary statements.
14 Q  Okay.  And who made the decision of --
15 A  And provide proof.
16 Q  On each of these responses, right?
17 A  Yes, ma'am.
18 Q  Okay.  And who made the decision to whom it was
19    going to be given?
20 A  Marc Stepp and he wanted me to have a copy for each
21    board member.
22 Q  Okay.  Did he also direct you to give a copy of all
23    of this to the State of Michigan?
24 A  He gave a copy of it to the State of Michigan.
25 Q  Okay.  Did you also make an oral presentation on

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 302

1   that meeting which we believe was February 23, 2010
2   with the State of Michigan about the subject matter
3   of Exhibit 31?
4   A   Yes.
5   Q   And what, how, what was the nature of that oral
6       presentation?  Did you read your --
7   A   Yes.
8   Q   You read the letter.  Did you refer to any of the
9       attachments as you read the letter?
10  A   They received it, we had a Power Point, they
11      received this, there was a couple of questions from
12      some of the statements on here and then they would
13      just look at them and there was no comment from the
14      State of Michigan.
15  Q   Okay.  How long did your presentation take regarding
16      this document, not about anything else?
17  A   Less than twenty minutes.
18  Q   Okay.  And who -- did anyone direct you to read this
19      or did they just tell you to, you know, deal with it
20      or address it or answer the questions?  How were you
21      directed?
22  A   Kind of like what you're doing.  They asked, they
23      may ask a couple of questions through here.
24          For instance, they may have asked a
25      question on number two and wanted me to elaborate a

Page 303

1       little bit more on that.
2   Q   Okay.  I thought you said nobody had any questions
3       from OFIR?
4   A   Well, they made comments, there weren't questions.
5   Q   Okay.
6   A   They said, elaborate on like number two.  I'm not,
7       I'm guessing but I'm just saying they --
8   Q   Well, I'm going to ask you not to guess, I'd like
9       you to testify as to what you remember.
10  A   Okay.  I don't remember any questions.
11  Q   Okay.  Do you remember, did, did Marc Stepp or
12      Ray Murphy tell you that you should read what you
13      gave me to OFIR?
14  A   No, they told me to use Power Point because it was
15      quicker.
16  Q   Okay.  Do you have a Power Point that covers pages
17      one through five?
18  A   The Power Point is in the possession of Co-Op
19      Optical's offices, I don't have it with me.
20  Q   Is it a Power Point that covers your rebuttal to Mr.
21      Broder's executive summary?
22  A   No, not totally.
23  Q   No?
24  A   It touches on some of this but not everything.
25  Q   The Power Point was to sort of give the State a

Page 304

1       sense of where Co-Op was right now, right?
2   A   Exactly.
3   Q   Okay.  It wasn't to rebut Andy Broder's letter,
4       right?  That wasn't the intent of the Power Point?
5   A   No, no, no.
6   Q   Am I right?
7   A   It was not, you're correct.
8   Q   Okay.  So you were told to do the Power Point
9       because it's quick to give the State an overview of
10      how things were at Co-Op, right?
11  A   Correct.
12  Q   Were you told to read this letter, pages, the --
13  A   No.
14  Q   The, you know, 1408 through 1412, okay, the answer
15      is no.  It was your choice to read the letter to
16      OFIR, is that correct?
17  A   If I chose to, yes, but I didn't read this, I didn't
18      read the entire thing.
19  Q   Oh.  You testified earlier that you read it to them.
20  A   If I did that, I made an error.
21  Q   What did you read to them?
22  A   I read the Power Point.
23  Q   You didn't read anything in this letter?
24  A   No.
25  Q   Did you say anything to OFIR addressing the

