# EXHIBIT F

# QUALIFIED COURT REPORTERS, INC.

Smith v Co/Op Optical

Deposition of
Marcellus Stepp

February 25, 2011

Qualified Court Reporters, Inc.
21909 Chase Drive
Novi, Michigan 48375
(248) 344-4364

Page 29

1   defammation of character. That's my general
2   understanding.
3   Q.  Okay. Do you know -- and Jackee Smith was
4       terminated as CEO; correct
5   A.  What?
6   Q.  Jackee Smith was terminated as Co/Op's CEO?
7   A.  Yes.
8   Q.  Do you remember when that was?
9   A.  On March 19th.
10  Q.  Okay.
11  A.  March 19th, 2010.
12  Q.  And how was she terminated?
13  A.  How? By a vote of the board of directors.
14  Q.  Okay. Do you remember what the vote was?
15  A.  The vote -- the legal vote was five to three.
16  Q.  Okay. Why do you say legal vote?
17  A.  Well, there was another vote that did not normally
18      count, which was Jackee's vote. She shouldn't
19      have voted. And that would have been five to
20      four, but the legal vote is five to three.
21  Q.  Okay. Why shouldn't Jackee's vote have been
22      counted?
23  A.  They have a policy that if you are a subject of
24      whatever is being considered and a vote is
25      required, you're normally excused from the meeting

Page 30

1   and you don't participate in the decision of that
2   particular situation. She was the subject of
3   discharge, her discharge and she should not have
4   been in the meeting and particularly in the
5   voting.
6   Q.  Even, though she was on the board?
7   A.  She was on the board, but she was the subject of
8       the discussion of the issue involved.
9   Q.  Okay. What's this policy that you're talking
10      about? Is there a name for it?
11  A.  What?
12  Q.  Is there a title for this policy?
13  A.  Other than -- I don't know. Other than conflict
14      of interest is the general term used for
15      situations of that sort.
16  Q.  Is there an actual policy that you can point me to
17      that says Jackee could not be in that meeting
18      because she was being voted on?
19  A.  Is there a policy?
20  Q.  Yeah.
21  A.  Yes. There's a policy and practice. Universal.
22  Q.  Okay. Is there a written policy at Co/Op that
23      states that?
24  A.  I don't know if there's a written one or not.
25  Q.  So why do you think there's a policy? What makes

Page 31

1   you say there's a policy?
2   A.  Custom and practice.
3   Q.  Okay. Who was the CEO before Jackee?
4   A.  Pat Korth.
5   Q.  Okay. Was Pat Korth ever allowed to vote on
6       himself, do you know?
7   A.  No, not after we changed the constitution.
8   Q.  When did that change?
9   A.  When did that happen?
10  Q.  Yeah.
11  A.  I'm going -- well, I shouldn't guess. I don't
12      know. I don't recall.
13  Q.  Okay. Was it after Jackee became CEO?
14  A.  What? What are you --
15  Q.  You said the constitution was changed.
16  A.  Yeah.
17  Q.  Was that changed after Jackee became CEO of
18      Co/Op?
19  A.  No. Before.
20  Q.  Before. Was it while Pat Korth was still the
21      CEO?
22  A.  Yes.
23  Q.  Okay. How did you vote with respect to Jackee
24      Smith?
25  A.  I voted in the affirmative.

Page 32

1   Q.  For her discharge?
2   A.  Yes.
3   Q.  Why did you make that vote?
4   A.  Because I was convinced that the services she had
5       rendered was completely exhausted in terms of
6       being effective.
7   Q.  Okay. What made you think that?
8   A.  Based on a number of items and occurrences that I
9       experienced and that I saw.
10  Q.  Okay. Can you give me any examples at all?
11  A.  Yeah. I sure can.
12  Q.  Okay.
13  A.  There are documents, I can't think of the name of
14      it, where it was recommended that Co/Op find a
15      merger, Co/Op to be sold. This came from the
16      state, came from OFIR. We should find an
17      investor, a number of suggestions, because the
18      management had failed to be an effective
19      management of the company, as well as the board
20      had failed for its lack of oversight obligation,
21      fiduciary obligations.
22          In addition to that, one thing that
23      happened that really sealed my conclusion that I
24      don't think she will be effective any longer,
25      there were seven employees selected by her or

