# EXHIBIT G

# QUALIFIED COURT REPORTERS, INC.

Smith v Co/op Optical

Deposition of
Bernice Adams

January 25, 2011

Qualified Court Reporters, Inc.
21909 Chase Drive
Novi, Michigan 48375
(248) 344-4364

Bernice Adams                                              January 25, 2011

Page 10

1  Q. Who is us?
2  A. Co/op.
3  Q. Let me back up. I guess I didn't ask the question
4     good enough. Have you ever been sued
5     individually, has anybody ever sued Bernice Adams
6     before?
7  A. Yes.
8  Q. Okay. How long ago was that?
9  A. Maybe eight years ago.
10 Q. Okay. What was that for, what was that about?
11 A. That I didn't take their case to arbitration.
12 Q. As a rep?
13 A. What's that?
14 Q. As a rep?
15 A. Yes.
16 Q. Okay. Any other cases?
17 A. What was that?
18 Q. Any other cases?
19 A. No.
20 Q. Okay. Have you ever been a plaintiff in a case
21    before, has Bernice Adams ever sued somebody
22    else?
23 A. No.
24 Q. Are you currently taking any medications that
25    would affect your ability to answer any of my

Page 11

1     questions today?
2  A. No.
3  Q. Have you discussed this case with anybody outside
4     of your attorneys?
5  A. No.
6  Q. What did you do to prepare for the deposition
7     today?
8  A. Just met with my attorney.
9  Q. Did you review any documents?
10 A. A couple.
11 Q. Which documents did you review?
12 A. I don't recall.
13 Q. Were they marked exhibits in this case, do you
14    know?
15 A. I don't know.
16 Q. Were they out of this book?
17 A. They were out of it.
18       MS. CAULEY: Okay.
19       THE WITNESS: Yes.
20       MR. YOUNG: And that book is the marked
21    exhibits from this case?
22       MR. CAULEY: Yeah.
23 Q. (MR. YOUNG) Okay. Have you read the complaint in
24    this case?
25 A. Yes.

Page 12

1  Q. Okay. When did you read that most recently?
2  A. Probably after we got it. I don't know exactly
3     when that was.
4  Q. Okay. So a few months ago probably?
5  A. Exactly. Probably.
6  Q. Okay. What's your understanding of the claims
7     that are being made in this case?
8  A. You want to repeat that?
9  Q. Sure. What's your understanding of the claims
10    that are being made in this case?
11 A. I'm not sure what you're referring to.
12 Q. Okay. Do you know why Jackee is suing Co/op? Do
13    you know what she's alleging?
14 A. Basically probably not.
15 Q. Probably not?
16 A. Ugh-ugh.
17 Q. You don't know?
18 A. I would say no.
19 Q. You don't know?
20 A. No.
21 Q. Okay. Do you know why Jackee was terminated? I'm
22    sorry. Was Jackee terminated from Co/op?
23 A. Yes.
24 Q. Do you know why?
25       MS. CAULEY: Objection. She can speak for

Page 13

1     her own reasons if she, in fact, voted in favor of
2     that. She can't know for every other person.
3     Foundation. Go ahead.
4        THE WITNESS: Well, I will relate it to
5     you in the navy language.
6  Q. (MR. YOUNG) Okay.
7  A. When a skipper loses control of the ship and their
8     executives and their members, then that skipper is
9     removed, so that's my analogy of this.
10 Q. Did the navy have executives and members?
11 A. The navy has, if they have a ship, they have a
12    captain and it's the same differential.
13 Q. Okay. Did you agree with the decision to
14    terminate Jackee?
15 A. Yes, I did.
16 Q. Okay. Did you vote --
17 A. Yes, I did.
18 Q. -- in favor of termination?
19       MS. CAULEY: Let him finish the question.
20       THE WITNESS: Okay.
21 Q. (MR. YOUNG) That's okay. That's okay. Did you
22    vote in favor of her termination?
23 A. Yes.
24 Q. Do you think Jackie should have been given another
25    chance as CEO?

