# EXHIBIT H

```
                                                                Page 1
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DISTRICT
 3
        JAQUELINE SMITH,
 4
 5               Plaintiff,
 6
        vs.                No. 2:20-cv-13470-PJD-MAR
 7
 8      CO/OP OPTICAL SERVICES, INC.,
        a Michigan corporation,
 9
10
                 Defendant.
11
12      _____/
13
14           The deposition of ROBERT MORRIS, taken
15      before Suzanne M. McGovern, CSR 2655, Notary
16      Public for Oakland County, at 38505 Woodward
17      Avenue, Suite 2000, Bloomfield Hills, Michigan, on
18      Monday, January 24, 2010, at approximately 12:35
19      p.m.
20      APPEARANCES:
21              JESSE L. YOUNG, ESQ.
                SOMMERS SCHWARTZ, P.C.
22              2000 Town Center, Suite 900
                Southfield, Michigan 48075
23
24           Appearing on behalf of the Plaintiff
25
```

Page 10

1  agency that provides regulation for entities that
2  are financial in nature or deal with insurance.
3  Q.  How familiar are you with Co/op's financial
4      condition?
5  A.  I think fairly familiar.
6  Q.  Okay.  Do you know what RBC is?
7  A.  Yeah.  It's a rate based capital ratio.
8  Q.  Okay.  Is there a certain ratio that is ideal for
9      Co/op to be at, do you know?
10 A.  Yeah.  The state expects -- the state expects
11     Co/op to be at three hundred or higher.
12 Q.  Okay.  Do you know what Co/op's RBC is
13     presently?
14 A.  I think it's around in the thirties.
15 Q.  Okay.
16 A.  And that's as high as it's been in some time.
17 Q.  Do you have any knowledge as to what the RBC was
18     in late December 2009?
19 A.  It was --
20 Q.  I'm sorry.  Early --
21 A.  Go ahead.
22 Q.  Late December 2009.  I'm sorry, late 2009, early
23     2010.
24 A.  It was very low.  Thirty if not lower.  And there
25     was great fear that it would go below zero and

Page 11

1      that would have triggered a bunch of problems.
2  Q.  Do you know if it ever went below zero?
3  A.  Has it -- yes.
4  Q.  When?
5  A.  Probably in '08, possibly '09 time period.
6  Q.  Have you ever testified in court before?
7  A.  No.
8  Q.  And you said you've never given a deposition;
9      right?
10 A.  No.
11 Q.  Okay.  Have you ever been a plaintiff or a
12     defendant in a case?
13 A.  No.
14 Q.  Are you currently taking any medications that
15     would affect your ability to answer my questions
16     that I ask you today?
17 A.  No.  I don't think so.
18 Q.  Have you discussed this case with anybody other
19     than your attorney?
20 A.  This case, I don't think so.  I may have mentioned
21     some things to my wife, but just in passing.
22 Q.  Did you ever have any conversations with any
23     individual board members about the case on an
24     individual one-on-one basis?
25 A.  Not directly.  Like depositions are occurring,

Page 12

1      things like that, but not specifics.
2  Q.  What did you do to prepare for this deposition
3      today?
4      MS. CAULEY:  Other than talk to your
5      lawyer.
6  Q.  (MR. YOUNG)  Yeah.  I don't want to know what you
7      talked to your attorney about.
8  A.  Yeah.  I talked to my attorney and I kind of went
9      through my files, which I think you should have.
10 Q.  Okay.
11 A.  Just to refresh my memory.
12 Q.  You've produced all those files to your
13     attorney?
14 A.  Yeah.
15     MS. CAULEY:  And they've been produced to
16     you.
17 Q.  (MR. YOUNG)  Okay.  Have you read the complaint in
18     this case?
19 A.  You know, I did.  I probably should have read it
20     before, you know, coming out, but I did read it
21     when it first, you know, when we first -- when it
22     first happened.
23 Q.  Okay.  Do you have any criticisms about Jackee
24     Smith's performance as CEO?
25 A.  Yeah.  I was very disappointed in a number of

Page 13

1      things.  I think the most significant being when I
2      came on the board in December of '09, there was an
3      issue with the state.  There was an issue in terms
4      of getting material to the state.  I think it was
5      our annual budget and in that budget was going to
6      be a series of cuts that had to be made and it
7      seemed after we sent that material to the state
8      there still wasn't a hurry -- there wasn't a plan
9      really to implement the cuts that had to be made.
10     It's over three hundred and, I think, forty
11     thousand dollars worth of administrative cuts and
12     that concerned me a lot and I think if you don't
13     make cuts like that at the beginning of a fiscal
14     year when you do have to make them, it becomes
15     harder and harder.  I was discouraged at the
16     conflict with the top management and almost all of
17     these top management had been people hired by her
18     and I was -- I thought board meetings and some
19     other activity that I saw were, frankly, just not
20     professional and that bothered me a great deal.
21 Q.  Okay.  With respect to the budget cuts that you
22     were just talking about, is that Jackee's full
23     responsibility as a CEO?
24 A.  She's the captain of the ship and I think the
25     board viewed her as responsible, yes.

