# EXHIBIT I

```
                                                              Page 1
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUHTERN DISTRICT
 3
     JAQUELINE SMITH,
 4
 5              Plaintiff,
 6
     vs.                      No. 2:20-cv-13470-PJD-MAR
 7
 8   CO/OP OPTICAL SERVICES, INC.,
     a Michigan corporation,
 9
10
                Defendant.
11
12   _____/
13
14              The deposition of BLAIR McGOWAN, taken
15   before Suzanne M. McGovern, CSR 2655, Notary
16   Public for Oakland County, at 38505 Woodward
17   Avenue, Suite 2000, Bloomfield Hills, Michigan, on
18   Monday, December 22, 2010, at approximately 12:30
19   p.m.
20   APPEARANCES:
21              JESSE L. YOUNG, ESQ.
                SOMMERS SCHWARTZ, P.C.
22              2000 Town Center, Suite 900
                Southfield, Michigan 48075
23
24        Appearing on behalf of the Plaintiff
25
```

Page 50

1 hundred jobs and the end of our operation.
2 Attorney Broder said that he'd talked with our
3 actuarial attorneys and explained to them the
4 meeting with OFIR and Broder reported back that
5 these attorneys felt that Larry Gardner's concern
6 about OFIR's actions were well warranted. Our
7 outside auditor, Tom Monteleon, who's a senior CPA
8 at Hungerford & Company, said that the finances
9 had deteriorated so drastically that his company
10 would have to write a special warning, which we
11 called a going concern letter, which would advise
12 the state and all the banks with whom we have
13 relations, including banks that we borrowed money,
14 that the ability of our organization to continue
15 was called into question.
16 Q. Okay.
17 A. Broder also talked about and it was explained by
18 Charles Benson and Ted Winiarski that there were
19 internal problems, that the use of credit cards by
20 Jackie Smith were inconsistent with our corporate
21 policies, that they made it appear that there
22 could be conflicts of interest and financial
23 irregularities. He pointed out that the payroll
24 system, which previously had been under the
25 supervision of the chief financial officer, had

Page 51

1 been removed in recent months or years and put
2 directly under Jackie Smith's authority and that
3 in the previous May of 2009 there was an
4 extraordinary event which made it appear that
5 Jackie had paid herself ten or twelve thousand
6 dollars that she was not entitled to. They
7 indicated that Jackie was operating in such a
8 fashion that they were not working as a team. I
9 came to two conclusions.
10 Q. Okay. Hold on one second. This was all at the
11 December 7th, 2009 meeting?
12 A. Yes.
13 Q. Okay.
14 A. And there were some other items. I'm not trying
15 to -- I'm trying to list the major items, but
16 there were other items. I just am not able to
17 pull them out of my head at this moment, so I'm
18 not -- if I miss something, it's not -- I'm
19 telling you right now I haven't got everything,
20 but I came out of that meeting with two
21 conclusions. First off, at this time Jackie was
22 no longer able to run a team, that she had lost
23 the ability to work with her inside managers and
24 she was no longer able to work with our outside
25 professionals, so the team work, which was the

Page 52

1 absolute most necessary attribute of our chief
2 executive officer, no longer existed. The second
3 conclusion I came to is that these major events
4 had not been disclosed to the board of directors
5 who run the Co/op and I realized right then and
6 there that Jackie would have to be replaced as
7 chief executive officer.
8 Q. Why was Jackie Smith terminated as the president
9 of Co/op Optical?
10 MS. CAULEY: Objection, lack of
11 foundation. He can speak to his own actions. He
12 can't speak for everyone or the board.
13 Q. (MR. YOUNG) Was Jackie Smith terminated from
14 Co/op Optical?
15 A. Yes.
16 Q. Do you know why?
17 A. Yes.
18 Q. Why?
19 A. Because five board members voted to terminate her.
20 Q. Do you know which board members?
21 A. No.
22 Q. Do you feel that Jackie Smith was wrongfully
23 discharged from Co/op Optical?
24 A. No.
25 Q. Do you think she should have been given another

