# EXHIBIT J

```
                                                        Page 1
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DISTRICT
 3

     JACQUELINE SMITH,
 4

 5              Plaintiff,

 6
     vs.              No. 2:20-cv-13470-PJD-MAR
 7

 8   CO/OP OPTICAL SERVICES, INC.,
     a Michigan corporation,

 9

10
                Defendant.
11

12   _____/

13

14         The deposition of LACHANDRA WHITE, taken
15   before Suzanne M. McGovern, CSR 2655, Notary
16   Public for Oakland County, at 38505 Woodward
17   Avenue, Suite 2000, Bloomfield Hills, Michigan, on
18   Thursday, February 24, 2011, at approximately
19   10:05 a.m.
20   APPEARANCES:
21            JESSE L. YOUNG, ESQ.
              SOMMERS SCHWARTZ, P.C.
22            2000 Town Center, Suite 900
              Southfield, Michigan 48075

23
24         Appearing on behalf of the Plaintiff

25
```

LaChandra White                                                                February 24, 2011

Page 10

```
 1       organization and the clients and everybody else,
 2       they have to have a certain risk-based capital in
 3       order to not be in jeopardy.  That's my
 4       understanding of it.
 5   Q.  Okay.  You said you gave a deposition before.
 6   A.  Yes.
 7   Q.  What kind of a case was that?
 8   A.  It was a car accident lawsuit.
 9   Q.  Okay.  And you were a party to the --
10   A.  Yes.
11   Q.  -- lawsuit?  Okay.  Any other depositions?
12   A.  No.
13   Q.  Have you ever testified in court before?
14   A.  Only if you would consider an insurance,
15       unemployment agency court.
16   Q.  Okay.
17   A.  I had to testify there before.
18   Q.  Okay.  When was that?
19   A.  That was last year.
20   Q.  After you --
21   A.  But it's very -- it's kind of strange because it
22       was just an unemployment case, so I don't know if
23       it was court itself.  It didn't look like court,
24       but I did like talk to a judge and sit on a stand
25       or an appointee or whatever they call it.
```

Page 11

```
 1   Q.  Administrative court basically.  Okay.
 2   A.  But I've never been to an actual court to answer
 3       your question.
 4   Q.  Okay.  And this was early 2010?  Was this
 5       before -- let me step back.  Was this before you
 6       started working in your current position that
 7       you're in now?
 8   A.  No.  I just had been appointed to my current
 9       position.
10   Q.  With UAW?
11   A.  Yes.
12   Q.  Okay.  When was the car accident lawsuit?
13   A.  I'm talking, I think it was like '97, '98.
14   Q.  All right.  And you were a plaintiff or a
15       defendant?
16   A.  A plaintiff.
17   Q.  Do you know what court?
18   A.  It wasn't at a court.  It was something like this
19       out in an office in Southfield.
20   Q.  Okay.  Do you know where the lawsuit was filed,
21       what court?
22   A.  No.
23   Q.  Was it Oakland County or Wayne County?
24   A.  I'm not really even sure.
25   Q.  Okay.  Are you currently taking any prescription
```

Page 12

```
 1       medications that would affect your ability to
 2       answer any of my questions today?
 3   A.  No.
 4   Q.  Okay.  Have you discussed this case with anybody
 5       outside of your attorney?
 6   A.  No.
 7   Q.  Have you read the complaint in this case?
 8   A.  No.
 9   Q.  Did anybody ever ask you to read the complaint?
10   A.  No.
11   Q.  What did you do to prepare for your deposition
12       today?
13   A.  I talked to the attorney last week, but that was
14       it.
15   Q.  Okay.  Did you review any documents or anything?
16   A.  She just showed me the book, but I didn't have
17       time to read anything.  I'm a busy person.
18   Q.  Okay.
19   A.  I just had come from out of town.
20   Q.  And that book was the marked depositions; is that
21       correct?
22   A.  Yes.
23   Q.  Okay.  I'm sorry.  The marked exhibits from the
24       depositions?
25   A.  Yes.
```