Page 305

1       individual points in the letter, your rebuttal to
2       the executive summary of Broder?
3   A   There's something in here about Gerber, I remember
4       that.  When Mr. Gerber came in and it -- and I was
5       telling what Mr. Gerber stated.  If I can, trying to
6       find it.
7   Q   I see his name mentioned on page two under number
8       four, the third paragraph.  I'm just telling you
9       where I see his name pop out if that helps.  It's
10      the only place I've seen it so far.
11  A   That might be it.
12  Q   Okay.  Let me ask you a couple questions if I could,
13      just about number four.
14  A   Sure, uh-huh.
15  Q   There was a statement that says the board of
16      directors has not been told of the financial
17      circumstances.  The CEO has prohibited management
18      from disclosing the facts and threatened to
19      discipline anyone who discusses the matter.
20          What part of that is not the truth?
21  A   That's true.
22  Q   That's all true?
23  A   Uh-huh.
24  Q   So when you rebut it you say this is not true?
25  A   No.  I'm referring to the memo as true.  It says the

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

Page 306

1    Board of Directors has been -- no, the Board of
2    Directors has not been told of the financial
3    circumstances.
4    Q    Okay, let's stop there, just one sentence.
5         Was that true as of December 8th when Mr.
6    Broder wrote the letter that you're rebutting, was
7    it, in fact, truthful that the Board of Directors
8    had not been told of the financial circumstances of
9    Co-Op?
10   A    We didn't have the financials at that time, in
11   December, for year, year-end 2009. That's what was,
12   that was told to me by the financial department.
13        So I could not tell them exactly and the
14   finance department was going up and down so we
15   really didn't know what was going on.
16   Q    But well then, for whatever it is, it's a true
17   statement, right? The Board of Directors had not
18   been told of financial circumstances? You're saying
19   it's because you didn't have them, the fact is they
20   weren't told.
21   A    Yeah.
22   Q    The CEO has prohibited management from disclosing
23   facts. Is that the truth?
24   A    That's true.
25   Q    Okay. And threatened to discipline anyone who

Page 307

1    discusses the matter, correct?
2    A    From the Gerber meeting, yes.
3    Q    Okay. Had you ever, prior to the Gerber meeting,
4    had you ever told anyone in your executive staff
5    that they should not disclose, not be talking to the
6    Board or else they were going to be fired or words
7    to the effect?
8    A    Disciplinary action is what I'm saying and
9    disciplinary action does not necessarily always mean
10   fired.
11        I have not -- certain things that were
12   confidential, that should be discussed only in the
13   executive staff meetings I always stated, this is
14   confidential it should not be discussed outside of
15   these walls or those walls or disciplinary action
16   could be, could, could occur.
17   Q    Okay.
18   A    So it's not the first time I've made that statement.
19   Q    Now you understood that the allegation, the Board of
20   Directors has not been told of the financial
21   circumstances, what that really referred to is that
22   the Board of Directors had not been told of the
23   December 1st OFIR meeting, is that right?
24   A    You're still on number four?
25   Q    Yes.

Page 308

1    A    Well, we didn't know of the -- well, we knew Ted
2    first told us that we were a hundred and thirty to a
3    hundred and forty thousand dollars in deficit.
4         So I'm not sure what you're trying to say.
5    Q    Okay. I'm asking you, when you were rebutting that
6    statement, the Board of Directors has not been told
7    of the financial circumstances, you understood that
8    to mean the financial circumstances as revealed by
9    OFIR at the December 1st meeting, isn't that
10   correct?
11   A    Yes.
12   Q    Okay. But it was true, wasn't it? As of
13   December 8th, that you had not told the Board of
14   what had occurred at the OFIR meeting on December
15   1st?
16   A    Well, because November 2009 it showed a profit
17   income in the fourth, in the fourth quarter for
18   Co-Op Optical. Mr. Gerber said that it was no, I
19   mean, it was, he said -- excuse me.
20        I'm reading from the second paragraph. I
21   made the statement and followed up with the
22   directive to prevent panic in the company, to let
23   the Board of Directors know first.
24        I felt that that -- officers, actually,
25   Board and officers know first. That is the typical