Page 33

1  someone else to meet with the board of directors
2  to air their complaints. I was, there again,
3  asked by the chairman of the board to chair that
4  committee. So we had the investigating committee
5  still alive, so the personnel that was on the
6  investigating committee became the committee to
7  listen to those employees, namely Blair McGowan
8  and Bernie Adams. Those seven employees came and
9  when they came to talk about their complaints,
10 they were leveled against the CEO, Jackee Smith,
11 all but one and they submitted their complaints in
12 writing. It's a matter of history.
13         When they came, I made sure that they
14 clearly understood that what you say here is not a
15 secret and they came one at a time, not all seven
16 at one time and what you will say will be
17 recorded, we had the secretary there to record it
18 and you may be confronted with this later on.
19 They all agreed that they would speak freely and
20 that if we wanted to circulate what they said
21 elsewhere later, it's fine with them, so that's
22 how we proceeded. Several of them came with
23 written statements and their complaints against
24 the management of the company. I was impressed to
25 the extent that if these employees would take the

Page 34

1  time to write down what their complaints are and
2  how they think the negative aspect of the
3  management is hurting the company, that this is a
4  very serious matter and so that's one thing that
5  chalked up a number of reasons that I thought that
6  Jackee had served her time.
7         I was on the committee to go to Lansing to
8  talk to the superintendent.
9  Q.  Is this a new reason?
10 A.  This is a new meeting. New reason?
11 Q.  Yeah.
12 A.  Additional reason that I'm giving you now.
13 Q.  Okay. Okay.
14 A.  Okay. The additional reason dealt with my meeting
15 with the commissioner of OFIR. They said to us
16 very clearly that our management has failed this
17 company and they said the board has failed this
18 company and we had quite a discussion and Ken
19 Ross, the chairman of the commission said we're
20 coming down to your meeting -- to your building to
21 tell your whole board that they have failed to
22 serve this company well and that the management
23 has failed to serve this company well. They came
24 down and they said that very clearly. There are
25 other --

Page 35

1  Q.  Let me stop you for a second. Is this different
2      from the first reason you gave me concerning
3      OFIR?
4  A.  You said is it different?
5  Q.  Yeah. The first reason you gave me was you said
6      OFIR thought Co/Op should be sold because of
7      mismanagement of the company?
8  A.  It's different. Yes.
9  Q.  That's different?
10 A.  Yeah.
11 Q.  Do you know when that happened?
12 A.  I can't think of this guy's name. Gerber, not
13     Gerber. You saw it in writing.
14 Q.  Okay.
15 A.  We've got memos to that.
16 Q.  Do you know when?
17 A.  What?
18 Q.  Do you know when that was communicated to Co/Op?
19 A.  It was in December sometime of '09.
20 Q.  Okay. And this meeting that you're just talking
21     about --
22 A.  It's the one in Lansing.
23 Q.  Yeah. What's --
24 A.  With Ken Ross.
25 Q.  What's the date of that?

Page 36

1  A.  Sir --
2  Q.  Approximately.
3  A.  Yeah. I'll be eighty-nine my next birthday. If I
4      can remember dates like that, I'll be sitting on
5      the side of the table where you are.
6  Q.  Was it after December 2009?
7  A.  What is the question?
8  Q.  The meeting that you had with Ken Ross --
9  A.  Yeah.
10 Q.  -- was this after December 2009?
11 A.  I don't know. I don't recall.
12 Q.  Can you put any kind of general time frame on
13     it?
14 A.  What?
15 Q.  Can you put any kind of general time frame on it
16     at all?
17        MS. CAULEY: Objection, foundation.
18 BY MR. YOUNG:
19 Q.  Was it 2010?
20 A.  2010? Well, I'm not supposed to guess.
21        MS. CAULEY: Well, don't guess.
22 BY MR. YOUNG:
23 Q.  I don't want you to guess.
24        MS. CAULEY: If anything he says reminds
25     you or helps your memory --