QUALIFIED COURT REPORTERS, INC. (248) 344-4364

Page 14

1. A. No.
2. Q. Do you know at the time that she was terminated
3. whether or not she was on medical leave?
4. A. I'm not sure.
5. Q. Did you ever hear anybody say that she was?
6. A. I heard that rumor.
7. Q. Okay. Who did you hear that from?
8. A. I don't recall.
9. Q. Okay. Did somebody tell you that it was a rumor
10. and not a fact or did somebody say, in fact,
11. Jackee's on medical leave? Do you remember?
12. A. I believe we got a communication from her husband
13. stating she was on a medical leave.
14. Q. Okay. And that was the first time you heard about
15. it?
16. A. No.
17. Q. Okay. When was the first time you heard about
18. it?
19. A. I don't recall.
20. Q. Before that, though, before the communication
21. about contacting her while she was on leave?
22. A. No. After. I believe after.
23. Q. Well, you just said it was before. Sorry.
24.    MS. CAULEY: Are you confused?
25.    THE WITNESS: Yeah.

Page 15

1. Q. (MR. YOUNG) That's okay. I'll re-ask it. I'll
2. clarify. You said Co/op had a communication not
3. to contact Jackee while she was on leave; right?
4. A. Right.
5. Q. Was that the first time that you learned about her
6. medical leave or did you learn about it sometime
7. before that?
8. A. I had heard rumors before that, but it was not
9. confirmed so --
10. Q. Okay. Got it. And you don't recall who you heard
11. those rumors from before --
12. A. No, I don't.
13. Q. Okay. How well was Jackee performing her job in
14. late 2009, early 2010?
15. A. Not very well in 2010.
16. Q. Okay. What about 2009?
17. A. I don't know about 2009.
18. Q. Okay. Just based on your personal life experience
19. did you ever observe Jackee to be stressed out or
20. under undue pressure at work?
21. A. I think she was under pressure.
22. Q. When do you think she was under pressure? Is it
23. late 2009, early 2010, that general time frame?
24. A. 2010.
25. Q. Okay. Why do you think she was under pressure?

Page 16

1. A. She related to me that she was under pressure.
2. Q. Okay. When did she do that?
3. A. I'm not sure.
4. Q. Was it before she was terminated?
5. A. Yes.
6. Q. Was it before you learned that Co/op -- that she
7. wanted Co/op to not contact her anymore?
8. A. No.
9. Q. It was after that?
10. A. It was before that.
11. Q. Oh, it was before that. Okay. Was it in 2010?
12. A. I believe so.
13. Q. Okay. Did she give you any specific reason why
14. she was under pressure?
15. A. I don't recall.
16. Q. Okay. What did you say in response? How did you
17. respond to her statement about being under
18. pressure? Do you remember?
19. A. No.
20. Q. Were you aware of any efforts by Mr. Winiarski or
21. Mr. Benson to force Jackee out of the company?
22. A. I'm not sure of an intent.
23. Q. Okay. Are you aware of any efforts, I understand
24. you can't tell me what their intent was, but did
25. you observe anything that would lead you to

Page 17

1. believe that Mr. Winiarski or Mr. Benson was
2. trying to force Jackee out of the company?
3.    MS. CAULEY: Well, that's asking the same
4. thing. It's asking the intent.
5.    MR. YOUNG: I'm asking what she observed.
6. Q. (MR. YOUNG) Did you observe any actions on the
7. part of either one of those?
8.    MS. CAULEY: But that goes to intent.
9.    MR. YOUNG: I'm asking what she observed.
10. That's all.
11.    MS. CAULEY: If you can answer. If not,
12. tell him.
13.    THE WITNESS: I don't believe that the
14. intent was to force her out of the company.
15. Q. (MR. YOUNG) Okay. We just talked about you can't
16. testify as to their intent.
17. A. Well --
18. Q. I'm just asking what you observed. If you didn't
19. observe anything, that's fine.
20.    MS. CAULEY: Counsel, you're arguing with
21. her now. She answered the question. Ask another
22. question.
23. Q. (MR. YOUNG) Is your answer no?
24.    MS. CAULEY: That was not her answer.
25. Your answer is on the record. Ask another