Page 14

```
 1  Q.  Okay.  With respect to conflict with the top
 2      management, who were you talking about when you
 3      say top management?
 4  A.  I'm talking about Jackee.  I'm not sure I've got
 5      all these positions right, but chief financial
 6      officer, the chief operating officer and I think
 7      those are the top ones.
 8  Q.  That is Ted and Charles?
 9  A.  Ted and Charles.  Yeah.
10  Q.  Did you ever communicate these criticisms to
11      Jackee personally?
12  A.  I think I did.  Yes.
13  Q.  How did you do that?
14  A.  Informal communication.
15  Q.  Orally?
16  A.  Yeah.
17  Q.  Did you ever send her e-mails or any letters or
18      anything?
19  A.  I don't think so.
20  Q.  How did she respond?
21  A.  Usually there'd be a conversation and, you know, I
22      would usually have a conversation, I think the
23      problem is either over or will hopefully begin to
24      be resolved, but sometimes the message apparently
25      wasn't received.  For example, and I think it was
```

Page 15

```
 1      mentioned at the first meeting we had with OFIR,
 2      that the person who they had the most confidence
 3      in in our organization was Ted and it was clear
 4      that no -- we were, yes, making some management --
 5      some changes and some decisions on employees, but
 6      Ted was a person that we could not afford to lose
 7      because we would -- it would be a direct --
 8      direct problems with OFIR and I think in late
 9      January Ted was fired.
10  Q.  When did you communicate your criticisms of Jackee
11      to Jackee?
12  A.  I think in a period -- and I can't remember
13      specific dates, but I think in a period maybe as
14      early as the last week in December in '09 and into
15      January and I want to -- I think my emphasis would
16      be on hearing things, what about this issue or
17      that issue and can we move -- is there a way to
18      move forward would have been the nature of the
19      type of discussion.
20  Q.  Do you know why Jackee was terminated from
21      Co/op?
22  A.  She was terminated because --
23          MS. CAULEY:  Well, wait.  I'm going to
24      object on foundation.  He can testify as to his
25      own vote or what anyone else told him, but he
```

Page 16

```
 1      can't guess as to what other people --
 2          MR. YOUNG:  I'm not asking him to guess.
 3  Q.  (MR. YOUNG)  Do you know why she was terminated?
 4  A.  Yeah.  She didn't have the votes on the board.
 5  Q.  You had a vote; right?
 6  A.  Yes.
 7  Q.  How did you vote?
 8  A.  I'm not sure if the vote was to terminate.  You
 9      know, sometimes it can be a yes or a no, but
10      essentially I thought it was time for a change.
11  Q.  Okay.  This vote was March 19th, 2010; correct?
12  A.  I believe so.
13  Q.  And you became a board member in December of 2009;
14      correct?
15  A.  Yes.
16  Q.  Did you ever feel that Jackee should be given
17      another chance as CEO?
18  A.  In the course of discussions with other board
19      members in January, primarily January, that was
20      talked about, you know, could we -- I mean the
21      Co/op was in danger of going under and the
22      conflict with top management was a huge
23      distraction and so the question was could -- could
24      Jackee work with the other staff and the board
25      stay, all the different players and so there was
```

Page 17

```
 1      hope that maybe she might be able to continue and
 2      then hope that maybe there might be a -- you know,
 3      she might move on on her own and that didn't
 4      happen.
 5  Q.  Was there any discussion about terminating the CFO
 6      or the COO during the same time period?
 7  A.  Yeah.  Yes.
 8  Q.  Did the board ever vote as to whether to terminate
 9      those positions, I'm sorry, terminate those people
10      from those positions that currently held them?
11  A.  There was a vote that I don't think some people
12      appreciated where Charles was removed.  There was
13      not a vote on Ted.
14  Q.  Why did -- if you know, why did some people not
15      appreciate the vote to remove Charles?
16  A.  Well, I think the way, if my memory is correct, we
17      had a meeting on a Tuesday in mid to late January,
18      officers meeting, I think and we saw a series
19      of -- there was a plan in place that had been
20      developed to implement the three hundred forty
21      thousand dollars in cuts that we wanted to make
22      and the next day there was a board meeting and I
23      think we were -- and the vote was made and we were
24      surprised after -- I think -- there wasn't enough
25      discussion made on that vote and I think in
```