Page 53

1 chance?
2 A. No.
3 Q. Did you vote to terminate her?
4 A. Yes. I made the motion.
5 Q. I saw that. Was Jackie Smith responsible for
6 bringing in new business while she was the CEO?
7 A. Was she responsible for it?
8 Q. For bringing in any new business while she was the
9 CEO?
10 A. As CEO, she was responsible for everything that
11 happened there.
12 Q. Okay. Did she ever bring in new business?
13 A. I think so.
14 Q. Do you know from where?
15 A. No.
16 Q. Did the annual revenues for Co/op increase between
17 '06 and '09, if you know, more than five million
18 dollars?
19 MS. CAULEY: Are you talking about
20 revenues or are you talking about profit?
21 MR. YOUNG: Revenues.
22 MS. CAULEY: I don't know what that
23 means.
24 THE WITNESS: I'm only speculating. When
25 I talk about the finances of the company, I put

### Page 54

1      the numbers in front of me and I don't have them
2      in front of me.
3  Q. (MR. YOUNG) Okay. So is your answer you don't
4      know?
5  A. I don't know.
6  Q. Okay. Did Jackie Smith receive raises while she
7      was the CEO, salary raise?
8  A. Jackie got both raises and a cut in her salary.
9  Q. That wasn't my question. Did she get raises?
10 A. She got raises and cuts.
11 Q. How much were the raises, do you know?
12 A. I don't know.
13 Q. How much were the cuts?
14 A. I don't know.
15 Q. Okay. Did Jackie Smith get bonuses between --
16     while she was CEO?
17 A. I don't know.
18 Q. At the time Jackie Smith was terminated was she on
19     FMLA leave?
20 A. She was on some sort of medical leave.
21 Q. Okay. Do you know why she was on this leave?
22 A. I'm sorry. Yes, sir.
23 Q. I apologize. Do you know why she was on the
24     medical leave?
25 A. Not really.

### Page 55

1  Q. Any idea?
2      MS. CAULEY: Objection, calls for
3      speculation.
4      THE WITNESS: Do I answer it or don't
5      answer it?
6      MS. CAULEY: If you can answer it without
7      speculating, you can answer it if you know the
8      answer.
9      THE WITNESS: She got some doctor to say
10     she was sick.
11 Q. (MR. YOUNG) Do you know what kind of sickness?
12 A. No.
13 Q. Are you aware of Co/op contributing five thousand
14     dollars to Janna Garrison, one of her campaigns?
15 A. I have become aware of it.
16 Q. Were you aware at the time?
17 A. No.
18 Q. How did you become aware of it?
19 A. After the revelations of early December 2009, the
20     board bent over backwards to try to be fair to
21     Jackie Smith and to do the correct thing for the
22     Co/op and one of the things that we did is we
23     created an investigation committee, which was
24     chaired by Treasurer Bernie Adams and I was on
25     that committee and during that time we looked at

### Page 56

1      many different things and in the process it came
2      out that we looked at contributions to --
3      contributions to, donations and stuff like that
4      and during that process the five thousand-dollar
5      payment stuck out like a sore thumb and upon
6      looking at it, we realized that it was a payment
7      to Janna Garrison and/or a political faction in
8      her campaign to run for president of the Detroit
9      Federation of Teachers.
10 Q. What were your thoughts about that contribution?
11 A. I was very surprised because it had been kept from
12     the board because it violated the orders from the
13     State of Michigan OFIR wherein they said not to
14     make payments of any kind outside of the ordinary
15     course of doing business. It was inappropriate to
16     make a donation that meddled with the internal
17     politics of an organization that did business with
18     the Co/op and it was an egregious conflict of
19     interest between one of our board members and the
20     Co/op and it was another indication of very bad
21     judgment on the part of Jackie as CEO.
22 Q. Do you attribute that contribution solely to
23     Jackie Smith?
24 A. I believe that Janna made a request and Jackie
25     could have done a number of things. She could

### Page 57

1      have taken the request to the board, she could
2      have simply said no, this is contrary to the way
3      that we're operating under the State of Michigan
4      at this time or, gee, we don't meddle with the
5      internal politics of another company, you put us
6      in an awkward spot. She could have said no, but
7      instead she simply -- well, instead it appears
8      that she had the check created and transmitted to
9      Janna and/or this coalition.
10 Q. So my question, do you attribute this solely to
11     Jackie Smith?
12 A. And I just explained Janna made a request, so
13     there's at least two people involved there.
14 Q. Okay.
15 A. Janna, who is either the chairman of the board at
16     the time or the officer, and Jackie.
17 Q. Okay. So you attribute it to Janna Garrison and
18     Jackie Smith?
19 A. Attribute what?
20 Q. The contribution.
21 A. I really don't know how to answer what attribute
22     means.
23 Q. Who was responsible for the contribution?
24 A. If Janna had never asked for it, there would have
25     never been a contribution.