Page 13

```
 1   Q.  Do you know why Jackee Smith was terminated from
 2       Co/op?
 3           MS. CAULEY:  Objection, she can --
 4       foundation.  She can testify as to her status.
 5       She can't testify as to everyone's -- or her
 6       understanding.  Go ahead.
 7       BY MR. YOUNG:
 8   Q.  You can still answer.
 9   A.  Repeat it.
10   Q.  Sure.  Do you know why Jackee was terminated from
11       Co/op?
12   A.  Me personally?
13   Q.  Yep.
14   A.  Because we, as a board, decided to terminate
15       her.
16   Q.  Why did you -- did you vote to terminate her?
17   A.  Yes, I did.
18   Q.  Why did you vote to terminate her?
19   A.  Because I don't think that she was acting on the
20       best interest of the people at Co/op and her
21       clients.
22   Q.  Okay.  Based on what information?
23   A.  Based on the information that I heard when I first
24       went to a meeting with the state -- when the state
25       was there and Ken Ross spoke to the board.
```

LaChandra White                                         February 24, 2011

Page 14

```
 1  Q.   Okay. You're talking about the February 23rd
 2       meeting?
 3  A.   Yes.
 4  Q.   Okay. And that was the same month that you became
 5       a board member at Co/Op; right?
 6  A.   Yes.
 7  Q.   Anybody else give you any information?
 8  A.   No.
 9  Q.   That influenced your vote?
10  A.   No.
11  Q.   Did Blair McGowan talk to you ever about how you
12       were going to vote?
13  A.   No.
14  Q.   Bernice Adams ever talk to you about how you were
15       going to vote?
16  A.   No.
17  Q.   What about Marc Stepp?
18  A.   No.
19  Q.   Ray Murphy?
20  A.   No.
21  Q.   Any other board members?
22  A.   No.
23  Q.   Okay. Do you have any sense of how Jackee was
24       performing her job at the time she was
25       terminated?
```

Page 15

```
 1  A.   Do I personally have any sense of it? I would
 2       say, based on the information that I got from the
 3       OFIR commission, that she wasn't performing up to
 4       the standards that were expected of her.
 5  Q.   Okay. Well, what did you get from OFIR that made
 6       you think that? Was it a document, did somebody
 7       tell you something?
 8  A.   It was Ken Ross and the team speaking to us as a
 9       board and brought to light the financial
10       difficulties Co/op was experiencing in addition to
11       we, as a board, needed to be proactive and to make
12       sure that it was transparent and we had
13       transparency with the executive staff, which would
14       be, of course, Miss Smith and her team.
15  Q.   Okay. So do you think Co/op's financial condition
16       was a result of Jackee's performance?
17  A.   She is responsible, yes.
18  Q.   Was it --
19  A.   She's the president and CEO.
20  Q.   Was it the result of anybody else's performance in
21       addition to hers?
22  A.   I would say no.
23  Q.   It was her alone?
24  A.   Yes.
25  Q.   Do you have any reason to think that or to believe
```

Page 16

```
 1       that?
 2  A.   I mean with the performance of Co/op being, you
 3       know, in the financial difficulty it was in, it's
 4       obvious that she didn't manage properly.
 5  Q.   Okay. Well, what's the financial condition of the
 6       company now?
 7  A.   It's a whole lot better.
 8  Q.   Is it?
 9  A.   Yes.
10  Q.   What's the RBC again?
11  A.   It's about forty.
12  Q.   What was it when she was terminated?
13  A.   I think it was a negative.
14  Q.   What if I were to tell you that there's testimony
15       in this case that it wasn't in the negative, would
16       you still think that it's a result of Jackee's
17       performance?
18  A.   Yes.
19            MS. CAULEY: Objection, assumes facts not
20       in evidence. Go ahead.
21            THE WITNESS: Oh.
22            MS. CAULEY: Go ahead. You can still
23       answer.
24            BY MR. YOUNG:
25  Q.   You can still answer.
```

Page 17

```
 1  A.   Yes.
 2  Q.   Are you aware of any efforts by Jackee Smith's
 3       subordinates to force her out of the company?
 4  A.   No.
 5  Q.   Have you ever heard that Ted Winiarski wanted her
 6       fired?
 7  A.   No.
 8  Q.   Have you ever heard that Charles Benson wanted her
 9       fired?
10  A.   No.
11  Q.   Are you aware of any letters by any employees that
12       wanted her fired?
13  A.   No.
14  Q.   Are you aware of the December 8th letter from Andy
15       Broder to the board of directors?
16  A.   I don't even know who that is.
17  Q.   Okay. Are you aware of the letter dated December
18       8th, 2009 that was sent to the board of directors
19       regarding Jackee Smith?
20  A.   No.
21  Q.   I'll show you exhibit thirty-four. Take all the
22       time you need to review it. I'll just ask you if
23       you've ever seen this letter before.
24  A.   Now, who was Andy Broder?
25            MS. CAULEY: No.
```