Page 309

1    protocol.
2         And also I felt that it was more of a
3    positive meeting with Mr. Gerber than a negative
4    meeting because he made so many suggestions to us.
5         I made this statement because November
6    2009 showed a profit income in the fourth quarter
7    for Co-Op Optical. Mr. Gerber said that there was
8    no need to come to Co-Op Optical.
9         He stated that -- and this is what they
10   were talking about, this is the paragraph, thank
11   you, that I was speaking of.
12        The fourth quarter that he has spoken to
13   Ken Ross, however, Mr. Ross indicated to Mr. Gerber
14   to visit Co-Op Optical anyway because he had already
15   made previous arrangements.
16        As you can see by sharing this with
17   others, it would have caused unnecessary panic and
18   chaos. Which it did.
19   Q    Ma'am, could you answer the question I asked?
20        Wasn't it true that when you were
21   rebutting this, you read that first sentence, the
22   Board of Directors has not been told of the
23   financial circumstances, to be referring to the fact
24   that the Board had not been told of the OFIR meeting
25   on December 1st? You understood that that's what

Jacqueline Smith                   Smith vs Co-Op Optical

                                                    December 15, 2010



Page 310

1    they were alleging, correct?
2    A   Yes.
3    Q   And you said that wasn't true but, in fact, by
4        December 8th you hadn't told the Board about the
5        OFIR meeting of December 1st, isn't that correct?
6    A   We're, we're having an —
7    Q   Isn't that correct?
8    A   Yes.
9    Q   Okay.  That's all I need to know.
10   A   We're having an officers meeting.
11   Q   I just need to know what's false about that.  You
12       hadn't.  You were going to tell them.  You say you
13       were going to tell them but you didn't, you hadn't
14       by then.
15             So there was nothing false in that
16       statement, was there?
17   A   No.
18   Q   Okay.  Now if everyone who was at that OFIR meeting
19       testified that you read this letter word for word to
20       everyone at OFIR, would you have any basis upon
21       which to dispute that?
22   A   Yes.  I did not do that.
23   Q   You did not.  Then everyone else would be lying if
24       they said you did read it word for word?
25   A   That's right.

Page 311

1    Q   Okay.  Did anyone ever indicate to you that your
2        presentation to OFIR was an embarrassment to Co-Op
3        by going into all of these details, by attacking the
4        CFO and criticizing him in front of OFIR?
5    A   I had no intentions of giving the State of Michigan
6        these letters.  Marc Stepp did that.
7    Q   Ma'am, that wasn't my question.
8             I asked if anyone told you that you had
9        embarrassed Co-Op by doing that kind of a verbal
10       presentation to OFIR at that meeting.  Did anyone
11       ever tell you that?
12   A   You mean for the Power Point?  Or this?
13   Q   The presentation regarding the rebuttal to the
14       Broder letter.
15   A   No one told me that.  No one at all.
16   Q   And you think it was perfectly appropriate for you
17       to verbally attack the CFO who was sitting in that
18       meeting, in front of OFIR at that time and at that
19       meeting, given the circumstances of the company?
20   A   Sure he said there was no need for me.
21   Q   He said that in that meeting to OFIR?
22   A   No, he said it to the Board of Directors.
23   Q   Ma'am, I'm asking you, you're here fighting for the
24       life of Co-Op in front of OFIR, right?  You're
25       trying to give them, the best foot forward for

Page 312

1    the company, is that fair to say?
2    A   Uh-huh.
3    Q   Is that a yes?
4    A   Yes.
5    Q   Okay.  This is your opportunity to make Co-Op look
6        good, is that right?
7    A   Yes.
8    Q   Okay.  And instead, you criticize — or did you feel
9        that criticizing your CFO in the meeting and going
10       into detail and every little point in this multi-
11       page, five-page letter, you think that put Co-Op in
12       a good light in front of OFIR?
13   A   I think it was true.  You know —
14   Q   That wasn't my question, ma'am.  I asked if the way
15       in which that you presented this —
16   A   Well, the way you're asking is not right, I'm sorry,
17       I don't have an answer for you and the only thing I
18       can say is that it was not my intention for the
19       State of Michigan to receive this document.
20             This document was handed by the Board of
21       Directors.  The Board of Directors can do whatever
22       they want to.
23             I did not tell the Board of Directors to
24       make sure that OFIR had a copy of this document and
25       anyone that says anything any different is a lie.