Page 53

```
1   A.  Ray himself.
2   Q.  Okay. Do you know whether or not that
3       transaction, the check -- I'm sorry. Let me back
4       up. Do you know whether or not that compensation
5       was brought before the board to Ray Murphy?
6   A.  The Ray Murphy thing?
7   Q.  Yeah.
8   A.  I don't remember.
9   Q.  Okay. Do you know of any other board members that
10      received compensation other than Ray Murphy?
11  A.  I don't know for sure. No.
12  Q.  Okay. And when I say compensation, I'm --
13  A.  Yeah.
14  Q.  -- asking about bringing in business and getting
15      compensation.
16  A.  Right. I understand.
17  Q.  Okay. Did Co/Op employees get bonuses?
18  A.  Not now. They have in the past.
19  Q.  Okay. And how were those bonuses determined, do
20      you know?
21  A.  Well, it was determined by the CEO, those that I
22      know.
23  Q.  Okay. Was there a procedure that would take place
24      for the bonuses? Would she submit something to
25      the board and say please approve?
```

Page 54

```
1   A.  Well, the CEO makes a determination how much the
2       bonus would be and so forth and then it is
3       presented to -- it has been presented to the board
4       for ratification. That's been the procedure.
5   Q.  Okay. Do you recall any controversy or disputes
6       about Jackee submitting a bonus recommendation in
7       late 2009?
8   A.  Repeat that.
9   Q.  Yeah. Do you remember any issues or disputes with
10      Jackee submitting bonus recommendations in late
11      2009?
12  A.  Yeah. If I understand the occasion you're talking
13      to -- talking about. Was there a dispute?
14  Q.  Yeah. Was there like any controversy or issue or
15      dispute about --
16  A.  Yes.
17  Q.  -- those bonuses? Can you tell me about that?
18  A.  Jackee wanted to give bonuses to the executive
19      staff and at the same time the employees had been
20      taking a cut in pay and there was opposition to
21      give bonuses to a certain number of employees
22      while other's pay was being reduced, so she
23      brought it to the board and the board rejected
24      that.
25  Q.  Did it have anything to do with the fact that OFIR
```

Page 55

```
1       was supervising the company?
2   A.  I'm not sure. May have been part of the
3       discussion, but I'm not sure.
4   Q.  Okay. Do you know -- okay. OFIR is supervising
5       Co/Op; correct? Co/Op is under OFIR's
6       supervision; correct?
7   A.  Is that the right word, supervision?
8   Q.  I think. --
9   A.  I know they're on surveillance.
10  Q.  Okay. Fair enough.
11  A.  Okay.
12  Q.  Do you know how long Co/Op has been under OFIR's
13      surveillance?
14  A.  I don't know how long.
15  Q.  Okay. More than a couple years?
16  A.  More than a couple of years? About a couple of
17      years that I know of.
18          (Marked exhibit seventy-eight.)
19  BY MR. YOUNG:
20  Q.  Okay. I'll show you what's been marked as exhibit
21      seventy-eight. This is a salary and compensation
22      committee meeting. These are the minutes, it
23      appears, from September 16th, 2009. Take all the
24      time you need. Okay. I'll just note that it
25      lists on the top that you were a committee member
```