Bernice Adams — January 25, 2011

Page 46

1         EXAMINATION
2     BY MS. CAULEY:
3 Q. Do you recall a meeting on February 23rd where it
4     was a board meeting at Co/op and people from OFIR
5     were there?
6 A. Yes.
7 Q. Okay. Do you recall Jackee Smith making some
8     statements about some of the concerns that had
9     been raised about her?
10 A. Yes.
11 Q. And did you have any concerns about the way in
12     which she handled that?
13 A. Yes.
14 Q. What were your concerns?
15 A. My concerns were watching the people from OFIR as
16     to their body language, kind of told me that they
17     were not impressed with what they were hearing.
18     In fact, they were kind of, I guess you would call
19     it, disgusted or something to that effect. That
20     was my impression.
21 Q. Okay. Do you think, other than viewing what you
22     think OFIR was -- how they were reacting, did you
23     have any problems with her doing what she did?
24 A. Yes.
25 Q. What was that?

Page 47

1 A. Prior to this meeting Jackee was advised by the
2     board to make a statement concerning the matters
3     that they were requesting, just a couple sentences
4     about everything and she had a sheaf of papers and
5     she went through them one by one and kind of read
6     off a big responses to every question.
7 Q. Okay. And you saw her reading something?
8 A. Yes.
9 Q. And in that read through did Miss Smith make any
10     criticisms about any other -- or any executive
11     staff members?
12 A. Yes.
13 Q. Who?
14 A. Ted.
15 Q. And was Ted at that meeting?
16 A. I don't believe so.
17 Q. Okay. You're not sure?
18 A. I'm not sure.
19 Q. Okay. Did you consider that Jackee had exhibited
20     poor judgment in the way in which she handled
21     that?
22 A. Yes.
23 Q. Did you have any other concerns about poor
24     judgment exhibited by Jackee in the '09, early '10
25     period?

Page 48

1 A. Some of the things that she did and was instructed
2     by the board not to do and she took it upon
3     herself to do anyway in defiance to the board's
4     recommendation.
5 Q. Was one of those instructions not to fire Ted
6     Winiarski?
7 A. Yes.
8 Q. And did she fire him anyway?
9 A. Yes.
10 Q. Did you have any -- did you ever learn that Jackee
11     was requesting or was about to request bonuses for
12     the executive staff in '09?
13 A. Yes.
14 Q. Did you have concerns about that?
15 A. Yes.
16 Q. What were those concerns?
17 A. My concerns were I had over the weekend received a
18     letter in response to the company's questions from
19     OFIR and it dawned on me that we were in -- we
20     were in trouble and at that point you do not ask
21     for raises and I met with Jackee and I told her I
22     was not going to vote for any raises and I was
23     going to vote against them.
24 Q. Was it the amount of the raise that you were
25     concerned with or just the fact that she was

Page 49

1     looking at raises?
2 A. It was the amount and the fact.
3 Q. Well, do you know what the amount was?
4 A. The amounts were negligible. They were not very
5     high.
6 Q. Okay. But you still didn't think there should be
7     any bonuses?
8 A. No.
9 Q. Okay. Well, first of all, who's -- who had the
10     authority at Co/op, if you know, and this is going
11     to be kind of a two-part question and then you can
12     answer it separately, but I want to just be clear,
13     to set the wages of the CEO and who had the
14     authority to set the wages of other executive
15     staff?.
16 A. The CEO was done by the committee that's in charge
17     of -- the compensation committee.
18 Q. Okay.
19 A. Okay. The other members are done by the CEO.
20 Q. Okay. All right. So did the board or a
21     committee, the compensation committee, go to
22     Mr. Winiarski or Mr. Edwards and say, you know, do
23     you want to reduce your salary and if so, how much
24     or did they -- how did that happen?
25 A. They initiated it to the board.

13 (Pages 46 to 49)