Page 34

1 charge. It seemed extremely high and then there's
2 a Comfort Suites, I think that was -- that may be
3 referring to a local hotel where Jackee indicated
4 she needed to get away from her house to do some
5 Co/op work.
6 Q. Okay. It says in the last paragraph at the bottom
7 that the Omni Hotel Spa is an approved expense.
8 A. Yes.
9 Q. Do you have any reason to dispute that?
10      MS. CAULEY: What, that it was approved or
11 that it should have been approved?
12      MR. YOUNG: That it was approved.
13      THE WITNESS: Just that in the course of
14 whatever, the acting chairman had, you know, this
15 is his document so --
16 Q. (MR. YOUNG) Okay. Is it your understanding that
17 Jackee after all this, all these allegations, that
18 she was only required to reimburse the company for
19 this Comfort Suites' expense for approximately a
20 hundred forty dollars?
21      MS. CAULEY: Objection, lack of
22 foundation. You have no foundation that he knows
23 what was going on during the course of this, where
24 your client, every time something was discovered,
25 she's reimbursing all along the line. You're

Page 35

1 asking a question of someone who could not
2 possibly know what happened.
3 Q. (MR. YOUNG) Do you know what happened?
4 A. I don't know what happened so --
5 Q. Okay. Well, do you know if Jackee ever paid the
6 hundred forty dollars?
7 A. I don't know. I assume she did, but I don't
8 know.
9 Q. Okay. Do you believe Jackie was treated
10 differently at Co/op because she was a woman?
11 A. No.
12 Q. Did you ever hear any of the board members ask her
13 to make plates of food for her -- for them?
14 Excuse me.
15 A. No. I think -- I was only at a couple board
16 meetings, but I think Jackee helped. We have some
17 board members who have mobility issues and I think
18 she may have helped and others helped. You know,
19 we'd serve a lunch at a board meeting and I never
20 saw anything that struck me as being a demand or
21 anything else. It was more if someone was
22 helping, it was more a friendly gesture that we
23 should see more of.
24 Q. Do you know whether Jackee was suffering from any
25 health problems in late 2009 or early 2010?

Page 36

1      MS. CAULEY: Objection, lack foundation.
2 Q. (MR. YOUNG) You can answer.
3      MS. CAULEY: If you know.
4 Q. (MR. YOUNG) If you know.
5 A. No. I mean I don't know. I don't know.
6 Q. Okay. Do you know whether Jackee ever requested a
7 medical leave from Co/op?
8 A. I assume she did when she went on medical leave.
9 I mean, so, you know, beyond that, I don't know.
10 I just know she was on medical leave, so I assume
11 there was a request made.
12 Q. When did you first learn she was on medical
13 leave?
14 A. Maybe immediately before or immediately after it
15 happened. That was in like early February, I
16 think.
17 Q. Do you remember how you learned of it?
18 A. I'm assuming from talking to one of the board
19 members.
20 Q. Do you know which one?
21 A. I think my guess would be Marc Stepp. It could
22 have been Ray.
23 Q. Could it have been Blair?
24 A. It could -- well, it could have been.
25      MS. CAULEY: Lack of foundation.

Page 37

1      THE WITNESS: You know, at that time, no.
2 No. I think it was more likely to be Marc Stepp
3 or Ray.
4 Q. (MR. YOUNG) Okay. Did you ever see the paperwork
5 that she turned in to HR?
6 A. No.
7 Q. What's your understanding of the, if you have one,
8 of the Family Medical Leave Act?
9 A. I have very little understanding of it, except --
10 Q. That's fine.
11 A. If one has certain types of health problems, they
12 can take a leave.
13 Q. Anything else, do you know anything about
14 employers' rights or the employee's rights under
15 the FMLA?
16 A. Not really, you know.
17 Q. Did anybody ever tell you that they thought Jackee
18 was faking a medical condition?
19 A. I don't think so. No.
20 Q. Did you ever have contact with Jackee while she
21 was on medical leave?
22 A. I don't think so. It's possible there may have
23 been a phone call or two, but I think -- but for
24 the most part I don't think so.
25 Q. Did you ever communicate directly to OFIR?