Page 130

```
 1        lied to her?
 2   A.   I don't think she ever told me. I think she said
 3        that at a board meeting and I think I've seen
 4        correspondence where she specifically said that
 5        Ted had lied to her.
 6   Q.   Did she ever tell you that Ted Winiarski
 7        improperly disclosed confidential information or
 8        tell the board?
 9   A.   I heard exposed confidentiality. Then you said
10        something about the board.
11   Q.   I'll repeat the question. Did Jackie Smith ever
12        tell you that Ted Winiarski improperly disclosed
13        confidential information?
14   A.   She never told me that.
15   Q.   Did she ever tell the board that?
16   A.   It doesn't -- I don't recall her ever
17        communicating to the board about that. Does it
18        relate to something specific that might jog my
19        memory?
20   Q.   Have you ever known Ted Winiarski to lie about
21        anything?
22        MS. CAULEY: You're not going to clarify
23        the question for him or try to help him remember?
24        MR. YOUNG: No.
25        MS. CAULEY: Okay.
```

Page 131

```
 1        THE WITNESS: No. I find that Ted is an
 2        honest and straightforward person.
 3   Q.   (MR. YOUNG) Was someone hired to replace Ted
 4        Winiarski?
 5   A.   Was someone?
 6   Q.   Yeah.
 7   A.   I don't think so.
 8   Q.   Do you know who Ashok Parik is?
 9   A.   P-a-r-o-u-k?
10   Q.   I've got P-a-r-i-k.
11   A.   No. I don't know who he is.
12   Q.   Okay. Was Ted rehired by Co/op?
13   A.   Yes.
14   Q.   Do you know when?
15   A.   No.
16   Q.   Do you know why?
17   A.   Yeah.
18   Q.   Why?
19   A.   Because everybody knew he was indispensable and he
20        was doing a great job.
21   Q.   Who made -- did the board make that decision?
22   A.   I don't recall. Maybe it was Ben that brought him
23        back. I don't recall. I don't remember.
24   Q.   Why do you think it might have been Ben?
25   A.   Because there came a time that Ben became the
```

Page 132

```
 1        temporary CEO when Jackie went on her leave and he
 2        might have brought him back. I don't recall the
 3        timing of Ted's being fired and I don't recall the
 4        timing of his being brought back.
 5   Q.   Okay. Did you ever hear Marc Stepp say that he
 6        didn't want to fire anybody until after Christmas
 7        2009?
 8   A.   No.
 9   Q.   Did you ever hear him say that he wanted to fire
10        everyone after Christmas 2009?
11   A.   No.
12   Q.   Okay. Do you believe Jackie was treated
13        differently because she's a woman at Co/op?
14   A.   No.
15   Q.   Why not?
16   A.   Because it's my conclusion.
17        MS. CAULEY: Are you asking him to prove a
18        negative?
19   Q.   (MR. YOUNG) Was she treated differently than Pat
20        Korth?
21   A.   No.
22   Q.   Was she treated differently than Ken Morris?
23   A.   She didn't have the same position as Ken Morris.
24   Q.   Was she treated differently?
25   A.   No.
```

Page 133

```
 1   Q.   Did you ever hear any board members ask Jackie to
 2        make them plates of food?
 3   A.   No.
 4   Q.   Did you ever hear the board members ask anybody
 5        else to make them plates of food?
 6   A.   Yeah.
 7   Q.   Who? Let's start with who made the request and
 8        who did they make it through.
 9   A.   Bernie Adams, she asked me to make her a plate of
10        food and I asked her what kind of salad dressing
11        she wanted.
12   Q.   Anybody else?
13   A.   It was regular -- it happened all the time.
14   Q.   Okay.
15   A.   We'd sit around the table, somebody would get up
16        and somebody would say will you grab me a pop and
17        would make each other food and would do that kind
18        of stuff. It was just the way that people that
19        work together try to relieve tension, by being as
20        sweet and kind to each other as possible.
21   Q.   Did any board member ever ask anybody to make them
22        a plate of food to take home with them that you
23        know?
24   A.   Oh, we did that all the time. People left --
25        people left with plates of food to take home,
```

34 (Pages 130 to 133)