QUALIFIED COURT REPORTERS, INC. (248) 344-4364

Page 26

1  Q.  Okay. Do you know -- you said you thought OFIR
2      investigated the allegations against Jackee Smith.
3      Do you know if anybody else --
4          MS. CAULEY: Excuse me. Misstates her
5      testimony. She said she didn't know if it was an
6      investigation. She knew it was a concern of
7      theirs.
8      BY MR. YOUNG:
9  Q.  Did anybody from Co/op investigate Jackee Smith
10     with respect to these allegations?
11 A.  Not to my knowledge.
12 Q.  I'll show you exhibit thirty-two, ask if you've
13     ever seen that document before.
14 A.  No.
15 Q.  This is a memo from Ray Murphy to Jackee Smith
16     asking her to reimburse the company for an amount
17     of one hundred thirty-nine dollars and forty-six
18     cents.
19         MS. CAULEY: Are you testifying, counsel?
20         MR. YOUNG: I'm just reading off the
21     document.
22         MS. CAULEY: She's telling you she's never
23     seen it before so any questions --
24         MR. YOUNG: I have a follow-up question.
25     Excuse me.

Page 27

1          MS. CAULEY: Any questions about this
2      document of this witness would be inappropriate.
3      BY MR. YOUNG:
4  Q.  Does that ring a bell with respect to any amounts
5      that she might have paid back?
6  A.  No. I've never seen that letter, so --
7  Q.  Okay. Have you ever used any Co/op credit cards
8      for personal use?
9  A.  Are you asking me that question?
10 Q.  Yes.
11 A.  No.
12 Q.  Do you know if any board members ever requested
13     personal items be bought with Co/op credit cards
14     to the best of your knowledge?
15 A.  Not to my knowledge.
16 Q.  Okay. Do you have any one-on-one communications
17     with OFIR?
18 A.  No.
19 Q.  Have you ever?
20 A.  No.
21 Q.  Okay. Did anybody tell you -- did anybody ever
22     tell you that Ted Winiarski lied to the board of
23     directors?
24 A.  No.
25 Q.  Have you ever known Ted Winiarski to lie to you

Page 28

1      about anything?
2  A.  Not to my knowledge.
3  Q.  Do you have any knowledge of Ted Winiarski's
4      termination from Co/op in January 2010?
5  A.  Yes. I didn't know about that until after I was a
6      board member.
7  Q.  Okay. How did you find out about that?
8  A.  I was at the board -- or after the board
9      meeting.
10 Q.  What board meeting?
11 A.  On the 23rd of February.
12 Q.  That's when you first found out about it?
13 A.  Yes.
14 Q.  Did you ever observe Jackee Smith to have any
15     health problems in 2009 or 2010?
16 A.  Not to my knowledge.
17 Q.  Are you aware that Jackee Smith requested a
18     medical leave from Co/op?
19 A.  No.
20 Q.  At anytime, did you ever learn that?
21 A.  After the fact, but not prior.
22 Q.  Okay. When did you first learn?
23 A.  Probably about two or three months after I was a
24     board member -- board member I should say.
25 Q.  So April or May of 2010?

Page 29

1  A.  Uh-huh.
2          MS. CAULEY: Is that a yes?
3          THE WITNESS: Yes.
4          MR. YOUNG: Thank you.
5      BY MR. YOUNG:
6  Q.  And how did you learn of that, who told you
7      that?
8  A.  I think I heard Janna mention it.
9  Q.  Okay. Anybody else mention it to you?
10 A.  No.
11 Q.  What did Janna say?
12 A.  That she was on a medical leave.
13 Q.  When --
14 A.  But I thought she was on a personal leave. I
15     never knew she was on a medical leave.
16 Q.  Okay. So the first time you ever learned she was
17     on medical leave was in April or May 2010;
18     correct?
19 A.  Uh-huh.
20 Q.  Okay. Did you ever see the paperwork that Jackee
21     Smith submitted to Co/op for her medical leave?
22 A.  No.
23 Q.  Did you ever hear anybody tell you that they
24     thought -- well, I'll withdraw the question. Did
25     you ever hear anybody say that they thought Jackee