Page 313

1    Q   I'm asking you, ma'am, about your verbal
2        presentation.
3    A   I didn't have a verbal presentation, I had a Power
4        Point and I did not read this document as I have
5        told you before.
6    Q   So you said nothing about what's in this document to
7        OFIR?
8    A   No.  Only — Gerber said one, only thing we touched
9        on was number four.  And I did not, as I said, give
10       this information to the — this is to Marc Stepp, it
11       tells you who it's from, the investigation
12       committee.
13   Q   Okay.
14   A   Not the State of Michigan.
15   Q   And you didn't read it or talk about it in detail to
16       OFIR because —
17   A   No.
18   Q   Excuse me, ma'am.  Because you thought it was
19       inappropriate to do so, is that right?  It wouldn't
20       have been right for you to do that, isn't that fair
21       to say?
22   A   Right, I wouldn't do that.
23   Q   You wouldn't have done it, it would have been
24       unprofessional?
25   A   It's not my character.

Jacqueline Smith                                    Smith vs Co-Op Optical
                                                                December 15, 2010

## Page 314

1  Q  It wouldn't have been in the best interest of Co-Op,
2     fair to say?
3  A  You're putting words in my mouth. It's not my
4     character.
5  Q  Is it fair to say that it would not have been in the
6     best interest of Co-Op to do a big long verbal
7     presentation of this rebuttal?
8  A  It's fair to say it would be not in my best interest
9     to give, to do a presentation like this to Co-Op
10    because that is not my character.
11 Q  Okay, that's good enough.
12        Now it's your testimony that Mr. Gerber
13    said on December 1st that there was no need for him
14    to come to Co-Op, correct?
15 A  Yes.
16 Q  Okay. How many times after December 1st did he come
17    back to Co-Op?
18 A  Well, they came out a couple of more times. The
19    embarrassment of the company is when Charles and
20    Nicole and Dr. -- Charles, Nicole and Ted or whoever
21    went to the State to Lansing. That was the
22    embarrassment of Co-Op Optical where you don't say
23    anything about what they said about the CEO.
24 Q  So Mr. Gerber came --
25 A  And the Benson case.

## Page 315

1  Q  Mr. Gerber came back twice is your testimony? After
2     December 1st?
3  A  No, I think he came back once or twice, I'm not
4     sure.
5  Q  Okay. Did you come to learn that, in fact, there
6     was good reason for Mr. Gerber to come to Co-Op?
7  A  No.
8  Q  Okay. Before whom did Mr. Gerber say that there was
9     no need for him to come to Co-Op? Was it just to
10    you or was it --
11 A  It was to Ted, Larry Gardiner, Matt and myself.
12 Q  Okay. Everyone at that meeting?
13 A  Everyone at the December 1st meeting.
14 Q  Gotcha, okay, good. Did you ever talk to anyone at
15    OFIR about the CFO buying steaks and seafood and
16    chicken and hotdogs and side dishes and fancy
17    desserts for everyone at Co-Op and using Co-Op money
18    for that? Did you ever tell?
19 A  No, I did not tell them that. That's in this report
20    here for Marc Stepp.
21 Q  Okay. Oh, but that --
22 A  That's when we had a retreat.
23 Q  But you never said that out loud to OFIR?
24 A  No.
25 Q  Okay.

## Page 316

1  A  No, that was over a three thousand dollar bill.
2  Q  Well, it says here that you never got the --
3  A  No, we found, we, yeah.
4  Q  Never got the credit cards from that.
5  A  Never got the credit, we found but we, we seen it,
6     it was, it, well the -- Armida told me at that time
7     that I think it was twenty, about twenty-seven
8     hundred dollars with gratuity for Boat Works and
9     then I don't know, I really don't know what the bill
10    was for the home picnic but that was a lot of food
11    there.
12 Q  In fact --
13 A  So I don't know.
14 Q  In fact, Co-Op, you never found any evidence that
15    Co-Op was ever charged for that meeting at Mr.
16    Winiarski's home, isn't that right? That Mr.
17    Winiarski paid for it?
18 A  Good for him.
19 Q  So you're accusing, you're telling people in this
20    letter --
21 A  He has a tendency to charge things to Co-Op so I'm
22    just assuming.
23 Q  Excuse me, ma'am. You're telling people in this
24    letter that he charged all this stuff to Co-Op when
25    you had no evidence to support the fact that he