Page 56

```
1       that was present at this meeting. Do you recall
2       attending this meeting, by chance?
3   A.  Yeah.
4   Q.  You do? Okay. On the second page, this paragraph
5       right here, it says that bonuses went out to these
6       people, and I think it's referring to the staff
7       that it talks about above, at the end of 2008 in
8       amounts up to thirty-five hundred. Do you recall
9       bonuses being paid to employees in 2008?
10  A.  I don't recall.
11  Q.  Okay. Do you have any reason to dispute that
12      bonuses --
13  A.  I don't dispute it. I just don't recall.
14  Q.  Okay. On the first page, towards the bottom, it's
15      showing the executive staff and it's showing what
16      appears to be pay cuts and other cuts. Do you see
17      that?
18  A.  Yes. I see that.
19  Q.  Okay. So do you have any knowledge of whether or
20      not those cuts were actually made, the pay cuts?
21  A.  I've got to assume they were.
22  Q.  Okay. So even though Co/Op was cutting people's
23      pay and laying off people, in 2008 it still paid
24      bonuses out to its employees; right?
25          MS. CAULEY: Objection, form,
```

Page 77

1  Q.  Uh-huh.
2  A.  I'm not too sure about that.
3  Q.  Why not?
4  A.  Well, let me tell you why. During the -- I was
5      called to her office in which she was talking to
6      Ray Murphy about her going on a sick leave. When
7      we got there, after a lot of discussion, she said,
8      well, I'm going to go, but I got to fire Ted
9      first. Ray Murphy and I said don't fire Ted and
10     when you come back from being off, to get some
11     rest, sick, we'll take care of it then. Ray
12     Murphy and I leave the building. Within five
13     minutes I got a call that she had fired Ted, so I
14     called Jackee and I said I thought we agreed you
15     wouldn't fire Ted until you got back. Well, I
16     didn't understand that to be that way and I just
17     think Jackee wanted to fire Ted and she lied to me
18     and Ray that she would not do -- would not fire
19     the man, but she did, so the point is that
20     impinged on her trustworthiness in my judgment.
21 Q.  Okay. Anything else?
22 A.  What?
23 Q.  Anything else?
24 A.  I can't think of anything else right now.
25 Q.  Okay. So you think she lied to you regarding

Page 78

1      firing Ted?
2  A.  That's right.
3  Q.  Okay. When was that conversation?
4  A.  When was it?
5  Q.  Yeah.
6  A.  I don't recall the date.
7  Q.  Do you recall the month?
8  A.  A month ago?
9  Q.  No. I'm sorry. Do you recall the month --
10 A.  Oh.
11 Q.  -- that that conversation took place?
12 A.  No.
13 Q.  Do you recall the year?
14 A.  Wait. Wait. No. I'd have to guess. No. I
15     don't recall the month.
16 Q.  Okay. Do you recall the year?
17 A.  Year?
18 Q.  Yeah.
19 A.  2010.
20 Q.  Okay. Who's Andy Broder?
21 A.  Who is Andy Broder?
22 Q.  Uh-huh.
23 A.  He's the former counsel -- general counsel for the
24     company.
25 Q.  Okay. And how is he used by Co/Op generally?

Page 79

1  A.  How what?
2  Q.  How was he used, how were his services used?
3  A.  He worked for the chairman, I mean for the CEO. I
4      had no dealings with him as such other than he
5      worked on by-laws. I was on the by-law
6      committee.
7  Q.  Okay.
8  A.  But he worked directly for the CEO.
9  Q.  Did he have any involvement with the board at
10     all?
11 A.  No more than giving reports and working on the
12     by-laws with the board committee.
13 Q.  Okay. And he reported to the CEO; right?
14 A.  What?
15 Q.  He reported to the CEO?
16 A.  Yes.
17 Q.  Okay. Did the CEO need to get permission from the
18     board to -- I'll withdraw that question. Are you
19     familiar with the letter that Mr. Broder submitted
20     to the board in December of 2009?
21 A.  Andy Broder?
22 Q.  Yeah.
23 A.  Is that the letter? Because I'm sure he submitted
24     many letters.
25 Q.  The letter? Well, I'll show you the letter I'm