Page 30

1   was faking a medical condition?
2 A. I didn't even know she was on a medical leave.
3 Q. I know. I'm saying at anytime.
4 A. No.
5 Q. Okay. Let's take a five-minute break. I don't
6   have a whole lot longer to go. Okay.
7 A. You can keep going.
8 Q. Well, I need to a take a five-minute break for me.
9 A. How about I give you two?
10      (Off the record from approximately
11       10:36 to 10:42 a.m.)
12 BY MR. YOUNG:
13 Q. Miss White, I'll just remind you that you're still
14   under oath. So you thought Jackee was on a
15   personal leave and not a medical leave; correct?
16 A. Uh-huh.
17 Q. Okay.
18      MR. YOUNG: Is that a yes?
19      THE WITNESS: Yes. I'm sorry.
20      MR. YOUNG: Thank you, Mary.
21 BY MR. YOUNG:
22 Q. Do you remember a March 5th, 2010 board meeting?
23 A. I went to a lot of meetings so --
24 Q. Okay. I'll show you exhibit forty-two. That
25   lists you as one of the board members present.

Page 31

1   Take all the time you need to look over it.
2 A. Okay. Thanks.
3 Q. Do you remember attending that meeting?
4 A. If my name is there, yes. I attend so many
5   meetings at Co/op so I -- yeah. My name is there,
6   so, yeah, I was there.
7 Q. Well, you just read through it. I mean do you
8   remember sitting through the meeting?
9 A. Yeah.
10 Q. Okay.
11 A. Some of the things, yeah, I can recall.
12 Q. On page eight about a third of the way down --
13 A. Okay.
14 Q. -- it says an e-mail regarding Jackee Smith was
15   read aloud and distributed to all board members
16   present. Do you remember that e-mail?
17      MS. CAULEY: Wait a minute. I'm not sure
18   you read that correctly.
19      MR. YOUNG: I'll read it again.
20      MS. CAULEY: Thanks.
21      MR. YOUNG: I thought I did.
22 BY MR. YOUNG:
23 Q. An e-mail regarding contacting Jackee Smith --
24      MS. CAULEY: Yeah.
25 BY MR. YOUNG:

Page 32

1 Q. -- was read aloud and distributed to all board
2   members present. I apologize. Do you remember
3   that e-mail?
4 A. What did the e-mail say?
5 Q. Well, I'm just asking if you remember it. If you
6   don't, you don't.
7 A. No. I don't recall.
8 Q. I'll show you what's been marked as exhibit
9   forty-one. This is an e-mail from Larry Smith to
10   Temeng Darko and a copy to Ben Edwards. There's
11   testimony in this case that this is the e-mail
12   that was read at this meeting. I'll just read the
13   first sentence.
14      MS. CAULEY: Objection. I don't think
15   there is such testimony.
16      MR. YOUNG: Yeah, there is. I read the
17   transcripts recently.
18 BY MR. YOUNG:
19 Q. The first sentence says as you are aware, my wife,
20   Jackee, is off work on a medical leave.
21 A. Okay.
22 Q. Okay. Does that refresh your memory as to when
23   you first learned about her medical leave?
24 A. No. Because I still thought she was on a personal
25   leave.

Page 33

1 Q. Okay. Did somebody tell you that she was on a
2   personal leave?
3 A. I want to say she told me when she sat next to me
4   at that February 23rd board meeting.
5 Q. Jackee told you she was on a personal leave?
6 A. Yeah. Because she said -- because I didn't
7   know -- I was just blown away by all the
8   negativity that I heard and she said, oh, I'll
9   talk to you later.
10 Q. Okay.
11 A. And I know, I know she told me she was on a
12   personal leave.
13 Q. Okay.
14 A. I didn't even know she was off work prior to
15   that.
16 Q. And you still believe --
17 A. And you can confirm with her if she told me that
18   or not, but I can -- my recollection of it is that
19   she told me she was on a personal leave.
20 Q. Okay. And that was before this board meeting?
21 A. This was -- she whispered to me after everything
22   that was going on and said she would talk to me
23   afterwards.
24 Q. Okay.
25      MS. CAULEY: At what meeting?