## Page 317

1     charged it at all for this meal at his home, isn't
2     that right?
3  A  Right. Just like they tell you that I was taking
4     money from Amway and they had no evidence that I was
5     taking money or commissions from Amway.
6  Q  I get it. So if somebody else lies it's okay for
7     the CEO to lie?
8  A  No, I'm not lying. This is not a lie, this is --
9  Q  That's not a lie?
10 A  This is not a lie. This is -- I said to this day I
11    do not know how much that cost. With what he had
12    there, Ted usually charges everything on his credit
13    card.
14 Q  It was your clear implication that Mr. Winiarski had
15    paid for this with Co-Op money, wasn't it? That's
16    what you were --
17 A  That's what I thought.
18 Q  -- trying to communicate here?
19 A  That's what I thought and that's what I wrote down.
20 Q  Okay. You thought it in good faith?
21 A  Yes.
22 Q  But Mr. Benson didn't think it was in good faith if
23    he said you hadn't paid for something did he?
24    You're saying he was just flat out lying when he did
25    it?

Jacqueline Smith

Smith vs Co-Op Optical

December 15, 2010

Page 318

1  A  When Mr. Benson paid --
2  Q  Accused you of misusing the credit card and it
3     turned out not to be true maybe in some cases?
4  A  They have been planning this for two years.
5  Q  But he just lied, you just made a good-faith
6     allegation, is that right, is that the difference?
7        You don't have to answer that.
8  A  Thank you.
9  Q  Did you ever send an email around with a recipe for
10    a chicken, for a turkey at Thanksgiving that had a
11    picture of a turkey with two halves of lemons
12    sticking under the skin so that it looked like the
13    turkey had breasts?
14 A  What? I don't even cook.
15 Q  I didn't ask if you cooked, ma'am. I'm sorry,
16    that's the --
17 A  I don't even know about a turkey.
18 Q  -- problem I'm having with you answering questions.
19    I just want an answer to the question.
20    Did you ever send an email around with a
21    phoney, jokey kind of recipe for a turkey that said,
22    all written out that says here --
23 A  I would have to see it.
24 Q  Could I finish my question or not?
25 A  Go ahead.

Page 319

1  Q  That explained how to cut a lemon in half and insert
2     it under the skin of the breast and then the picture
3     showed a turkey with women's breasts or some -- you
4     never sent that around?
5  A  Not to my knowledge.
6  Q  You wouldn't have done that, it's inappropriate?
7  A  I don't know, I have four pictures here that I sent
8     around that I wasn't aware of so I'm not going to
9     say anything. I'm really not, I don't know.
10 Q  Okay.
11    MS. CAULEY: Subject to the possibility of
12    having to come back to discuss mitigation,
13    mitigation issues only, I am through.
14    MR. SWANSON: Okay. I have a few questions for
15    the witness.
16    MS. CAULEY: And subject to redirect, of
17    course. Go ahead.
18    EXAMINATION
19 BY MR. SWANSON:
20 Q  Prior to January 2010, had you ever received any
21    sort of performance reviews?
22 A  Yes.
23 Q  How were those reviews?
24 A  They were glowing, all of them with an excellent.
25 Q  And from whom did you get those reviews?

Page 320

1  A  They were not in writing but I received them from
2     the Board.
3  Q  And who on the board?
4  A  Janna Garrison, Marc Stepp, John Trohimczyk, Letha
5     Lardy or Letha Kelly. I'm not sure if it's Kelly or
6     Lardy.
7  Q  Were you ever advised prior to January 2010 that you
8     were being placed on any sort of performance
9     improvement program because your performance was
10    inadequate or unsatisfactory?
11 A  No.
12 Q  Were you ever told by the Board that you were in
13    jeopardy of being fired because of unsatisfactory
14    performance prior to January 2010?
15 A  No.
16 Q  You've looked at Exhibit 31 and the allegations that
17    were being made here. Was there any final
18    resolution to all this?
19 A  An investigation was conducted and I was found that
20    things were not true, that what I was accused of.
21 Q  Was there ever -- what was the final finding, if you
22    can recall?
23 A  That I pay a hundred and thirty-nine dollars and
24    sixty cent for going to the Comfort Inn to do Co-Op
25    Optical's work.