Page 80

1      talking about and you can tell me if this is the
2      letter. Exhibit thirty-four.
3  A.  Yeah. I never read all of it, but I'm familiar
4      with this. Is the one that has -- yeah.
5  Q.  You can hang on --
6  A.  Oh.
7  Q.  -- to that for just a second. You said you
8      never -- I'm sorry. You've never read all of this
9      letter?
10 A.  No. No.
11 Q.  Okay.
12 A.  See, I was never given this letter. I found it on
13     the table. There was a stack of them and I picked
14     one up. That's how I happened to get one.
15 Q.  What table did you pick them up from?
16 A.  On the board room table.
17 Q.  Okay. During a board meeting?
18 A.  Yeah. Either during or after the board meeting.
19 Q.  Well --
20 A.  That's when I discovered the letter.
21 Q.  Was anybody else in the room when you found it?
22 A.  The whole board.
23 Q.  Okay. What did you do with the letter?
24 A.  What did I do with it?
25 Q.  Yeah.

Page 81

1  A.  I kept it.
2  Q.  Okay. But you didn't read it?
3  A.  What?
4  Q.  But you didn't read it?
5  A.  No. I scanned it, but I was more concerned about
6      the executive summary, so I thought maybe this
7      summary would -- does exactly -- it summarizes the
8      letter. I don't know.
9  Q.  Okay.
10 A.  But I did scan some of the paragraphs.
11 Q.  Do you know how this letter came to be?
12 A.  No.
13 Q.  Okay. What do you think about this letter?
14 A.  What do I think about it?
15 Q.  Yes.
16     MS. CAULEY: Objection, form of the
17 question.
18     THE WITNESS: I haven't even read it
19 all.
20 BY MR. YOUNG:
21 Q.  Okay. Do you have any opinions about it or
22     anything?
23     MS. CAULEY: Objection.
24     THE WITNESS: No.
25     MS. CAULEY: Form of the question.

Page 82

1      THE WITNESS: I have no opinion.
2      MS. CAULEY: Calls for a narrative. Go
3  ahead.
4  BY MR. YOUNG:
5  Q.  When was the investigative committee set up?
6  A.  When was it set up?
7  Q.  Yeah.
8      MS. CAULEY: Asked and answered. Lack
9  of foundation. Are you going to let him read his
10 testimony from before when he answered the
11 question?
12     MR. YOUNG: He can.
13 BY MR. YOUNG:
14 Q.  Was it before or after this letter, before or
15     after December 8th, 2009?
16 A.  Oh, I think that was before, before the letter.
17 Q.  Okay.
18 A.  I think. Let me -- wait a minute. Wait. I don't
19     recall exactly, the answer to your question,
20     before or after 2009.
21 Q.  Okay. And you were on that investigative
22     committee though; right?
23 A.  Yes.
24 Q.  Okay. Was one of the functions of that committee
25     to investigate the allegations that were made in

Page 83

1      this letter?
2  A.  Say that again.
3  Q.  Was one of the functions of that committee to
4      investigate the allegations --
5  A.  No.
6  Q.  -- that were made in this letter?
7  A.  No. It had no, none --
8  Q.  Okay. Was there a committee set up to investigate
9      the allegations that were made in this letter?
10 A.  Set up to investigate this letter?
11 Q.  Uh-huh. Not investigate the letter, investigate
12     the allegations that were contained in the letter.
13 A.  Oh, no. No.
14 Q.  Do you know -- do you have any knowledge about who
15     directed Andy Broder to write this letter?
16     MS. CAULEY: Objection, assumes facts not
17 in evidence, form.
18     THE WITNESS: No. I don't really know.
19 BY MR. YOUNG:
20 Q.  Okay. Did you ever ask anybody?
21 A.  No.
22 Q.  Do you know whether anybody outside of the CEO
23     would have authority to direct Andy Broder to
24     write this letter?
25     MS. CAULEY: Objection, assumes facts --

Page 84

1      THE WITNESS: Well, you've got board
2  members who could do it, I guess.
3  BY MR. YOUNG:
4  Q.  Particular board members or just any board
5      member?
6  A.  Well, all the board members have equal
7      authority.
8  Q.  Okay. So you're saying in general just the
9      board?
10 A.  Yeah.
11 Q.  Okay. Do you know if any board members directed
12     Andy Broder to write this letter?
13 A.  I don't know.
14 Q.  Was this letter ever brought to the attention of
15     the board at a board meeting?
16 A.  Not that I recall.
17 Q.  Are you aware of any allegations that Jackee Smith
18     misappropriated funds with a company credit
19     card?
20 A.  Misappropriated funds? Yeah. She was one of the
21     worst offenders of abusing the credit card
22     policy.
23 Q.  How do you know that?
24 A.  Because the investigative committee -- it was
25     revealed from our investigation.