Page 54

1  yourself to be familiar with the by-laws of Co/op
2  at this point?
3  A. No, not fully.
4  Q. Okay. Do you know under the by-laws is an agenda
5     required to be attached to any notices for special
6     board meetings?
7  A. We haven't even -- I haven't personally dove that
8     deep into it, so no.
9  Q. So you don't know?
10 A. No.
11 Q. Okay. Do you know what happens with respect to
12    the by-laws if there's an issue that the by-laws
13    are silent? Do you know what at that point
14    happens?
15 A. No.
16 Q. Okay. I don't have any further questions.
17 A. Okay.
18         EXAMINATION
19    BY MS. CAULEY:
20 Q. Did Jacqueline Smith demonstrate any conduct at
21    the February 23rd meeting with OFIR that raised
22    any concerns for you?
23 A. Yes. I think personally, yes.
24 Q. What conduct was that that raised concerns?
25 A. Well, it -- because I was just really shocked and

Page 55

1  appalled that, you know, you have the state
2  government agency in there and it was embarrassing
3  to me to even be a part of something so foolish as
4  to, you know, everything that they had accusations
5  about where there was misappropriation of funds,
6  she had rebuttals to it and I just thought it was
7  inappropriate personally.
8  Q. Inappropriate for her to rebut those?
9  A. To rebut them in such a manner that was
10    unprofessional.
11 Q. Okay. And what was the manner that was
12    unprofessional?
13 A. It was the fact that when Ken Ross was speaking to
14    her about the allegations or accusations, she
15    actually, instead of just, you know, taking it,
16    being a CEO and fixing the problem, she had an
17    excuse for every --
18 Q. Okay.
19 A. -- problem presented or, you know, an excuse in
20    the sense of why she did it versus taking
21    ownership of the problem, fixing the problem, so
22    everybody can move on and hopefully Co/op can
23    survive.
24 Q. Okay. When Ms. Smith was talking about those
25    we'll call them allegations or concerns at that

Page 56

1  meeting, was she -- did she read from something or
2  was she just giving short answers or what
3  happened?
4  A. She was reading from a log or something.
5  Q. Okay. I'll show you what's been marked as exhibit
6     thirty-one and ask -- no. I'm not going to --
7     because I don't want to sit here for you to read
8     the whole thing.
9  A. Okay.
10 Q. Frankly, because it's multiple pages. How do you
11    know she was reading?
12 A. Because I was sitting right next to her.
13 Q. Okay. Did you ever reach a conclusion that Miss
14    Smith had ever misused any Co/op funds as opposed
15    to stolen I think is what you were asked
16    earlier?
17 A. Yeah. The personal use of the credit card, the
18    corporate credit card was a concern of OFIR and
19    then it became a concern of mine because that's
20    something that you don't do, you don't use a
21    company credit card for personal use.
22 Q. Okay. Did you ever become aware of any other
23    expenditures made by Miss Smith that raised
24    concerns for you?
25 A. The only thing that did raise concern after I had

Page 57

1  been a board member was that something came up
2  where she donated five thousand dollars in Co/op's
3  name to Janna Garrison's PAC fund when she was
4  running for DPS president.
5  Q. Okay. And what concerned you about that?
6  A. I don't think it's ethical and it could be
7     borderline illegal to do so.
8  Q. To make that kind of a donation?
9  A. Yeah. Because she's a board member.
10 Q. Okay. Did you -- did the fact that Ms. Smith is a
11    woman play any role at all in your decision to
12    terminate her employment?
13 A. No.
14 Q. If it were shown that she was on an FMLA leave at
15    the time that you voted to terminate her
16    employment, would that fact have played any role
17    in your decision to terminate her?
18 A. No.
19 Q. Would you have voted to terminate Ms. Smith had
20    she been working at the time?
21 A. Yes.
22 Q. Okay. That's all I have.
23         RE-EXAMINATION
24    BY MR. YOUNG:
25 Q. Miss White, are you an attorney?