Page 321

1        And I paid the hundred and thirty-nine
2     dollars and sixty cent on a credit card.
3  Q  Do you recall approximately when that was, when you
4     paid that?
5  A  I paid it the same day of the meeting.
6  Q  And what was the date of the meeting approximately?
7  A  February 23rd I think is what she, you, she
8     indicated.
9  Q  And you were fired when?
10 A  I was fired March 18th or 19th.
11 Q  2010?
12 A  Of 2010.
13 Q  Okay. Now, we've had some discussion about policies
14    concerning use of credit cards.
15    Are you aware of any board members using
16    corporate credit cards for personal reasons?
17 A  Yes.
18 Q  Okay. And who?
19 A  Well, Marc Stepp would have us purchase football
20    tickets for his neighbors for the Loins game, for
21    the black football association.
22    We would buy tables for the Bernard Choral
23    group that we were not a part of, it was a singing
24    group.
25    And also for the, I think it's a black

Jacqueline Smith                    Smith vs Co-Op Optical                    December 15, 2010

### Page 322

1    football team, too. Grambling and another football
2    team that comes and plays. He wanted tickets for
3    that, he would ask for them every year and I would
4    put it on a credit card.
5    Q   What position did Marc Stepp hold on the board as of
6    2010?
7    A   As of 2010 I think he's the assistant chairman.
8    Q   He was head of personnel and compensation as well,
9    those committees?
10   A   Yes, he still is.
11   Q   Did he ever serve as chairperson?
12   A   Both, both committees.
13   Q   Did he ever serve as chairperson of the board?
14   A   No.
15   Q   There was some discussion about receiving
16   gratuities.
17        Did the board members ever receive
18   freebies from vendors, suppliers?
19   A   They received glasses, a lot of glasses. They would
20   have their kids that were not their dependents to
21   receive glasses. They would ask me to provide
22   glasses to other people, friends at no charge and I
23   wound up having to write them off.
24   Q   Which board members were those?
25   A   Marc, Letha, Bernie, Blair, his daughter wanted

### Page 323

1    contact lenses, that was the difference. And that
2    was it that I can remember.
3    Q   Mr. Murphy ever receive --
4    A   And Ray Murphy.
5    Q   Okay. There was some discussion about financial
6    records and other documents that were produced by
7    you pursuant to a document request by defendants in
8    this case.
9        Did you ever work at home?
10   A   Yes.
11   Q   Were you working at home at all in 2010?
12   A   Yes.
13   Q   And how were you able to work at home in terms of
14   getting access to records?
15   A   Through the computer.
16   Q   You had a home computer?
17   A   Yes.
18   Q   Did the Board, do you know if the Board understood
19   or realized that while you were on this medical
20   leave you were doing work at home?
21        MS. CAULEY: Objection foundation.
22        WITNESS: Yes, because this document here is
23   February 17, 2010.
24   BY MR. SWANSON:
25   Q   That's Exhibit 31?