Page 133

1  A.  What?
2  Q.  Did he tell her to take the documents back to HR?
3  A.  I don't recall him saying that.
4  Q.  Okay. Can you tell me anything specifically that
5      he said?
6  A.  Did he tell me anything?
7  Q.  No. Can you tell me anything that Ray Murphy said
8      specifically?
9  A.  Oh. No. None other than agreeing with me she
10     ought to take some time off because of her
11     health --
12 Q.  Okay.
13 A.  -- called for it. And he said her doctor's
14     telling her to do that and he said to her, you
15     know, you got to follow your doctor's orders.
16     Same thing I told her.
17 Q.  Did you ever talk to anybody from the HR
18     department?
19 A.  Me?
20 Q.  Yeah.
21 A.  No.
22 Q.  I'm sorry. I didn't quite finish the question.
23     Did you ever talk to anybody from the HR
24     department about Jackee Smith?
25 A.  No.

Page 134

1  Q.  Okay. Did you ever talk to any employees at Co/Op
2      about Jackee's request for medical leave?
3  A.  Co/Op employees?
4  Q.  Yes.
5  A.  No.
6  Q.  Did you ever talk to anybody from the board of
7      directors about Jackee's medical leave?
8  A.  Medical leave, no.
9  Q.  Did you ever talk to Blair McGowan about it?
10 A.  Who?
11 Q.  Blair McGowan.
12 A.  About Jackee's medical leave? No. I don't
13     remember talking to him about it.
14 Q.  Did anybody ever ask you any questions about
15     Jackee's medical leave?
16 A.  No. You got to understand, sir, my reputation and
17     history is to treat people's medical situations
18     confidentiality. I don't go around talking about
19     it.
20 Q.  Okay. Was this meeting between you and Ray and
21     Jackee the same meeting where you talked about Ted
22     Winiarski?
23 A.  Yes.
24 Q.  Okay. Do you know whether or not Jackee went on
25     medical leave that day?

Page 135

1  A.  That day? I don't know.
2  Q.  Okay. Do you know the day that she actually went
3      on medical leave?
4  A.  No.
5  Q.  Do you know if she actually took medical leave?
6  A.  I don't know. I just assumed she went on regular
7      sick leave. Yeah.
8  Q.  How did you know that?
9  A.  Because she said that's what she would be doing.
10 Q.  Okay. And then she was gone and you just
11     assumed -- I don't want to use --
12 A.  I assumed that's what she's doing. Yeah.
13 Q.  Okay. I don't know if I asked you this or not.
14     Did you ever -- did you ask Jackee if anybody else
15     had seen that paperwork?
16 A.  No.
17 Q.  Did Ray ask her that?
18 A.  I don't know.
19 Q.  Did you understand that Jackee was entitled to
20     take a medical leave from Co/Op?
21 A.  Do I understand she was entitled?
22 Q.  Yeah.
23 A.  Yeah. I just assumed she had been there long
24     enough to qualify for a medical leave.
25 Q.  Okay.

Page 136

1  A.  I never even questioned it.
2  Q.  Do you have any knowledge about the paperwork that
3      Jackee submitted to HR?
4  A.  No.
5  Q.  Okay. Do you know who Temeng Darko is?
6  A.  What?
7  Q.  Do you know who Temeng Darko is?
8  A.  Who?
9  Q.  Temeng Darko.
10 A.  Yeah. Yeah.
11 Q.  Okay.
12 A.  He's the HR man, isn't he?
13 Q.  Right.
14 A.  I think. Yeah. I think. I only met him once, I
15     think.
16 Q.  Okay. Did you ever talk to him about Jackee's
17     medical leave?
18 A.  No.
19 Q.  Okay. Did you have a second meeting with Jackee
20     regarding her medical leave?
21 A.  What?
22 Q.  Sorry. Did you have a second meeting with Jackee
23     regarding her medical leave?
24 A.  A second meeting?
25 Q.  Yeah.