QUALIFIED COURT REPORTERS, INC. (248) 344-4364

LaChandra White                                                                February 24, 2011

Page 58

1  A.  No, I'm not.
2  Q.  Do you have any knowledge of laws with regard to
3      PAC?
4  A.  Well, not necessarily, but I know we're not
5      supposed to take stuff from people, being a union
6      rep myself.
7  Q.  You weren't on the board when the events that
8      caused the allegations against Ms. Smith with
9      respect to the credit cards -- you weren't on the
10     board at that point; correct?
11 A.  No.
12 Q.  You said you never read the December 8th letter
13     before, you never saw it before today; correct?
14 A.  No.
15 Q.  And you said you never talked to anybody about it
16     before today; correct?
17 A.  No.
18         MS. CAULEY:  Wait a minute.
19         MR. YOUNG:  She said --
20         THE WITNESS:  OFIR brought those
21     allegations up at the board meeting.
22         MS. CAULEY:  Yeah.
23 BY MR. YOUNG:
24 Q.  Okay.
25 A.  My very first one.  Everything that I received, I

Page 59

1      got it from OFIR and I was appalled.  I couldn't
2      even believe it and that's why she said, oh, I'll
3      talk to you afterwards because I could not even
4      believe that was the foolishness happening at
5      Co/op.
6  Q.  And you don't know the results of the
7      investigation; correct?
8  A.  No.
9  Q.  Did you ever see Marc Stepp provide OFIR with the
10     statement that Jackee Smith was reading off of at
11     the meeting?
12 A.  Not to my knowledge 'cause that was my very first
13     one and it was a lot movement and activity so --
14         MR. YOUNG:  Mark this as exhibit seventy-
15     six, I think.
16         (Marked exhibit seventy-six.)
17 BY MR. YOUNG:
18 Q.  These are, well, I'll call them the minutes from
19     the February 23rd, 2010 meeting for lack of a
20     better term.
21         MS. CAULEY:  I'm going to object to the
22     characterization.  We don't have any foundation
23     for this document, so we don't know how it was
24     prepared, for what it was prepared or by whom it
25     was prepared.

Page 60

1  BY MR. YOUNG:
2  Q.  If you turn to the third page, the second to the
3      last paragraph -- I can just point it --
4  A.  Okay.
5  Q.  It says Mr. Stepp distributed the responses of
6      Jackee Smith to the allegations in the executive
7      summary of the December 8th, 2009 letter from Andy
8      Broder.  Do you recall that?
9  A.  No.
10 Q.  Does that in any way change your opinion that you
11     were shocked and appalled that Miss Smith read
12     that to OFIR?
13 A.  Yeah.  'Cause Ken Ross didn't look very happy.
14         MS. CAULEY:  Wait.  It changes your
15     opinion?
16         THE WITNESS:  Oh.  What do you mean?
17         MS. CAULEY:  Ask the question again,
18     please.
19         MR. YOUNG:  Can you read it back, please?
20     Thank you.
21         (Whereupon the record was read.)
22         THE WITNESS:  No.
23 BY MR. YOUNG:
24 Q.  If you already had a copy of that statement, why
25     would it make any difference whether or not Jackee

Page 61

1      read it out loud?
2          MS. CAULEY:  Objection, argumentative,
3      form.
4          THE WITNESS:  I don't know where you're
5      going with the question so--
6  BY MR. YOUNG:
7  Q.  That's okay.  You can just answer it.
8          MR. YOUNG:  Can you read it back, please?
9          (Whereupon the record was read.)
10         THE WITNESS:  That's a matter of opinion,
11     but being my first time on the board, I just
12     thought it was inappropriate.
13 BY MR. YOUNG:
14 Q.  Have you ever been the CEO of a company before?
15 A.  No.
16 Q.  Do you know how long Jackee Smith worked for
17     Co/op?
18 A.  I believe over thirty years.
19 Q.  Do you respect her judgment?
20 A.  Meaning what?  I mean what do you mean by that?
21 Q.  I mean she was employed with Co/op for over thirty
22     years and was a CEO for approximately seven years.
23 A.  Many CEOs don't become CEOs after things happen,
24     so I'm not understanding you're asking me.
25 Q.  That's okay.  I'll withdraw the question.  Do you

16 (Pages 58 to 61)