### Page 324

1    A   Yes, Exhibit 31.
2    Q   And who on the Board do you believe understood you
3    were doing work at home?
4    A   None of them, they didn't really care.
5    Q   But who on the Board, if anyone on the Board, do you
6    know asked you to do work while you were on the
7    leave?
8    A   Marc.
9    Q   Marc Stepp?
10   A   Yes. Mostly Marc and Blair McGowan.
11   Q   Okay. And Exhibit 31 would be an example of a
12   project you put together while working at home?
13   A   Yes.
14   Q   And how did you obtain the documents to put together
15   Exhibit 31?
16   A   I would put them together and I would have either
17   Matt look for them or ask him for copies and he
18   would and I would get the copies off of the
19   computer.
20   Q   So you would get these various records by way of
21   computers in your home?
22   A   And then sometimes I would walk into the office and
23   pick them up.
24   Q   Okay.
25        MR. SWANSON: I don't have any further

### Page 325

1    questions.
2          REEXAMINATION
3    BY MS. CAULEY:
4    Q   Weren't you told while you were on leave to return
5    all records that you had regarding Co-Op?
6    A   Uh-huh.
7    Q   Okay. And you didn't do that, did you?
8    A   I would have been insubordinate with Marc Stepp.
9    This document is dated February 17, 2010. If I
10   didn't answer this I would have definitely been
11   fired if I told him I'm on medical leave, I'm not
12   going to do this. I would have definitely be fired.
13   Q   Okay. Ma'am, that wasn't my question.
14   A   I know but you need some explanation sometimes.
15   Q   I said, weren't you, in fact, told to return all
16   documents?
17   A   I did. By computer.
18   Q   Well, you didn't return the documents that have been
19   produced in this case, did you?
20   A   I don't know, I don't know what you have in that
21   case.
22   Q   Well, financial reports, minutes of some meetings,
23   that document.
24   A   Those, those documents --
25   Q   You didn't return all those.

Jacqueline Smith                    Smith vs Co-Op Optical

                                                              December 15, 2010

Page 326

1   A   Those documents are mine.  They are, just like every
2       board member that has been on the board or has left
3       the board, no one has ever returned documents back
4       to Co-Op Optical.  Not even Artis Thomas.
5   Q   And on what do you base your belief that you were
6       told that the final resolution was that nothing in
7       that was true --
8   A   They said --
9   Q   -- nothing in the Broder letter was true?
10  A   There should be -- pardon me?
11  Q   Are you -- maybe I'd better ask it more clearly.
12          Are you of the belief that the
13      investigative committee made a finding that nothing
14      that was alleged against you in the Broder letter
15      was true?
16  A   That was my understanding.
17  Q   Okay.  Even though you've admitted to violating the
18      company credit card policy, right?  Didn't, in fact,
19      the Board find that you violated the credit card
20      policy?
21  A   Yes.
22  Q   Okay.
23  A   We violated --
24  Q   And that was --
25  A   But I was, but also they, in this -- yes.

Page 327

1   Q   Okay.  And that was --
2   A   In answer to your question.
3   Q   -- one of the allegations against you in the Broder
4       letter, wasn't it?
5   A   Yes.  So did everybody else.
6   Q   So that, in fact, was found -- he'll introduce it.
7          That, in fact, was found to be true,
8       wasn't it?
9   A   Uh-huh.
10  Q   Is that a yes?
11  A   That's a yes.
12  Q   So you can't sit here and say that there was a final
13      determination that you did nothing wrong, isn't that
14      correct?
15         There was a finding that you did something
16      wrong, at least you violated the credit card policy
17      of the company, at least you hadn't informed the
18      Board by December 8th of what had occurred in the
19      December 1st meeting.
20  A   Then everyone should be fired.
21  Q   Ma'am, that's not my question.  I'm asking you --
22         MR. SWANSON:  Well, you're asking multiple
23      questions, actually.
24         WITNESS:  Everybody should be fired.
25  BY MS. CAULEY:

Page 328

1   Q   I'm asking you, I mean, you sit here and say that
2       you were found to have been guilty of nothing.  That
3       isn't true, is it?
4          MR. SWANSON:  She -- excuse me.
5          WITNESS:  I didn't say that.
6   BY MS. CAULEY:
7   Q   Okay.  Well, what did you say?  You told us that --
8       you were told that nothing in the letter was true.
9   A   That the investigation had been conducted.
10  Q   Uh-huh.
11  A   And I told -- and the credit card, they said that
12      since I paid it back, since I paid them back --
13  Q   Okay.
14  A   -- that the only thing that I owe and it should be
15      on there is a hundred and thirty-nine dollars.
16  Q   Okay.
17  A   It was between that and the spa bill that I had for
18      about six hundred and something dollars.
19  Q   And that goes to the allegations in the Broder
20      letter having to do with you not paying personal
21      money back to Co-Op, correct?  That deals with --
22  A   Not paying?
23  Q   Yeah.  It deals with the allegation that you hadn't
24      paid some personal money back, right?
25  A   Yes, a hundred and thirty-nine dollars.