Page 169

1  A.  Who told her?
2  Q.  Yeah.
3      MS. CAULEY: Objection, lack of
4  foundation.
5      THE WITNESS: I don't remember.
6  BY MR. YOUNG:
7  Q.  Do you remember if the committee considered
8  reducing the salary of other executive staff
9  members?
10 A.  Say that again.
11 Q.  Yeah. Do you recall if this committee considered
12 reducing the salary of other executive staff
13 members?
14 A.  I don't remember.
15     MS. CAULEY: You mean other than what
16 appears in this document?
17     MR. YOUNG: No. I'm just saying in
18 general?
19     MS. CAULEY: At any point in time, ever,
20 or this meeting on March 1st?
21     THE WITNESS: You're talking about during
22 the same time as reducing the hundred thousand?
23 BY MR. YOUNG:
24 Q.  Yes.
25 A.  That's what I assume, you're talking about the

Page 170

1  same time.
2  Q.  Yeah.
3  A.  If you're talking about a different time --
4  Q.  No. No.
5  A.  -- you should let the old man know.
6  Q.  No. You were understanding.
7  A.  Okay.
8  Q.  Yep.
9  A.  I don't know who told Jackee.
10     MS. CAULEY: That wasn't the question.
11 BY MR. YOUNG:
12 Q.  No.
13 A.  Oh.
14 Q.  The question was did the committee consider
15 reducing the salary of other executive staff
16 members?
17 A.  I don't think so. I don't know. I don't
18 recall.
19 Q.  Okay. The committee wanted to wait until Jackee
20 returned from her medical leave --
21 A.  That is correct, that is the point I want to
22 make.
23 Q.  Okay. Let me finish my question and then I'll let
24 you --
25 A.  What's that?

Page 171

1  Q.  Let me finish my question, then you can give me
2  your answer.
3  A.  Okay. Go ahead.
4  Q.  The committee wanted to wait till Jackee got back
5  from medical leave before effectuating the change;
6  correct?
7  A.  Yeah. I trust you were saying medical leave, it's
8  just sick leave.
9  Q.  Okay. We'll just call it her leave.
10 A.  Huh? What?
11 Q.  We'll just call it her leave. How about that
12 that?
13 A.  What?
14 Q.  Her leave.
15 A.  Yeah. Okay.
16 Q.  Is that -- I'm sorry. Did you answer? Did you
17 say yes? I'm sorry. I missed it if you did.
18 A.  What?
19 Q.  Did you say yes?
20 A.  Yes to what?
21     MS. CAULEY: What's the answer to the
22 question?
23     THE WITNESS: What is the question?
24 BY MR. YOUNG:
25 Q.  I'll start over. I'm sorry. Did the committee

Page 172

1  want to wait until Jackee returned from her leave
2  to effectuate the salary reduction?
3  A.  The medical leave?
4  Q.  Yeah.
5  A.  Yeah.
6  Q.  Is that a yes?
7  A.  That's a yes.
8  Q.  Okay. Thank you.
9  A.  Yeah. My medical leave is synonymous to sick
10 leave. Okay?
11 Q.  No. I understand.
12 A.  All right.
13 Q.  We're trying to make it clear for the record.
14 A.  Yeah. All right.
15 Q.  As clear as we can anyway.
16 A.  Okay.
17 Q.  Do you know why they wanted to wait until she
18 returned from the leave, why it wanted to wait?
19 A.  My thinking was we didn't want to disturb her
20 while she's ill and to give her the impression
21 that something's going to happen to her because
22 all the benefits stayed in effect, whatever they
23 were, at the level of the -- salary level when she
24 left, so when she would come back, that's when the
25 reduction would kick in and all the related