Page 329

1   Q   And besides the finding there that there was just
2       some, a little bit that you hadn't paid back, you
3       were exonerate almost for all of that, correct?
4   A   Correct.
5   Q   Okay.  That was one of the allegations in the Broder
6       letter, correct?
7   A   Correct.
8   Q   Were you ever told that the Board made a finding
9       that none of the other allegations were true?
10         Set aside just the credit card one, I
11      understand what you're saying about that.
12  A   Okay.
13  Q   Now how about all the other allegations?  Were you
14      ever told that those, that the Board found that
15      those weren't true?
16  A   I don't, something was said, I don't remember what
17      was said.  I remember being under a great amount of
18      distress.  In fact, I remember crying, my head
19      started hurting, my joints started hurting, I left
20      the office in the room and went into the other room.
21         I remember someone saying take a break and
22      that's about it.
23         My mind is blank.  I don't remember.
24  Q   Okay, that's fine.
25         MS. CAULEY:  Thanks.  That's all.

Page 330

1    MR. SWANSON:  Well, so we have a complete
2    record, why don't we just mark this as Exhibit 32.
3    MS. CAULEY:  Can I have a copy or do you have a
4    number?
5    MR. SWANSON:  Yeah.
6    (Document Marked for Identification as
7    Plaintiff's Exhibit No. 32)
8            REEXAMINATION
9    BY MR. SWANSON:
10   Q   I may show the witness Exhibit 32.  Have you seen
11      that before?
12   MS. CAULEY:  Can I see it?
13   MR. SWANSON:  Yeah.
14   MS. CAULEY:  Because I don't know what you're
15      looking at.  Oh, yeah.
16   MR. SWANSON:  I'm sure you've seen it.
17   MS. CAULEY:  Yeah.  What's the number at the
18      bottom, please?
19   MR. SWANSON:  Confidential 1165 Smith.
20   MS. CAULEY:  Thanks.
21   BY MR. SWANSON:
22   Q   Have you seen that before?
23   A   Yes.
24   Q   And to your knowledge, is that a document that you
25      received from the Board as to its investigation?

Page 331

1    A   Yes.
2    Q   And that document refers only to payment of a bill
3       for Comfort Suites for a hundred and thirty-nine
4       dollars and forty-six cents?
5    A   Yes.
6    Q   And you paid that?
7    A   Yes, I did.
8    MR. SWANSON:  I don't have any further
9       questions.
10   MS. CAULEY:  Could I see the document, please,
11      if I may?
12           REEXAMINATION
13   BY MS. CAULEY:
14   Q   It's also accurate to say that Exhibit No. 32 does
15      not address any of the other allegations in the
16      Broder letter other than the misuse of the credit
17      card, is that correct?
18   A   Yes.
19   Q   Okay.
20   MS. CAULEY:  Done.
21   MR. SWANSON:  We're done.
22   (Deposition concluded at 6:22 p.m.)
23
24
25

Page 332

CERTIFICATE OF NOTARY

STATE OF MICHIGAN   )
                    )
COUNTY OF MACOMB    )

    I certify that this transcript, consisting of three
hundred and thirty-two pages, is a complete, true and
correct record of the testimony of JACQUELINE SMITH, held
in this case on Wednesday, December 15, 2010.
    I also certify that prior to taking this deposition,
JACQUELINE SMITH was duly sworn to tell the truth.
    I also certify that I am not a relative or employee
of or an attorney for a party; or a relative or employee

of an attorney for a party; or financially interested in

the action.



    JUDY JETTKE VANDENBOSSCHE CSR-1398

    309 S. Gratiot #2

    Mt. Clemens, Michigan 48043