Page 213

1  A.  Yeah. That was in 1960 -- 1960.
2  Q.  Okay.
3  A.  I was working in the plant at the time and for the
4      1961 contract I ran to be elected to that national
5      negotiating committee.
6  Q.  Okay. When did you go to work for Walter
7      Reuther?
8  A.  Came out in 1961.
9  Q.  Okay.
10 A.  See, Walter was the president of the CHA program,
11     which is now HAP. HAP, Ford bought it and then
12     HAP took it over later.
13 Q.  Okay. All right. I've almost got the connection
14     here. Just before the national negotiation
15     committee, where were you at?
16 A.  Chrysler Highland Park plant.
17 Q.  Okay. Were you there from 1946 till 1960?
18 A.  Yes.
19 Q.  Okay. All right. That's what I was missing.
20 A.  1942 to 1960.
21     MS. CAULEY: You were in the Army.
22 BY MR. YOUNG:
23 Q.  Right.
24 A.  I left for three years.
25 Q.  Right.

Page 214

1  A.  To go in the Army, see.
2  Q.  Right.
3  A.  Then I came back to the plant.
4  Q.  Got it. All right. Okay. Was there a written
5      policy at Co/Op regarding nepotism, do you know?
6  A.  I don't think so.
7  Q.  Okay.
8  A.  I don't know of any.
9  Q.  We also talked earlier about -- we were talking
10     about Jackee's termination and why you thought --
11     why you voted --
12 A.  Yeah.
13 Q.  -- for her termination. And you gave me, I think
14     you gave me three reasons, but I might have cut
15     you off, so I'll just recap.
16     MR. YOUNG: Mary, correct me if I'm wrong.
17 BY MR. YOUNG:
18 Q.  Number one, OFIR had mentioned that Co/Op should
19     be sold or that they should find an investor to
20     help them out.
21 A.  That came from OFIR.
22 Q.  Yes.
23 A.  Yeah.
24 Q.  Number two, you talked about employees making
25     complaints?

Page 215

1  A.  Correct.
2  Q.  Okay. And number three, you had mentioned Ken
3      Ross had made some comments to you about the
4      management of the company?
5  A.  Correct.
6  Q.  Okay. Did you have any other reasons that you
7      voted for Jackee's termination?
8  A.  I just thought with the morale being a negative
9      factor and I didn't think she could restore it
10     because it had gotten so deep and I don't mind
11     telling you those seven employees really effected
12     me when they very boldly registered their
13     displeasure with her. The question would then
14     come how could she lead them if they feel this
15     strongly about it.
16 Q.  Okay. What kind of employees were they, do you
17     remember?
18 A.  What?
19 Q.  Were these executive level employees or --
20 A.  No.
21 Q.  Was it a mixed bag?
22 A.  Well, let's see. One -- wait just a minute. You
23     said executive level. I think maybe one or two of
24     them were.
25 Q.  Okay.

Page 216

1  A.  Yeah.
2  Q.  And then others weren't is what you're saying?
3  A.  What?
4  Q.  Others were not? You said two were and then the
5      rest of them were not?
6  A.  Yes. I wouldn't --
7  Q.  Okay.
8  A.  -- say that they were top executives. They may
9      have been in the nonunion staff, but --
10 Q.  Okay. Going back to morale --
11 A.  What?
12 Q.  Going back to morale. I'm sorry.
13 A.  The morale?
14 Q.  Yeah.
15 A.  Yeah.
16 Q.  Was it -- did you blame --
17 A.  The reports we got on that was very, very low.
18 Q.  Okay. Did you blame that solely on Jackee?
19 A.  Not solely, but she is a major contributor.
20 Q.  Okay. Who else was a contributor that you know
21     of?
22 A.  I can't think of any offhand.
23 Q.  Okay. But you think there were others?
24 A.  What?
25 Q.  You think there were others?